

SEAN P. REIS – SBN 184044
(sreis@reisfirm.com)
THE REIS LAW FIRM, A.P.C.
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 713-9440

RAFEY S. BALABANIAN
(rbalabanian@edelson.com)*
CHRISTOPHER L. DORE
(cdore@edelson.com)*
BENJAMIN S. THOMASSEN
(bthomassen@edelson.com)*
EDELSON LLC
350 North LaSalle, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

*Pro hac vice admission to be sought

Attorneys for Plaintiff Damion Perrine

**FILED**

APR 29 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

MEJ

DAMION PERRINE, individually and on
behalf of a class of similarly situated persons,

Plaintiff,

v.

SEGA OF AMERICA, INC., a California
corporation, and GEARBOX SOFTWARE,
L.L.C., a Texas limited liability company,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 13 1962

**CLASS ACTION COMPLAINT FOR:**

1. Violations of Cal. Civ. Code § 1750 *et seq.*
2. Violations of Cal. Civ. Code § 1720 *et seq.*
3. Violations of Cal. Bus. & Prof. Code
   § 17500 *et seq.*
4. Breach of Express Warranties
5. Fraud in the Inducement
6. Negligent Misrepresentation

**DEMAND FOR JURY TRIAL**

1        Plaintiff Damion Perrine ("Plaintiff" or "Perrine"), for his Class Action Complaint, alleges

2  as follows upon personal knowledge as to his own acts and experiences and, as to all other matters,

3  on information and belief, including, *inter alia*, investigation conducted by his attorneys:

4                                    **INTRODUCTION**

5      1.      This case centers on Defendants Sega of America, Inc.'s ("Sega") and Gearbox

6  Software, L.C.C.'s ("Gearbox," collectively "Defendants") collaborative efforts to sell their highly

7  anticipated video game "Aliens: Colonial Marines" by knowingly using and relying upon false

8  statements about the game's development, design, quality, and features. At its core, this case is a

9  classic bait-and-switch: Defendants promised consumers that they would receive a product with

10  specific qualities and features, but then delivered something else entirely—to the tune of ill-gotten

11  sales.

12      2.      As explained in more detail below, the Defendants in this case opted to advertise

13  (and convince consumers to buy) Aliens: Colonial Marines by showcasing and distributing self-

14  described "actual gameplay" demonstrations of the video game. These "actual gameplay"

15  demonstrations were used and widely publicized as early as June 2011, and continued up until the

16  game's actual release in February 2013.

17      3.      Each of the "actual gameplay" demonstrations purported to show consumers exactly

18  what they would be buying: a cutting edge video game with very specific features and qualities.

19  Unfortunately for their fans, Defendants never told anyone—consumers, industry critics, reviewers,

20  or reporters—that their "actual gameplay" demonstration advertising campaign bore little

21  resemblance to the retail product that would eventually be sold to a large community of unwitting

22  purchasers.

23      4.      As a result, and through the misrepresentations described below, Defendants

24  wrongfully induced Plaintiff and the other members of the Class to purchase Aliens: Colonial

25  Marines when they otherwise would not have purchased the game or would have paid less for their

26  purchase.

27

28

CLASS ACTION COMPLAINT          2

1

**JURISDICTION AND VENUE**

2   5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d). At least

3   one Class member is a citizen of a different state than Defendants, and the amount in controversy

4   exceeds, exclusive of interest, fees, and costs, $5,000,000.00. This Court has jurisdiction over

5   Defendants because they conduct business in this District and/or because the improper conduct

6   alleged in the Complaint occurred in, was directed from, and/or emanated or exported from this

7   District. Personal jurisdiction is additionally proper because Defendant Sega resides in this District.

8   6.      Venue is proper in this District under 28 U.S.C. § 1391(a) because the injury arose in

9   this District. Venue is additionally proper because Defendants transact significant business in this

10  District, including entering into business and consumer transactions, and Defendant Sega resides in

11  this District.

12

**PARTIES**

13  7.      Plaintiff Damion Perrine is a natural person and citizen of the State of Pennsylvania.

14  8.      Defendant Sega of America, Inc., is a corporation incorporated in and existing under

15  the laws of the State of California with its principal place of business located at 350 Rhode Island

16  Street, Suite 400, San Francisco, California 94103. Sega does business throughout the United

17  States, the State of California, and this District.

18  9.      Defendant Gearbox Software, L.L.C., is a limited liability company organized in and

19  existing under the laws of the State of Texas with its principal place of business located at 101 East

20  Park Boulevard, Suite 1200, Plano, Texas 75074. Gearbox does business throughout the United

21  States, the State of California, and this District.

22

**INTRADISTRICT ASSIGNMENT**

23  10.     Pursuant to Civil Local Rule 3-2(d), this case shall be assigned to either the San

24  Francisco or Oakland Division.

25

26

27

28

CLASS ACTION COMPLAINT                    3

1

## FACTUAL BACKGROUND

2    *The promotion of new releases in the video game industry*

3    11.    As reported through countless media outlets, the video game industry is—in a
4    word—huge. Every month, millions of gamers each spend fifty to sixty dollars (or more) to pre-
5    order and/or purchase the latest video game releases the day of their public release.

6    12.    To take advantage of this market, video game publishers and developers have many
7    choices with how to advertise and showcase their new releases, including, *inter alia*: (i) giving
8    interviews in industry websites and publications; (ii) releasing early screenshots or pre-rendered
9    "concept" videos of an unreleased game; (iii) showcasing gameplay through tradeshows/
10   exhibitions, where a game is demonstrated before an audience; (iv) releasing playable demos, so
11   that prospective purchasers can "try before they buy;" and, in many cases, (v) distributing "pre-
12   release" copies of games to industry reviewers and critics, so as to ensure broad media coverage
13   either leading up to or immediately after a game's release.

14   13.    Regardless of the approach, the end goal is the same: convince as many consumers
15   as possible to spend their money before release or immediately on a game's "launch day." Because
16   it is almost impossible for consumers to return a newly purchased video game for a refund, pre-
17   orders and launch day purchases are "money in the bank," and are of vital importance to a game's
18   economic success—particularly in cases where a game receives negative feedback from industry
19   reviews following its release.

20   14.    Of course, hype is often just that: hype. Not surprisingly, early speculation as to what
21   features a game *might have* sometimes resorts to puffery, cites to a developer's aspirations or vague
22   descriptions, or doesn't even pretend to describe what a final product might look like. Likewise,
23   early "concept" videos might not show what the game looks like when played by an actual person
24   and, instead, show pre-rendered cinematic scenes—similar to the pre-rendered computer graphic
25   sequences that are ubiquitous in today's movies.

26   15.    This sort of pre-release hype was addressed and summed up in a recent industry

27

28

CLASS ACTION COMPLAINT                                    4

1   article that asked "[e]ver wonder why sometimes a preview for a game sounds positive, then the
2   final product comes out and gets a critical drubbing? Sometimes that's because the demo acts as a
3   highlight reel, detailing the best parts. Other times the writer wants to remain cautiously
4   optimistic."[1]

5       16.   Actual gameplay demonstrations, on the other hand, serve a purpose beyond puffery
6   and speculative hype: they showcase what a prospective purchaser of a game can expect to
7   experience if they buy the final product.

8       17.   Such demonstrations can highlight, *inter alia*, a videogame's graphics engine (*i.e.*,
9   the programming that, much like a car's engine, renders what a gamer sees when playing the game
10  and runs the overall gameplay experience), aspects of the gameplay itself (such as certain sequences
11  of events or level designs that a gamer will experience in the final product), and other features that
12  will be included in the final product (such as multiplayer modes, artificial intelligence, strategy and
13  dynamics, and/or various difficulty settings).

14  *Defendants' campaign of "actual gameplay" demonstrations*

15      18.   At first blush, you'd think Aliens: Colonial Marines would sell itself. It was held out
16  as the canon sequel to James Cameron's 1986 film "Aliens;" was developed by Gearbox Software,
17  whose recent releases (including "Borderlands" and its sequel, "Borderlands 2") have garnered
18  excellent industry reviews and an overwhelmingly positive reception from gamers; and was
19  produced by Sega of America, a company with a well-known heritage within the video game
20  industry.

21      19.   But the development history for Aliens: Colonial Marines—originally announced on
22  December 11, 2006 and scheduled for release in 2009—was fraught with delays, which often
23  forecasts problems for videogames and dissuades consumers from spending their money before or
24  around a game's release. In this case, the delays resulted in negative media coverage as the industry

25

26      [1]   Eurogamer.net, "Aliens: Colonial Marines' demo looked much prettier than the final game,"
    available online at http://www.eurogamer.net/articles/2013-02-13-aliens-colonial-marines-demo-
27  looked-much-prettier-than-the-final-game (last accessed March 11, 2013).

28

CLASS ACTION COMPLAINT          5

1    expressed skepticism about the game's quality, or whether it would be released at all.

2        20.    Instead, when facing such concerns, gamers will often wait for industry reviews of a

3    particular title before buying—and, if the reviews are poor, will wait months or even years to

4    purchase the title at a discount, if they elect to purchase it at all.

5        21.    In the case of Aliens: Colonial Marines, and to assure gamers that the title would live

6    up to its theatrical namesake, Defendants used a series of "actual gameplay" demonstrations of

7    Aliens: Colonial Marines, beginning at the annual "E3" conference in early June 2011. E3 is the

8    video game industry's largest and most widely publicized exposition where developers and

9    publishers advertise new videogames and hardware, and is widely covered by the video game

10   reporting industry.

11       22.    Each "actual gameplay" demonstration involved a broadcast of "a live demo [of the

12   game] played by a Gearbox representative" before an audience, often consisting of videogame

13   journalists and other industry insiders.[2]

14       23.    The first "actual gameplay" demonstration at E3 2011 included a live narration

15   provided by Randy Pitchford, President of Gearbox Software. As the demo began, Pitchford

16   explained that "Today, we're going to show you a bit of the game . . . [Y]ou're going to see what

17   the game *actually looks like*. Not just screenshots but the *actual gameplay*."[3]

18       24.    The only hint that the live demonstration was not representative of the final product

19   was a "Work in Progress" watermark that briefly appeared in the top left corner of the video.

20       25.    The first "actual gameplay" demonstration was well-received, with industry

21   reporters making particular note of the demonstration's graphics, robust artificial intelligence,

22   atmosphere, and exciting gameplay sequences, which bore a close relation to action sequences from

23

24   [2]    Gamespot.com, "E3 2011: Aliens: Colonial Marines Demo Preview," available online at
25   http://www.gamespot.com/aliens-colonial-marines/previews/e3-2011-aliens-colonial-marines-demo-preview-6318046/ (last accessed March 11, 2013).

26   [3]    Metacritic.com, "Aliens: Colonial Marines E3 Demo with Randy Pitchford," available
27   online at http://www.metacritic.com/game/pc/aliens-colonial-marines/trailers/2970592 (last accessed March 11, 2013).

28

1  the Aliens movie.

2      26.    Following the E3 2011 "actual gameplay" demonstration, Defendants continued to
3  showcase additional "actual gameplay" demonstrations of Aliens: Colonial Marines up until the
4  game's release in February 2013. For example, Defendants featured live-broadcasts of "actual
5  gameplay" demonstrations at expositions and tradeshows throughout 2012—including at E3 2012
6  and PAX ("Penny Arcade Expo") 2012—and spoke with industry reviewers/critics about the
7  content and overwhelmingly positive reception of those demonstrations.

8      27.    As before, all "actual gameplay" demonstration videos maintained the same high
9  standards of graphics and gameplay showcased at the E3 2011 demo, only (if anything) increasing
10  in quality. These videos were distributed/promoted both by media sources and Defendants
11  themselves, and thus were accessed and viewed by tens of thousands of gamers (and potential
12  buyers).

13      28.    Further, and as time neared the game's release, Defendants would—at times—
14  remove the "Work in Progress" watermark from the "actual gameplay" videos released to the
15  public.

16      29.    Defendants never suggested—either through the "actual gameplay" demonstrations
17  themselves, interviews, or other media releases—that qualities and features of Aliens: Colonial
18  Marines shown in these "actual gameplay" demonstrations were not representative of (and, in fact,
19  were far superior to) the planned retail version of Aliens: Colonial Marines that would be sold to
20  consumers.

21      30.    As such, these "actual gameplay" demonstrations—which were Defendants' primary
22  (if not only) method of advertising Aliens: Colonial Marines—served as public, pre-release
23  guarantees: put your money down, and you'll receive *at least* what you saw in the demos—which
24  showcased the game's graphics engine, level design, and artificial intelligence, among other
25  specific qualities and features.

26

27

28

*The public reception of Aliens: Colonial Marines following its retail release*

31.     Following its public release on February 12, 2013—at which time the game went on sale for between $50.00 and $100.00 (depending on whether the game was purchased for the PC, console (*i.e.*, Sony PlayStation 3 or Microsoft Xbox 360), or whether a special "collector's edition" was purchased)—Aliens: Colonial Marines drew immediate concerns and criticisms regarding the quality of the final product, which earned overwhelmingly poor reviews from industry reporters.

32.     While poorly received videogames are certainly nothing new, the Aliens: Colonial Marines retail game immediately drew stunning and specific comparisons between the final product and the "actual gameplay" demonstrations that were showcased by Defendants.

33.     The comparisons are not hard to make, as a portion of the retail game showcased in many pre-release gameplay demonstrations is part of the very first piece of gameplay experienced by a player after booting up and running the core Aliens: Colonial Marines game.

34.     Several industry reviewers and critics immediately weighed in with their surprise. One, for example, noted that "the demo look[ed] nothing like the final game . . . [and that the] differences are shocking. Most of the lighting effects and textures have been pared down to a stunning degree."[4]

35.     Another noted that "none of the gameplay shown [in the 'actual gameplay' demo] ever happens, and we were never told [the 'actual gameplay demonstration'] was just conceptual . . . . When screens from the previous demo are compared to the finish[ed] product, the lack of environmental detail, dated lighting effects, and linear-to-a-fault gameplay become apparent. Games shown at E3 don't suddenly look worse as development continues. Like early trailers for Hollywood blockbusters, graphics and gameplay in early game demos get repeatedly touched-up and expanded for release."[5]

---

[4]     Eurogamer.net, "Aliens: Colonial Marines' demo looked much prettier than the final game," available online at http://www.eurogamer.net/articles/2013-02-13-aliens-colonial-marines-demo-looked-much-prettier-than-the-final-game (last accessed March 11, 2013).

[5]     Destructoid.com, "Gearbox lied about Aliens: From E3 demo to retail product," available online at http://www.destructoid.com/gearbox-lied-about-aliens-from-e3-demo-to-retail-product-244966.phtml (last accessed March 27, 2013).

1    36.    To demonstrate the extreme extent to which Defendants' "actual gameplay"

2  demonstrations were wholly unrepresentative of the game's actual gameplay, two critics from

3  VideoGamer.com assembled a scene-by-scene comparison of the "actual gameplay" demo

4  showcased at E3 2012 and the retail product sold to the public. Among other differences, those

5  critics noted that:

6         a.    Everything in the E3 2012 demo had a "much higher [graphical] resolution"

7               than the final product;

8         b.    Extreme differences in lighting throughout the gameplay, with the demo

9               utilizing advanced dynamic lighting effects (*i.e.*, lighting that is rendered on

10              the fly by the game's graphic engine), that was "not the same at all" as the

11              final product, which, in many circumstances, included "no dynamic lighting

12              in the final game;"

13        c.    "A lot of the textures changed" for the worse in the final game as compared

14              to the E3 2012 demo;

15        d.    Many "custom animations" present in the E3 2012 demo are missing from

16              the final game;

17        e.    The E3 2012 demo used "dynamic" weather effects (*e.g.*, rain generated by

18              the in-game engine), whereas the final product used pre-rendered weather

19              effects, which is "completely different;"

20        f.    The technology included and showcased in the E3 2012 demo is simply not

21              present in the final version; and

22        g.    Many "iconic" gameplay sections showcased in the E3 2012 demo are not

23              present in the final version.

24    37.    To make matters worse, the VideoGamer.com video noted that the comparisons it

25  made were based on the PC version of the Aliens: Colonial Marines game, which has the potential

26  to display a better overall graphic resolution relative to the Xbox 360 and PlayStation 3 versions of

27

28

CLASS ACTION COMPLAINT                          9

1 the game (which look even worse).

2      38.    These are not nitpicky or subjective distinctions reliant upon particular tastes or
3 opinions. A videogame's graphics engine is the "guts" that drive the entire experience, much like a
4 car's actual engine and electrical components affect its performance. Features such as dynamic
5 lighting and weather effects, high-resolution graphics, and "custom animations" (all of which were
6 present in the Aliens: Colonial Marines "actual gameplay" demos) rely on a sophisticated graphics
7 engine, whereas pre-rendered lighting and weather effects, and low-resolution graphics (which are
8 present in the publically released version of Aliens: Colonial Marines) do not.

9      39.    Likewise, a major selling point of the "actual gameplay" demonstrations were
10 "iconic" gameplay sections where consumers might essentially step into the role of a character from
11 the Aliens movie. Many of such sections previewed in the "actual gameplay" demonstrations were
12 either gutted beyond recognition or missing entirely from the final product.

13      40.    In addition, a key aspect of the pre-release demos was the lively and intelligent
14 movement, adaptation, and reactiveness of the game's antagonists—the eponymous aliens—which
15 were directed by innovative artificial intelligence programming ("AI"). The retail version of the
16 game, however, utilized a rudimentary AI that bore little, if any resemblance to the one previewed
17 in Defendants' "actual gameplay" demonstrations.

18      41.    In short, the advertised and promised "actual gameplay"—touted again and again by
19 Defendants as a reason to buy—was not delivered in the product sold to consumers.

20 *Defendants acknowledge the "discrepancies" between the Aliens: Colonial Marines retail*
*product and "actual gameplay" demonstrations*

21
22      42.    Prior to Aliens: Colonial Marines' public release, only Defendants could have

23 known that the game they sold to consumers bore little resemblance to the "actual gameplay"

demonstrations they championed between E3 2011 and February 2013.
24
25      43.    A long-time videogame industry critic, Jim Sterling, summed up his (and many

others') disappointment and surprise by explaining that "[i]t's rare, in all my years, to see a demo so
26
unrepresentative of the finished product. Even worse, I've never seen a demo that looks so much
27

28

CLASS ACTION COMPLAINT                    10

1   BETTER than the finished product … The 'work in progress' warning attached to demos is to warn
2   you the [final] product doesn't look [as rough as the demo]. This may be the first game I've covered
3   where it meant the opposite. Gearbox's definitely on the hook for dishonesty…."[6]

4       44.     At no time before the public release of Aliens: Colonial Marines, did Defendants
5   explain—in any forum—that the "actual gameplay" demonstrations were not representative of the
6   product that would be sold to consumers.

7       45.     To make matters worse, and on information and belief, Defendants utilized a
8   "review embargo" that prohibited any critics or industry game reviewers that received pre-release
9   copies of the game from publishing reviews and/or feedback about the game until on or after the
10  game's release date (i.e., on or after February 12, 2013).

11      46.     Thus, no consumer who purchased the Aliens: Colonial Marines game before or on
12  release day could have been aware that the product was "not as advertised" until playing it for him
13  or herself.

14      47.     The ramifications of this scenario are obvious: because retailers do not allow new
15  video games to be returned after they are opened and/or played (i.e., once the shrink-wrapped
16  packaging has been opened, or once the game has been activated on a PC, in cases where it has
17  been downloaded), every gamer was stuck with his or her purchase.

18      48.     The vitriol surrounding Aliens: Colonial Marines caused an unprecedented and
19  immediate drop in the game's price. While new video game releases will typically retain their
20  $60,00 price point for at least several months (and can be bought "used" at some retailers for a
21  meager discounted price of $55.00), Aliens: Colonial Marines was—within a *month* of its release—
22  sold at discounted prices, at times cutting nearly $30.00 of its price point at major retailers.

23      49.     In response to the massive media and consumer backlash following Aliens: Colonial
24  Marines' public release, Randy Pitchford "acknowledged the discrepancy between the Aliens:

25

26  ---
    [6]   Destructoid.com, "Gearbox lied about Aliens: From E3 demo to retail product," available
    online at http://www.destructoid.com/gearbox-lied-about-aliens-from-e3-demo-to-retail-product-
27  244966.phtml (last accessed March 27, 2013).

28

CLASS ACTION COMPLAINT          11

1  Colonial Marines hands-off demo and the final game," but only promised that gamers' desire for an
2  explanation as to why the demo look so much better "is understood and fair and we are looking at
3  that. Lots of info to parse, lots of stake holders to respect."[7]

4      50.    Despite this acknowledgement, Defendants continue to host and promote videos of
5  the "actual gameplay" demonstrations of the Aliens: Colonial Marines through various online
6  channels.

7      51.    Unfortunately, each of the thousands of consumers who purchased or pre-purchased
8  Aliens: Colonial Marines were duped into paying full price for a product that—as agreed by nearly
9  every industry critic to review the title—delivered few (if any) of the real promises made by
10  Defendants.

11  **FACTS RELATING TO PLAINTIFF**

12      52.    Plaintiff Damion Perrine—a long-time video gamer and fan of the Aliens
13  franchise—first learned that the Aliens: Colonial Marines video game was in development
14  sometime before its initial scheduled release in 2009.

15      53.    At that time, and based on his review of the limited information available (which, at
16  that time, described the companies involved with securing the "Aliens" license and responsible for
17  developing the video game itself, along with the anticipated 2009 release date), Perrine pre-ordered
18  the game at his local GameStop—putting sixty dollars ($60) down so as to receive the title on the
19  day of its release.

20      54.    Prior to the game's scheduled release, however, Perrine continued to monitor the
21  game's development and read several industry articles detailing that Aliens: Colonial Marines was
22  being delayed and would not be released as scheduled.

23      55.    The delay gave Perrine concerns about his decision to preorder and, in an abundance
24  of caution (*i.e.*, in case the game was "rushed" and released as a substandard product or was

25

26      [7]    Eurogamer.net, "Aliens: Colonial Marines' demo looked much prettier than the final game,"
    available online at http://www.eurogamer.net/articles/2013-02-13-aliens-colonial-marines-demo-
27  looked-much-prettier-than-the-final-game (last accessed March 11, 2013).

28

CLASS ACTION COMPLAINT          12

1   cancelled outright), he decided to cancel his preorder. Because he cancelled prior to the game's

2   release, he recovered his entire pre-purchase commitment (*i.e.*, sixty dollars ($60)).

3       56.     Some time later, Perrine—like thousands of other gamers—viewed the E3 2011

4   "actual gameplay demo" of Aliens: Colonial Marines on several websites and learned that the game

5   had been given a new release date.

6       57.     Because it purported to demonstrate "actual gameplay" of the Aliens: Colonial

7   Marines game, Perrine decided to—once again and based on the E3 2011 gameplay

8   demonstration—pre-order the game. This time, Perrine returned to GameStop and put $5.00 down

9   on the title, which guaranteed that he would receive a copy on launch day after paying the

10  difference (*i.e.*, $55.00).

11      58.     Given the prior development problems with Aliens: Colonial Marines, Perrine

12  monitored industry articles for any announcements that might cause him to—once again—cancel

13  his pre-order commitment.

14      59.     As such, Perrine viewed—with interest—the additional gameplay demonstrations

15  previewed by Defendants through 2012, and up to the game's release.

16      60.     Convinced that he knew he'd be satisfied with his purchase (based on the many pre-

17  release "actual gameplay" demos showcased by Defendants), Perrine returned to his local

18  GameStop on February 12, 2013, paid the amount due on the title, and returned home with his copy

19  of Aliens: Colonial Marines for the Xbox 360 console.

20      61.     Once home, and excited to play, Perrine opened and launched the Aliens: Colonial

21  Marines video game and immediately noted that the game looked nothing like the "actual

22  gameplay" demonstrated by Defendants in either 2011 or 2012.

23      62.     Perrine continued to play the game over the course of February 12, 2013. At the end

24  of the day, however, Perrine believed that what he had purchased bore little resemblance to, and

25  was in fact much worse than, the product that was advertised.

26      63.     Completely unsatisfied with his purchase and wanting to recuperate as much of his

27

28

1 | losses as possible, Perrine returned—that same day—to the GameStop from which he had pre-

2 | ordered and purchased the Aliens: Colonial Marines game and sold his now "used" copy to the

3 | retailer for $17.00.

4 |     64.    Later, Perrine—like other gamers—read several industry reviews and articles

5 | specifically describing the differences between the "actual gameplay" demonstrations and the actual

6 | released version of Aliens: Colonial Marines.

7 |     65.    Unfortunately for Perrine, all public criticism of the retail version of Aliens: Colonial

8 | Marines was only published *following* its release. Had the same articles been published before the

9 | game's release on February 12, 2013, or had Defendants publically explained that the "actual

10 | gameplay" demos were not representative of the retail version of Aliens: Colonial Marines, Perrine

11 | would have (once again) cancelled his pre-order and not spent sixty dollars ($60) on the title.

12 | **CLASS ALLEGATIONS**

13 |     66.    Plaintiff Damion Perrine brings this action pursuant to Fed. R. Civ. P. 23(b)(3) on

14 | behalf of himself and the following class:

15 | 
16 |       All persons in the United States who paid for a copy of the Aliens: Colonial Marines video game either on or before February 12, 2013.

17 |     67.    Excluded from the Class are Defendants, their legal representatives, assigns and

18 | successors, and any entity in which Defendants have a controlling interest. Also excluded is the

19 | judge to whom this case is assigned and the judge's immediate family, as well as any individual

20 | who contributed to the design, development, and deployment of Defendants video game products.

21 |     68.    **Numerosity**: The exact number of members of the Class is unknown to Plaintiff at

22 | this time, but thousands of consumers—both in California and nationwide—pre-ordered and/or

23 | purchased Aliens: Colonial Marines on or before February 12, 2013, making joinder of each

24 | individual member impracticable.

25 |     69.    **Typicality**: Plaintiff's claims are typical of the claims of the other members of the

26 | Class. Plaintiff and the Class sustained damages as a result of Defendants' uniform wrongful

27 | 
28 |

conduct as described above. Plaintiff's claims are typical of the claims of all of the other members of the Class.

70.     **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Class.

71.     **Commonality and Predominance:** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members, including, *inter alia*:

    a.    Whether Defendants made false statements, promises, and/or descriptions (along with the nature of those statements, promises, and/or descriptions) regarding the features and gameplay content of the Aliens: Colonial Marines video game;

    b.    Whether such false statements, promises, and/or descriptions were made by Defendants to deceive consumers into purchasing its product;

    c.    Whether Defendants in fact included such features and gameplay content with the retail copies of the Aliens: Colonial Marines video game;

    d.    Whether Defendants gave timely notice to their customers that they would not include such features and gameplay content with purchased copies of the Aliens: Colonial Marines video game;

    e.    Whether Defendants' conduct violated Cal. Civ. Code § 1750 *et seq.*;

    f.    Whether Defendants' conduct violated Cal. Civ. Code § 1720 *et seq.*;

    g.    Whether Defendants' conduct violated Cal. Bus. & Prof. Code § 17500 *et seq.*; and

h.      Whether Plaintiff and the Class are entitled to relief, and the nature of such
relief.

72.    **Superiority:** This class action is appropriate for certification because class
proceedings are superior to all other available methods for the fair and efficient adjudication of this
controversy and joinder of all members of the Class is impracticable. The damages suffered by the
individual members of the Class will be small (*i.e.*, less than Aliens: Colonial Marines' release-day
retail price) relative to the burden and expense of individual prosecution of the complex litigation
necessitated by Defendants' wrongful conduct. Thus, it would be virtually impossible for the
individual members of the Class to obtain effective relief from Defendants' misconduct. Even if
members of the Class could sustain such individual litigation, it would not be preferable to a class
action because individual litigation would increase the delay and expense to all parties due to the
complex legal and factual controversies presented in this Complaint. By contrast, a class action
presents far fewer management difficulties and provides the benefits of single adjudication,
economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and
expense will be fostered and uniformity of decisions will be ensured.

73.    **Policies Generally Applicable to the Class:** This class action is also appropriate for
certification because Defendants have acted or refused to act on grounds generally applicable to the
Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of
conduct toward the members of the Class, and making final injunctive relief appropriate with
respect to the Class as a whole. Defendants' policies challenged herein apply to and affect members
of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct
with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. Defendants
have acted and failed to act on grounds generally applicable to Plaintiff and the other members of
the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of
conduct toward members of the Class.

74.    Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class

Definition" based on facts learned in discovery.

## FIRST CAUSE OF ACTION
### Violation of the Consumer Legal Remedies Act
### Cal. Civ. Code § 1750 *et seq.*
### (On Behalf of Plaintiff and the Class)

75.     Plaintiff incorporates by reference the foregoing allegations.

76.     The Consumers Legal Remedies Act ("CLRA") applies to Defendants' actions and conduct as described herein because it extends to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

77.     Defendants are "persons" as defined by Cal. Civ. Code § 1761(c).

78.     Plaintiff and each member of the Class are "consumers" as defined by Cal. Civ. Code § 1761(d).

79.     The Aliens: Colonial Marines video game is a "good" within the meaning of Cal. Civ. Code § 1761(a).

80.     As described herein, Defendants have engaged in deceptive practices, unlawful methods of competition, and/or unfair acts as defined by Cal. Civ. Code §§ 1750 et seq., to the detriment of Plaintiff and the Class.

81.     Defendants, acting with knowledge, intentionally and unlawfully brought harm upon Plaintiff and the Class by representing that the video game Aliens: Colonial Marines would be of a certain quality and contain those specific features shown in the "actual gameplay" demonstrations when in fact Defendants were unwilling or unable to release a retail product consistent with such representations.

82.     Specifically, Defendants violated Cal. Civ. Code § 1750 in at least the following respects:

        a.     In violation of § 1770(5), representing that the Aliens: Colonial Marines video game had characteristics, ingredients, uses, benefits, or quantities which it did not have;

        b.     In violation of § 1770(7), representing that the Aliens: Colonial Marines

video game was of a particular standard, quality, or grade of which it is not;

     c.    In violation of § 1770(9), advertising the Aliens: Colonial Marines video game with the intent not to sell their goods as advertised.

83.    Defendants' unfair or deceptive acts or practices were capable of deceiving a substantial portion of the purchasing public.

84.    Defendants knew that they were unable or unwilling to include the qualities and specific features shown in the "actual gameplay" demonstrations the retail version of Aliens: Colonial Marines at the time they made representations claiming they would be included and at the time the game became available for purchase.

85.    Once Defendants made specific public representations regarding the quality and characteristics of their product through their "actual gameplay" demonstrations, Defendants were under a duty to Plaintiff and the Class to disclose their inability or unwillingness to include those qualities and specific features in the retail version of Aliens: Colonial Marines video game because:

     a.    Defendants were in a superior position to know the true state of facts about what features would and would not (or could and could not) be included in the Aliens: Colonial Marines video game;

     b.    Plaintiff and the Class Members could not reasonably have been expected to learn or discover that Defendants were unable or unwilling to include certain features in the release version of the Aliens: Colonial Marines video game;

     c.    Defendants knew that Plaintiff and the Class Members could not reasonably have been expected to learn or discover that Aliens: Colonial Marines did not in fact release with the qualities and specific features shown in the "actual gameplay" demonstrations; and

     d.    Defendants knew, and in fact intended, that Plaintiff and the Class Members would rely on Defendants' public representations, including the "actual gameplay" demonstration, in choosing whether or not to purchase Aliens:

1    Colonial Marines.

2       86.    In failing to disclose its inability or unwillingness to include the qualities and

3    specific features shown in the "actual gameplay" demonstrations in the retail version of Aliens:

4    Colonial Marines, Defendants have knowingly and intentionally concealed material facts and

5    breached their duty not to do so.

6       87.    The facts concealed or not disclosed by Defendants to Plaintiff and the Class are

7    material in that a reasonable consumer would have considered them to be important in deciding

8    whether to pre-order or purchase a copy of the Aliens: Colonial Marines video game in the first

9    place, whether or not to cancel a pre-ordered copy of the Aliens: Colonial Marines video game,

10   whether to purchase the game at the time of its initial release, or whether to pay a discounted price

11   for the game.

12      88.    Plaintiff and the Class reasonably expected their copies of Aliens: Colonial Marines

13   to include the qualities and specific features shown in the "actual gameplay" demonstrations based

14   on Defendants' public representations. Plaintiff and Class members' expectations were reasonable

15   under the circumstances.

16      89.    The inclusion of the qualities and specific features shown in the "actual gameplay"

17   demonstrations in the retail version of Aliens: Colonial Marines is and was a material selling point

18   of Aliens: Colonial Marines, and a primary reason to purchase the game.

19      90.    Plaintiff and Class Members relied on the representations made by Defendants about

20   the inclusion of the qualities and specific features shown in the "actual gameplay" demonstrations

21   in the retail version of Aliens: Colonial Marines when purchasing the video game.

22      91.    Defendants' false representations about the inclusion of the qualities and specific

23   features shown in the "actual gameplay" demonstrations in the retail version of Aliens: Colonial

24   Marines was an act likely to mislead Plaintiff and members of the Class acting reasonably under the

25   circumstances.

26      92.    Through the misrepresentations and omissions detailed herein, Defendants

27

28

CLASS ACTION COMPLAINT                19

1  wrongfully induced Plaintiff and the other members of the Class to purchase Aliens: Colonial

2  Marines when they otherwise would not have purchased the game or would only have agreed to

3  purchase it at a lower price.

4      93.     As a direct and proximate result of Defendants' violation of Cal. Civ. Code § 1750,

5  *et seq.*, Plaintiff and each Class member has suffered harm in the form of paying monies to

6  Defendants without receiving the entire benefit of his or her bargain.

7      94.     Under Cal. Civ. Code § 1780(a) and (b), Plaintiff, individually and on behalf of the

8  Class, seeks an injunction requiring Defendants to cease and desist the illegal conduct alleged in

9  this Complaint, and all other appropriate remedies for their violations of the CLRA. For the sake of

10  clarity, Plaintiff explicitly disclaims any claim for damages under the CLRA at this time.

11
12
**SECOND CAUSE OF ACTION**
**Violations of the Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 et seq.**
**(On Behalf of Plaintiff and the Class)**

13      95.     Plaintiff incorporates by reference the foregoing allegations.

14      96.     California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code §§ 17200, et

15  seq.) protects both consumers and competitors by promoting fair competition in commercial

16  markets for goods and services.

17      97.     The UCL prohibits any unlawful, unfair or fraudulent business act or practice. A

18  business practice need only meet one of the three criteria to be considered unfair competition. An

19  unlawful business practice is anything that can properly be called a business practice and that at the

20  same time is forbidden by law.

21      98.     As described above, Defendants have violated the unlawful prong by violating the

22  CLRA.

23      99.     Plaintiff and the Class reasonably expected the Aliens: Colonial Marines video game

24  to include the qualities and specific features shown in the "actual gameplay" demonstrations.

25  Plaintiff and Class members' expectations were reasonable under the circumstances.

26      100.    Defendants have violated the fraudulent prong of the UCL by knowingly and

27
28

CLASS ACTION COMPLAINT                    20

1  willfully making false and misleading claims to the public regarding their willingness or ability to
2  include the qualities and specific features shown in the "actual gameplay" demonstrations in the
3  retail version of Aliens: Colonial Marines.

4      101.   Defendants violated the unfair prong of the UCL by representing that they would
5  include the qualities and specific features shown in the "actual gameplay" demonstrations in the
6  retail version of Aliens: Colonial Marines, when in fact they were unable or unwilling to do so.

7      102.   Defendants' false representations made through and along with the "actual
8  gameplay" demonstrations shown throughout 2011 and 2012, *i.e.* regarding the qualities and
9  specific features of Aliens: Colonial Marines, were acts likely to mislead Plaintiff and members of
10  the Class acting reasonably under the circumstances, and constitutes a deceptive trade practice in
11  violation of the UCL.

12      103.   In failing to disclose their inability or unwillingness to include the qualities and
13  specific features shown in the "actual gameplay" demonstrations in the retail version of Aliens:
14  Colonial Marines, Defendants have knowingly and intentionally concealed material facts and
15  breached their duty not to do so.

16      104.   Defendants have violated the fraudulent prong of the UCL by knowingly and
17  willfully failing to disclose their inability or unwillingness to include the qualities and specific
18  features shown in the "actual gameplay" demonstrations in the retail version of Aliens: Colonial
19  Marines.

20      105.   As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent acts,
21  Plaintiff and each Class member has suffered injury in fact and lost money by purchasing the
22  Aliens: Colonial Marines and/or paying more than they would have if Defendants informed them
23  that the qualities and specific features shown in the "actual gameplay" demonstrations would not be
24  included in the retail version of the Aliens: Colonial Marines video game.

25      106.   Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order (1) requiring
26  Defendants to cease the unfair practices described herein; (2) requiring Defendants to restore to
27
28

CLASS ACTION COMPLAINT                    21

1  Plaintiff and each Class member any money acquired by means of unfair competition (restitution);

2  and, (3) awarding reasonable costs and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.

3  ### THIRD CAUSE OF ACTION
   **Violation of False Advertising Law**
4  **Cal. Bus. & Prof. Code §§ 17500 *et seq.***
   **(On Behalf of Plaintiff and the Class)**
5

6  107.    Plaintiff incorporates by reference the foregoing allegations.

7  108.    Defendants engaged in advertising and marketing to the public, and offered for sale

   the video game Aliens: Colonial Marines on a nationwide basis, including in California. Defendants
8
   publically represented and advertised that the qualities and specific features shown in the "actual
9
   gameplay" demonstrations would be included in the retail version of the Aliens: Colonial Marines
10
   video game. Defendants did so with the intent to induce Plaintiff and the Class members to
11
   purchase and continue using the Aliens: Colonial Marines game.
12
   109.    Defendants' advertising and marketing statements were untrue and misleading and
13
   likely to deceive the public in that the public statements portrayed the inclusion of specific features
14
   or qualities for Aliens: Colonial Marines that Defendants knew or should have known they were
15
   unwilling or unable to deliver.
16
   110.    In making and disseminating the statements alleged herein, Defendants knew or
17
   should have known that their statements were false and misleading and therefore in violation of Cal.
18
   Bus. & Prof. Code §§ 17500, et seq.
19
   111.    Plaintiff and members of the Class relied on Defendants' statements in deciding to
20
   pre-order and/or purchase Aliens: Colonial Marines.
21
   112.    As a direct and proximate result of Defendants' false advertising, Plaintiff and the
22
   Class have suffered injury in fact and lost monies to Defendants.
23
   113.    Plaintiff seeks an order (1) requiring Defendants to cease the false advertising
24
   practices described herein; (2) requiring Defendants to restore to Class members any money
25
   acquired by means of false advertising (restitution); and, (3) awarding reasonable costs and
26
   attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.
27

28

**FOURTH CAUSE OF ACTION**
**Breach of Express Warranties**
**(On Behalf of Plaintiff and the Class)**

114. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

115. Defendants advertised and otherwise represented to Plaintiff and the members of the Class that when they purchased a copy of the Aliens: Colonial Marines video game, the game would include the qualities and specific features shown in the "actual gameplay" demonstrations.

116. Defendants' statements were affirmations of fact or a promise made by Defendants about the Aliens: Colonial Marines game sold by or on behalf of Defendants, or otherwise constitute a description of the Aliens: Colonial Marines game. As such, Defendants expressly warranted that copies of the Aliens: Colonial Marines game, sold by or on behalf of Defendants, would include the qualities and specific features shown in the "actual gameplay" demonstrations.

117. Plaintiff and the members of the Class relied upon those affirmations, promises, and descriptions when pre-ordering and/or purchasing the Aliens: Colonial Marines video game.

118. Defendants, under the California Commercial Code, were obliged to deliver Aliens: Colonial Marines as advertised, promised, and/or described.

119. Defendants' failure to include the qualities and specific features shown in the "actual gameplay" demonstrations in purchased copies of Aliens: Colonial Marines breached their express warranty to include such qualities and specific features with those purchases.

120. Because they did not receive the Advertised Features in their purchased copy of Aliens: Colonial Marines, Plaintiff and the members of the Class have been damaged insofar as they did not receive the benefit of their bargain.

121. By serving this Complaint, Plaintiff and the Class hereby give Defendants notice that they have breached the express warranties described above. Plaintiff and the members of the Class request maximum damages under the California Commercial Code.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### FIFTH CAUSE OF ACTION
#### Fraud in the Inducement
#### (On Behalf of Plaintiff and the Class)

122.   Plaintiff incorporates by reference the foregoing allegations.

123.   As detailed herein, Defendants misrepresented and/or failed to disclose material facts regarding the inclusion of the qualities and specific features shown in the "actual gameplay" demonstrations in the retail version of the Aliens: Colonial Marines video game.

124.   Through the misrepresentations and omissions detailed herein, Defendants wrongfully induced Plaintiff and the other members of the Class to purchase Aliens: Colonial Marines when they otherwise would not have purchased the game or would only have agreed to purchase it at a lower price.

125.   Defendants knew or should have known that their misstatements and omissions regarding the inclusion of the qualities and specific features shown in the "actual gameplay" demonstrations in the retail version of Aliens: Colonial Marines were false, misleading, incomplete, and deceptive, and would cause Plaintiff and Class members to choose to purchase the Aliens: Colonial Marines video game when they otherwise would not have purchased the game or would only have agreed to purchase it at a lower price.

126.   Defendants intended that consumers rely upon the misstatements and omissions detailed in this Complaint in purchasing the Aliens: Colonial Marines video game.

127.   Defendants knew that that consumers were relying upon the misstatements and omissions detailed in this Complaint in purchasing the Aliens: Colonial Marines video game.

128.   Plaintiff and the members of the Class relied upon those misstatements when purchasing the Aliens: Colonial Marines video game.

129.   In deceiving Plaintiff and the other members of the Class regarding the inclusion of the qualities and specific features shown in the "actual gameplay" demonstrations in the retail version of the Aliens: Colonial Marines video game, Defendants have engaged in fraudulent conduct designed to induce consumers to purchase the Aliens: Colonial Marines game.

130.   As a proximate result of Defendants' violations of law and wrongful conduct alleged

CLASS ACTION COMPLAINT                    24

herein, Plaintiff and members of the Class have suffered damages in the form of monies paid to Defendants.

## SIXTH CAUSE OF ACTION
### Negligent Misrepresentation
### (On Behalf of Plaintiff and the Class)

131.    Plaintiff incorporates by reference the foregoing allegations.

132.    Through their public statements and marketing materials, Defendants represented to Plaintiff and the members of the Class that the qualities and specific features shown in the "actual gameplay" demonstrations would be included in the retail version of Aliens: Colonial Marines.

133.    Through each "actual gameplay" demonstration, Plaintiff and the members of the Class were exposed to representations made by Defendants regarding the inclusion of the specific qualities and features in the retail version of Aliens: Colonial Marines. Those representations were repeated on and through various websites and publications throughout 2011 and 2012.

134.    Those representations were false, and at the time such false statements were made, Defendants knew or should have known of their falsity or, at the very least, Defendants acted with negligence and carelessness in ascertaining the truth of the statements. Defendants knew or should have known that they were unwilling or unable to include the qualities and specific features shown in the "actual gameplay" demonstrations in the retail version of Aliens: Colonial Marines. Defendants did not have any reasonable ground for believing their statements to be true.

135.    Defendants intended that Plaintiff and the members of the Class rely on their misrepresentations and omissions by purchasing the Aliens: Colonial Marines video game.

136.    Defendants knew that their affirmative statements about the qualities and specific features shown in the "actual gameplay" demonstrations had been widely disseminated on video game related websites and in other publications, and further understood, and intended, that their current and future customers would see those statements.

137.    Defendants had a duty to not make the above-described misrepresentations, and to take steps to correct any further dissemination of such misrepresentations before the Aliens: Colonial Marines video game was released to the public for purchase.

1    138.    However, Defendants did not take any steps to correct, clarify, or prevent further

2  dissemination of their false representations about the qualities and specific features shown in the

3  "actual gameplay" demonstrations.

4    139.    Plaintiff and Class Members justifiably relied on Defendants' misrepresentations by

5  purchasing the Aliens: Colonial Marines video game, and were unaware of the falsity of

6  Defendants' statements at the time they were made.

7    140.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff and the

8  members of the Class suffered damages in the form of monies paid to purchase Defendants' product

9  when they otherwise would not have purchased the game or would only have agreed to purchase it

10  at a lower price.

11

12                              **PRAYER FOR RELIEF**

13    WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for the following

14  relief:

15    A.    Certify this case as a class action on behalf of the Class defined above, appoint

16  Damion Perrine as class representative, and appoint his counsel as class counsel;

17    B.    Declare that Defendants' actions, as described herein, violate the CLRA (Cal. Civ.

18  Code §§ 1750, *et seq.*); the UCL (Cal. Bus. & Prof. Code §§ 17200 *et seq.*); the FAL (Cal. Bus. &

19  Prof. Code §§ 17500, *et seq.*); the California Commercial Code (Cal. Com. Code § 2313); and

20  constitute fraud in the inducement and negligent misrepresentation;

21    C.    Awarding all economic, monetary, actual, consequential, statutory and compensatory

22  damages caused by Defendants' conduct, and if the conduct is proven to be willful, award Plaintiff

23  and the Class exemplary damages;

24    D.    Awarding injunctive relief as necessary to cease Defendants' violations of the Cal.

25  Bus. & Prof. Code §§ 17200 et seq. and §§ 17500, et seq., and Cal. Civ. Code §§ 1750, et seq.;

26    E.    Awarding Plaintiff and the Class equitable relief, including, but not limited to,

27

28

CLASS ACTION COMPLAINT                    26

1 | restitution in the form of disgorgement of all revenue derived from sales of Aliens: Colonial

2 | Marines;

3 |     F.    Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys'

4 | fees;

5 |     G.    Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent

6 | allowable;

7 |     H.    Entering such other injunctive and/or declaratory relief as is necessary to protect the

8 | interests of Plaintiff and the Class; and

9 |     I.    Awarding such other and further relief as equity and justice may require.

10 | **JURY TRIAL**

11 |     Plaintiff demands a trial by jury for all issues so triable.

12 |

13 | Dated April 29, 2013              Respectfully Submitted,

14 |                             **DAMION PERRINE**, individually and on behalf of a class of similarly situated individuals,

15 |                             By: /s/ Sean P. Reis

16 |                             SEAN P. REIS – SBN 184044

17 |                             (sreis@reisfirm.com)
THE REIS LAW FIRM, A.P.C.
30021 Tomas Street, Suite 300

18 |                             Rancho Santa Margarita, California 92688
Telephone: (949) 713-9440

19 |

20 |                             RAFEY S. BALABANIAN*
(rbalabanian@edelson.com)
CHRISTOPHER L. DORE*

21 |                             (cdore@edelson.com)
BENJAMIN S. THOMASSEN*

22 |                             (bthomassen@edelson.com)
EDELSON LLC

23 |                             350 North LaSalle, Suite 1300
Chicago, Illinois 60654

24 |                             Telephone: (312) 589-6370
Facsimile: (312) 589-6378

25 |

26 |

27 |

28 |

CLASS ACTION COMPLAINT        27