United States District Court

For the Northern District of California

1
2
3
4
5 **NOT FOR PUBLICATION**
6 IN THE UNITED STATES DISTRICT COURT
7
8 FOR THE NORTHERN DISTRICT OF CALIFORNIA
9 DAMION PERRINE, and JOHN LOCKE,
individually and on behal of a class of similarly
10 situated persons,                                     No. C 13-01962 JSW
11              Plaintiffs,
12    v.                                                 **ORDER DENYING MOTION TO**
                                                         **DISMISS FIRST AMENDED**
                                                         **CLASS ACTION COMPLAINT**
13 SEGA OF AMERICA, INC., and GEARBOX
SOFTWARE, L.L.C.,                                        **(Docket No. 29)**
14
              Defendants.
15
16 _____/
17          This matter comes before the Court upon consideration of the motion to dismiss filed by

18 Defendants Sega of America, Inc. ("Sega") and Gearbox Software, L.L.C. ("Gearbox")

19 (collectively "Defendants").  The Court has considered the parties' papers, relevant legal

20 authority, and the record in this case, and it finds the motion suitable for disposition without

21 oral argument.  *See* N.D. Civ. L.R.  7-1(b).  The Court VACATES the hearing scheduled for

22 October 11, 2013, and it HEREBY DENIES the motion to dismiss.  The parties shall appear on

23 October 11, 2013 at 1:30 p.m. for the case management conference.

24                                      **BACKGROUND**

25          This lawsuit arises out of a dispute over whether Defendants engaged in a "bait and

26 switch" regarding the video game *Aliens: Colonial Marines*.  (First Amended Complaint

27 ("FAC") ¶ 1.)  Plaintiffs, John Locke ("Locke") and Damion Perrine ("Perrine") (collectively

28 "Plaintiffs"), allege that Defendants originally announced that they would release *Aliens:*

*Colonial Marines* in 2009.  According to Plaintiffs, Defendants delayed the release date in order to allocate resources to other projects, which resulted in negative publicity and statements that such delays often signify troubles with product development.  (*Id.* ¶¶ 20-22.)

When enthusiasm about the game began to wane, "[o]n information and belief, Defendants chose to address [the] situation by developing a non-retail but technically superior version of *Aliens: Colonial Marines* that would be presented to the public and described as 'actual gameplay' in place of the retail version of the game."  (*Id.* ¶ 23.)  Plaintiffs allege that the non-retail version of *Aliens: Colonial Marines* ran on a Demo Engine that was capable of producing higher quality effects and ran advanced artificial intelligence.  (*Id.* ¶ 24.)  According to Plaintiffs, Defendants actively promoted *Aliens: Colonial Marines* by showing this non-retail version of the game to the public and represented that it consisted of "actual gameplay," to drum up pre-release sales.  The only "hint that the live demonstration was not representative of the retail version ... was a 'Work in Progress' watermark that briefly appeared in the top left corner of the video."  (*Id.* ¶ 32; *see generally* ¶¶ 27-50.)

Plaintiffs also allege that Defendants never intended to include those features in the retail version of the game and knew that the non-retail version could not run on "contemporary video game consoles."  (*Id.* ¶ 25.)  Defendants released the retail version of *Aliens: Colonial Marines* on February 12, 2013.  (*Id.* ¶ 51.)  Based on many of the "actual gameplay" demonstrations he had seen, Locke pre-purchased a collectors edition of *Aliens: Colonial Marines* for $100.  (*Id.* ¶¶ 76-77.)  Perrine also viewed one of the actual game play demonstrations.  Although he had previously cancelled a pre-order of the game, based on this demonstration he decided to pre-order the game once more.  Perrine paid $60 for his version of the game.  (*Id.* ¶¶ 87-90.)

Plaintiffs claim the differences between the non-retail and retail versions of *Aliens: Colonial Marines* were immediately apparent.  (*Id.* ¶¶ 52-60, 81-84, 94-97.)  After playing the game, Perrine returned to the store where he had purchased it, and sold it for $17.00.  (*Id.* ¶ 97.)  Both Perrine and Lock allege that had they known that the actual gameplay demonstrations

1  were not representative of the retail version of *Aliens: Colonial Marines*, they would not have

2  purchased the game.  (*Id.* ¶¶ 83-84, 93, 99-100.)

3      On April 29, 2013, Plaintiffs filed their original complaint.  In response to a motion to

4  dismiss, Plaintiffs filed the FAC on July 5, 2013.  At issue in this motion are Plaintiffs' claims

5  for violations of the California Consumer Legal Remedies Act ("CLRA"), California Civil

6  Code Sections 1750, *et seq.* and their claim for breach of express warranty.

7      The Court shall address additional facts as necessary in the remainder of this Order.

8                          **ANALYSIS**

9  **A.      Legal Standards Applicable to Motion to Dismiss.**

10      Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  A

11  motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings

12  fail to state a claim upon which relief can be granted.  The complaint is construed in

13  the light most favorable to the non-moving party and all material allegations in the complaint

14  are taken to be true.  *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir. 1986).  Plaintiffs are

15  proceeding *pro se*, and the Court must construe *pro se* filings liberally.  *Zichko v. Idaho*, 247

16  F.3d 1015, 1020 (9th Cir. 2001).  However, even under the liberal pleading standard of Federal

17  Rule of Civil Procedure 8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his

18  'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of

19  the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

20  555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

21      Pursuant to *Twombly*, a plaintiff must not merely allege conduct that is conceivable but

22  must instead allege "enough facts to state a claim to relief that is plausible on its face."  *Id.* at

23  570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

24  court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

25  *Ashcroft v. Iqbal*, 556 U.S.662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  "The plausibility

26  standard is not akin to a probability requirement, but it asks for more than a sheer possibility

27  that a defendant has acted unlawfully....  When a complaint pleads facts that are merely

28  consistent with a defendant's liability, it stops short of the line between possibility and

United States District Court
For the Northern District of California

1    plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation

2    marks omitted).  If the allegations are insufficient to state a claim, a court should grant leave to

3    amend, unless amendment would be futile.  *See, e.g., Reddy v. Litton Indus., Inc.*, 912 F.2d 291,

4    296 (9th Cir. 1990); *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242,

5    246-47 (9th Cir. 1990).

6    **B.      The CLRA Claim.**

7             Plaintiffs allege that Defendants violated the CLRA, which prohibits "unfair methods of

8    competition and unfair or deceptive acts or practices undertaken by any person in a transaction

9    intended to result or which results in the sale or lease of goods or services to any consumer."

10   Cal. Civ. Code § 1770(a).  Defendants move to dismiss this claim on the basis that *Aliens:*

11   *Colonial Marines* is software and, thus, is not a "good" or "service" as those terms are used in

12   the CLRA.[1]

13           The CLRA defines "goods" to mean "tangible chattels bought or leased for use

14   primarily for personal, family, or household purposes, including certificates or coupons

15   exchangeable for these goods, and including goods that, at the time of the sale or subsequently,

16   are to be so affixed to real property as to become a part of real property, whether or not they are

17   severable from the real property."  Cal. Civ. Code § 1761(a).  Although there are no California

18   cases directly on point, a number of district courts, including this Court, have concluded that

19   software does not fall within this statutory definition.  *See, e.g., Yunker v. Pandora Media, Inc.*,

20   2013 WL 1282980, at *13 (N.D. Cal. Mar. 26, 2013); *Goodman v. HTC America, Inc.*, 2012

21   WL 2412070, at *12 (W.D. Wash. June 26, 2012); *In re iPhone Application Litig.*, 2011 WL

22   4403963, at *10 (N.D. Cal. Sep. 20, 2011); *Ferrington v. McAfee*, 2010 WL 3910169, at *18-19

23   (N.D. Cal. Oct. 5, 2010); *but see Pelletier v. Pacific Webworks, Inc.*, 2012 WL 43281, at *5

24   (E.D. Cal. Jan. 9, 2012) (on facts of case, plaintiff stated a claim under the CLRA).

25

26

---

27           [1]      The CLRA defines "services" as "work, labor, and services for other than a
     commercial or business use, including services furnished in connection with the sale or
28   repair of goods."  Cal. Civ. Code § 1761(b).  Plaintiffs do not contend that *Aliens: Colonial*
     *Marines* is a service.

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

Of these cases, the *Ferrington* case contains the most comprehensive analysis of the issue. The court first cited to California's Commercial Code governing secured transactions, which includes software in its definition of "general intangibles." *Id.*, 2010 WL 3910169, at *18; *see also* Cal. Comm. Code § 9102(a)(42) (stating that the term "[g]eneral intangible ... includes payment intangibles and software"); Cal. Comm. Code § 9102(a)(44). The *Ferrington* court also noted that Section 9102(a)(44) excludes computer programs from the definition of "goods." *Id.*, 2010 WL 3910169, at *18. However, that section of the Commercial Code does not entirely exclude computer programs from the term "goods." Rather, it provides that a computer program qualifies as a "good," when it is

> embedded in goods and any supporting information provided in connection with a transaction relating to the program if (i) the program is associated with the goods in such a manner that it customarily is considered part of the goods, or (ii) by becoming the owner of the goods, a person acquires a right to use the program in connection with the goods. The term *does not* include a computer program embedded in goods that consist solely of the medium in which the program is embedded.

Cal. Comm. Code § 9102(a)(44) (emphasis added).

The *Ferrington* court also cited to *Ward General Ins. Services, Inc. v. Employers Fire Ins. Co.*, 114 Cal. App. 4th 548 (2003). *Id.*, 2010 WL 3910169, at *18. In the *Ward* case, the court concluded that a database stored on a computer is not considered tangible property. In reaching this conclusion, the *Ward* court relied heavily on *America Online, Inc. v. St. Paul Mercury Insurance Co.*, 207 F. Supp. 2d 459 (E.D. Va. 2002). *Ward*, 114 Cal. App. 4th at 557-58. The *America Online* case, like the *Ward* case, involved an insurance dispute and turned on the meaning, *inter alia*, of the term "tangible property."

The *America Online* court held that "computer data, software, and systems are not 'tangible' property in the common sense understanding of the word. The plain and ordinary meaning of the term 'tangible' is property that can be touched. Computer data, software, and systems are incapable of perception by any of the senses and are therefore intangible. ... Similar to the information written on a notepad, or the ideas recorded on a tape, or the design memorialized in a blueprint, computer data, software, and systems are intangible items stored on a tangible vessel - the computer or a disk." *America Online*, 207 F. Supp. 2d at 462, 468.

United States District Court

For the Northern District of California

1    However, the courts in *Ward* and *America Online* were interpreting terms in insurance policies,

2    and neither case examined how the definition of the term "goods" as it is used in the CLRA.

3        The *Ferrington* court also noted that, under California law, software appears to be

4    treated as "tangible personal property for purposes of sales tax." *Ferrington*, 2010 WL

5    3910169, at *19 (citing Cal. Rev. & Tax Code §§ 6006, 6010.9); *see also Navistar Int'l*

6    *Transportation Corp. v. State Board of Equalization*, 8 Cal. 4th 868, 874 (1994) (noting that

7    "California law imposes a tax on the retail sale of tangible personal property, but not on the sale

8    of intangible personal property," and upholding the imposition of sales tax on a non-custom

9    software").

10       Although it acknowledged that the plaintiffs' policy arguments "have significant force"

11   and found the issue to be a "close call," the *Ferrington* court ultimately concluded that "[t]he

12   CLRA's express limitation of goods to 'tangible chattels' must be given meaning, and current

13   California law suggests that these words exclude software from the Act's coverage." *Id.*, 2010

14   WL 3910169.

15       Relying on *Pelletier*, the Plaintiffs argue that the Court should not follow *Ferrington*.  In

16   the *Pelletier* case, the plaintiff alleged she purchased a "Google Business Kit," from the

17   defendant and never received it, although the defendant charged her recurring amounts for the

18   kit.  Arguing that software was not a good, the defendant moved to dismiss the CLRA claim.

19   *Id.*, 2012 WL 43281, at *5.  The court denied the motion and noted that the plaintiff had not

20   alleged that the Google Business Kit was software.  The court also distinguished the *Ferrington*

21   case on the basis that the plaintiff there had "downloaded a program from the internet."  *Id.*

22   Because the "plaintiff tendered money for the Kit in the expectation of receiving a physical,

23   tangible product," the court concluded she stated a claim under the CLRA.  *Id.*; *cf. In re Phone*

24   *4S Consumer Litigation*, 2013 U.S. Dist. LEXIS 103058 (N.D. Cal. July 23, 2013) (denying

25   motion to dismiss CLRA claim where plaintiffs' theory of the case was that "a specific function

26   of the iPHone 4S did not perform as advertised," and was not based on complaints about the

27   SIRI software program itself).  *Id.,* 2013 U.S. Dist. LEXIS, at *44-46.

28

As set forth above, in certain circumstances, computer programs and software may be considered tangible goods or tangible personal property.  *See* Cal. Comm. Code § 9102(a)(44); Cal. Rev. & Tax Code §§ 6006, 6010.9; *Navistar*, 8 Cal. 4th 874.  The Court recognizes that, in *Yunker*, it stated that it found the *Ferrington* court's reasoning persuasive and concluded that software is not a "good" under the CLRA.  However, in the *Yunker* case, the plaintiffs specifically alleged that "'[a]pps are software that consumers download and install on their phones," and the facts in that case were more analogous to the facts in *Ferrington.  See Yunker*, 2013 WL 1282980, at *13; *Ferrington*, 2010 WL 3910169, at *1.  In contrast, the Plaintiffs here repeatedly allege that they purchased a game and allege that the Defendants misrepresented certain features of that game.  (*See, e.g.,* FAC ¶¶ 1, 3, 74, 77, 80, 90, 93.)  The Court concludes that, on the facts of this case, its decision in *Yunker* does not control the outcome here.

The CLRA expressly provides that it must be "liberally construed and applied to promote its underlying purposes which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."  Cal. Civ. Code § 1760.  If *Ferrington* was a "close call," the Court finds the facts of this case present an even closer call.  Although the Court may ultimately be persuaded by Defendants' argument that *Aliens: Colonial Marines* cannot be considered a good under the CLRA, at this stage of the proceedings, the Court concludes that Plaintiffs have alleged sufficient facts to state a claim under the CLRA.

**C.**     **The Breach of Express Warranty Claim.**

Defendants also move to dismiss Plaintiffs' claim for breach of express warranty on the basis that Plaintiffs fail to allege the exact terms of the warranty at issue.  "[T]o plead a cause of action for breach of express warranty, one must allege the exact terms of the warranty, plaintiff's reasonable reliance thereon, and a breach of that warranty which proximately causes

**United States District Court**
For the Northern District of California

7

1   plaintiff injury." *Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135, 142 (1986); *see*

2   *also Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978, 986-87 (N.D. Cal. 2009).[2]

3       With respect to the first element, a plaintiff must show that a defendant "made

4   affirmations of fact or promises that became part of the basis of the bargain." *Maneely v.*

5   *General Motors Corporation*, 108 F.3d 1176, 1181 (9thc Cir. 1997); *see also* Cal. Comm. Code

6   § 2313(1)(a)-(c).

7       Plaintiffs contend that the "breach of express warranty is simple: Defendants set forth

8   the terms of their warranty by ... *showing* consumers exactly what they could buy," in the Demo

9   Version, and by "*explaining* that what consumers saw (i.e. the demonstrated Demo Version...)

10  would conform to what they could-pre purchase and own." (Opp. Br. at 10:20-23.) This theory

11  is reflected in Plaintiffs' allegations that "the many 'actual gameplay' demonstrations and other

12  promotional materials featuring the non-retail version of *Aliens: Colonial Marines* and rendered

13  from the Demo Engine were Defendants' method of advertising and served as public pre-release

14  guarantees...." (FAC ¶ 50.)

15      In reply, Defendants acknowledge that "the terms of this alleged warranty are clear..."

16  (Reply Br. at 5:9-10.) However, they argue that Plaintiffs' theory of liability is untenable in

17  light of the fact that the Plaintiffs allege that the non-retail version of *Aliens: Colonial Marines*

18  used in the demonstrations contained a "work in progress" watermark. However, Plaintiffs

19  allege that "none of the 'actual gameplay' demonstrations that took place in or after 2012

20  contained even the cursory 'work in progress' disclaimer." (FAC ¶ 46.)

21      Defendants also argue that any such warranty would be limited to the circumstances

22  surrounding the game play demonstrations. In support of this argument, they rely on *Baltazar*

23  *v. Apple, Inc.*, 2011 U.S. Dist. LEXIS 96140 (N.D. Cal. Aug. 26, 2011). In that case, the

24  plaintiffs alleged that although Apple represented that the iPad could function outdoors without

25  interruption when, in fact, the iPads would overheat and shut down in sunny conditions. *Id.*,

26

27      [2]     In certain circumstances, a plaintiff must also allege that he or she provided
    the defendant with pre-suit notice of the breach. *See Sanders*, 672 F. Supp. 2d at 987, 988-
28  89 (citing *Greenman v. Yuba Power Prods.*, 59 Cal. 2d 57, 61 (1963) (pre-suit notice not
    required when an injured consumer has not dealt directly with a manufacturer).

United States District Court

For the Northern District of California

1  2011 U.S. Dist. LEXIS 96140, at *1.  To support their breach of express warranty claim, the

2  plaintiffs relied on advertisements that contained depictions of the iPad being "outdoors, at least

3  some of the time on sunny days."  *Id.*, 2011 U.S. Dist. LEXIS 96140, at *3.  The court

4  recognized that "a warranty can be created by statements in advertisements," however it also

5  noted that the plaintiffs had not pointed to any cases where "advertisements images alone are

6  sufficient to create[] an express warranty."  *Id.*, 2011 U.S. Dist. LEXIS 96140, at *8.  The court

7  therefore concluded that the plaintiffs failed to allege the terms of a warranty.

8        The court also noted that the plaintiffs premised their claim on "seven brief scenes in a

9  thirty-second commercial depicting the iPad un use in 'outdoor locations,' some of which uses

10  allegedly occurred on a 'sunny day.' ... Several of the images are on the screen for less than a

11  second, and none show the iPad being used in direct sunlight or for an extended period of time."

12  *Id.*  The court concluded that "[e]ven under the most liberal pleading standards, these brief clips

13  of iPad use in some outdoor locations cannot be construed as a direct warranty that the device

14  will operate without interruption in direct sunlight or in outdoor conditions generally."  *Id.*

15  The court also concluded that "even if [it] were to conclude that Apple's advertisement could be

16  construed as an express warranty that the iPad would work in the *exact* situations depicted, such

17  a warranty would not apply to *other* situations."  *Id.* (emphasis added).

18        The *Baltazar* court also relied on the *Maneely* case, in which the Ninth Circuit affirmed

19  the district court's ruling on summary judgment that an advertisement of a number of persons

20  riding in the back of a pick-up truck did not constitute a representation of a fact or promise that

21  riding in the back of a truck would be safe.  "Unlike a specific and unequivocal written

22  statement, ... these ads present visual images of the product set in certain surroundings and

23  make no explicit guarantees."  *Maneely*, 108 F.3d at 1181.

24        The Court finds *Maneely* and *Baltazar* distinguishable on their facts.  Plaintiffs here do

25  not rely solely on the actual gameplay demonstrations to support their allegations, which might

26  give Defendants' argument more force.  Rather, Plaintiffs also allege numerous statements by

27  Defendants to the effect that the demonstrations were "real," and were "representative of the

28  retail product."  (*See* FAC ¶ 36.)  Plaintiffs also allege that one of Defendants' trailers stated

that it "was shot with '100% IN-GAME FOOTAGE.'" (*Id.* ¶ 42.)  Plaintiffs contend that, contrary to these statements, the retail version of the game was not the version presented during the presentations at which these statements were made.  Thus, the Plaintiffs have alleged facts that, if true, show the Defendants did make "specific and unequivocal" statements to the effect of what you see is what you will get.  At this stage of the proceedings, the Court concludes that Plaintiffs have alleged facts sufficient to state a claim for breach of express warranty.

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss in its entirety.

**IT IS SO ORDERED.**

Dated: October 3, 2013

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California