Mark S. Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251

Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Benjamin S. Thomassen (Admitted *Pro Hac Vice*)
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiff John Locke and the Putative Class*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN LOCKE, individually and on behalf of a class of similarly situated persons,<br><br>*Plaintiff,*<br><br>v.<br><br>SEGA OF AMERICA, INC., a California corporation, and GEARBOX SOFTWARE, L.L.C., a Texas limited liability company,<br><br>*Defendants.* | Case No. 13-cv-01962-JD<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**1. Violations of Cal. Civ. Code §§ 1750 *et seq.***<br>**2. Violations of Cal. Civ. Code §§ 1720 *et seq.***<br>**3. Violations of Cal. Bus. & Prof. Code §§ 17500 *et seq.***<br>**4. Breach of Express Warranties**<br>**5. Fraud in the Inducement**<br>**6. Negligent Misrepresentation**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff John Locke ("Plaintiff"), for his Class Action Complaint, alleges as follows upon personal knowledge as to his own acts and experiences and, as to all other matters, on information and belief, including, *inter alia*, investigation conducted by his attorneys:

**INTRODUCTION**

1.     This case centers on Defendants Sega of America, Inc.'s ("Sega") and Gearbox Software, L.L.C.'s ("Gearbox," collectively "Defendants") collaborative efforts to sell their highly anticipated video game "Aliens: Colonial Marines" by knowingly making false statements about the game's development, design, quality, and features. At its core, this case is a classic bait-and-switch: Defendants promised consumers that they would receive a product with specific qualities and features, but then delivered something else entirely.

2.     As explained in more detail below, the Defendants in this case opted to advertise (and convince consumers to buy) Aliens: Colonial Marines by developing a technically advanced, non-retail version of the game that Defendants never intended to sell to the public. Defendants then used this non-retail version of the game to create and distribute self-described "actual gameplay" demonstrations of Aliens: Colonial Marines, which first appeared as early as June 2011 and were used and promoted up until the game's actual retail release in February 2013.

3.     Each of the "actual gameplay" demonstrations purported to show consumers exactly what they would be buying: a cutting- edge video game with very specific features and qualities. Unfortunately for their fans, Defendants never told anyone—consumers, industry critics, reviewers, or reporters—that the "actual gameplay" they had been demonstrating, using the technically advanced (and non-retail) version of the game, bore no more than a passing resemblance to the game they eventually sold to the public. The two games had different artificial intelligence, different gameplay elements, and even ran on different graphics engines—they were, effectively, different games altogether.

4.     As a result, and through the misrepresentations described below, Defendants wrongfully induced Plaintiff and the other members of the Class to purchase Aliens: Colonial

1  Marines when they otherwise would not have purchased the game or would have paid less for their

2  purchase.

3  **JURISDICTION AND VENUE**

4  5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d). At least

5  one Class member is a citizen of a different state than Defendants, and the amount in controversy

6  exceeds, exclusive of interest, fees, and costs, $5,000,000.00. This Court has jurisdiction over

7  Defendants because they conduct business in this District and/or because the improper conduct

8  alleged in the Complaint occurred in, was directed from, and/or emanated or exported from this

9  District. Personal jurisdiction is additionally proper because Defendant Sega resides in this District.

10  6.      Venue is proper in this District under 28 U.S.C. § 1391(a) because the injury arose in

11  this District. Venue is additionally proper because Defendants transact significant business in this

12  District, including entering into business and consumer transactions, and Defendant Sega resides in

13  this District.

14  **PARTIES**

15  7.      Plaintiff John Locke is a natural person and citizen of the State of California.

16  8.      Defendant Sega of America, Inc., is a corporation incorporated in and existing under

17  the laws of the State of California with its principal place of business located at 350 Rhode Island

18  Street, Suite 400, San Francisco, California 94103. Sega does business throughout the United

19  States, the State of California, and this District.

20  9.      Defendant Gearbox Software, L.L.C., is a limited liability company organized in and

21  existing under the laws of the State of Texas with its principal place of business located at 101 East

22  Park Boulevard, Suite 1200, Plano, Texas 75074. Gearbox does business throughout the United

23  States, the State of California, and this District.

24  **FACTUAL BACKGROUND**

25  ***The promotion of new releases in the video game industry***

26  10.      As reported through countless media outlets, the video game industry is—in a

27

28  3

---

SECOND AMENDED CLASS ACTION COMPLAINT                    NO. 13-CV-01962-JD

word—huge. Every month, millions of gamers each spend fifty dollars or more to pre-order and/or purchase the latest video game releases the day of their public release.

11.     To take advantage of this market, video game publishers and developers have many choices with how to advertise and showcase their new releases, including, *inter alia*: (i) giving interviews in industry websites and publications; (ii) releasing early screenshots or pre-rendered "concept" videos of an unreleased game; (iii) showcasing gameplay through tradeshows/ exhibitions, where a game is demonstrated before an audience; (iv) releasing playable demos, so that prospective purchasers can "try before they buy;" and (v) distributing "pre-release" copies of games to industry reviewers and critics.

12.     Regardless of the approach, the end goal is the same: convince as many consumers as possible to spend their money before release or immediately on a game's "launch day." Because it is almost impossible for consumers to return a newly purchased video game for a refund, pre-orders and launch day purchases are "money in the bank," and are of vital importance to a game's economic success—particularly in cases where a game receives negative industry reviews following its release, which can seriously impact subsequent sales.

13.     Of course, hype is often just that: hype. Not surprisingly, early speculation as to what features a game *might have* sometimes resorts to puffery, cites to a developer's aspirations or vague descriptions, or doesn't even pretend to describe what a final product might look like. Likewise, early "concept" videos might not show what the game looks like when played by an actual person and, instead, show pre-rendered cinematic scenes.

14.     This sort of pre-release hype was addressed and summed up in a recent industry article that asked "[e]ver wonder why sometimes a preview for a game sounds positive, then the final product comes out and gets a critical drubbing? Sometimes that's because the demo acts as a highlight reel, detailing the best parts. Other times the writer wants to remain cautiously

optimistic."[1]

15.     Actual gameplay demonstrations, on the other hand, serve a purpose beyond puffery and speculative hype: they showcase what a prospective purchaser of a game can expect to experience if they buy the final product—i.e., the actual qualities and features of the retail game.

16.     Such demonstrations can highlight, *inter alia*, a videogame's graphics engine (i.e., the programming that renders what a gamer sees when playing the game and runs the overall gameplay experience), aspects of the gameplay itself (such as certain sequences of events or level designs that a gamer will experience in the final product), and other features that will be included in the final product (such as multiplayer modes, artificial intelligence, strategy and dynamics, and/or various difficulty settings).

### *Defendants' development of a separate, non-retail version of Aliens: Colonial Marines*

17.     At first blush, you'd think Aliens: Colonial Marines would sell itself. It was held out as the canon sequel to James Cameron's 1986 film "Aliens;" was developed by Gearbox Software, whose recent releases (including "Borderlands" and its sequel, "Borderlands 2," which was developed contemporaneously with Aliens: Colonial Marines) have garnered excellent industry reviews and an overwhelmingly positive reception from gamers; and was produced by Sega of America, a company with a well-known heritage within the video game industry.

18.     But the development of Aliens: Colonial Marines was fraught with delays and dogged by skepticism. Originally announced on December 11, 2006 and scheduled for release in 2009, the game would eventually see its release date pushed back by almost four years. As the media noted at the time, such extended delays often signify major troubles with a game's development and portend a lackluster final product. As that release moved ever further into the future, media coverage continued to sour, suggesting at times that the game might not be released at all.

---

[1]     Eurogamer.net, "Aliens: Colonial Marines' demo looked much prettier than the final game," http://www.eurogamer.net/articles/2013-02-13-aliens-colonial-marines-demo-looked-much-prettier-than-the-final-game (last accessed July 5, 2013).

SECOND AMENDED CLASS ACTION COMPLAINT                    No. 13-cv-01962-JD

19.     Faced with such concerns, gamers will often wait for industry reviews of a particular title before pre-ordering or otherwise purchasing a certain game—and, if the reviews are poor, will wait months or even years to purchase the title at a discount, if at all.

20.     In the case of Aliens: Colonial Marines, these delays were predominately caused by Gearbox allocating resources and human capital *away from* Aliens: Colonial Marines in favor of its other projects, including "Borderlands 2." This resource-shifting continued until the gaming media's negative coverage reached a breaking point in 2011, at which time both Defendants recognized the rapidly waning enthusiasm for Aliens: Colonial Marines and the poor development state of the retail product.

21.     On information and belief, Defendants chose to address this situation by developing a non-retail but technically superior version of Aliens: Colonial Marines that would be presented to the public and described as "actual gameplay" in place of the retail version of the game.

22.     This non-retail version of Aliens: Colonial Marines featured advanced artificial intelligence programming, certain gameplay sequences drawn from the Aliens movie, and—most of all—a highly advanced graphics engine (the "Demo Engine") capable of creating, *inter alia*, dynamic moving light sources, highly detailed and differentiated textures, complex particle effects, a rich variety of custom animations, and immersive dynamic weather effects.

23.     Defendants never intended to include these features in the retail version of Aliens: Colonial Marines that would ultimately be sold to the public. Indeed, Defendants knew that the non-retail version of Aliens: Colonial Marines simply could not run on contemporary video game consoles like the PlayStation 3 or Xbox 360, which lacked the processing power needed to run the Demo Engine.

24.     As such, the retail version of Aliens: Colonial Marines utilized different programming altogether and a different—and much less advanced—graphics engine (the "Retail Engine"). The Retail Engine lacked the technical capabilities of the Demo Engine and, thus, could not produce the same qualities and features present in the non-retail version of the game.

*Defendants' promotional campaign of "actual gameplay" demonstrations using the non-retail version of Aliens: Colonial Marines.*

25.    Defendants first presented the non-retail version of Aliens: Colonial Marines to the public through a series of "actual gameplay" demonstrations.

26.    Each "actual gameplay" demonstration involved a broadcast of "a live demo [of the non-retail version of the game] played by a Gearbox representative" before an audience, often consisting of videogame journalists and other industry insiders.[2]

27.    With this setup, each controlled "actual gameplay" demonstration was analogous to the demonstration of a new car that is not yet available for public purchase. In such a demonstration, a manufacturer might show prospective purchasers (or industry reporters, etc.) a new car, demonstrate its various features—like its engine, for example—by driving it on a racetrack, promise that the car "actually driven" in the demonstrations will be available for purchase soon, but not let the public rev the engine or kick the tires.

28.    In this case, Defendants staged their first "actual gameplay" demonstration using the non-retail version of Aliens: Colonial Marines, which utilized the Demo Engine, at the annual "E3" conference in early June 2011. E3 is the video game industry's largest and most widely publicized exposition where developers and publishers advertise new videogames and hardware, and is widely covered by the video game reporting industry.

29.    Defendants' E3 2011 "actual gameplay" demonstration included a live narration provided by Randy Pitchford, President of Gearbox. As the demo began, Mr. Pitchford explained that "Today, we're going to show you a bit of the game . . . [Y]ou're going to see what the game *actually looks like*. Not just screenshots but the *actual gameplay*."[3]

30.    The only hint that the live demonstration was not representative of the retail version

---

[2]    Gamespot.com, "E3 2011: Aliens: Colonial Marines Demo Preview," http://www.gamespot.com/aliens-colonial-marines/previews/e3-2011-aliens-colonial-marines-demo-preview-6318046/ (last accessed July 5, 2013).

[3]    Metacritic.com, "Aliens: Colonial Marines E3 Demo with Randy Pitchford," available online at http://www.metacritic.com/game/pc/aliens-colonial-marines/trailers/2970592 (last accessed July 5, 2013).

of Aliens: Colonial Marines was a "Work in Progress" watermark that briefly appeared in the top left corner of the video. Defendants did not explain that the live demonstration utilized the non-retail version of Aliens: Colonial Marines that they never intended to sell to the public.

31.     This first "actual gameplay" demonstration was well received, with industry reporters making particular note of the demonstration's graphical features, robust artificial intelligence, atmosphere, and exciting gameplay sequences, which bore a close relation to action sequences from the Aliens movie.

32.     Defendants showcased a similar gameplay demonstration using the non-retail version of the game, which again featured the Demo Engine, on June 11, 2012 during Gearbox's "community day." Mr. Pitchford introduced this demonstration by telling the audience, "[e]verything you're going to see today is real. It's real software, not prototype stuff.  It's production stuff."[4]

33.     As before, however, Defendants did not explain that the demonstration utilized the non-retail version of Aliens: Colonial Marines that was never intended for sale to the public.

34.     Defendants continued to both demonstrate the non-retail version of Aliens: Colonial Marines and show video footage captured from the non-retail version of the game (i.e., created using the Demo Engine) at two more game conferences that year—Gamescon 2011 and Penny Arcade Expo ("PAX") 2011. As before, Defendants presented those demonstrations and related video footage as representative of the retail product, without explaining that they showed the non-retail version of Aliens: Colonial Marines.

35.     On September 30, 2011, Defendants uploaded the 2011 E3 "actual gameplay" demonstration, complete with the accompanying narration by Mr. Pitchford, to the official Sega of America YouTube channel. The video was available up through the game's public release, and is still available as of the time of this filing.

---

[4]     Twisted Gamer Radio, "Aliens Colonial Marines Panel," available online at http://twistedgamerradio.s3.amazonaws.com/twistedgamerradio-20110611alienscolonialmarinespanel.mp3 (last accessed July 5, 2013).

36.     Defendants again showcased the non-retail version of Aliens: Colonial Marines during the 2012 convention season, this time with a five-minute video that debuted at the Destination PlayStation event in February 2012 and was shown again at PAX East in April 2012.

37.     As before, this video consisted entirely of footage rendered by the Demo Engine and, as such, featured advanced artificial intelligence, exiting gameplay sequences drawn from the film, dynamic moving light sources, detailed and differentiated textures, particle effects, custom animations, and dynamic weather effects. And, as before, Defendants did not explain that the video—which contained no disclaimer at all—showed the non-retail version of the game that Defendants never intended to sell to the public.

38.     Next, Defendants returned to E3 and PAX in 2012 with yet another lengthy "actual gameplay" demonstration, this time showcasing multi-player as well as single-player modes of the non-retail version of the game. Like all the previous demonstrations, this demonstration utilized the Demo Engine and thus showcased the same advanced graphical and gameplay features. The demonstration contained no disclaimer, and Defendants did not explain that the demonstration featured the non-retail version of the game.

39.     Throughout this period, and continuing to the present, Defendants also used the Demo Engine to create shorter-form videos used to advertise Aliens: Colonial Marines. Because these videos were produced by the non-retail version of the game and rendered from the Demo Engine, they all showed the same product and featured the same characteristic advanced artificial intelligence, exiting gameplay sequences, dynamic moving light sources, detailed and differentiated textures, particle effects, custom animations, and dynamic weather effects.

40.     True to form, no footage appearing in *any* of these videos has any mark indicating that it was rendered using the Demo Engine. To the contrary, one of the commercials, the so-called "suspense trailer," specifically states that it was shot with "100% IN-GAME FOOTAGE."[5] These

---

[5]     Sega of America, "Aliens: Colonial Marines Suspense Trailer," available online at http://www.youtube.com/watch?v=CgSHqjwFcd8&list=SPVajZ7rjLrPMOaJA0qz2tcFcmaj1gEw3n (last accessed July 5, 2013).

1   promotional videos were available on Sega's website and official YouTube channel both before and

2   at the game's public release, and remain available there to this day.

3       41.     Defendants further reinforced the prevailing perception that the retail version of

4   Aliens: Colonial Marines would feature the Demo Engine and other aspects of the non-retail

5   version of the game by stating in pre-release interviews that the game was completed and ready to

6   ship to consumers.[6]

7       42.     For instance, when discussing and showing the non-retail version of Aliens: Colonial

8   Marines to the public, Mr. Pitchford explained that all *retail* versions of the game (i.e., console and

9   PC) would feature "deferred lighting," which was an advanced graphics feature that could be

10  produced by the Demo Engine. However, only *following* the retail release of Aliens: Colonial

11  Marines, did Mr. Pitchford admit that the retail version of Aliens: Colonial Marines did not feature

12  deferred lighting at all.[7]

13      43.     Defendants never publicly suggested—either through the "actual gameplay"

14  demonstrations themselves, interviews, advertisements, or other videos showing the non-retail

15  version of Aliens: Colonial Marines—that the game they had been showcasing to the purchasing

16  public was not representative of (and, in reality, was far superior to) the retail version of Aliens:

17  Colonial Marines that would be sold to consumers.

18      44.     Likewise, none of the "actual gameplay" demonstrations that took place in or after

19  2012 contained even the cursory "work in progress" disclaimer.

20      45.     In the end, *every* advertisement of the Aliens: Colonial Marines video game

21

22  [6]    *See* OXM.com, "Gearbox Talks Aliens: Colonial Marines," available online at
23  http://www.oxm.co.uk/32305/interviews/gearbox-talks-aliens-colonial-marines/ (last accessed July
     5, 2013) ("Now, we have a game. We are in production.").

24  [7]    *See* Destructoid.com, "Aliens: Colonial Marines to Use 'Next-Gen' lighting,"
     http://www.destructoid.com/aliens-colonial-marines-to-use-next-gen-lighting-225194.phtml (last
25  accessed July 5, 2013) ("It's very possible that *Aliens: Colonial Marines* is the first commercial
     product to ship with deferred lighting."). Pitchford later implicitly acknowledged on Twitter that the
26  version of Aliens: Colonial Marines actually shipped to consumers did not have deferred lighting.
     *See* Twitter, "@DuvalMagic," (Mar. 27, 2013, 12:10 PM) (last accessed July 5, 2013),
27  https://twitter.com/DuvalMagic/status/316990695141412864.

28

SECOND AMENDED CLASS ACTION COMPLAINT                          NO. 13-CV-01962-JD

distributed prior to the game's retail release showed the same non-retail version of the game and utilized "in-game" footage created by the same Demo Engine, both of which were used to create all "actual gameplay" demonstrations of the non-retail version of the game.

46.     Stated otherwise, if *any* consumer watched *any* gameplay video released by Defendants purporting to show footage of the Aliens: Colonial Marines video game prior to the game's release, they necessarily viewed the same product—i.e., the non-retail version of the game as rendered by the Demo Engine.

47.     Tellingly, although Aliens: Colonial Marines has now been available for public purchase for several months, Sega's website and official YouTube channel *still* contain *no* videos depicting the retail version of the game as rendered by the Retail Engine. But the 2011 E3 "actual gameplay" demonstration (featuring the non-retail version of Aliens: Colonial Marines and the Demo Engine), for example, remains.

48.     In all, the many "actual gameplay" demonstrations and other promotional materials featuring the non-retail version of Aliens: Colonial Marines and rendered from the Demo Engine were Defendants' method of advertising and served as public, pre-release guarantees: if you put your money down, you would receive *at least* what you saw in the demos, including a graphics and game engine capable of the producing the advertised qualities and features (e.g., advanced artificial intelligence, exiting gameplay sequences, dynamic moving light sources, detailed and differentiated textures, particle effects, custom animations, and dynamic weather effects) that had won the demos so much praise.

***The public reception of Aliens: Colonial Marines following its retail release***

49.     Following its public release on February 12, 2013—at which time the game went on sale for between $50.00 and $100.00 (depending on whether the game was purchased for the PC, console (i.e., the Sony PlayStation 3 or Microsoft Xbox 360), or whether a special "Collector's Edition" was purchased)—Aliens: Colonial Marines drew immediate concerns and criticisms regarding the quality of and features present in the final retail product, which earned

1   overwhelmingly poor reviews from industry reporters.

2        50.     While poorly received videogames are certainly nothing new, the Aliens: Colonial

3   Marines retail game immediately drew stunning and specific comparisons between the retail

4   product and the "actual gameplay" demonstrations that were showcased by Defendants.

5        51.     Several industry reviewers and critics immediately weighed in with their surprise.

6   One, for example, noted that "the demo look[ed] nothing like the final game . . . [and that the]

7   differences are shocking. Most of the lighting effects and textures have been pared down to a

8   stunning degree."[8]

9        52.     Another noted that "none of the gameplay shown [in the 'actual gameplay' demo]

10  ever happens, and we were never told [the 'actual gameplay demonstration'] was just

11  conceptual  . . . When screens from the previous demo are compared to the finish[ed] product, the

12  lack of environmental detail, dated lighting effects, and linear-to-a-fault gameplay become

13  apparent. Games shown at E3 don't suddenly look worse as development continues. Like early

14  trailers for Hollywood blockbusters, graphics and gameplay in early game demos get repeatedly

15  touched-up and expanded for release."[9]

16       53.     Outrage over the discrepancy between the advertised and retail versions of Aliens:

17  Colonial Marines was so great that two critics from VideoGamer.com assembled a short film that

18  compared—scene-by-scene—the footage Defendants' had previously presented as "actual

19  gameplay" with the retail product sold to the public. [10] Among other differences, those critics noted:

20            a.     Everything in the E3 2012 "actual gameplay" demonstration had a "much

21                   higher [graphical] resolution" than the retail version of the game;

---

22  [8]     Eurogamer.net, "Aliens: Colonial Marines' demo looked much prettier than the final game,"
23  http://www.eurogamer.net/articles/2013-02-13-aliens-colonial-marines-demo-looked-much-prettier-
    than-the-final-game (last accessed July 5, 2013).

24  [9]     Destructoid.com, "Gearbox lied about Aliens: From E3 demo to retail product,"
    http://www.destructoid.com/gearbox-lied-about-aliens-from-e3-demo-to-retail-product-
25  244966.phtml (last accessed July 5, 2013).

26  [10]    VideoGamer.Com, "What the Hell Happened to Aliens: Colonial Marines,"
    http://www.videogamer.com/videos/aliens_colonial_marines_what_the_hell_happened_to_aliens_c
27  olonial_marines_2.html (last accessed July 5, 2013).

28

SECOND AMENDED CLASS ACTION COMPLAINT                          NO. 13-CV-01962-JD

b.    Extreme differences in lighting throughout the gameplay, with the demonstration utilizing advanced dynamic lighting effects (i.e., lighting that is rendered on the fly by the game's graphic engine), that was "not the same at all" as the retail product, which, in many circumstances, included "no dynamic lighting;"

c.    "A lot of the textures changed" for the worse in the retail game as compared to the E3 2012 "actual gameplay" demonstration;

d.    Many "custom animations" present in the E3 2012 "actual gameplay" demonstration are missing from the retail game;

e.    The E3 2012 "actual gameplay" demonstration used "dynamic" weather effects (i.e., generated by the Demo Engine), whereas the retail product used pre-rendered weather effects, which is "completely different;"

f.    The technology included and showcased in the E3 2012 "actual gameplay" demonstration is simply not present in the retail version; and

g.    Many "iconic" gameplay sections showcased in the E3 2012 "actual gameplay" demonstration are not present in the retail version.

54.    To make matters worse, the VideoGamer.com video additionally noted that the comparisons it made were based on the PC version of the Aliens: Colonial Marines game, which has the potential to display a better overall graphic resolution relative to the Xbox 360 and PlayStation 3 versions of the game (which, in comparison, are limited in their hardware capabilities and, as a result, look even worse).

55.    These are not nitpicky or subjective distinctions reliant upon particular tastes or opinions. A videogame's game and graphics engine drive the entire experience. Features such as dynamic lighting and weather effects, high-resolution graphics, custom animations, and robust artificial intelligence (all of which were featured in the "actual gameplay" demonstrations utilizing the non-retail version of Aliens: Colonial Marines) require a sophisticated graphics engine and

advanced programming. Pre-rendered lighting and weather effects, and low-resolution graphics (all of which are present in the retail version of Aliens: Colonial Marines) do not.

56.     Likewise, a major selling point of the "actual gameplay" demonstrations were "iconic" gameplay sections where consumers might essentially step into the role of a character from the Aliens movie. Many such sections previewed in the "actual gameplay" demonstrations, which utilized the non-retail version of the game, were either gutted beyond recognition or missing entirely from the retail product.

57.     In addition, a key aspect of the pre-release demos was the lively and intelligent movement, adaptation, and reactiveness of the game's antagonists—the eponymous aliens—which were directed by innovative artificial intelligence programming produced by the non-retail version of Aliens: Colonial Marines. The retail version of the game, however, utilized rudimentary artificial intelligence programming that bore little, if any, resemblance to the one previewed in Defendants' "actual gameplay" demonstrations.

58.     In short, the advertised and promised "actual gameplay"—touted again and again by Defendants as *the* reason to buy—was not delivered in the retail product sold to consumers.

***Defendants acknowledge the "discrepancies" between the Aliens: Colonial Marines retail product and "actual gameplay" demonstrations featuring the non-retail version of the game.***

59.     Prior to Aliens: Colonial Marines's public release, only Defendants could have known that the retail version of the game they would ultimately sell to consumers bore little resemblance to the "actual gameplay" demonstrations, and all advertising generated therefrom, that they championed between E3 2011 and February 2013.

60.     A long-time videogame industry critic, Jim Sterling, summed up his (and many others') disappointment and surprise by explaining that "[i]t's rare, in all my years, to see a demo so unrepresentative of the finished product. Even worse, I've never seen a demo that looks so much BETTER than the finished product … The 'work in progress' warning attached to demos is to warn you the [final] product doesn't look [as rough as the demo]. This may be the first game I've covered

SECOND AMENDED CLASS ACTION COMPLAINT                    NO. 13-CV-01962-JD

where it meant the opposite. Gearbox's definitely on the hook for dishonesty…."[11]

61.     At no time before the public release of Aliens: Colonial Marines, did Defendants explain—in any forum—that the "actual gameplay" demonstrations were not representative of the retail version of the game that was ultimately sold to consumers or utilized the vastly superior Demo Engine.

62.     To make matters worse, Defendants utilized a "review embargo" that prohibited any critics or industry game reviewers from publishing reviews and/or feedback about the retail version of the game until on or after Aliens: Colonial Marines's release date (i.e., on or after February 12, 2013).

63.     Thus, no consumer who purchased the retail version of Aliens: Colonial Marines game before or on release day could have been aware that the product was "not as advertised" until playing it for him or herself.

64.     The ramifications of this scenario are obvious: because retailers do not allow new video games to be returned after they are opened and/or played (i.e., once the shrink-wrapped packaging has been opened, or once the game has been activated on a PC, in cases where it has been downloaded), every gamer was stuck with his or her purchase.

65.     The vitriol surrounding Aliens: Colonial Marines caused an unprecedented and immediate drop in the game's price. While new video game releases will typically retain their opening retail price point for at least several months (and can be bought "used" at some retailers for a meager five dollar discount), Aliens: Colonial Marines was—within a *month* of its release—sold at discounted prices, at times cutting nearly thirty dollars ($30) of its price point at major retailers. Worse still, as soon as four months after release, the game could be purchased *new* for as little as five dollars ($5) from certain major retailers.

66.     In response to the massive media and consumer backlash following Aliens: Colonial

---

[11]     Destructoid.com, "Gearbox lied about Aliens: From E3 demo to retail product," http://www.destructoid.com/gearbox-lied-about-aliens-from-e3-demo-to-retail-product-244966.phtml (last accessed July 5, 2013).

Marines's public release, Mr. Pitchford quickly "acknowledged the discrepancy between the Aliens: Colonial Marines hands-off demo and the final game," but only promised that gamers' desire for an explanation as to why the demo looked so much better "is understood and fair and we are looking at that. Lots of info to parse, lots of stake holders to respect."[12]

67.     Defendants also acknowledged the discrepancy in response to a consumer complaint submitted to the UK Advertising Standards Authority, which claimed that pre-release trailers of Aliens: Colonial Marines "did not accurately reflect the final content of the game." In response to that complaint, Defendants "acknowledged" the claim and agreed to (and did in fact) add disclaimers to the advertising material used through their European advertising channels explaining that "the trailers depict footage of the demo versions of the game" rather than the retail version of the game.

68.     Despite these acknowledgements overseas, Defendants continue to host and promote videos of the "actual gameplay" demonstrations of Aliens: Colonial Marines through various online channels—all of which feature the non-retail version of the game.

69.     Unfortunately, each of the thousands of consumers who purchased or pre-purchased Aliens: Colonial Marines were duped into paying full price for a product that—as agreed by nearly every industry critic to review the title—delivered few (if any) of the real promises made by Defendants.

### FACTS RELATING TO PLAINTIFF JOHN LOCKE

70.     Plaintiff John Locke first learned that the Aliens: Colonial Marines game was in development around the time of its initial announcement, in or around December 2006.

71.     Over the next several years, Locke followed Aliens: Colonial Marines's progress and delays, primarily using industry websites.

72.     In or about the summer of 2012, and like thousands of other gamers, Locke viewed

---

[12]     Eurogamer.net, "Aliens: Colonial Marines' demo looked much prettier than the final game," available online at http://www.eurogamer.net/articles/2013-02-13-aliens-colonial-marines-demo-looked-much-prettier-than-the-final-game (last accessed July 5, 2013).

the E3 2012 "actual gameplay" demonstration of Aliens: Colonial Marines on a webpage hosted on www.ign.com. Among the features and qualities of the non-retail version of the game shown in the E3 2012 "actual gameplay" demonstration, Locke was particularly interested in the advanced artificial intelligence, exiting gameplay sequences, and the game's demonstrated graphical fidelity—including its use of dynamic moving light sources, detailed and differentiated textures, particle effects, custom animations, and immersive dynamic weather effects.

73.    As an avid fan of the series, Locke further viewed all of Defendant's short form commercials, which were generated using the non-retail version of the game, and developer diaries, which featured footage rendered from the Demo Engine.

74.    Based upon the many "actual gameplay" demonstrations he had seen, all of which were created by and rendered from the non-retail version of Aliens: Colonial Marines and the Demo engine, Locke decided to pre-purchase a copy of Aliens: Colonial Marines in the fall of 2012.

75.    Locke chose to pre-purchase a "Collector's Edition" of the game for PlayStation 3 from Amazon.com for approximately one hundred dollars ($100).

76.    As Aliens: Colonial Marines neared its retail release date, Locke became concerned that a playable demo (i.e., one that could be actually downloaded and played by *consumers*, as opposed to the "actual gameplay" demonstrations that had been controlled by Gearbox representatives) had not been released—but, satisfied that the "actual gameplay" demonstrations accurately described the product he'd committed over one hundred dollars ($100) towards, Locke did not cancel his pre-purchase.

77.    Had Locke known that the features of the non-retail release of the game depicted in the "actual gameplay" demonstrations (i.e., the advanced artificial intelligence, exciting gameplay sequences, dynamic moving light sources, detailed and differentiated textures, particle effects, custom animations, and dynamic weather effects) were not present in the Aliens: Colonial Marines retail product, he would have either waited to purchase the game and taken advantage of the price drops that occurred shortly after its public release, or not purchased the game at all.

SECOND AMENDED CLASS ACTION COMPLAINT                    No. 13-CV-01962-JD

78.     Likewise, had Locke known that the retail version of Aliens: Colonial Marines did not utilize the Demo Engine like every "actual gameplay" demonstration he had viewed, he would have either waited to purchase the game, or not purchased it at all.

79.     Locke received his copy of the Aliens: Colonial Marines game through the mail on February 12, 2013.

80.     That same day, Locke opened and played the Collector's Edition version of Aliens: Colonial Marines he had pre-ordered and received from Amazon.com and immediately recognized that the retail product was markedly different—and much worse—than the "actual gameplay" demonstrations he had viewed previously.

81.     In the end, had Locke known of the *actual* quality of the *retail* version of Aliens: Colonial Marines, he would not have pre-purchased the game.

82.     Unfortunately for Locke, all public criticism of the retail version of Aliens: Colonial Marines was only published *following* its release. Had the same articles been published before the game's release on February 12, 2013, or had Defendants publicly explained that the "actual gameplay" demos were not representative of the retail version of Aliens: Colonial Marines or utilized a non-retail graphics engine (i.e., the Demo Engine), Locke would have cancelled his pre-order and not spent one hundred dollars on the title.

## CLASS ALLEGATIONS

83.     Plaintiff John Locke brings this action pursuant to Fed. R. Civ. P. 23(b)(3) on behalf of himself and the following class:

> All persons in the United States who paid for a copy of the Aliens: Colonial Marines video game either on or before February 12, 2013.

84.     Excluded from the Class are Defendants, their legal representatives, assigns and successors, and any entity in which Defendants have a controlling interest. Also excluded is the judge to whom this case is assigned and the judge's immediate family, as well as any individual who contributed to the design, development, and deployment of Defendants' video game products.

85.     **Numerosity**: The exact number of members of the Class is unknown to Plaintiff at

1   this time, but thousands of consumers—both in California and nationwide—pre-ordered and/or

2   purchased Aliens: Colonial Marines on or before February 12, 2013, making joinder of each

3   individual member impracticable. Based on publically available information, there were, at a

4   minimum, approximately 300,000 pre-orders.[13]

5   86.   **Typicality**: Plaintiff's claims are typical of the claims of the other members of the

6   Class. Plaintiff and the Class sustained damages as a result of Defendants' uniform wrongful

7   conduct as described above. Plaintiff's claims are typical of the claims of all of the other members

8   of the Class.

9   87.   **Adequate Representation:** Plaintiff will fairly and adequately represent and protect

10  the interests of the Class, and has retained counsel competent and experienced in complex

11  litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and

12  Defendants have no defenses unique to Plaintiff. Plaintiff and his counsel are committed to

13  vigorously prosecuting this action on behalf of the members of the Class, and have the financial

14  resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other

15  members of the Class.

16  88.   **Commonality and Predominance:** Common questions of law and fact exist as to

17  all members of the Class and predominate over any questions affecting only individual members,

18  including, *inter alia*:

19         a.   Whether Defendants made false statements, promises, and/or descriptions

20              (along with the nature of those statements, promises, and/or descriptions)

21              regarding the features and gameplay content of the Aliens: Colonial Marines

22              video game;

23         b.   Whether such false statements, promises, and/or descriptions were made by

24              Defendants to deceive consumers into purchasing their product;

25         c.   Whether Defendants in fact included such features and gameplay content

26  ───────────────

27  [13]   *See* http://www.vgchartz.com/article/250757/usa-preorders-chart-9-february-2013-aliens-colonial-marines/ (last accessed July 5, 2013).

28

SECOND AMENDED CLASS ACTION COMPLAINT                    NO. 13-CV-01962-JD

with the retail copies of the Aliens: Colonial Marines video game;

    d.    Whether Defendants gave timely notice to their customers that they would not include such features and gameplay content with purchased copies of the Aliens: Colonial Marines video game;

    e.    Whether Defendants' conduct violated Cal. Civ. Code §§ 1750 *et seq.*;

    f.    Whether Defendants' conduct violated Cal. Civ. Code §§ 1720 *et seq.*;

    g.    Whether Defendants' conduct violated Cal. Bus. & Prof. Code §§ 17500 *et seq.*; and

    h.    Whether Plaintiff and the Class are entitled to relief, and the nature of such relief.

89.    **Superiority:** This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class will be small (i.e., less than Aliens: Colonial Marines's release-day retail price) relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

90.    **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of

SECOND AMENDED CLASS ACTION COMPLAINT        No. 13-cv-01962-JD

conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the other members of the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Class.

91.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned in discovery.

**FIRST CAUSE OF ACTION**
**Violation of the Consumer Legal Remedies Act**
**Cal. Civ. Code §§ 1750 *et seq.***
**(On Behalf of Plaintiff and the Class)**

92.     Plaintiff incorporates by reference the foregoing allegations.

93.     The Consumers Legal Remedies Act ("CLRA") applies to Defendants' actions and conduct as described herein because it extends to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

94.     Defendants are "persons" as defined by Cal. Civ. Code § 1761(c).

95.     Plaintiff and each member of the Class are "consumers" as defined by Cal. Civ. Code § 1761(d).

96.     The Aliens: Colonial Marines video game is a "good" within the meaning of Cal. Civ. Code § 1761(a).

97.     As described herein, Defendants have engaged in deceptive practices, unlawful methods of competition, and/or unfair acts as defined by Cal. Civ. Code §§ 1750 *et seq.*, to the detriment of Plaintiff and the Class.

98.     Defendants, acting with knowledge, intentionally and unlawfully brought harm upon Plaintiff and the Class by representing that the video game Aliens: Colonial Marines would be of a

SECOND AMENDED CLASS ACTION COMPLAINT                    NO. 13-CV-01962-JD

certain quality and contain those specific features of the non-retail version that were shown in the "actual gameplay" demonstrations when in fact Defendants were unwilling or unable to release a retail product consistent with those representations.

99. Specifically, Defendants violated Cal. Civ. Code § 1750 in at least the following respects:

        a. In violation of § 1770(5), representing that the Aliens: Colonial Marines video game had characteristics, ingredients, uses, benefits, or quantities which it did not have;

        b. In violation of § 1770(7), representing that the Aliens: Colonial Marines video game was of a particular standard, quality, or grade of which it is not;

        c. In violation of § 1770(9), advertising the Aliens: Colonial Marines video game with the intent not to sell their goods as advertised.

100. Defendants' unfair or deceptive acts or practices were capable of deceiving a substantial portion of the purchasing public.

101. Defendants knew that they were unable or unwilling to include in the retail version of Aliens: Colonial Marines the qualities and specific features of the non-retail version of the game that were shown in the "actual gameplay" demonstrations at the time they made representations claiming they would be included and at the time the game became available for purchase.

102. Once Defendants made specific public representations regarding the quality and characteristics of their product through their "actual gameplay" demonstrations, Defendants were under a duty to Plaintiff and the Class to disclose their inability or unwillingness to include those qualities and specific features in the retail version of Aliens: Colonial Marines video game because:

        a. Defendants were in a superior position to know the true state of facts about what features would and would not (or could and could not) be included in the Aliens: Colonial Marines video game;

        b. Plaintiff and the Class Members could not reasonably have been expected to

SECOND AMENDED CLASS ACTION COMPLAINT        No. 13-cv-01962-JD

1    learn or discover that Defendants were unable or unwilling to include certain

2    features in the release version of the Aliens: Colonial Marines video game;

3    c.    Defendants knew that Plaintiff and the Class Members could not reasonably

4    have been expected to learn or discover that Aliens: Colonial Marines did not

5    in fact release with the qualities and specific features shown in the "actual

6    gameplay" demonstrations; and

7    d.    Defendants knew, and in fact intended, that Plaintiff and the Class Members

8    would rely on Defendants' public representations, including the "actual

9    gameplay" demonstration, in choosing whether or not to purchase Aliens:

10    Colonial Marines.

11    103.    In failing to disclose their inability or unwillingness to include in the retail version of

12    Aliens: Colonial Marines the qualities and specific features of the non-retail version that were

13    shown in the "actual gameplay" demonstrations, Defendants have knowingly and intentionally

14    concealed material facts and breached their duty not to do so.

15    104.    The facts concealed or not disclosed by Defendants to Plaintiff and the Class are

16    material in that a reasonable consumer would have considered them to be important in deciding

17    whether to pre-order or purchase a copy of the Aliens: Colonial Marines video game in the first

18    place, whether or not to cancel a pre-ordered copy of the Aliens: Colonial Marines video game,

19    whether to purchase the game at the time of its initial release, or whether to pay a discounted price

20    for the game.

21    105.    Plaintiff and the Class reasonably expected their copies of Aliens: Colonial Marines

22    to include the qualities and specific features shown in the "actual gameplay" demonstrations based

23    on Defendants' continuous and consistent public representations. Plaintiff's and Class members'

24    expectations were reasonable under the circumstances.

25    106.    The inclusion of the qualities and specific features shown in the "actual gameplay"

26    demonstrations in the retail version of Aliens: Colonial Marines is and was a material selling point

27

28

1    of Aliens: Colonial Marines, and a primary reason to purchase the game.

2         107.    Plaintiff and Class Members relied on the representations made by Defendants about

3    the inclusion of the qualities and specific features shown in the "actual gameplay" demonstrations

4    in the retail version of Aliens: Colonial Marines when purchasing the video game.

5         108.    Defendants' false representations about the inclusion in the retail version of Aliens:

6    Colonial Marines of the qualities and specific features of the non-retail version of Aliens: Colonial

7    Marines that were shown in the "actual gameplay" demonstrations was an act likely to mislead

8    Plaintiff and members of the Class acting reasonably under the circumstances.

9         109.    Through the misrepresentations and omissions detailed herein, Defendants

10   wrongfully induced Plaintiff and the other members of the Class to purchase Aliens: Colonial

11   Marines when they otherwise would not have purchased the game or would only have agreed to

12   purchase it at a lower price.

13        110.    As a direct and proximate result of Defendants' violation of Cal. Civ. Code §§ 1750,

14   *et seq.*, Plaintiff and each Class member have suffered harm in the form of paying monies to

15   Defendants without receiving the entire benefit of their bargain.

16        111.    Under Cal. Civ. Code § 1780(a) and (b), Plaintiff, individually and on behalf of the

17   Class, seeks an injunction requiring Defendants to cease and desist the illegal conduct alleged in

18   this Complaint, and all other appropriate remedies for their violations of the CLRA. For the sake of

19   clarity, Plaintiff explicitly disclaims any claim for damages under the CLRA at this time.

20                              **SECOND CAUSE OF ACTION**
                     **Violations of the Unfair Competition Law**
21                    **Cal. Bus. & Prof. Code §§ 17200 *et seq.***
                       **(On Behalf of Plaintiff and the Class)**
22
          112.    Plaintiff incorporates by reference the foregoing allegations.

23        113.    California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code §§ 17200, *et*

24   *seq.*) protects both consumers and competitors by promoting fair competition in commercial

25   markets for goods and services.

26        114.    The UCL prohibits any unlawful, unfair or fraudulent business act or practice. A

27

28                                          24

---

business practice need only meet one of the three criteria to be considered unfair competition. An unlawful business practice is anything that can properly be called a business practice and that at the same time is forbidden by law.

115. As described above, Defendants have violated the unlawful prong by violating the CLRA.

116. Plaintiff and the Class reasonably expected the Aliens: Colonial Marines video game to include the qualities and specific features of the non-retail version of the game that were shown in the "actual gameplay" demonstrations. Plaintiff's and Class members' expectations were reasonable under the circumstances.

117. Defendants have violated the fraudulent prong of the UCL by knowingly and willfully making false and misleading claims to the public regarding their willingness or ability to include in the retail version of Aliens: Colonial Marines the qualities and specific features of the non-retail version that were shown in the "actual gameplay" demonstrations.

118. Defendants violated the unfair prong of the UCL by representing that they would include in the retail version of Aliens: Colonial Marines the qualities and specific features of the non-retail version of the game that were shown in the "actual gameplay" demonstrations, when in fact they were unable or unwilling to do so.

119. Defendants' false representations made through and along with the "actual gameplay" demonstrations shown throughout 2011 and 2012 regarding the qualities and specific features of Aliens: Colonial Marines, were acts likely to mislead Plaintiff and members of the Class acting reasonably under the circumstances, and constitute a deceptive trade practice in violation of the UCL.

120. In failing to disclose their inability or unwillingness to include in the retail version of Aliens: Colonial Marines the qualities and specific features of the non-retail version that were shown in the "actual gameplay" demonstrations, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

121.    Defendants have violated the fraudulent prong of the UCL by knowingly and willingly failing to include in the retail version of Aliens: Colonial Marines the qualities and specific features of the non-retail version that were shown in the "actual gameplay" demonstrations.

122.    As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent acts, Plaintiff and each Class member have suffered injury in fact and lost money by purchasing Aliens: Colonial Marines and/or paying more than they would have if Defendants informed them that the qualities and specific features shown in the "actual gameplay" demonstrations would not be included in the retail version of the Aliens: Colonial Marines video game.

123.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order (1) requiring Defendants to cease the unfair practices described herein; (2) requiring Defendants to restore to Plaintiff and each Class member any money acquired by means of unfair competition (restitution); and, (3) awarding reasonable costs and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.

**THIRD CAUSE OF ACTION**
**Violation of False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500 *et seq.***
**(On Behalf of Plaintiff and the Class)**

124.    Plaintiff incorporates by reference the foregoing allegations.

125.    Defendants engaged in advertising and marketing to the public, and offered for sale the video game Aliens: Colonial Marines on a nationwide basis, including in California. Defendants publically represented and advertised that the qualities and specific features shown in the "actual gameplay" demonstrations would be included in the retail version of the Aliens: Colonial Marines video game. Defendants did so with the intent to induce Plaintiff and the Class members to purchase and continue using the Aliens: Colonial Marines game.

126.    Defendants' advertising and marketing statements were untrue and misleading and likely to deceive the public in that the public statements portrayed the inclusion of specific features or qualities for Aliens: Colonial Marines that Defendants knew or should have known they were unwilling or unable to deliver.

127.     In making and disseminating the statements alleged herein, Defendants knew or should have known that their statements were false and misleading and therefore in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

128.     Plaintiff and members of the Class relied on Defendants' statements in deciding to pre-order and/or purchase Aliens: Colonial Marines.

129.     As a direct and proximate result of Defendants' false advertising, Plaintiff and the Class have suffered injury in fact and lost monies to Defendants.

130.     Plaintiff seeks an order (1) requiring Defendants to cease the false advertising practices described herein; (2) requiring Defendants to restore to Class members any money acquired by means of false advertising (restitution); and, (3) awarding reasonable costs and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.

### FOURTH CAUSE OF ACTION
**Breach of Express Warranties**
**(On Behalf of Plaintiff and the Class)**

131.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

132.     Defendants advertised and otherwise represented to Plaintiff and the members of the Class that when they purchased a copy of the Aliens: Colonial Marines video game, the game would include the qualities and specific features of the non-retail version of the game that were shown in the "actual gameplay" demonstrations.

133.     Defendants' statements were affirmations of fact or a promise made by Defendants about the Aliens: Colonial Marines game sold by or on behalf of Defendants, or otherwise constitute a description of the Aliens: Colonial Marines game. As such, Defendants expressly warranted that copies of the Aliens: Colonial Marines game, sold by or on behalf of Defendants, would include the qualities and specific features shown in the "actual gameplay" demonstrations.

134.     Plaintiff and the members of the Class relied upon those affirmations, promises, and descriptions when pre-ordering and/or purchasing the Aliens: Colonial Marines video game.

135.     Defendants, under the California Commercial Code, were obliged to deliver Aliens:

SECOND AMENDED CLASS ACTION COMPLAINT                    NO. 13-CV-01962-JD

1    Colonial Marines as advertised, promised, and/or described.

2    　　　136.　　Defendants' failure to include the qualities and specific features shown in the "actual

3    gameplay" demonstrations in purchased copies of Aliens: Colonial Marines breached their express

4    warranty to include such qualities and specific features with those purchases.

5    　　　137.　　Because they did not receive the Advertised Features in their purchased copy of

6    Aliens: Colonial Marines, Plaintiff and the members of the Class have been damaged insofar as

7    they did not receive the benefit of their bargain.

8    　　　138.　　By serving this Complaint, Plaintiff and the Class hereby give Defendants notice that

9    they have breached the express warranties described above. Plaintiff and the members of the Class

10   request maximum damages under the California Commercial Code.

11                          **FIFTH CAUSE OF ACTION**
                            **Fraud in the Inducement**
12                      **(On Behalf of Plaintiff and the Class)**

13   　　　139.　　Plaintiff incorporates by reference the foregoing allegations.

14   　　　140.　　As detailed herein, Defendants misrepresented and/or failed to disclose material facts

15   regarding the inclusion of the qualities and specific features shown in the "actual gameplay"

16   demonstrations in the retail version of the Aliens: Colonial Marines video game.

17   　　　141.　　Through the misrepresentations and omissions detailed herein, Defendants

18   wrongfully induced Plaintiff and the other members of the Class to purchase Aliens: Colonial

19   Marines when they otherwise would not have purchased the game or would only have agreed to

20   purchase it at a lower price.

21   　　　142.　　Defendants knew or should have known that their misstatements and omissions

22   regarding the inclusion in the retail version of Aliens: Colonial Marines of the qualities and specific

23   features of the non-retail version that were shown in the "actual gameplay" demonstrations were

24   false, misleading, incomplete, and deceptive, and would cause Plaintiff and Class members to

25   choose to purchase the Aliens: Colonial Marines video game when they otherwise would not have

26   purchased the game or would only have agreed to purchase it at a lower price.

27

28

SECOND AMENDED CLASS ACTION COMPLAINT                              NO. 13-CV-01962-JD

143.   Defendants intended that consumers rely upon the misstatements and omissions detailed in this Complaint in purchasing the Aliens: Colonial Marines video game.

144.   Defendants knew that consumers were relying upon the misstatements and omissions detailed in this Complaint in purchasing the Aliens: Colonial Marines video game.

145.   Plaintiff and the members of the Class relied upon those misstatements when purchasing the Aliens: Colonial Marines video game.

146.   In deceiving Plaintiff and the other members of the Class regarding the inclusion of the qualities and specific features shown in the "actual gameplay" demonstrations in the retail version of the Aliens: Colonial Marines video game, Defendants have engaged in fraudulent conduct designed to induce consumers to purchase the Aliens: Colonial Marines game.

147.   As a proximate result of Defendants' violations of law and wrongful conduct alleged herein, Plaintiff and members of the Class have suffered damages in the form of monies paid to Defendants.

## SIXTH CAUSE OF ACTION
### Negligent Misrepresentation
### (On Behalf of Plaintiff and the Class)

148.   Plaintiff incorporates by reference the foregoing allegations.

149.   Through their public statements and marketing materials, Defendants represented to Plaintiff and the members of the Class that the qualities and specific features of the non-retail version of the game that were shown in the "actual gameplay" demonstrations would be included in the retail version of Aliens: Colonial Marines.

150.   Through each "actual gameplay" demonstration, Plaintiff and the members of the Class were exposed to representations made by Defendants regarding the inclusion of the specific qualities and features in the retail version of Aliens: Colonial Marines. Those representations were repeated on and through various websites and publications throughout 2011 and 2012.

151.   Those representations were false, and at the time such false statements were made, Defendants knew or should have known of their falsity or, at the very least, Defendants acted with

SECOND AMENDED CLASS ACTION COMPLAINT                    No. 13-CV-01962-JD

negligence and carelessness in ascertaining the truth of the statements. Defendants knew or should have known that they were unwilling or unable to include the qualities and specific features shown in the "actual gameplay" demonstrations in the retail version of Aliens: Colonial Marines. Defendants did not have any reasonable ground for believing their statements to be true.

152.   Defendants intended that Plaintiff and the members of the Class rely on their misrepresentations and omissions by purchasing the Aliens: Colonial Marines video game.

153.   Defendants knew that their affirmative statements about the qualities and specific features shown in the "actual gameplay" demonstrations had been widely disseminated on video game related websites and in other publications, and further understood, and intended, that their current and future customers would see those statements.

154.   Defendants had a duty to not make the above-described misrepresentations, and to take steps to correct any further dissemination of such misrepresentations before the Aliens: Colonial Marines video game was released to the public for purchase.

155.   However, Defendants did not take any steps to correct, clarify, or prevent further dissemination of their false representations about the qualities and specific features shown in the "actual gameplay" demonstrations.

156.   Plaintiff and Class Members justifiably relied on Defendants' misrepresentations by purchasing the Aliens: Colonial Marines video game, and were unaware of the falsity of Defendants' statements at the time they were made.

157.   As a direct and proximate result of Defendants' misrepresentations, Plaintiff and the members of the Class suffered damages in the form of monies paid to purchase Defendants' product when they otherwise would not have purchased the game or would only have agreed to purchase it at a lower price.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for the following relief:

SECOND AMENDED CLASS ACTION COMPLAINT                    NO. 13-CV-01962-JD

A.      Certify this case as a class action on behalf of the Class defined above, appoint John Locke as class representative, and appoint his counsel as class counsel;

B.      Declare that Defendants' actions, as described herein, violate the CLRA (Cal. Civ. Code §§ 1750, *et seq.*); the UCL (Cal. Bus. & Prof. Code §§ 17200 *et seq.*); the FAL (Cal. Bus. & Prof. Code §§ 17500, *et seq.*); the California Commercial Code (Cal. Com. Code § 2313); and constitute fraud in the inducement and negligent misrepresentation;

C.      Award all economic, monetary, actual, consequential, statutory and compensatory damages caused by Defendants' conduct, and if the conduct is proven to be willful, award Plaintiff and the Class exemplary damages;

D.      Award injunctive relief as necessary to cease Defendants' violations of Cal. Bus. & Prof. Code §§ 17200 *et seq.* and §§ 17500, *et seq.*, and Cal. Civ. Code §§ 1750, *et seq.*;

E.      Award Plaintiff and the Class equitable relief, including, but not limited to, restitution in the form of disgorgement of all revenue derived from sales of Aliens: Colonial Marines;

F.      Award Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

G.      Award Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

H.      Enter such other injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

I.      Award such other and further relief as equity and justice may require.

### JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

1

2

Dated June 26, 2014

Respectfully Submitted,

3

**JOHN LOCKE** individually and on behalf of a class of similarly situated individuals,

4

By:  s/ Benjamin S. Thomassen

5

6

Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Benjamin S. Thomassen (Admitted *Pro Hac Vice*)
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

7

8

9

10

11

Mark S. Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251

12

13

14

15

*Attorneys for Plaintiff John Locke
and the Putative Class*

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT                                      No. 13-cv-01962-JD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I, Benjamin S. Thomassen, an attorney, hereby certify that on June 26, 2014, I served the above and foregoing ***Second Amended Class Action Complaint***, by causing a true and accurate copy of such paper to be filed and served upon all counsel of record via the Court's CM/ECF electronic filing system.

s/ Benjamin S. Thomassen

SECOND AMENDED CLASS ACTION COMPLAINT                    No. 13-cv-01962-JD