ROBERT M. SCHWARTZ (S.B. #117166)
  rschwartz@omm.com
VICTOR JIH (S.B. #186515)
  vjih@omm.com
HARRISON A. WHITMAN (S.B. #261008)
  hwhitman@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Seventh Floor
Los Angeles, California 90067-6035
Telephone:    (310) 553-6700

Attorneys for Defendant Gearbox Software, LLC

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

DAMION PERRINE, and JOHN LOCKE, individually and on behalf of a class of similarly situated persons,

    Plaintiffs,

v.

SEGA OF AMERICA, INC., and GEARBOX SOFTWARE, L.L.C.,

    Defendants.

Case No. 3:13-CV-01962 JD

**DECLARATION OF STEVE GIBSON IN SUPPORT OF DEFENDANT GEARBOX'S MOTION FOR PARTIAL SUMMARY JUDGMENT (CLAIMS 1-4)**

Hearing Date:  September 10, 2014
Time:          9:30 a.m.
Courtroom:     11
Judge:         Hon. James Donato

# DECLARATION OF STEVE GIBSON

I, STEVE GIBSON, do hereby declare as follows:

I submit this declaration in support of Gearbox Software's Motion for Partial Summary Judgment (Claims 1-4). I am Vice President of Marketing for Gearbox Software, and I have worked at Gearbox since 2009. The facts set forth herein are known to me of my own personal and firsthand knowledge, and if called as a witness, I could and would testify competently thereto.

*Background*

1. Gearbox began in 1999. Gearbox is an independent video game developer. By "independent," I mean that Gearbox is not owned by or affiliated with any one video game publisher—*i.e.*, the company that replicates the game discs, markets and advertises the game, and sells it to retailers, wholesalers, and others who sell it to the public. This gives Gearbox the freedom to work with different publishers and on different projects.

2. Gearbox has created some of the industry's most popular games. For years, Gearbox has worked to develop a loyal fan base and industry respect. We are dedicated to our work and our fans, and to the development of the highest quality video games.

3. In 2006, Gearbox and Sega began discussing the possibility of Sega engaging Gearbox to develop the video game software for a game based on the *Aliens* motion pictures (*Alien*, *Aliens*, *Alien 3*, and *Alien: Resurrection*). Those discussions resulted in Sega and Gearbox entering a Development Agreement in late 2006. True and correct copies of sections 1.1, 2.1, 6.1, 7.3, 8.1, and 9.1 from the Development Agreement dated October 5, 2006 are attached hereto as Exhibit A.

4. Under the Development Agreement, Sega reserved to itself absolute discretion over the game's marketing, advertising, and sale. Sega also was the owner of copyrights in the game. On that latter point, the game was a "work for hire" by Gearbox for Sega, under a contract in which Gearbox was hired to write the software in accordance with specifications ("milestones") that Sega approved.

5. With the agreement in place, Gearbox began developing the software for the game, which was eventually titled *Aliens: Colonial Marines ("A:CM")*. To develop the software, Gearbox utilized the Unreal "game engine," licensed from Epic Games; this was the only game engine Gearbox used in the design and development of the game. Contrary to what some believe, the pre-release demonstrations were not made using different game engines.

6. During the development process, Gearbox supplemented Sega's development budget with its own money to help Sega finish its game; Gearbox's contributions to *A:CM* totaled millions, none of which was ever repaid. Gearbox never received money from Sega's *A:CM* purchasers, nor has Gearbox received a single royalty from any such sales by Sega.

7. Sega approved every milestone submission from Gearbox throughout *A:CM's* development. Gearbox eventually completed and delivered the software in accordance with Sega's specifications, which Sega vetted, approved and accepted.

### *Sega Promotes and Releases Aliens: Colonial Marines*

8. Beginning in mid-2011, Sega launched its marketing plan for *A:CM*. In July 2011, Sega sponsored a live gameplay demonstration at the video game industry's annual convention, known as "E3," in Los Angeles. The demonstration included a "work-in-progress" disclaimer on screen.

9. At the next year's E3 convention, the game was further along in development and Sega again sponsored live demonstrations using existing code from the game. Between September 2012 and January 2013, Sega released "Pre-Order Trailers," each of which contained in-game footage from the final version of the game.

10. On February 2, 2013, video game website IGN.com hosted a live event. Those who attended the exhibition played the actual game, were not restricted from publicly commenting on the game, and the entire event was viewable on the Internet. This exhibition of retail content lasted nearly two hours, and occurred more than a week prior to *A:CM's* commercial release.

11. On February 12, 2013, Sega released *Alien: Colonial Marines*. As a developer Gearbox did not sell any units of the game; the development agreement assigned this function to the game's publisher.

12. The game's sales were insufficient to trigger any sales-based payments to Gearbox and, as a result, Gearbox has not received any additional monies from Sega for the sale of the game. Gearbox only received the milestone payments made by Sega during the game's development. Those milestone payments were pre-set before any games were sold, and the milestone payments to Gearbox were not tied to the number of units of the game that Sega ultimately sold.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct. Executed this 30th day of July 2014 at Plano, Texas.

_____
Steve Gibson

3

Gibson Decl. ISO Summ. J. Motion
No. 3:13-CV-01962 JD

# EXHIBIT A

# DEVELOPMENT AGREEMENT

This Development Agreement is made as of October 5th, 2006 (the "**Effective Date**")

**BY AND BETWEEN:**

(1) Sega of America, Inc., whose principal place of business is at 650 Townsend St., Suite 650, San Francisco, CA 94103 ("**Sega**"); and

(2) Gearbox Software, whose principal place of business is at 101 East Park Blvd., Suite 1069, Plano, TX 75074 ("**Developer**") (hereinafter Sega and Developer shall each be individually referred to as a "**Party**" and collectively referred to as the "**Parties**").

### Recitals:

WHEREAS, the Developer is a leading developer of interactive video games and related products and is fully qualified to develop the Product (as defined below) for Sega; and

WHEREAS, Sega wishes to commission the development of the Product by Developer as referred to in this Agreement, in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the promises and covenants herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1. DEFINITIONS AND INTERPRETATION.

1.1. In this Agreement, unless the context otherwise requires, the following words have the following meanings:

| | |
|---|---|
| "'A' Class Bugs" | means any documented and repeated error or material defect in the Product which makes the Product substantially inoperable or results in repeated crashes. |
| "Accounting Period" | means each calendar quarter (1 January to 31 March, 1 April to 30 June, 1 July to 30 September, 1 October to 31 December) with the first Accounting Period running from the date on which the Packaged Product is first made available for sale to the public anywhere in the Territory until the end of the first complete calendar quarter. |
| "Affiliated Company(ies)" | means Sega's direct or indirect parent companies and such companies' subsidiaries. |
| "Agreement" | means this Agreement including any Exhibits or schedules attached to it or incorporated by reference. |
| "Business Proceed(s)" | means the percentage amounts more particularly set out in **Exhibit C**, which become due to Developer upon sales by Sega |

| | |
|---|---|
| | of the Packaged Product. |
| **"Compilation"** | means a video game product consisting of the Product and at least one other video game title. |
| **"Confidential Information"** | has the meaning set forth in Section 17.1. |
| **"Derivative Work"** | means any work that Sega, or a third party (including Developer) with which Sega contracts, develops/has developed and/or publishes or ports that is either a new version of, based substantially upon, substantially adapted from, or substantially modified from the content of the Product, including, without limitation, sequels (including any prequels), expansion packs, add-ons or levels sold at retail or through electronic distribution. |
| **"Design Document"** | means the design document written by Developer and approved by Sega for the Product which shall include, but not be limited to, basic application architecture, functionality description, navigational charts, description and basic conceptualization of core elements of the Product, a technical implementation plan and other relevant information and which is to be developed in accordance with Section 2.1 and subsequently attached as **Exhibit B** to this Agreement. |
| **"Design Error"** | means: (i) any material failure to meet the Specifications; (ii) any material failure to meet the full specification of the Milestone Deliverable; (iii) any material failure to meet the Instructions and/or representations or warranties made by Developer; (iv) any failure to properly interface with any related operating system software or related hardware designs referenced in the Specifications; (v) any material inability of the Product to perform repeatedly, without interruption, loss of data or erroneously or improperly formatted output and in compliance with the performance characteristics described in the Specifications; (vi) any misspelled or incorrect texts or localization inaccuracies in the Product that have a material adverse effect; (vii) any audio-visual display or programmer signature in the Product which in the opinion of Sega is offensive or could adversely affect the name or reputation or goodwill of Sega or which create liability to any third party; (viii) inclusion of any virus in the Product; (ix) inclusion of any 'A' Class Bugs in the Product; and/or (x) in relation to any Milestone Deliverable that is required to be submitted to a Platform Manufacturer, any non-acceptance of the Product by a Platform Manufacturer. |
| **"Developer's Marks"** | means Developer's marks and logos. |
| **"Developer's Property"** | means the Developer's Marks, the Developer's Tools, and all |

2

| | |
|---|---|
| | Intellectual Property Rights in and to the foregoing. |
| **"Developer's Tools"** | means:<br><br>(i) any and all back end materials, technology (and all know-how related thereto), software libraries and development tools, software development kits, textures, engines, rendering engines, Product play engines, AI, audio and visual assets that do not impact the uniqueness of the Product, and computer code (both object code and source code) and other software that do not impact the uniqueness of the Product, all of which are owned, developed or controlled by or on behalf of Developer and are incorporated in the Product; and<br><br>(ii) all third party code licensed by Developer and incorporated into the Product and all derivatives, improvements, and fixes to such code that are incorporated into the Product. |
| **"Final Staffing Plan"** | means the members of Developer's development team, in addition to the Key Members, assigned by Developer after approval of the Design Document to work on the development of the Product as well as the amount of time in aggregate months that each member of Developer's development team will be working on the Product, as set forth on **Exhibit E**, which may be revised and amended from time to time by Developer, acting in good faith, upon written notice (email will suffice) to Sega. |
| **"Fox"** | means Twentieth Century Fox Licensing and Merchandising, as administrator for Twentieth Century Fox Film Corporation. |
| **"Intangible Right(s)"** | means all rights (if any) of "droit moral," rental rights, and other similar rights in and to the Product. |
| **"Intellectual Property Rights"** | means, on a worldwide basis, all now known and hereafter known or acquired tangible or intangible (i) rights associated with works of authorship including, without limitation, copyrights (including, but not limited to, ownership rights in all titles, computer code, themes, objects, characters, character names, stories, dialog, catch phrases, locations, concepts, artwork, animation, sounds, musical compositions, audio-visual effects and methods of operation, moral rights and any related documentation) and (where said registrations, renewals and/or extensions exist) copyright registrations, applications, renewals and extensions therefore, moral rights, data base rights, and mask-works, (ii) rights associated with trademarks, service marks, trade names and similar rights, including, without limitation, design rights, and rights in trade dress and packaging, (iii) trade secret rights, (iv) patents, designs, algorithms and patent registrations, applications, renewals and extensions therefore, (v) all other intellectual and industrial property rights of every kind and nature and however |

| | |
|---|---|
| | designated, whether arising by operation of law, contract, license or otherwise recognized by U.S. law and other applicable foreign and international laws, treaties and conventions, (vi) all registrations, applications, renewals, extensions, continuations, divisions or reissues thereof now or hereafter existing, made, or in force (including any rights in any of the foregoing), and (vii) any and all causes of action arising from or related to any of the foregoing. |
| **"Key Members"** | means the members of Developer's current development team working on the development of the Product, as set forth on **Exhibit E**, which may be revised and amended from time to time by Developer, acting in good faith, upon written notice (email will suffice) to Sega. |
| **"Milestone Deliverables"** | means the deliverables of the Product which are required to be delivered at various stages throughout the development of the Product for Sega to test and approve, which are more particularly set out in the Milestone Program set forth in **Exhibit A**. |
| **"Milestone Payment"** | means the payments made by Sega to Developer upon approval and acceptance of any Milestone Deliverable in accordance with this Agreement and which are set out in **Exhibit A** to this Agreement and are paid by way of advance against Business Proceeds. |
| **"Milestone Program"** | means the development plan setting forth the timetable for progress in the development of the Product and the delivery of the Milestone Deliverables, as set forth in **Exhibit A**. |
| **"Minimum Spec"** | means the minimum technical specifications of the personal computer hardware required to play the Product and as defined in **Exhibit B**, Section 2 and subject to the provisions contained herein. |
| **"Net Receipts"** | means all amounts that are invoiced or received by or on behalf of Sega or its affiliates for the Product, Packaged Product, or Port (as applicable) (**"Gross Receipts"**) less the sum of: (i) sales taxes where due; (ii) mark downs, credits, rebates, returns and discounts whether taking place at the time of sale or retrospectively (collectively, **"Credits and Returns"**), whether actual or anticipated, with respect to which Sega shall be entitled to deduct the Retention in accordance with Sections 10.4 and 10.5; (iii) any Retention Overage (as defined in Section 10.4); (iv) applicable freight, warehouse and distribution fees specific to the Product, Packaged Product, or Port, as applicable; and (v) reasonable and actual costs of manufacturing, including relevant royalties to the Platform Manufacturer(s). |

|   |   |
|---|---|
|   | If the Product, Packaged Product, or Port is distributed in a Compilation, the Net Receipts attributable to the Product, Packaged Product, or Port, respectively, in such a Compilation shall be determined by prorating the Net Receipts from the Compilation by the number of products contained in the Compilation. In the event that the Product, Packaged Product, or Port is distributed as part of a Compilation and the titles within the Compilation have vastly disparate lifetime average wholesale prices (greater than fifty percent (50%) higher or lower than the lifetime average wholesale price of the Product, Packaged Product, or Port, respectively), then the average wholesale prices for each title will be used to calculate the prorated Net Receipts. |
| **"Packaged Product"** | means a copy of the Product on an item of physical storage medium appropriate for each Platforms, together with user documentation and other materials based on the Release Candidate Materials, if applicable, and packaged ready to be sold to an end user. |
| **"Platform(s)"** | means Microsoft's Xbox 360 ("**360**"), Sony's Playstation 3 ("**PS3**") and Playstation Portable ("**PSP**"), and personal computers based on the Microsoft Windows operating systems ("**PCs**"). |
| **"Platform Manufacturer(s)"** | means Microsoft Corporation and Sony Computer Entertainment of America, Inc. and any of their agents, designees, assigns, subsidiaries and/or affiliated companies involved with the approval of the Product for the relevant Platform. |
| **"Port"** | means a conversion of the Product to another Product System (that specifically is not a Platform) regardless of improvements or adaptations made to the Product in the course of the conversion. |
| **"Product"** | means the interactive software video game product currently known as "Alien FPS", which shall be in the first person shooter genre ("**FPS**") and shall based upon and incorporate the characters, world, available movie clips and music, weapons, images, and universe associated with the Twentieth Century Fox Film Corporation's Property "Alien", "Aliens", "Alien3" and "Alien: Resurrection" ("**Aliens World**") (to the extent mutually agreed upon by the Parties and permitted under any applicable license to the Aliens World procured by Sega), together with the Release Candidate Materials, associated audio-visual works, music, related documentation and textual and user materials in respect of which Developer shall develop, subject to the terms of this Agreement. |

5

| | |
|---|---|
| "Product System" | means a machine, device or manner by which computer software may be delivered (now known or hereafter devised), including, but limited to, video game consoles, the Platforms, video arcade machines, portable systems, electronically or digitally distributed systems now known or hereinafter devised (including, but not limited to, internet service, satellite, telephone or broadband), excluding mobile telephones, pagers and personal digital assistant devices. |
| "Promotional Material" | means with respect to the Product packaging, in-store displays and other promotional materials, advertisements or promotional publications of all forms howsoever distributed, broadcast or disseminated and including all forms of merchandise, sponsorship, endorsement or other spin off derivative or secondary exploitation of the Products and/or services relating thereto; provided, however, "Promotional Material" shall not include any Port, Sequel, or other Derivative Work. |
| "Reconciliation Statement" | means a statement showing the Net Receipts (taking into account the actual deductions for any marketing or sales volumes rebates) and the payments made to Developer in accordance with Section 9.1. |
| "Release Candidate" | has the meaning set forth in **Exhibit A.** |
| "Release Candidate Materials" | means any and all documents and assets submitted to a Platform Manufacturer for approval of the relevant Release Candidate, as required by such Platform Manufacturer, including, but not limited to, a product manual for the Product (if applicable) and all code of the Product. |
| "Retention" | means: (i) for the 360, PS3 and PSP, an amount of no more than fifteen percent (15%) of Gross Receipts (calculated without taking any deduction for Credits and Returns), which may be withheld and reconciled in accordance with Sections 10.4 and/or 10.5; and (ii) for PCs, an amount of no more than twenty-five percent (25%) of Gross Receipts (calculated without taking any deduction for Credits and Returns), which may be withheld and reconciled in accordance with Sections 10.4 and/or 10.5. |
| "Retention Account" | means an account for Retention as set forth in 10.4. |
| "Retention Period" | means, the first twelve (12) months after the date that the Product is commercially released, and thereafter, one Accounting Period. |
| "Sega Development Costs" | means services relating to the development and finalization of the Product which are the primary obligation of Developer in accordance with this Agreement but which it is agreed between the Parties that Sega will procure and pay for on Developer's |

| | |
|---|---|
| | behalf (not to include the testing facilities provided by Sega in accordance with Section 4, the procurement of any license or other Intellectual Property Rights in the Aliens World, and the localization of screen text and audio into languages that the Developer is not obligated to provide herein). |
| **"Sega Properties"** | means: (i) all logos, trademarks, and registered trademarks of Sega and the Product; (ii) the title of the Product; (iii) the Product itself (excluding Developer's Property), including, without limitation, the compiled codes, and any related reports, designs, drawings, audiovisual works, technical documentation, images, characters, character names, graphics, worlds, weapons, plots, storylines, dialog, scripts, environments, and sounds uniquely associated with the Product; and (iv) all Intellectual Property Rights in and to the items set forth in subsections (i) through (iii) above (excluding Developer's Property). For purposes of clarification and subject to the licenses granted in this Agreement, the **"Sega Properties"** expressly exclude the Developer's Property. |
| **"Specifications"** | means the Design Document and the Technical Design Document. |
| **"SOJ"** | means Sega Corporation, a Japanese corporation with its principal address at 1-2-12 Haneda, Ohta-ku, Tokyo 144-8531, Japan. |
| **"Technical Design Document"** | means the document created by Developer and approved by Sega setting out the technical specification and implementation of the Product in order for it to comply with and achieve that the specifications set forth in the Design Document, which is be developed in accordance with Section 2.1 and subsequently attached to this Agreement as **Exhibit B**. |
| **"Team Month"** | means the equivalent of the aggregate amount of time and direct development cost to have Developer's full development team work for one month. For the purposes of this Agreement, one (1) Team Month is equal to five hundred thousand dollars ($500,000.00). |
| "Term" | means, subject to the provisions of this Agreement, in perpetuity. |
| "Territory" | means worldwide. |
| **"Third Party License Costs"** | means royalty and/or license fees (not to include the fees payable by Sega in order to manufacture the Packaged Product) that are payable by Sega to procure certain rights and assets for inclusion in the Product to enable the unfettered sale of the Packaged Product. Such Third Party License Costs shall be incurred only upon request by Developer, but Sega, in its sole |

| | |
|---|---|
| | discretion, shall decide whether such costs are necessary. |
| "VAT" | means any value added or other similar sales taxes, duties or levies. |

Redacted

2. **DEVELOPMENT OF THE PRODUCT.**

   2.1. Developer shall, following the Effective Date, complete the Design Document, Technical Design Document and set out in full the Milestone Program. Developer shall at all times take into account the reasonable suggestions of Sega. The Design Document, Technical Design Document, Minimum Spec and full Milestone Program shall be finalized and approved by Sega as soon as is reasonably practicable following the Effective Date and in any event by May 1, 2007.

   Redacted

6. **MARKETING.**

    6.1. As between the Parties, all aspects of marketing, distribution and/or other such exploitation of the Packaged Product shall be in Sega's absolute discretion, including, without limitation, the title and logo of the Packaged Product, the manner and timing of distribution, the channels of distribution, pricing, naming, packaging, labeling, advertising, promotion, terms and conditions of sale, compilation of customer names and use of warranty and user registration information. Notwithstanding the aforementioned sentence, Sega agrees to keep Developer informed of all marketing activities along with sales pricing and forecasts on a regular basis, and to discuss and consult with Developer in good-faith on such issues as well as on all other aspects of marketing, distribution and/or other such exploitation of the Packaged Product.

Redacted

7. **OWNERSHIP.**

Redacted

7.3. <u>Work-for-Hire</u>. The Parties agree that this Agreement shall be a contract for services and each Party will consider the work performed by Developer hereunder, along with all documentation and other products and results of the services rendered by Developer to Sega hereunder (other than Developer's Property) to be a "work made for hire" under the U.S. Copyright Act and any and all similar provisions of law in other jurisdictions. Developer agrees and acknowledges that, as between Developer and Sega, Sega is the author of the Product for all purposes, and that Sega is the exclusive owner of all the rights comprised in the undivided copyright and all renewals, extensions, and reversions therein, in and to such Product, in perpetuity, and throughout the universe. If, for any reason, the Product or any portion thereof (other than Developer's Property) would not be considered a work-for-hire under applicable law, Developer does hereby sell, assign, and transfer to Sega, its successors and/or assigns, the entire right, title, and interest in and to: (i) the copyright in the Product (other than Developer's Property), and any registrations and copyright applications relating thereto, and any renewals and extensions thereof; (ii) all works based upon, derived from, or incorporating the Product (other than Developer's Property); (iii) all income, royalties, damages, claims and payments now or hereafter due or payable with respect thereto, except with respect to Developer's right to Business Proceeds and any other amounts due to Developer set forth in this Agreement; (iv) all causes of action, either in law or in equity for past, present, or future infringement based on the copyrights; and (v) all rights corresponding to the foregoing throughout the world. With the exception of Developer's Property, Developer hereby waives and releases in favor of Sega all Intangible Rights (if any) and recognizes that Sega shall have the right to revise, condense, abridge, expand, adapt, change, modify, add to, subtract from, re-draw, re-color, or otherwise modify the Product without the consent of Developer, except as set forth herein. Developer agrees that it will execute all papers and to perform such other proper acts as Sega may deem necessary to secure for Sega or its designees the rights assigned under this Agreement.

Redacted

*Redacted*

8. **MILESTONE PAYMENTS.**

   8.1. In exchange for Developer's commitments and performance of its obligations under this Agreement, Sega agrees to provide Developer with the Milestone Payments, provided that each respective Milestone Payment is expressly conditioned upon Sega's, and, in relation to a Release Candidate, the relevant Platform Manufacturer's, acceptance and approval of the Milestone Deliverables. Details of the Milestone Payments are set out in the Milestone Program. Each Milestone Payment shall be made within ten (10) business days upon Sega providing written approval (email will suffice) of the associated Milestone Deliverable or upon deemed approval of such Milestone Deliverable in accordance with this Agreement. All invoices relating to such Milestone Payments may be submitted when Developer submits Milestone Deliverables per the Milestone Program

*Redacted*

9. **BUSINESS PROCEEDS.**

   9.1. Subject to the provisions of this Agreement, Sega shall pay Developer the Business Proceeds. For the avoidance of doubt: (i) no Business Proceeds shall be due to Developer unless specifically stated in this Agreement; and (ii) such Business Proceeds

shall be fully recoupable against the aggregate of the Milestone Payments such that no Business Proceeds shall be payable until the aggregate of the Milestone Payments have been fully recouped.

Redacted