1  Mark S. Eisen (SBN 289009)
   meisen@edelson.com
2  EDELSON PC
   555 West Fifth Street, 31st Floor
3  Los Angeles, California 90013
   Tel: 213.533.4100
4  Fax: 213.947.4251

5  Rafey S. Balabanian (Admitted *pro hac vice*)
   rbalabanian@edelson.com
6  Benjamin S. Thomassen (Admitted *pro hac vice*)
   bthomassen@edelson.com
7  EDELSON PC
   350 North LaSalle Street, Suite 1300
8  Chicago, Illinois 60654
   Tel: 312.589.6370
9  Fax: 312.589.6378

10 *Attorneys for Plaintiffs and the Putative Class*

11

12            **UNITED STATES DISTRICT COURT**

13           **NORTHERN DISTRICT OF CALIFORNIA**

14              **SAN FRANCISCO DIVISION**

15

16 DAMION PERRINE and JOHN LOCKE,            Case No. 3:13-cv-01962-JD
   individually and on behalf of all others similarly
   situated,                                **PLAINTIFF LOCKE'S NOTICE OF**
17                                           **MOTION AND MOTION FOR**
                       *Plaintiffs,*         **PRELIMINARY APPROVAL OF CLASS**
18                                           **ACTION SETTLEMENT AGREEMENT**
   *v.*
19
   SEGA OF AMERICA, INC., a California       Date: September 17, 2014
20 corporation, and GEARBOX SOFTWARE,        Time: 9:30 a.m.
   L.L.C., a Texas limited liability company,
21                                           Judge: Honorable James Donato
                       *Defendants.*         Action Filed: April 29, 2013
22

23

24

25

26

27

28

**NOTICE OF MOTION**

NOTICE IS HEREBY GIVEN that on September 17, 2014 at 9:30 a.m., or at such other time as may be set by the Court, Plaintiff John Locke will move the Court, pursuant to Federal Rule of Civil Procedure 23, to grant preliminary approval of the partial class action settlement reached by Plaintiff Locke and Defendant Sega of America, Inc., and attached hereto as Exhibit 1, in Courtroom 11, 19th Floor, 450 Golden Gate Avenue, San Francisco, California 94102, before the Honorable James Donato.

Plaintiff Locke seeks preliminary approval of this class action settlement, certification of the proposed settlement class, appointment of Plaintiff Locke as class representative, and appointment of his counsel as class counsel. The Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, oral argument of counsel, all documents in the record, and any other matter that may be submitted or raised at the hearing.

Dated: August 11, 2014                                  Respectfully Submitted,

                                                        JOHN LOCKE, individually and on behalf of the
                                                        Class of similarly situated individuals,

                                                         /s/  Rafey S. Balabanian
                                                        One of Plaintiff's Attorneys

Rafey S. Balabanian (Admitted *pro hac vice*)
rbalabanian@edelson.com
Benjamin S. Thomassen (Admitted *pro hac vice*)
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiffs and the Putative Class*

# Table of Contents

I.      INTRODUCTION ........................................................................................ 1

II.     BACKGROUND ........................................................................................... 2

    A.  The Facts .............................................................................................. 2

    B.  The Litigation and Settlement History ................................................ 3

III.    TERMS OF THE SETTLEMENT AGREEMENT .................................... 5

    A.  Monetary Relief .................................................................................. 5

    B.  Notice and Administrative Expenses .................................................. 6

    C.  Incentive Award for Class Representative ......................................... 6

    D.  Attorneys' Fees and Expenses ............................................................ 6

    E.  Release ................................................................................................ 6

IV.    THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED .................... 6

    A.  The Requirement of Numerosity is Satisfied ..................................... 8

    B.  The Requirement of Commonality is Satisfied ................................... 8

    C.  The Requirement of Typicality is Satisfied ........................................ 9

    D.  The Requirement of Adequate Representation is Satisfied ................ 10

    E.  The Proposed Settlement Class Meets the Requirements of Rule 23(b)(3) ........ 11

        1.  Common Questions of Law and Fact Predominate ................................ 12

        2.  A Class Action is the Superior Method for Adjudicating this Controversy .......... 12

V.     THE COURT SHOULD APPOINT PLAINTIFF'S COUNSEL AS CLASS COUNSEL ........ 14

VI.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL ........ 14

    A.  The Settlement is the Product of Serious, Informed, Non-Collusive Negotiations ........ 15

    B.  There Are No Obvious Deficiencies in the Proposed Settlement ........ 16

    C.  The Proposed Settlement Does Not Give Preferential Treatment to Any Settlement Class Members ........ 17

    D.  The Settlement Falls Within the Range of Possible Approval ........ 17

VII.   THE PROPOSED NOTICE PLAN SHOULD BE APPROVED ................ 20

**VIII.   CONCLUSION** ................................................................................................ 22

## **Table of Authorities**

United States Supreme Court Cases:

*Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................................... 7, 13

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ................................................................ 20

*Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179 (2011) ..................................... 7

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ........................................................ 7, 8

United States Circuit Court of Appeals Cases:

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ............................................... 7

*Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015 (9th Cir. 2012) ................................... 8

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) .................................................. 9

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ...................................................... 12

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) ............................................. 19

*In re Syncor ERISA Litig.*, 516 F.3d 1095 (9th Cir. 2008) ...................................................... 14

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006) ............................................... 13

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ................................................................ 7

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2013) .......................................................... 19

*United Steel, Paper & Forestry, Rubber, Mfg. Energy Allied Indus. & Serv. Workers*
    *Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802 (9th Cir. 2010)....................................... 7

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) ........................................... 13

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010).................... 9, 12, 13

*Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) .................................... 11

United States District Court Cases:

*Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558 (S.D. Cal. 2012) ........................................... 7

*Boring v. Bed Bath & Beyond of Cal. LLC*, No. 12-cv-05259,
    2013 WL 6145706 (N.D. Cal. Nov. 21, 2013) ...................................................... 15, 17

*Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524 (C.D. Cal. 2011) .................................. 12

*Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544 (N.D. Cal. 2007) ............................................. 8

*Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524 (N.D. Cal. 2004) .................................... 11, 13

*Ching v. Siemens Indus., Inc.*, No. 11-cv-4838,
        2013 WL 6200190 (N.D. Cal. Nov. 26, 2013)  ....................................................... 15, 17

*Cole v. Asurion Corp.*, 267 F.R.D. 322 (C.D. Cal. 2010) ........................................................ 9

*Cordy v. USS-Posco Indus.*,
        No. 12-cv-00553, 2014 WL 212587 (N.D. Cal. Jan. 17, 2014)  ............................ 15, 17

*Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468 (C.D. Cal. 2012) ......................................... 7, 9, 12

*Harris v. Marketing Corp.*, No. 08-cv-5198,
        2011 WL 1627973 (N.D. Cal. Apr. 29,2011)........................................................ 15

*Holloway v. Full Spectrum Lending*, No. 06-cv-5975,
        2007 WL 7698843 (C.D. Cal. June 26, 2007)...................................................... 13

*In re Ferrero Litig.*, 278 F.R.D. 552 (S.D. Cal. 2011) ................................................. 11

*In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005).................................... 8

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007) ............................ 15, 17

*Johns v. Bayer Corp.*, 280 F.R.D. 551 (S.D. Cal. 2012)................................................ 12

*Nigh v. Humphreys Pharmacal, Inc.*, No. 12-cv-12714,
        2013 WL 5995382 (S.D. Cal. Oct. 23, 2013)........................................................ 16

*Tijero v. Aaron Bros., Inc.*, No. 10-cv-01089,
        2013 WL 6700102 (N.D. Cal. Dec. 19, 2013)........................................................ 17

*Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554 (C.D. Cal. 2012) ................................ 13

*Villegas v. J.P. Morgan Chase & Co.*, No. 09-cv-00261,
        2012 WL 5878390 (N.D. Cal. Nov. 21, 2012) ..................................................... 17, 19

*Weeks v. Kellogg Co.*, No. 09-cv-08102, 2013 WL 6531177 (C.D. Cal. Nov. 23, 2013) ........... 20

*Whitten v. ARS Nat. Servs., Inc.*, No. 00 C 6080,
        2001 WL 1143238 (N.D. Ill. Sept. 27, 2001)........................................................ 11

*Williams v. Costco Wholesale Corp.*, No. 02-cv-2003,
        2010 WL 761122 (S.D. Cal. Mar. 4, 2010) .......................................................... 15

*Wyatt v. Creditcare, Inc.*, No. 04-cv-03681, 2005 WL 2780684 (N.D. Cal. Oct. 25, 2005)..... 10

*Zeisel v. Diamond Foods, Inc.*, No. 10-cv-01192,
        2011 WL 2221113 (N.D. Cal. June 7, 2011)......................................................... 10

California Court of Appeal Cases:

*In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83 (Cal. Ct. App. 2009) ................................ 18

<u>Statutes:</u>

Cal. Bus. & Prof. Code § 1720 *et seq* ...................................................................... 3, 4

Cal. Bus. & Prof. Code § 17500 *et seq* ...................................................................... 3

Cal. Civ. Code § 1750 *et seq* ...................................................................................... 3

Fed. R. Civ. P. 23 ................................................................................................... *passim*

28 U.S.C. § 1715 ......................................................................................................... 21

<u>Miscellaneous:</u>

Federal Judicial Center,
  *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*
  (2010), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/
  $file/NotCheck.pdf .................................................................................................. 20

Herbert B. Newberg & Alba Conte, Newberg on Class Actions (4th ed. 2002) .................... 14, 20

Manual for Complex Litigation (Fourth) (2004) ................................................................. 7, 14

National Consumer Law Center,
  *About Us*, http://www.nclc.org/about-us/about-us.html (last visited July 30, 2014) ........ 16

# I.     INTRODUCTION

This proposed class action settlement resolves claims against Defendant Sega of America, Inc. ("Sega") arising out of the allegedly deceptive marketing of the highly-anticipated video game *Aliens: Colonial Marines*, produced and developed by Sega and co-Defendant Gearbox Software, LLC ("Gearbox").[1] The agreement, reached after extensive investigation, substantive motion practice, formal and informal discovery, and a lengthy mediation with the Honorable Rebecca Westerfield (ret.) at JAMS in San Francisco, provides an exceptional result for consumers who purchased the video game based on alleged misrepresentations about its quality and features. Specifically, the agreement provides that Sega will establish a $1,250,000 non-reversionary settlement fund that, following payment of certain costs and expenses, will be distributed to claimants within the class.

Avoiding some of the pitfalls of other settlements, no amount of the fund will revert back to Sega. Nor will any amount of the fund be distributed to *cy pres* unless and until every class member submitting a valid claim has received a distribution from the settlement fund up to a full refund of their purchase price. And depending on how many class members ultimately submit claims against the fund, it is entirely possible that claiming class members will receive a full refund, making them more than whole, considering that they will also get to keep the video game. In any event, even if every member of the proposed class submitted a claim, they would each still receive a significant portion of their purchase price back, and because this is not a case about a worthless or non-functional product, but rather, class members being induced to overpay for the game, such a recovery would still be appropriate. And all of this will be achieved while avoiding the risk, delay, and expense of continued litigation against Sega. Also, and quite importantly, the settlement only releases claims against Sega—not Gearbox— so the litigation will continue as to

---

[1]     *Aliens: Colonial Marines* is a "first-person shooter" game that, while hailed as the true sequel to James Cameron's 1986 film *Aliens*, puts the player in the role of a United States Colonial Marine on a search-and-rescue mission occurring after the events of the film *Alien 3* (1992). In the game, the player encounters enemies including aliens from the film franchise and human mercenaries.

that defendant with the prospect of further recovery. Indeed, class members who are not made whole from the settlement fund created by this partial settlement—either because they choose not to submit a claim against the fund or because they submitted a claim but received a payment less than their total injury—will have another chance to recover in this litigation against Gearbox. In short, the instant settlement is an excellent result for the class.

Accordingly, and as further discussed below, Plaintiff John Locke ("Plaintiff") respectfully requests that this Court certify a class for settlement purposes, appoint him as representative of the settlement class and his counsel as class counsel, preliminarily approve the partial settlement, and approve a plan to notify the class of the same.

## II.    BACKGROUND

### A.    The Facts[2]

In 2006, to much fanfare, Sega announced it would produce a video game sequel to the 1986 blockbuster film *Aliens*, entitled *Aliens: Colonial Marines*. The game was to be developed by Gearbox. Production of the game suffered several delays, however, and Plaintiff alleges that by 2011 consumer excitement for the game began to wane. Plaintiff goes on to allege that Sega and Gearbox began a marketing campaign to once again drum up anticipation for the game's approaching release date, and that as part of their marketing efforts, and as is the norm in the industry, they jointly hosted narrated demonstrations of *Aliens: Colonial Marines* where their agents would play the game before a crowd. Video footage of the demonstrations was uploaded to Sega's YouTube channel for the general public to view and featured on various popular video game industry websites. Plaintiff alleges that while Sega and Gearbox each represented and promoted the demonstrations as exhibiting actual gameplay content from the to-be-released retail version of the game, in reality the retail version turned out to be nothing like the game

---

[2]    The parties' differing takes on certain facts have been well-documented for the Court, and Plaintiff provides his view of the facts here insofar as they provide necessary context for consideration of the fairness of the instant settlement. (*See* Dkts. 1, 14, 26, 29, 30, 31, 43.) Sega, of course, disputes Plaintiff's version of the facts, and denies any wrongdoing whatsoever.

1  demonstrated to consumers. Plaintiff maintains that consumers who purchased the game on or

2  before its February 12, 2013 retail release date did not learn of the differences until after purchase.

3      In the fall of 2012, Plaintiff preordered a copy of *Aliens: Colonial Marines* based on the

4  many gameplay demonstrations he had seen. (Dkt. 26 ¶ 76, 81.) He received his copy of the game

5  in the mail on February 12, 2013, the day it was released. (*Id.*)[3] Approximately 135,000

6  individuals in the United States also purchased copies of the game on or before the release date of

7  February 12, 2013. (Declaration of Rafey S. Balabanian ("Balabanian Decl.") ¶ 7, a copy of which

8  is attached as Exhibit 2.)[4] Plaintiff asserts that had he known that certain features present in the

9  demonstrations would not exist in the retail version of the game, he would have either waited to

10  purchase the game (and taken advantage of the price drops that occurred shortly after the game's

11  release) or not purchased the game at all, and contends that other early purchasers would have

12  done the same. (Dkt. 26 ¶¶ 80, 83, 127, 146, 152, 163, 174.)

13    **B.    The Litigation and Settlement History**

14      On July 5, 2013, in response to these alleged misrepresentations regarding *Aliens: Colonial*

15  *Marines*'s gameplay, Plaintiff filed a First Amended Complaint pleading the following causes of

16  action: (a) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code

17  § 1750 *et seq.*; (b) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.

18  Code § 1720 *et seq.*; (c) violation of California's False Advertising Law ("FAL"), Cal. Bus. &

19  Prof. Code § 17500 *et seq.*; (d) breach of express warranties; (e) fraud in the inducement; and (f)

20  negligent misrepresentation of the use, functionality, operation, and performance of the game.

21

22

23    [3]  Defendants sold three versions of *Aliens: Colonial Marines*: (1) a PC version that sold for

24  $50, (2) a console version available for Xbox 360 and PlayStation 3 that sold for $60, and (3) a
    collector's edition of the console version that sold for $100 and included, in addition to the game,
    a collectible figure and special packaging.

25    [4]  While the parties had previously represented to the Court that approximately 150,000

26  individuals had purchased the game on or before the release date, Sega has informed Plaintiff that
    that number included all North American purchasers, including those in Mexico and Canada.

27  According to Sega, the number of U.S. purchasers is estimated to be on the order of 132,000–
    135,000. (Balabanian Decl. ¶ 7.)

28

(Dkt. 26.)[5] Sega and Gearbox moved to dismiss, arguing that software is not a covered "good" under the CLRA and that Plaintiff failed to set out the terms of the warranty at issue in his breach of express warranty claims. (Dkt. 29.) On October 10, 2013, after full briefing, the Court denied the motion to dismiss in its entirety. (Dkts. 30, 31, 32.) Sega and Gearbox then jointly answered the amended complaint, denying the material allegations of the complaint and setting forth eight affirmative defenses. (Dkt. 43.)

With the pleadings set, both sides initiated discovery, including the propounding of interrogatories and requests for production, and the scheduling of Plaintiff's deposition. (Balabanian Decl. ¶ 4.) During the discovery process, counsel for both sides also began discussing the possibility of attempting to resolve this matter through private mediation. (*Id.* ¶ 5.) Consequently, they agreed to focus the exchange of discovery on issues each side would need to effectively advocate their respective settlement position, including information regarding the size of the class and the marketing and sale of the game. (*Id.* ¶¶ 5–6.)[6] The parties also drafted and exchanged mediation briefs prior to the mediation that contained additional factual information as well as each side's ultimate legal positions. (*Id.* ¶ 8.)

On January 21, 2014, counsel for the parties met at JAMS in San Francisco and engaged in a full day of mediated negotiations with the assistance of Judge Westerfield. (Balabanian Decl. ¶ 9.) At the end of the day, the parties had made substantial progress towards a resolution but were unable to reach an agreement. (*Id.*) However, Plaintiffs left Sega and Gearbox with their best-and-final offer: a $1.25 million non-reversionary settlement to release just Sega, or a $2 million non-

---

[5]   An original complaint had been filed by Damion Perrine, another purchaser of the game. (Dkt. 1.) Mr. Perrine has since decided that he is no longer able to serve as a named plaintiff in this matter, and has moved to withdraw as a plaintiff and to voluntarily dismiss his claims without prejudice. (Dkt. 69.)

[6]   This information included the number of copies of the game sold as of the release date, a copy of the agreement entered into between Sega and Gearbox to develop and publish the game, a complete list of all trailers advertising the game, links and descriptions of the code used to create the game trailers, and a detailed description of a live gameplay event that took place shortly before the game's release date. (Balabanian Decl. ¶ 6.)

1  reversionary settlement to release both defendants. (*Id.*) After some further negotiations, the

2  parties reached a compromise in which claims against both Defendants would be released in

3  exchange for their creating a $2 million settlement fund, with the potential for a partial reverter of

4  $750,000. (*Id*. ¶ 10.)

5      At a case management conference on June 26, 2014, however, this Court expressed some

6  concerns about the terms of that compromise agreement, and Locke and Sega thus attempted to re-

7  negotiate the agreement to address those concerns. (Balabanian Decl. ¶ 11.) Ultimately, Sega

8  agreed to the settlement that Plaintiff had proposed at the end of the mediation, which Plaintiff

9  now presents to this Court for preliminary approval. (*Id.*) Gearbox declined to participate in the

10 settlement, is not contributing to any portion of the proposed settlement payment, and thus is not a

11 party to this settlement. (*Id.* ¶ 12.) Consequently, the proposed settlement releases no claims

12 against Gearbox, and litigation is expected to continue against Gearbox even if the proposed

13 settlement with Sega is approved. (*Id.*)

14 **III.   TERMS OF THE SETTLEMENT AGREEMENT**

15     A copy of the settlement agreement between Plaintiff and Sega (the "Settlement

16 Agreement" or "Agreement") is attached hereto as Exhibit 1. The key terms of the Agreement are

17 briefly summarized as follows:

18         **A.   Monetary Relief**

19     Sega has agreed to establish a settlement fund of $1,250,000. (Agreement § 1.34.)

20 Following payment of all settlement administration expenses, attorneys' fees, and an incentive

21 award, the money in the fund will be distributed *pro rata* to all class members who submit a

22 simple, three-question claim form. (Agreement § 2.1(a).) The amount that any individual class

23 member may receive from the fund is capped at the amount they paid for the game. (*Id.*) In the

24 event that any money remains in the fund after each individual class member submitting a valid

25 claim has received a full refund of their purchase price, any such remainder shall be donated to the

26 National Consumer Law Center ("NCLC") and Consumers Union. (Agreement § 1.9; 2.1(b).) In

27 no event shall any portion of the fund revert to Sega.

28

### B.  Notice and Administrative Expenses

The settlement will be administered by KCC Class Action Services ("KCC"). (Agreement § 1.31.) All notice and administrative expenses will be paid from the fund, and, pursuant to an agreement with KCC, shall not exceed $200,000. (Agreement § 1.30.)

### C.  Incentive Award for Class Representative

In recognition of Plaintiff's time and effort serving as class representative, the parties have agreed that, subject to this Court's approval, Plaintiff shall be paid an incentive award of $2,500 from the fund in addition to any amounts to which he is otherwise entitled as a claiming class member. (Agreement § 9.3.)

### D.  Attorneys' Fees and Expenses

The parties have agreed that Plaintiff's counsel shall be paid reasonable attorneys' fees and expenses from the fund in an amount to be determined by this Court but not exceeding $312,500. (Agreement §§ 9.1–9.2.)

### E.  Release

In exchange for the relief described above, Sega—but not Gearbox—will receive a full release of all claims related to *Aliens: Colonial Marines*, including claims relating to the design, marketing, operation of, or warranties provided in connection with, the game. (Agreement §§ 1.24–1.26; 3.1–3.2.)

## IV.  THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED

Plaintiff respectfully requests that the following class be certified:

> All persons in the United States and its territories that, prior to or on February 12, 2013, paid for a copy of *Aliens: Colonial Marines*.[7]

This class is the same as that proposed in the original complaint in this action. (Dkt. 1 ¶¶ 66–67.)

---

[7]  Plaintiff further requests that the following persons be excluded from the class: (1) all persons who file timely requests for exclusion; (2) all persons who had their claims discharged in bankruptcy, finally adjudicated on the merits, or otherwise released against Sega; (3) Sega, the settlement administrator, and any respective parent, subsidiary, affiliate, or control person of either, as well as their officers, directors, agents, servants, or employees; (4) any judge presiding over this action; and (5) the immediate family members of any such person.

Prior to granting preliminary approval of a settlement, a court should determine that the proposed settlement class is proper for settlement purposes, and thus appropriate for certification. Manual For Complex Litigation § 21.632 (4th ed. 2004); *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). To certify a class, Plaintiff must demonstrate that the proposed class and proposed class representative meet the following prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a)(1)–(4). Where, as here, Plaintiff seeks certification under Rule 23(b)(3), he must also show that common questions of law or fact predominate and that maintenance of the lawsuit as a class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011). Although in some cases a court may have to "probe behind the pleadings" to determine whether the plaintiffs have met the requirements of Rule 23, courts only consider the merits of a plaintiff's claim insofar as they overlap with the certification requirements. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551–52 (2011); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011); *United Steel, Paper & Forestry, Rubber, Mfg. Energy Allied Indus. & Serv. Workers Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (stating that a court's class certification determination should be based on the analysis of Rule 23's criteria and not on the underlying merits of the claim).

Moreover, courts throughout the Ninth Circuit have held that certification is appropriate in cases such as this, where the class's claims are based primarily upon the uniform design, marketing, and sale of a product of diminished value. *See*, *e.g.*, *Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558, 566 (S.D. Cal. 2012) (citing collected cases) ("Courts routinely certify diminished value/overpayment claims . . . ."); *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 478 (C.D. Cal. 2012) *on reconsideration*, 2012 WL 2458118 (C.D. Cal. June 25, 2012) (certifying class that suffered loss in value and usefulness of product based on alleged omissions and misrepresentations in advertising and promotion). In this case, the proposed class meets each of the prerequisites for certification.

### A.     The Requirement of Numerosity is Satisfied

The numerosity prerequisite is met when "the class is so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). To satisfy this requirement there is no "specific" number required, nor are plaintiffs required to state the "exact" number of potential class members. *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 548 (N.D. Cal. 2007). Rather, courts are permitted to "make common sense assumptions to support a finding that joinder would be impracticable." *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005). Generally, courts find the numerosity requirement satisfied when the proposed class comprises 40 or more members. *Celano*, 242 F.R.D. at 549.

Through discovery and the exchange of information prior to mediation, Sega confirmed that approximately 135,000 U.S. consumers purchased *Aliens: Colonial Marines* either on or before February 12, 2013. (Balabanian Decl. ¶ 7.) Accordingly, there is no question that joinder of all members of the proposed class would be impractical and that Rule 23(a)(1)'s numerosity requirement is satisfied.

### B.     The Requirement of Commonality is Satisfied

The second threshold to certification requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Simply put, commonality requires the representative plaintiffs to demonstrate that the proposed class members "have suffered the same injury." *Dukes*, 131 S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). The common contention must be of such a nature that it is capable of class-wide resolution, and that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2545. Moreover, the permissive standard of commonality does not require all questions to be common and provides that "[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012) (quoting *Parra v. Bashas', Inc.*, 536 F.3d 975, 978–79 (9th Cir. 2008)). Commonality is satisfied here.

Plaintiff alleges that Defendants made identical, false and misleading statements to the

class by advertising the same exact "actual gameplay" demonstrations to them. Plaintiff also claims that the class members suffered injuries identical in nature, as they all received the same game of lesser value in lieu of what they were allegedly promised and paid for. (Dkt. 26 at ¶¶ 19–50.) As a result, some of the common factual questions include (1) whether Defendants made false representations regarding the features and gameplay of *Aliens: Colonial Marines*; (2) whether Defendants made these representations to induce consumers into purchasing the game; (3) whether Defendants notified consumers that they would not include the represented features in the retail version of the game; and (4) whether these common facts establish violations of the California statutory and common law claims thereby entitling Plaintiff and the class to relief (and the nature of such relief).

Regardless of the answers to any of these questions, they will be the same for Plaintiff and each member of the class because they are not based on any individual class member's conduct, but instead, on Defendants' alleged uniform marketing campaign and warranties, and thus can be resolved in a single stroke. *See Guido*, 284 F.R.D. at 477 (concluding that commonality is satisfied when there are "issues of whether defendants' alleged omissions and misrepresentations . . . are unlawful, deceptive, unfair, or misleading to reasonable consumers. . . .").

Thus, there are multiple questions of law and fact common to the proposed class members, and the commonality requirement is satisfied.

### C.     The Requirement of Typicality is Satisfied

Rule 23 next requires that Plaintiff's claims be typical of those of the proposed settlement class. Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). The typicality requirement is closely related to the commonality requirement and is satisfied if the plaintiff's claims arise from the same practice or course of conduct that gives rise to the claims of other class members. *Cole v. Asurion Corp.*, 267 F.R.D. 322, 326 (C.D. Cal. 2010) (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Under the rule's permissive standards, "[r]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be

substantially identical," however. *Zeisel v. Diamond Foods, Inc.*, No. 10-cv-01192, 2011 WL 2221113, at *7 (N.D. Cal. June 7, 2011) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

Here, Plaintiff and the proposed settlement class share the same legal theories that are based upon the same core set of alleged facts and result in a claim for uniform damages. That is, Plaintiff and the proposed class members were each subjected to the same alleged uniform and widely disseminated misrepresentations about the actual gameplay of *Aliens: Colonial Marines*. And because the retail version failed to live up to the alleged misrepresentations, each member of the proposed settlement class, like Plaintiff, overpaid for the game. Accordingly, by pursuing his own claims, Plaintiff will necessarily advance the interests of the settlement class in satisfaction of Rule 23(a)(3)'s typicality requirement.

### D.       The Requirement of Adequate Representation is Satisfied

The final Rule 23(a) prerequisite requires that the proposed class representative has and will continue to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This factor requires both that "the named representatives . . . appear able to prosecute the action vigorously through qualified counsel, and . . . not have antagonistic or conflicting interests with the unnamed members of the class." *Wyatt v. Creditcare, Inc.*, No. 04-cv-03681, 2005 WL 2780684, at *5 (N.D. Cal. Oct. 25, 2005) (quoting *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)). In this case, Plaintiff has no interests antagonistic to those of the settlement class. (Balabanian Decl. ¶ 20.) In fact, Plaintiff has the exact same interests as the other proposed class members because they have all been injured in the exact same manner by Defendants' alleged conduct, and Plaintiff thus has and will continue to adequately represent the interests of the settlement class. (*Id.*)

Further, proposed class counsel have regularly engaged in major complex litigation involving consumer technology issues, have frequently been appointed lead class counsel by courts throughout the country, have the resources necessary to conduct litigation of this nature, and have extensive experience in consumer class action lawsuits that are similar in size, scope, and complexity to the present case. (Balabanian Decl. ¶ 18; *see also* Firm Resume of Edelson PC, a

true and accurate copy of which is attached as Exhibit A to the Balabanian Declaration.)
Specifically, proposed class counsel have prosecuted numerous class actions related to the alleged
fraudulent design and marketing of various types of software and consumer goods. *See id*; *see also
Whitten v. ARS Nat. Servs., Inc.*, No. 00 C 6080, 2001 WL 1143238, at *4 (N.D. Ill. Sept. 27,
2001) ("The fact that attorneys have been found adequate in other cases is persuasive evidence
that they will be adequate again." (internal quotation marks omitted)). In addition, proposed class
counsel have already diligently pursued the claims at issue in this action through their own
investigation and discovery, participated in substantive motion practice, dedicated substantial
resources to reaching the Settlement Agreement and to the case in general, and will continue to do
so throughout its pendency. (Balabanian Decl. ¶ 19.) Accordingly, both Plaintiff and his counsel
have and will continue to adequately represent the proposed settlement class, and thus the final
Rule 23(a) requirement is satisfied.

**E.     The Proposed Settlement Class Meets the Requirements of Rule 23(b)(3)**

In addition to meeting the prerequisites of Rule 23(a), the proposed settlement class must
also meet one of the three requirements of Rule 23(b) for class certification. *Zinser v. Accufix
Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001) *amended by* 273 F.3d 1266. Plaintiff
seeks to certify the class under Rule 23(b)(3), which requires that (1) the questions of law and fact
common to members of the class predominate over any questions affecting only individuals, and
(2) the class action mechanism is superior to other available methods for the fair and efficient
adjudication of the controversy. Fed. R. Civ. P. 23(b)(3). Certification under Rule 23(b)(3) is
appropriate and encouraged "whenever the actual interests of the parties can be served best by
settling their differences in a single action." *In re Ferrero Litig.*, 278 F.R.D. 552, 559 (S.D. Cal.
2011) (citing *Hanlon*, 150 F.3d at 1022). The same is true when class members will likely choose
not to pursue an action based on the small amount of redress available. *See Chamberlan v. Ford
Motor Co.*, 223 F.R.D. 524, 527 (N.D. Cal. 2004) ("The policy at the very core of the class action
mechanism is to overcome the problem that small recoveries do not provide the incentive for any
individual to bring a solo action prosecuting his or her rights.") (quoting *Amchem*, 521 U.S. at
617).

### 1. *Common Questions of Law and Fact Predominate.*

Rule 23(b)(3)'s predominance requirement tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wolin*, 617 F.3d at 1172 (quoting *Amchem*, 521 U.S. at 623). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." *Hanlon*, 150 F.3d at 1022. Here, there is little question that the common issues stemming from Defendants' alleged conduct predominate in this litigation.

For alleged deceptive marketing cases like this one, "[c]ourts in California routinely find that [the predominance] inquiry focuses on the Defendants' representations about the product . . . ." *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 537 (C.D. Cal. 2011) (holding that "the central predominating question is whether Defendants' marketing statements about [the product are] materially misleading"). Plaintiff here alleges that Defendants intentionally misrepresented the "actual gameplay" of *Aliens: Colonial Marines* through demonstrations of a version of the game they knew was superior to the version that would ultimately be sold at retail. (Dkt. 26 ¶¶ 27–50.) Plaintiff further alleges that these demonstrations were performed widely at leading video game expos such as E3 (2011 and 2012), Penny Arcade Expo (2011 and 2012), and Gamescon (2011); were uploaded to Sega's YouTube channel; and were otherwise widely distributed prior to the game's February 2013 retail release. (*Id.*) Where, as here, "each class member purchased [defendant's product] and was subject to the same deceptive marketing and advertising," predominance is satisfied. *Guido*, 284 F.R.D. at 481. *See also Johns v. Bayer Corp.*, 280 F.R.D. 551, 558 (S.D. Cal. 2012) ("[W]hen plaintiffs are exposed to a common advertising campaign, common issues predominate.").

### 2. *A Class Action is the Superior Method for Adjudicating this Controversy.*

Further satisfying Rule 23(b)(3)'s requirements, this class action is superior to other available methods for the fair and efficient adjudication of the proposed settlement class's claims. The purpose of the superiority requirement is judicial economy and assurance that a class action is the "most efficient and effective means of resolving the controversy." *Wolin*, 617 F.3d at 1175–76;

1   *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234–35 (9th Cir. 1996) (describing a

2   class action as superior when it will reduce the costs inherent in litigation and "no realistic

3   alternative exists" for the class members). "Where recovery on an individual basis would be

4   dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class

5   certification." *Wolin*, 617 F.3d at 1175. Moreover, the class action mechanism is superior to

6   individual actions in consumer cases with thousands of members as "Rule 23(b)(3) was designed

7   for situations such as this . . . in which the potential recovery is too slight to support individual

8   suits, but injury is substantial in the aggregate." *Holloway v. Full Spectrum Lending*, No. 06-cv-

9   5975, 2007 WL 7698843, at *9 (C.D. Cal. June 26, 2007) (quoting *Murray v. GMAC Mortg.

10  Corp.*, 434 F.3d 948, 953 (7th Cir. 2006)). Finally, as in this action, when parties have already

11  negotiated a compromise, courts need not focus on issues that could surface at trial, because a

12  finally approved settlement would extinguish the need for one. *Amchem*, 521 U.S. at 620.

13          Here, if the proposed settlement class members were to pursue their claims against Sega

14  individually, each of them would be required to provide nearly the same—if not identical—legal

15  and factual arguments and evidence to prove their common claims. The result would be thousands

16  of trials at enormous expense to the proposed class members, Sega, and the courts. Comparing the

17  relatively small amount of damages each class member seeks to recover—*i.e.*, some portion of the

18  game's purchase price—with the costs of actually prosecuting those claims (*e.g.*, hiring the experts

19  necessary to analyze the game's true functionality compared against Defendants' alleged

20  promotional claims), makes clear that individual class members would have little incentive to

21  pursue such claims. *See Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, 562 (C.D. Cal.

22  2012) (holding that a class action is superior to maintaining individual claims for a small amount

23  of damages). Where, as here, individual recoveries for Plaintiff and the proposed class would be

24  small and, but for the class action, would likely not even be pursued, the practical utility of the

25  class action mechanism under federal law is apparent. *See Chamberlan*, 223 F.R.D. at 527.

26          Accordingly, this class action is the superior method for adjudicating the instant

27  controversy, and, as all requirements of class certification under Rule 23 are met, the proposed

28  settlement class should be certified.

---

## V.   THE COURT SHOULD APPOINT PLAINTIFF'S COUNSEL AS CLASS COUNSEL

Under Rule 23, "a court that certifies a class must appoint class counsel . . . [who] must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, the Court must consider counsel's following attributes: (1) work in identifying or investigating potential claims; (2) experience in handling class actions or other complex litigation, and the types of claims asserted in the case; (3) knowledge of the applicable law; and (4) resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i–iv).

As discussed above, proposed class counsel have extensive experience in prosecuting similar class actions, including numerous actions involving the promotion and functionality of consumer goods and software. (Balabanian Decl. ¶ 18.) Importantly, proposed class counsel have diligently investigated and prosecuted *this* matter by dedicating substantial resources to the investigation of the claims at issue in the action and have successfully negotiated the present Settlement Agreement for the benefit of the proposed class. (*Id.* ¶ 19.) Accordingly, the Court should appoint Rafey Balabanian and Ben Thomassen of Edelson PC as class counsel.

## VI.   THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL

After determining that the proposed settlement class should be certified, this Court must approve any class settlement. Fed. R. Civ. P. 23(e). The procedure for review is a well-established two-step process. *See* Herbert Newberg & Alba Conte, Newberg on Class Actions § 11.25 at 3839 (4th ed. 2002). The first step is a preliminary, pre-notification hearing to ensure that the settlement is not "unacceptable at the outset." *Id*. The Manual for Complex Litigation characterizes the preliminary approval stage as an "initial evaluation" of the fairness of the proposed settlement made by a court on the basis of written submissions and informal presentations from the settling parties. Manual for Complex Litigation (Fourth) § 21.632 (2004).

While the Ninth Circuit has expressed a policy favoring the voluntary conciliation and settlement of complex class action litigation, *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008), it has not specified a particular standard for granting preliminary settlement approval. Nevertheless, courts in this District generally look to four factors in making this determination.

Specifically, preliminary approval should be granted, and notice of the settlement disseminated to class members, where "[1] the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives or segments of the class, and [4] falls within the range of possible approval . . . ." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (quoting Manual for Complex Litigation (Second) § 30.44 (1985)). *See also Boring v. Bed Bath & Beyond of Cal. LLC*, No. 12-cv-05259, 2013 WL 6145706, at *7 (N.D. Cal. Nov. 21, 2013) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079); *Cordy v. USS-Posco Indus.*, No. 12-cv-553, 2014 WL 212587, at *2 (N.D. Cal. Jan. 17, 2014) (same); *Ching v. Siemens Indus., Inc.*, No. 11-cv-4838, 2013 WL 6200190, at *5 (N.D. Cal. Nov. 26, 2013) (same). The proposed settlement easily satisfies these four factors.

### A. The Settlement is the Product of Serious, Informed, Non-Collusive Negotiations

First, the settlement is the product of serious, informed, non-collusive negotiations. The parties engaged in numerous and extensive arm's-length settlement discussions throughout the course of litigation, including the mediation with Judge Westerfield that ultimately allowed the parties to reach the instant settlement—in fact, the settlement structure eventually reached between Plaintiff and Sega mirrors that reached at the end of the mediation. Courts generally find that a settlement was non-collusive where it was reached with the assistance of a third-party neutral. *See, e.g.*, *Boring*, 2013 WL 6145706, at *7; *Ching*, 2013 WL 6200190, at *6. The parties' negotiations were also well-informed as they were represented by experienced counsel who had the benefit of a substantive ruling from the Court and possessed sufficient information obtained through formal and informal discovery. *See Williams v. Costco Wholesale Corp.*, No. 02-cv-2003, 2010 WL 761122, *5 (S.D. Cal. Mar. 4, 2010) ("[P]laintiff ha[d] sufficient information from investigation and from informal discovery to have a clear view of the strengths and weaknesses of the case and to support settlement."); *Harris v. Marketing Corp.*, No. 08-cv-5198, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011) ("With the Court's prior rulings as guidance, the parties were in a position to assess the strengths and weaknesses of their arguments and evidence, and make an

1   *informed* decision about the risks associated with proceeding . . . to trial.") (emphasis added).

2   **B.    There Are No Obvious Deficiencies in the Proposed Settlement**

3   Second, there are no obvious deficiencies in the proposed settlement. In light of this

4   Court's concerns expressed at the case management conference on June 26, 2014, Plaintiff and

5   Sega have agreed that no amount of the $1.25 million settlement fund will revert to Sega. Instead,

6   after payment of administrative costs, any incentive award and attorneys' fees as determined by

7   the Court, the entire balance of the fund will be distributed *pro rata* to class members submitting a

8   valid claim form, up to their purchase price.[8] The proposed settlement thus provides real and

9   substantial monetary relief to the class, all without the risk, delay, and expense of further

10  litigation. Indeed, Sega has indicated that absent this settlement it would vigorously contest both

11  the merits and class treatment of Plaintiff's claims. (Balabanian Decl. ¶ 21.) Further, as explained

12  above, given that Gearbox has provided no contribution to the settlement, no claims are being

13  released as to Gearbox, and each proposed class member retains their right to seek additional

14  recovery against Gearbox.

15  Although Plaintiff is confident in the strength of the claims alleged against Sega, that the

16  Court would have ultimately certified a class, and that Plaintiff would have obtained summary

17  judgment on some key issues, balancing the strength of the claims against the legal and factual

18  obstacles remaining, Plaintiff and proposed class counsel concluded that accepting the relief

19  afforded by the proposed settlement was in the best interest of the proposed class. (Balabanian

20  _____

21  [8]   As noted above, in the event that any money remains in the fund after each individual class
22  member submitting a valid claim has received a full refund of their purchase price, that money
    will be donated—subject to the Court's approval—to the NCLC and Consumers Union. The
23  NCLC is a nationwide nonprofit consumer law organization dedicated to consumer justice, whose
    work includes policy analysis and advocacy, consumer law publications, litigation, expert witness
24  services, and training and advice for advocates. *See generally* National Consumer Law Center,
    *About Us*, http://www.nclc.org/about-us/about-us.html (last visited July 30, 2014). Consumers
25  Union is a well-known consumer protection organization that seeks to ensure that consumers
    receive truthful information about consumer products, and various courts have approved
26  Consumers Union as an appropriate *cy pres* recipient in consumer fraud cases. *See, e.g., Nigh v.
    Humphreys Pharmacal, Inc.*, No. 12-cv-12714, 2013 WL 5995382, at *9 (S.D. Cal. Oct. 23,
27  2013).

28

Decl. ¶ 21.) Because the proposed settlement provides immediate monetary relief to the proposed class (the reasonableness of the amount of which is discussed below), and because it avoids the concerns expressed by this Court with respect to reverter, it has no obvious deficiencies. *See, e.g.*, *Tijero v. Aaron Bros., Inc.*, No. 10-cv-01089, 2013 WL 6700102, at *8 (N.D. Cal. Dec. 19, 2013) ("[T]here are no obvious deficiencies. To the contrary, the settlement confers tangible monetary benefits to the class . . . ."); *Ching*, 2013 WL 6200190, at *6 (finding "no obvious deficiencies" in settlement providing monetary relief to class); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080 ("Based on [the] risk and the anticipated expense and complexity of further litigation, the court cannot say the proposed settlement is obviously deficient . . . .").

### C.     The Proposed Settlement Does Not Give Preferential Treatment to Any Settlement Class Members

The proposed settlement provides no preferential treatment to any individual class member or segment of the proposed class. Each class member seeking to recover a portion of the fund must submit exactly the same claim form, and each class member submitting a valid claim form will receive the same *pro rata* distribution from the fund (up to that class member's purchase price). While Plaintiff will be seeking a modest incentive award from the Court in recognition of the time and effort he spent acting as class representative, such awards are common and in no way preclude preliminary approval. *See, e.g.*, *Villegas v. J.P. Morgan Chase & Co.*, No. 09-cv-00261, 2012 WL 5878390, at *7 (N.D. Cal. Nov. 21, 2012) (granting preliminary approval to settlement calling for $10,000 incentive award); *Cordy*, 2014 WL 212587, at *1, 3 (granting preliminary approval to settlement calling for $9,500 in "enhanced payments" to class representatives); *Boring*, 2013 WL 6145706, at *2, 8 (granting preliminary approval to settlement calling for $7,500 incentive award); *Ching*, 2013 WL 6200190, at *6 (noting that requests for incentive payments of up to $5,000 are "presumptively reasonable").

### D.     The Settlement Falls Within the Range of Possible Approval

Finally, the proposed settlement falls well within the range of possible approval. In evaluating this factor, "courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080. Here,

Plaintiff alleges that the game he and other class members purchased was inferior to the game that had been advertised, but does not allege that the game was completely valueless or non-functional. Consequently, a full recovery for class members after complete victory at trial would be the difference between the price they paid for the game as advertised and the value of the game they actually received. *See, e.g.*, *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 96 (Cal. Ct. App. 2009) ("The difference between what the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution."). If the value of the game actually received were zero, full recovery would be the purchase price of the game, which varied from $50–$60.[9] *See supra* note 3. But the game actually received was not completely worthless—indeed, one member of the proposed class, former named plaintiff Damion Perrine, played the game and re-sold his copy of it for $17. (Dkt. 26 ¶¶ 90–97.) Thus, assuming a complete victory at trial, class members would likely be entitled to something more like $33–$43.[10]

Balanced against this potential recovery, the value to class members of the proposed settlement puts it well within the range of possible approval. As noted above, after payment of administrative costs, an incentive award, and attorneys' fees, the balance of the $1.25 million settlement fund will be distributed to class members submitting a valid claim form, up to their purchase price. Thus, given that administrative costs will not exceed $200,000, and assuming this Court ultimately approves the requested incentive award and attorneys' fees in the amounts of $2,500 and $312,500 respectively, there will be $735,000 remaining in the fund to be distributed to class members.

If all 135,000 class members submitted a claim, each would receive over five dollars

---

[9]    While some class members, including Plaintiff, purchased the collector's edition of the game for $100, that edition included the same console version of the game that sold for $60, as well as a collectible figure and special packaging. *See supra* note 3. Plaintiff does not assert that the figure and packaging are worth less than the $40 he paid for them.

[10]   Further, given that complete victory is far from certain, the expected value to class members of proceeding with litigation is actually lower than $33–$43. For example, even if the class had a 75% chance of obtaining a full victory at trial, the expected value of each class member's recovery would be between $24.75 and $32.25 (75% of $33–$43).

1   ($735,000 / 135,000 = $5.44). That amount represents over 12–16% of the $33–$43 recoverable

2   after trial, which places the proposed settlement within the range of possible approval. *See, e.g.*, *In*

3   *re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) ("It is well-settled law that a

4   cash settlement amounting to only a fraction of the potential recovery does not per se render the

5   settlement inadequate or unfair."); *Villegas*, 2012 WL 5878390, at *6–7 (finding settlement

6   providing approximately 15% of potential recovery was "within the range of possible approval").

7   Further, the $33–$43 potential recovery amount represents a *full victory* at trial *against both*

8   *Defendants*. But the proposed settlement here releases only claims against Sega, and class

9   members retain all rights to seek additional recovery against Gearbox. The retention of claims

10  against Gearbox is valuable, as Gearbox was an active participant in the allegedly deceptive

11  marketing, having made some of the key misrepresentations that product demonstrations showed

12  "actual gameplay." (Dkt. 26 ¶¶ 31, 34, 37, 44.) Thus, even though the proposed settlement

13  provides a recovery that would be within the range of possible approval even if it were against

14  both Defendants, the fact that class members retain their claims against Gearbox makes the

15  settlement fall even more within the range of possible approval.

16       In addition, $5.44 is the absolute floor of an individual class member's recovery under the

17  proposed settlement, and given that not every class member will likely file a claim, class members

18  submitting claims are in a position to recover substantially more. For example, as one circuit court

19  has noted, claims rates in consumer class action settlements rarely exceed 7%. *Sullivan v. DB*

20  *Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2013). If 7% of the 135,000 class members here submit

21  valid claim forms, the *pro rata* distribution amount would be over $77 (with the understanding

22  that no claimant may receive more than their purchase price). In that case, every claimant who

23  paid less than $77 for the game would receive a full refund, and even those who purchased the

24  $100 collector's edition would receive at least a 77% refund. This is well in excess of the $33–$43

25  recovery class members could expect after a full victory at trial.

26       For all these reasons, the proposed settlement falls well within the range of possible

27  approval. And because the proposed settlement satisfies each of the four factors generally

28  considered by courts in this District on preliminary approval, this Court should preliminarily

1  approve the Partial Settlement Agreement.

2  **VII.    THE PROPOSED NOTICE PLAN SHOULD BE APPROVED**

3         Rule 23(c)(2)(B) provides that, "[f]or any class certified under Rule 23(b)(3), a court must

4  direct to class members the best notice practicable under the circumstances, including individual

5  notice to all members who can be identified through reasonable effort." Fed. R. Civ. P.

6  23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). Rule 23(c)(2)(B)

7  also provides that the substance of the "notice must clearly and concisely state in plain, easily

8  understood language" the nature of the action, the definition of the class to be certified, and the

9  class claims and defenses at issue; explain that class members may enter an appearance through

10 counsel if so desired or request to be excluded from the settlement class; and describe the binding

11 effect of a class judgment. Fed. R. Civ. P. 23(c)(2)(B). Notice is "adequate if it may be understood

12 by the average class member." Newberg, § 11:53 at 167. Rule 23(e)(1) similarly advises that

13 "[t]he court must direct notice in a reasonable manner to all class members who would be bound

14 by the proposal." Fed. R. Civ. P. 23(e)(1). Here, as described below, the parties have agreed on a

15 notice plan that satisfies these requirements (the "Notice Plan"), and respectfully request that this

16 Court approve it.

17        Direct notice to class members is not possible here; neither Sega nor Gearbox sold *Aliens:*

18 *Colonial Marines* directly to consumers, and thus cannot identify individual purchasers.[11] Because

19 direct notice is not possible, the parties asked KCC to design a publication notice plan that would

20 reach at least 70% of class members. (Balabanian Decl. ¶ 13.)[12]

21        KCC analyzed marketing data, such as consumer demographics and product and brand

22 usage, to determine the characteristics, interests, and habits of class members (*i.e.*, individuals who

23

24        [11]   Direct notice is not required in such circumstances. *See Weeks v. Kellogg Co.*, No. 09-cv-
     08102, 2013 WL 6531177, at *3 (C.D. Cal. Nov. 23, 2013) (approving proposed notice when no
25   direct notice was provided to class members because defendant did not sell directly to customers).

26        [12]   The Federal Judicial Center has suggested that 70% is a reasonable target for a notice plan.
     Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain*
27   *Language Guide* at 3 (2010), *available at*
     http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf.

28

1    play first-person-shooter video games, and would have been early purchasers of *Aliens: Colonial*

2    *Marines*). (Balabanian Decl. ¶ 14.) KCC then proposed a publication plan to best reach these

3    individuals. (*Id.* ¶¶ 14–15.) KCC's proposal included print publication in three widely-circulated

4    magazines whose readers are more than twice as likely as the general public to play shooter and

5    war video games: *ESPN: The Magazine, Guns & Ammo*, and *Rolling Stone*. (*Id.* ¶ 15.) In addition,

6    KCC's proposal called for the placement of internet banner ads designed to create 39 million

7    unique impressions among men aged 18–49 on automotive, sports, news, and technology sites.

8    (*Id.*) The Notice Plan adopts each of these proposals. (*See* Agreement §§ 4.1, 4.2.) Further,

9    consistent with the CLRA, the Notice Plan requires four consecutive weekly notices in either the

10   *San Francisco Chronicle* or the *Modesto Bee*, which is the largest circulation paper where Plaintiff

11   resides (Turlock, Stanislaus County, California). (Agreement § 4.2.)[13] In addition, the controversy

12   surrounding *Aliens: Colonial Marines* has been widely covered by video game industry press—

13   including on the same websites where the allegedly misleading gameplay demonstrations were

14   shown, featured, and viewed by Settlement Class Members—and Plaintiff's counsel anticipates

15   that such outlets will widely report on this settlement should it be given preliminary approval.

16   (Balabanian Decl. ¶ 17.)

17         The magazine and newspaper notice (a copy of which is attached to the Settlement

18   Agreement as Exhibit C) will, among other things, reference a settlement website to be established

19   by KCC. (*See* Agreement §§ 4.3, 6.5.) The internet banner ads (copies of which are attached to the

20   Settlement Agreement as Exhibit D) will also redirect potential class members to the settlement

21   website. The settlement website will serve as the traditional long form notice and provide class

22   members with the ability to file claim forms on-line. The settlement website will contain, in plain

23   language, all required elements of Rule 23(c)(2)(B), regarding the nature of the lawsuit and class

24   members' rights, including their rights to exclude themselves from the class or object to the

25   proposed settlement. It will also provide access to relevant court documents, instructions on how

26

27   _____

     [13]   The Settlement also requires Sega to serve upon the required government officials, notice
     of the proposed settlement in accordance with 28 U.S.C. § 1715. (Agreement § 4.4.)

28

to access the case docket via PACER or in person, the date of the final approval hearing, answers to frequently asked questions, and a toll-free number to reach proposed class counsel. (Balabanian Decl. ¶ 16.)

The Notice Plan—carefully designed to reach members of the proposed class through specifically-targeted but widely-viewed media—comports with Rule 23, and should be approved by this Court as well.

## VIII.   CONCLUSION

For the foregoing reasons, Plaintiff John Locke respectfully requests that this Court enter an order (1) certifying the proposed settlement class for settlement purposes; (2) naming Plaintiff as class representative; (3) appointing Rafey Balabanian and Benjamin Thomassen of Edelson P.C. as class counsel; (4) granting preliminary approval to the Partial Settlement Agreement; (5) approving the proposed Notice Plan; (6) scheduling a final fairness hearing; and (7) granting such other and further relief as the Court deems equitable and just.

Dated: August 11, 2014                                    Respectfully Submitted,

JOHN LOCKE, individually and on behalf of the
Class of similarly situated individuals,

/s/ Rafey S. Balabanian_____ ____
One of His Attorneys

Rafey S. Balabanian (Admitted *pro hac vice*)
rbalabanian@edelson.com
Benjamin S. Thomassen (Admitted *pro hac vice*)
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiff Locke and the Putative Class*

1

**CERTIFICATE OF SERVICE**

2
     I, Rafey S. Balabanian, an attorney, hereby certify that on August 11, 2014, I caused the
foregoing document to be electronically filed with the Clerk of the United States District Court for
3
the Northern District of California, using the CM/ECF electronic filing system, which will send
notification of filing to counsel of record for each party.

4

5
Dated: August 11, 2014

6
                                          /s/ Rafey S. Balabanian

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28