Mark S. Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251

Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Christopher L. Dore (Admitted *Pro Hac Vice*)
cdore@edelson.com
Benjamin S. Thomassen (Admitted *Pro Hac Vice*)
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiffs and the Putative Class*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN LOCKE and DAMION PERRINE, individually and on behalf of all others similarly situated, | Case No. 13-cv-01962-JD |
| *Plaintiffs*, | **PLAINTIFF JOHN LOCKE'S MOTION FOR CLASS CERTIFICATION** |
| *v.* | |
| SEGA OF AMERICA, INC. a California corporation, and GEARBOX SOFTWARE L.L.C., a Texas limited liability company, | Judge: Hon. James Donato Hearing Date: November 12, 2014 Time: 9:30 a.m. Courtroom: 11 |
| *Defendants*. | |

**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**

NOTICE IS HEREBY GIVEN that on November 12, 2014 at 9:30 a.m., or at such other time as may be set by the Court, Plaintiff John Locke will, and hereby does, move the Court, pursuant to Federal Rule of Civil Procedure 23, to certify a class in Courtroom 11, 19th Floor, 450 Golden Gate Avenue, San Francisco, California 94102, before the Honorable James Donato. Plaintiff's Motion is based on this Notice of Motion, the following Memorandum of Points and Authorities, oral argument of counsel, all documents in the record, and any other matter that may be submitted or raised at the hearing.

**RELIEF REQUESTED**

By this motion, Plaintiff John Locke requests an order pursuant to Federal Rule of Civil Procedure 23 certifying the class of similarly situated persons defined in Plaintiffs' First Amended Complaint, (*See* Dkt. 26 ¶ 101), appointing Plaintiff John Locke as class representative, and appointment of his counsel as class counsel.

Dated:  September 11, 2014

**JOHN LOCKE**, individually and on behalf of a class of similarly situated individuals,

By:  ___/s/ Rafey S. Balabanian___
        One of Plaintiff's Attorneys

Mark S. Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251

Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Christopher L. Dore (Admitted *Pro Hac Vice*)
cdore@edelson.com
Benjamin S. Thomassen (Admitted *Pro Hac Vice*)
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiffs and the Putative Class*

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................1

II.   FACTUAL BACKGROUND .................................................................................2

      A.    Defendants' Early Promotion of ACM and Use of a Demoed Version
            at and after the E3 2011 Video Game Conference ...............................2

      B.    Defendants' Further (But Unqualified and Undisclosed) Use of the
            Demoed Versions to Advertise ACM ...................................................7

      C.    While Successful in Generating Pre-Orders, Defendants' Focused Use
            of the Demoed Versions to Promote ACM Resulted in Immediate
            Backlash Upon the Game's Retail Release ..........................................9

      D.    John Locke Pre-Ordered ACM ...........................................................12

III.  ARGUMENT ........................................................................................................13

      A.    The Proposed Class Satisfies the Requirements of Rule 23(a).........................13

            1.    The Proposed Class is Sufficiently Numerous...........................................13

            2.    The Claims of the Proposed Class Share Common Questions of Law
                  and Fact .................................................................................................14

            3.    Plaintiff's Claims are Typical of the Proposed Class Members'
                  Claims ....................................................................................................16

            4.    Plaintiff (and his Counsel) Will Adequately Represent the Class..............17

      B.    The Proposed Class Falls Within Rules 23(b)(3) ...............................18

            1.    Common Questions of Law and Fact Predominate. ...................................19

            2.    A Class Action is Superior to Other Available Methods of
                  Adjudication .........................................................................................22

      C.    Plaintiffs' Counsel Should be Appointed Class Counsel .................................23

IV.   CONCLUSION .....................................................................................................24

# TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES:**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ......................................................... 18-19

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ........................................................14, 15

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708 (9th Cir. 2010) ......................................12

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975). ..................................................................15

*Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015 (9th Cir. 2012) ...............................14

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .................................................16, 17

*In re First Alliance Mortg. Co.*, 471 F.3d 977 (9th Cir. 2006) ............................................15

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
        244 F.3d 1152 (9th Cir. 2001) ....................................................................................23

*Parra v. Bashas', Inc.*, 536 F.3d 975(9th Cir. 2008) ...........................................................14

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011) .........................................19, 20, 21

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010). ................ 16, 17, 22-23

**UNITED STATES DISTRICT COURT CASES:**

*Astiana v. Kashi Co.*, 291 F.R.D. 493 (S.D. Cal. 2013) ....................................................16, 17, 20

*In re Brazilian Blowout Litig.*, No. CV 10-8452-JFW (MANx),
        2011 WL 10962891 (C.D. Cal. Apr. 12, 2011) ...........................................16, 19, 20, 22, 23

*In re Google Referrer Header Privacy Litig.*, No. 5:10-cv-04809 EJD,
        2014 WL 1266091 (N.D. Cal. Mar. 26, 2014) ..............................................................13

*In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005). ..............................12-13

*Kanawi v. Bechtel Corp.*, 254 F.R.D. 102 (N.D. Cal. 2008) ...............................................18

*Makaeff v. Trump Univ., LLC*, No. 3:10-cv-0940-GPC-WVG, 2014 WL 688164,
        (S.D. Cal. Feb. 21, 2014) ......................................................................................19, 20, 22

*Plascencia v. Lending 1st Mortg.*, 259 F.R.D. 437 (N.D. Cal. 2009) ...................................15-16

*Zeisel v. Diamond Foods, Inc.*, No. C 10-01192, 2011 WL 2221113,
        (N.D. Cal. June 7, 2011) .......................................................................................12 n.16

**STATUTES:**

Fed. R. Civ. P. 23 ................................................................................................ *passim*

**MISCELLANEOUS:**

5 Alba Conte & Herbert Newberg, *Newberg on Class Actions*, § 24.25 (3d ed. 1992) ...............16

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
       *Federal Practice & Procedure* § 1775 (2d ed.1986).............................................................

I.     **INTRODUCTION**[1]

This case, revolving around the video game *Aliens: Colonial Marines* ("ACM"), arises out of the differences between demonstration versions of the game that were created and used as part of a broad and aggressive marketing campaign promising cinematic detail, advanced artificial intelligence, and advanced technical features (the "Demoed Versions"), and the disappointing retail version of the game actually delivered to the public, which failed to live up to those promises (the "Retail Version"). Specifically, Defendants Gearbox Software L.L.C.'s ("Gearbox") and Sega of America, Inc.'s ("Sega") (collectively, "Defendants") initially used a Demoed Version to purportedly demonstrate the "actual gameplay" of ACM to the press in June 2011 at the video game industry's largest exposition, E3 ("E3 2011"). Following the E3 2011 event, Gearbox staged and recorded a "reenacted" gameplay demonstration of that initial Demoed Version—through which Gearbox's President and CEO, Randy Pitchford, gave an 11-minute narrated presentation of the Demoed Version, which he described as "actual gameplay" showing "what the game actually looks like." These presentations—*i.e.*, the E3 2011 gameplay demonstrations and the E3 2011 reenactment video—were widely reported on and lauded by the press, and the reenactment video was posted online, including on Sega's and Gearbox's respective YouTube channels. Defendants went on to create several video trailers of ACM—along with other advertising— ██████████ ███████████████████████ and used those trailers to further promote ACM before its retail release as additional public showcases of the game's "actual gameplay." Likewise, Defendants continued to use the Demoed Versions of ACM through 2011 and 2012 to market the game—each of which supported Mr. Pitchford's early contentions that "actual gameplay" was being demonstrated and shown. The goal of the campaign was to generate excitement for the game and encourage consumers to order the game before it was even released. Defendants were quite successful in doing so, as more than 130,000 consumers paid for the game on or before its release date.

---

[1]     All references to Exhibits refer to Exhibits A-I, as attached to and explained in the Declaration of Rafey S. Balabanian ("Balabanian Decl."), submitted contemporaneously herewith.

When the Retail Version of the game was ultimately delivered to consumers, however, it was dramatically inferior to the Demoed Versions that had been the focal point of Defendants' pre-release promotional campaign and disappointingly lacked many of the key features that had been promised. And those differences weren't minor—the press and consumers alike picked up on them right away, even though the press could only publicize their thoughts about the Retail Version *after* ACM's release, thanks to a "review embargo" utilized and enforced by Defendants. Plaintiff John Locke ("Plaintiff" or "Locke") was one of the many consumers who pre-ordered ACM based on Defendants' pre-release marketing.

Following his receipt of the Retail Version of ACM, Locke filed a complaint alleging several causes of action for fraud and false advertising, and now moves to certify a class against Gearbox of all consumers who pre-ordered the game. Because ultimate liability here will revolve around (1) Gearbox's conduct in promoting the Demoed Versions of ACM—conduct that does not vary with respect to the tens of thousands of consumers who pre-ordered the game—and (2) the actual differences between the Demoed Versions and the Retail Version of ACM—which also cannot vary with respect to members of the putative class—the motion should be granted.

## II.    FACTUAL BACKGROUND

### A.    Defendants' Early Promotion of ACM and Use of a Demoed Version at and after the E3 2011 Video Game Conference.

ACM is a first-person shooter video game developed by Defendants and set in the fictional universe of the *Aliens* film franchise. (93-22 at 5.) According to an internal marketing strategy document,[2] ████████████████████████████████████████████████████████,

---

[2]    As noted in the Declaration of John Cheng (Sega's CFO and COO), the "Proposition Document" referenced here, along with other details about the marketing and promotion of ACM was emailed to, *inter alia*, Steve Gibson, Gearbox's Vice President of Marketing and Rule 30(b)(6) designee on marketing issues relating to ACM. (Dkt. 93-1 ¶ 20); (Exhibit B, Gearbox Responses and Objections to Plaintiffs' Rule 30(b)(6) Deposition Notice, at 3-6.) ███████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████ Exhibit C, Development Agreement, at GB0000015 (§ 6.1)). ███████████████████████████████████████████████ (Exhibit C at GB0000080 (§2.14).) ███████████████████████████████ (Exhibit C at GB0000113 ("Exhibit D to Fourth Amendment to Development Agreement, Marketing Assets").)



(93-22 at 6.) (*See also id.* at 5

*id.* at 6

(Dkt. 93-22 at 6-7.) Defendants believed that the game would

(Dkt. 93-22 at 6-7.) Defendants intended that their pre-release marketing efforts would

(Dkt. 93-22 at 7.)

The centerpieces of this campaign were the Demoed Versions of ACM, which were presented by Gearbox for the first time at the E3 event in June 2011 to the video game press. (Dkt. 43 ¶ 30; Exhibit D, Dep. Tr. of Gearbox R. 30(b)(6) designee, Steve Gibson ("Gibson Tr.") at 78:3-7 ("                     ").) E3 is one of the largest video game conventions in the world, and is widely-covered and attended by members of the video game industry press. (Dkt. 43 ¶ 30.)

. (Dkt. 93-24 at 3.)

. (Dkt. 93-25 at 4

(*See* Dkt. 93-24 at 3

1   ███████ ; (Gibson Tr. at 78:22 – 80:8). ████████████████████

2   ████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████

4   ████████████████████ (Dkt. 93-22 at 7.) (*See also id.* ████████

5   ████████████████████████████████████

6   Although the E3 2011 gameplay demonstrations were conducted behind closed doors, (Dkt. 43

7   ¶ [30], ████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████████████ (Gibson Tr. 125:21 – 127:7.)

10      Shortly after the E3 2011 event, Gearbox staged and recorded a "reenacted" presentation of

11  the same Demoed Version shown at E3 2011 (the "E3 Reenactment"). The E3 Reenactment

12  showed an eleven-minute display of a Gearbox employee playing ████████████████

13  ████████████████████████████████████████████████████████

14  ████████████████████████████████████████████

15  ████████████████████████████ Randy Pitchford

16  narrated the entire E3 Reenactment. (Gibson Tr. at 82:20 – 84:25.) ████████

17  ████████████████████████████████████████████████████████

18  the E3 Reenactment portrayed the eerie atmosphere of the *Aliens* franchise, and Gearbox made

19  sure to highlight events and areas from the films that a player could interact with and experience

20  through gameplay. (*See, e.g.,* E3 Reenactment at 3:51[3] (Pitchford narrating over video footage

21  generated by the Demoed Version: "Remember that map that Hudson used to find civvies [in the

22  film]? That's it [in the game] . . . . As you look out the destroyed windows [in the game], we can

23  see the gnarled landscape of LV-426 [the planet on which the films are set.] We can come later to

24  investigate the destruction [in the game].").) In addition, Pitchford pointed out that the Demoed

---

[3]   Citations to the E3 Reenactment refer to a video of the presentation that can be found
online on Gearbox's YouTube channel, which was available as of September 11, 2014 at
http://youtu.be/-EOlzCrVFvs?list=UUSRO0JNUYTCjsk7VmMdNYKw. The number in the
citation (here, 3:51) refers to the time in the video at which the cited material begins.

Version featured in the E3 Reenactment employed advanced artificial intelligence to guide the behavior of the enemy aliens, sometimes called xenomorphs. (E3 Reenactment at 4:57) ("Aliens can climb on the ceilings, on the walls; it's all driven by sophisticated artificial intelligence."). ACM was a huge hit at and after E3 2011, garnering multiple award nominations and glowing reviews from the press—many of which drew comparisons between the films and the demonstrated game. (Dkt. 93-9 at 10) (Gearbox webpage quoting numerous reviews, including a Wall Street Journal review stating "Go grab your DVD of *Aliens—the Director's Cut*, if you have it. Fast forward to [a particular exciting scene.] That's pretty much exactly how the demo of Colonial Marines feels.").

Not only did the Demoed Version shown at E3 2011 compellingly portray the *Aliens* universe aesthetics and xenomorph behavior, but as Pitchford explained—during the E3 Reenactment (and, as confirmed by many members of the press, at the E3 2011 closed door demonstrations themselves)—as far as the demonstrated gameplay footage went, what you see is what you get. For example, Pitchford began the E3 Reenactment by stating:

> Today we're going to show you a bit of the game. This is really kind of a big moment for us because, you know, we haven't shown the game in action before. And so you're going to see *what the game actually looks like*. Not just screen shots, but the *actual gameplay*.

(E3 Reenactment at 1:10) (emphasis added). Similarly, Pitchford closed the presentation by stating "I hope you enjoyed this clip *of gameplay* demonstration." (*Id*. at 11:12) (emphasis added). Likewise, at the E3 2011 gameplay demonstrations themselves (*i.e.*, apart from the staged reenactment featured on Gearbox's YouTube channel and other websites), Pitchford also repeatedly told reporters that the E3 Presentation represented "real live gameplay" of ACM, which featured "sophisticated artificial intelligence." Allistair Pinsof, *Pitchford Goes to Molyneux and Beyond*, Destructoid, Feb. 14, 2013, http://www.destructoid.com/gearbox-lied-about-aliens-from-e3-demo-to-retail-product-244966.phtml ("[Two other reporters] and I all heard the same thing, even though we were in different presentations (and representing different publications at the time)."). Further, the E3 Reenactment was uploaded to various internet sites, including Gearbox's, where consumers were encouraged to "[t]ake a good hard look at Aliens: Colonial Marines in this

11 minute video, *featuring direct-feed gameplay* narrated by Gearbox CEO and President Randy Pitchford." (Dkt. 93-9 at 4) (emphasis added); *see also* (Dkt. 43 ¶ 37 (admitting that E3 Reenactment was uploaded to Sega's website)); (Ex. I, Declaration of Amir Missaghi, ¶¶ 5, 9 (noting that the E3 Reenactment video is still available on several websites—including Sega's and Gearbox's YouTube channels—which, according to publicly available statistics, collectively generated over a million views *prior to* ACM's retail release).)

These representations—that the game demonstrations at the center of Defendants' pre-release marketing campaign showed actual gameplay—carried forward with Defendants' on-going campaign to show the Demoed Versions of ACM to the public, including at other industry events prior to the game's retail sale to consumers (*e.g.*, Gamescom 2011 (Dkt. 43 ¶ 36), Penny Arcade Expo 2011 (*id.*), Destination PlayStation 2012 (*id.* ¶ 38), and Penny Arcade Expo East 2012 (*id.*)). Defendants' on-going use of the Demoed Versions of ACM at these events—like their use of the version demonstrated at E3 2011—continued to garner rave reviews from the press. As Gearbox highlighted on its website:

> We've been travelling around the world, showing Aliens: Colonial Marines to press and gamers alike. Here's what they have to say:
> - "Looking very impressive." [PlayStation Blog review]
>   …
> - "Looks and feels faithful to its movie inspiration." [1UP.com review]
> - "Everyone in the room was hanging on every scene and jaws dropped at the gameplay." [GotGame.com review]

(Dkt. 93-9 at 5.) Also:

> Some of the latest reviews for Aliens: Colonial Marines, direct from Gamescom:
>   …
> - "Appears to nail the action-packed, panic-filled moments of the Aliens film with vigour." [Digitial Spy review]
> - "The attention to detail and, more importantly, atmosphere look to be second to none." [Square-Go.com review]

(Dkt. 93-9 at 7.)

In short, Defendants actively marketed—both to the press and consumers alike—that the Demoed Versions of ACM showcased "actual gameplay" and continued to solidify expectations

about what the game would ultimately deliver.

**B.    Defendants' Further (But Unqualified and Undisclosed) Use of the Demoed Versions to Advertise ACM.**

In addition to showing them at numerous video game conventions that were widely-covered by the press (and representing that they were "what the game actually looks like"), the Demoed Versions of ACM were also ████████████████████████████████████████ ███████████████████████████████████████████. (*See* Exhibit F, ACM Trailer Timeline[4].) And, for reasons known only to them, Defendants decided to ███████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████ ████████████ ██████████████████████ (Bahl Tr. at 27:9-20, 41:3 – 42:11, 49:13 – 51:20, 52:18-25; Ex. F, ACM Trailer Timeline.) For example, in August 2011, Defendants released a two-minute trailer advertising ACM. (*Id.*[5]) The trailer featured ███████████████████████████████████████████████████████, and was widely-disseminated over various internet sites, including both industry-specific websites such as IGN and

---

[4]       It must be noted that Defendants created and released many additional trailers for ACM that were readily accessible by members of the class but which are not referenced on the ACM Trailer Timeline. For example, Defendants' "First Contact" gameplay demonstration video showed around five minutes of uninterrupted gameplay footage generated by a Demoed Version of ACM, and was released in March or April of 2012. It appeared on sites like MTV (at http://www.mtv.com/videos/misc/756860/aliens-colonial-marines-first-contact-gameplay.jhtml) and GameTrailers.com (http://www.gametrailers.com/video/first-contact-aliens-colonial/728781). The video is still available today on different YouTube channels (e.g., https://www.youtube.com/watch?v=J22dKXP3zjk), was viewed by Locke prior to ACM's retail release, (Exhibit G, Declaration of Plaintiff John Locke ("Locke Decl."), ¶ 5.) and is featured on VideoGamer.com in a video that compared the Demoed Version of ACM (as shown in the First Contact trailer) against the Retail Version of the game. (http://www.videogamer.com/videos/aliens_colonial_marines_what_the_hell_happened_ to_aliens_colonial_marines_2.html).

[5]       A copy of this trailer is available at https://www.youtube.com/watch?v=V5OBMl0ov1Y.

G4,[6] and more mainstream sites like MTV and the Huffington Post.[7] (Ex. F (Column for Aug. 2011, "Aug 2011 Trailer").) Another two-minute trailer, released in May 2012 likewise ███████ ████████████████████████████████████████████ and was widely disseminated over the internet. (Ex. F (Column for May 2012, "Suspense Trailer").)[8] Not only did the May 2012 trailer ████████████████████████████████████████, however, it expressly stated— without qualification—that "THIS TRAILER IS SHOT WITH 100% IN-GAME FOOTAGE."[9] Importantly, in none of these trailers did Defendant explain or qualify that the gameplay footage being shown was generated not from the Retail Version of ACM, ████████████████████ ████████████████.

In addition to these more traditional video game trailers, Gearbox also released three videos referred to as "Developer Diaries" that, in addition to showing footage ███████████████ ███████████████ of ACM, featured Gearbox employees discussing their creation of the game. (Ex. F (Columns for Jul and Aug 2012 ("Dev Diaries" Parts 1, 2, and 3)).) One of the Developer Diaries highlighted ACM's fidelity to the cinematic aesthetic of the *Aliens* film franchise:

I think one of the similarities that you would find between [film director James]

---

[6]   The trailer is available on IGN at http://www.ign.com/videos/2011/08/25/pax-aliens-colonial-marines-teaser-trailer-2; the trailer is available on G4 at http://www.g4tv.com/videos/54935/aliens-colonial-marines-action-trailer/.

[7]   The trailer is available on MTV's website at http://www.mtv.com/videos/misc/685604/pax-2011-aliens-colonial-marines-full-complement-trailer.jhtml; the trailer is available at the Huffington Post's website at http://videos.huffingtonpost.com/pax-aliens-colonial-marines-teaser-trailer-517150950.

[8]   For example, a copy of the trailer is available on Sega's website at https://www.youtube.com/watch?v=CgSHqjwFcd8&oref=http%3A%2F%2Fwww.youtube.com%2Fwatch%3Fv%3DCgSHqjwFcd8&has_verified=1; on IGN's website at http://www.ign.com/videos/2012/05/21/aliens-colonial-marines-suspense-trailer; and on GameSpot's website at http://www.gamespot.com/videos/aliens-colonial-marines-suspense-trailer/2300-6377682/.

[9]   The "THIS TRAILER IS SHOT WITH 100% IN-GAME FOOTAGE" text can be seen at 0:05 – 0:12 as displayed on Sega's YouTube channel at https://www.youtube.com/watch?v=CgSHqjwFcd8&oref=http%3A%2F%2Fwww.youtube.com%2Fwatch%3Fv%3DCgSHqjwFcd8&has_verified=1.

Cameron's *Aliens* and where we are with the game is really in sort of look and feel, tone of the game has what you would think as if Cameron was directing it himself, at least that's our hope, is that you feel like the cinematography feels correct, you feel like the look and feel of the weapons, the way the aliens move, is something that maybe he would have done if he was directing a game like this.

(ACM Developer Diary 1, http://blogs.sega.com/2012/07/31/aliens-colonial-marines-developer-diary-1/, at 1:59.) (*See also id.* at 2:25 ("So we want to present something that's as compelling and detailed and beautiful and exciting as the films but in an interactive experience.").) Another of the Developer Diaries focused on the artificial intelligence powering the enemy aliens in the game:

The things that make the xenomorphs believable in the world and something that we're working on for all of the characters is they have to have purpose. They have to have purpose and they have to feel like they are in command of their capacities, you know, they understand how to move through the environment as a creature that you believe that they're trying to do things in the world (mostly trying to kill you).

(ACM Developer Diary 2, http://blogs.sega.com/2012/08/07/aliens-colonial-marines-developer-diary-2-xenos-vs-marines/, at 1:08.) As with the trailers discussed above, none of the developer commentary offered in the three Developer Diaries explains that the footage being shown in *all* of those videos ███████████████████████ ████████, which would ultimately not be sold to anyone.

## C. While Successful in Generating Pre-Orders, Defendants' Focused Use of the Demoed Versions to Promote ACM Resulted in Immediate Backlash Upon the Game's Retail Release.

Defendants' pre-release marketing campaign—whose centerpiece was the Demoed Versions of the ACM, which compellingly re-created the look and feel of the *Aliens* universe and, as described by Randy Pitchford, promised to show "what the game actually looks like"—was ultimately quite successful. In total, the many videos created by Gearbox using the Demoed Versions of ACM (including the version shown at E3 2011), were hosted online and generated millions of individual views prior to ACM's retail release. (*See generally* Exhibit I, Declaration of Amir Missaghi.) The campaign itself resulted in over 130,000 pre-orders and first-day purchases of ACM. (Dkt. 78-2 ¶ 7.)

Unfortunately for those consumers who took Gearbox at its word, though, the gameplay appearing in the Retail Version they actually purchased and received was vastly inferior to the

Demoed Versions of the game. The differences were picked up right away, both by the press and consumers alike. For example, one post-release review noted that "the demo looks absolutely nothing like the final game…. The differences are shocking. Most of the lighting effects and textures have been pared down to a stunning degree." Jeffrey Matulef, *Aliens: Colonial Marines*' Demo Looked Much Prettier than the Final Game, Eurogamer.net, Feb. 19, 2013, http://www.eurogamer.net/articles/2013-02-13-aliens-colonial-marines-demo-looked-much-prettier-than-the-final-game. Another noted that

> [w]hen screens from the [Demoed Versions] are compared to the [Retail Version], the lack of environmental detail, dated lighting effects, and linear-to-a-fault gameplay become apparent. Games shown at E3 don't suddenly look worse as development continues. Like early trailers for Hollywood blockbusters, graphics and gameplay in early game demos get repeatedly touched-up and expanded for release.

Allistair Pinsof, *Pitchford Goes to Molyneux and Beyond*, Destructoid, Feb. 14, 2013, http://www.destructoid.com/gearbox-lied-about-aliens-from-e3-demo-to-retail-product-244966.phtml. And two others created a shot-by-shot comparison video that detailed the many differences between the Demoed and Retail Versions of the game, especially in the Demoed Versions' use of advanced technologies and gameplay showcased in a five minute gameplay trailer (entitled "First Contact" and created using a Demoed Version of ACM in 2012[10]) released in or around April 2012. Matt Lees and Steve Burns, *Aliens: Colonial Marines: what the hell happened to Aliens: Colonial Marines?*, Feb. 13, 2013, http://www.videogamer.com/videos/aliens_colonial_marines_what_the_hell_happened_to_aliens_colonial_marines_2.html.

Further, despite the fact that the Retail Version differed greatly from the Demoed Versions,

(*See* Bahl Tr. at 128:4 – 130:9.)

---

[10]     *See* https://www.youtube.com/watch?v=J22dKXP3zjk.

1  ████████████████████████████[11] (*See Id.* at 165:4 – 167:12.) Indeed, to the

2  contrary, Defendants utilized a pre-release review embargo, which prevented consumers from

3  learning the truth about the Retail Version prior to the release date from "critics or industry

4  reviewers"—*i.e.*, the very source that Defendants used to publicize their many gameplay

5  demonstrations of the Demoed Versions. (Dkt. 43 ¶ 64.) It was only after the release (and

6  subsequent widespread panning of ACM, including the many public comparisons drawn between

7  the two versions of the game) that Defendants finally acknowledged a difference between the

8  Demoed Versions and the Retail Version. *See*

9  https://twitter.com/DuvalMagic/status/303907130195464192 (Twitter exchange between consumer

10  and Pitchford stating "[Consumer:] [M]ost people just want an explanation why the game is so

11  different from the demo. [Pitchford:] That is understood and fair and we are looking at that.");

12  https://twitter.com/DuvalMagic/status/316990695141412864 (Twitter exchange between consumer

13  and Pitchford stating "[Consumer:] KojiPro using deferred rendering techniques, which

14  @DuvalMagic told me a year ago was the future of next-gen rendering . . . .[12] [Pitchford:] Newly

15  Learned Pro-tip: Try not to attempt next gen software techniques on current gen hardware;

16  tradeoffs cause expectation gaps."); Carol Pinchefsky, *Sega Admits 'Aliens: Colonial Marines'*

17  *Trailer Was Misleading*, Forbes, Apr. 3, 2013, available at

18  http://www.forbes.com/sites/carolpinchefsky/2013/04/03/sega-admits-aliens-colonial-marines-

19  ─────────────────────────────

20  [11] ████████████████████████████████████████

(*See* Dkt. 93-13 at p. 3 (Sega requesting that
21  Gearbox ask a "VIP" to remove content discussing certain features of ACM from the
"www.gamezone.com" website, and Gearbox complying); Dkt. 93-17 at 2-3 (Gearbox removing a
22  screenshot of ACM from its website at Sega's request).)

23  [12]     One reason the press was raving about the game's recreation of the *Aliens* atmosphere was
because of the lighting in the Demoed Version. *See, e.g.,* Jim Sterling, *Aliens: Colonial Marines to*
24  *Use "Next Gen" Lighting*, Destructoid, Apr. 4, 2012, 3:30 p.m., www.destructoid.com/aliens-
colonial-marines-to-use-next-gen-lighting-225194.phtml ("[T]he lighting in *Colonial Marines* does
25  look bloody fantastic."). Randy Pitchford explained to the press that Gearbox had developed a
powerful technique he called "deferred rendering," excitedly noted that, while the process was
26  difficult to achieve on the current generation of gaming hardware (*i.e.*, the PlayStation 3 and
Xbox360—the consoles that ACM was developed for), they "found a way and we're f***ing
27  doing it," and boasted that "[i]t's very possible that *Aliens: Colonial Marines* is the first
commercial product to ship with deferred lighting." *Id.*

28

trailer-was-misleading/ (noting that Sega responded to a consumer complaint to the UK

Advertising Standards Authority by stating "Sega Europe acknowledges your objection that trailers

did not accurately reflect the final content of the game," and by adding additional disclaimers to

the trailers stating that they do not represent the final product).

### D.    John Locke Pre-Ordered ACM.

Plaintiff Locke was one of the more than 130,000 consumers who were exposed to

Defendants' pre-release marketing showcasing the Demoed Versions and who pre-ordered ACM.

Specifically, Locke viewed actual gameplay demonstrations of ACM (including the E3

Reenactment and the "First Contact" gameplay video that was critiqued in the post-release

comparison video referenced *supra* at Motion p.10:13-20) and many of Defendants' trailers for

ACM—including, of course, those created using the E3 2011 Demoed Version. (Locke Decl. ¶ 5.)

Based on what he saw, Locke decided to pre-order ACM from Amazaon.com. (*Id.* ¶¶ 4, 6.) After

he pre-purchased the title, Plaintiff became concerned that the quality of the ACM game would

suffer (since Defendants chose not to release a consumer-playable demo for the title), but

ultimately he "believed that [Defendants'] videos and trailers showed what [ACM] would actually

look and play like [and therefore decided] not to cancel [his] pre-order with Amazon." (*Id.* ¶ 7.)

And like the many consumers who received their purchased copy of ACM on its retail launch day

(and the many industry reviewers who noted as much), Locke *immediately* recognized that the

Retail Version of ACM that he'd purchased was far inferior to the Demoed Versions he'd been

seeing and hearing about for years. (*Id.* ¶¶ 8-9.) What's more, had Locke known the truth about

what he was purchasing—whether from industry reviews or from Defendants' public recognitions

(both of which, as noted *supra*, came too late)—he would not have spent $100 on ACM prior to its

retail release. (*Id.* ¶ 10.)

Disappointed and angry that the Retail Version failed to live up to the promises of

Defendants' pre-release marketing, Plaintiff Locke filed suit on behalf of himself and all others

who purchased ACM on or before the release date. Plaintiff now moves to certify a class of all

such purchasers as against Gearbox.[13]

## III.   ARGUMENT

Plaintiff respectfully requests that the following class be certified:

> All persons in the United States who paid for a copy of the *Aliens: Colonial Marines* video game either on or before February 12, 2013.[14]

To be certified, a proposed class must satisfy the criteria set forth in Federal Rule of Civil Procedure 23(a), and fit into one of the three categories described in Rule 23(b). *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010). Rule 23(a) requires that (1) the proposed class is so numerous that joinder of all individual class members is impracticable (numerosity), (2) that there are questions of law or fact common to the proposed class (commonality), (3) that the claims of the plaintiff are typical of those of the class (typicality), and (4) that the plaintiff will adequately protect the interests of the class (adequacy). Fed. R. Civ. P. 23(a). Here, the proposed class satisfies all of the requirements of Rule 23(a), and falls into one of the Rule 23(b) categories. Consequently, the proposed class should be certified.[15]

### A.   The Proposed Class Satisfies the Requirements of Rule 23(a).

#### 1.   The Proposed Class is Sufficiently Numerous.

The first requirement of Rule 23(a)—numerosity—is satisfied where "the class is so

---

[13]    Sega has agreed to settle the claims against it, and there is a pending motion to certify a class for settlement purposes with respect to Sega. (Dkt. 78.) Consequently, the instant motion seeks only to certify a class of consumers as to Gearbox.

[14]    The class definition covers only those consumers who purchased ACM on or before the day of its retail release, and is therefore limited to consumers who paid for the game *before* the deficiencies of the retail version came to light. Indeed, the actual number of consumers who bought the game based on Gearbox's misleading representations almost certainly is much larger, since footage from Gearbox's "actual gameplay" demonstrations remains on display to this day. (*See* FAC ¶ 37; Ex. I ¶¶ 5, 9.)

[15]    In addition to the Rule 23 requirements, some courts require that "the class must be adequately defined and clearly ascertainable before a class action may proceed." *Zeisel v. Diamond Foods, Inc.*, No. C 10-01192, 2011 WL 2221113, at *6 (N.D. Cal. June 7, 2011). Where a class definition "includes objective characteristics that would permit a consumer to identify themselves as a member of the proposed class," it is sufficiently ascertainable. *Id.* Here, an individual is a member of the proposed class if they purchased ACM prior to or on the release date. This is an objective definition easily allowing consumers to identify themselves as class members. *See id.* (finding class defined as all persons who purchased specified products during specified time period ascertainable). Ascertainability thus presents no obstacle to certification here.

numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). No specific

number of class members is required for numerosity, nor is Plaintiff required to state the exact

number of potential class members. *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350

(N.D. Cal. 2005). Numerosity is generally satisfied where the number of class members exceeds

forty, and particularly where class members number in excess of one hundred. *In re Google

Referrer Header Privacy Litig.*, No. 5:10-cv-04809 EJD, 2014 WL 1266091, *3 (N.D. Cal. Mar.

26, 2014). Here, over 130,000 consumers pre-ordered ACM on or before its release date, thus

easily satisfying Rule 23(a)'s numerosity requirement.

### 2.   The Claims of the Proposed Class Share Common Questions of Law and Fact.

The second requirement of Rule 23(a)—commonality—is satisfied where "there are

questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality exists

"[w]here the circumstances of each particular class member vary but retain a common core of

factual or legal issues with the rest of the class." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978-79 (9th

Cir. 2008). The standard is "construed permissively," *id*. at 978, and "[i]t is not necessary that

members of the proposed class share every fact in common." *Evon v. Law Offices of Sidney

Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) (internal quotations omitted). Further, "even a single

common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011). The

claims of all class members "must depend upon a common contention … [and that] common

contention must be of such a nature that it is capable of classwide resolution—which means that

determination of its truth or falsity will resolve an issue that is central to the validity of each one of

the claims in one stroke." *Id.* at 2551.

Here, the common contention on which the claims of all class members depend is that

Gearbox misrepresented the nature and quality of the game they sold to consumers who pre-

ordered ACM. Specifically, Plaintiff contends that, in order to create buzz and encourage its target

market to pre-order ACM, Gearbox engaged in a wide-spread marketing campaign to disseminate

and promote—through video game conventions, the media, trailers, and other videos—Demoed

Versions of the game purporting to show what actual gameplay of the Retail Version would look

1    like, but which, in truth, were vastly superior to the Retail Version. Whether Gearbox

2    misrepresented ACM in its pre-release marketing campaign is an issue that is central to each of the

3    six counts in the complaint, which state various statutory and common law claims.[16] Further,

4    because the truth or falsity of the contention that Gearbox misrepresented the nature and quality of

5    ACM in its pre-release marketing campaign is the same as to every member of the proposed class

6    (i.e., it either did or it didn't), its determination resolves an issue central to each class member's

7    claims "in one stroke." *Wal-Mart*, 131 S. Ct. at 2551.

8           Not surprisingly, then, courts in this circuit have repeatedly held that cases like this one—in

9    which defendants engage in a common course of allegedly fraudulent conduct toward a class of

10   plaintiffs—raise common issues and are thus appropriate for class treatment. As the Ninth Circuit

11   has explained:

12          The overwhelming weight of authority holds that repeated misrepresentations of the
            sort alleged here satisfy the "common question" requirement. Confronted with a
13          class of purchasers allegedly defrauded over a period of time by similar
            misrepresentations, courts have taken the common sense approach that the class is
14          united by a common interest in determining whether a defendant's course of
            conduct is in its broad outlines actionable, which is not defeated by slight
15          differences in class members' positions, and that the issue may profitably be tried in
            one suit.

16   *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975). *See also In re First Alliance Mortg. Co.*, 471

17   F.3d 977, 990 (9th Cir. 2006) ("[T]his court has followed an approach that favors class treatment of

18   fraud claims stemming from a common course of conduct.") (internal quotations omitted);

19   *Plascencia v. Lending 1st Mortg.*, 259 F.R.D. 437, 447 (N.D. Cal. 2009) ("Class certification of a

20   fraud claim may be appropriate if the plaintiffs allege that an entire class of people has been

21

22   [16]    Count I alleges a violation of the Consumer Legal Remedies Act, which depends on
         whether Gearbox represented that the game had characteristics it did not have or was of a
23       particular quality that it was not. Cal. Civ. Code § 1770(5), (7). Count II alleges a violation of the
         Unfair Competition Law, which depends on whether Gearbox's pre-release marketing campaign
24       constituted untrue or misleading advertising. Cal. Bus. & Prof. Code § 17200. Count III alleges a
         violation of the False Advertising Law, which depends on whether Gearbox's representations were
25       untrue or misleading. Cal. Bus. & Prof. Code § 17500. Count IV alleges breach of express
         warranty, which depends on whether Gearbox's representations created an express warranty and
26       whether the Retail Version's gross inferiority to the Demoed Versions breached that warranty.
         Count V alleges fraud in the inducement, which depends on whether Gearbox's pre-release
27       marketing was fraudulent. Count VI alleges negligent misrepresentation, which depends on
         whether Gearbox's pre-release marketing campaign misrepresented ACM.

28

1   defrauded by a common course of conduct.").

2          Thus, because whether Gearbox misrepresented ACM in its pre-release marketing is a

3   question central to each of the claims here and having an answer common to every member of the

4   proposed class, the commonality requirement is satisfied. *See Plascencia*, 259 F.R.D. at 443 ("The

5   class members' claims clearly have something in common: all class members purchased [a

6   product] from [defendant], and their claims are based on a common theory of liability. Rule 23(a)'s

7   commonality requirement has therefore been satisfied."); *In re Brazilian Blowout Litig.*, No. CV

8   10-8452-JFW (MANx), 2011 WL 10962891, *3 (C.D. Cal. Apr. 12, 2011) (finding commonality

9   where common questions included whether defendant misrepresented product, whether the

10  misrepresentations were false or misleading or likely to deceive the public, and whether defendant

11  knew that its representations were false or misleading); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501-

12  02 (S.D. Cal. 2013) (finding commonality where plaintiff alleged misrepresentative advertising

13  violated UCL, FAL, CLRA and defendant's warranties).

14          **3.      Plaintiff's Claims are Typical of the Proposed Class Members' Claims.**

15          The third requirement of Rule 23(a)—typicality—is satisfied where "the claims … of the

16  representative parties are typical of the claims … of the class." Fed. R. Civ. P. 23(a)(3). The test of

17  typicality is "whether other members have the same or similar injury, whether the action is based

18  on conduct which is not unique to the named plaintiff[], and whether other members have been

19  injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168,

20  1175 (9th Cir. 2010). Like commonality, typicality is viewed "permissive[ly]," and the standard is

21  satisfied if the representative's claims "are reasonably co-extensive with those of the absent class

22  members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020

23  (9th Cir. 1998). *See also* 5 Alba Conte & Herbert Newberg, *Newberg on Class Actions*, § 24.25 (3d

24  ed. 1992) (Typicality "does not mean that the claims of the class representative must be identical or

25  substantially identical to those of the absent class members.").

26          Here, Plaintiff—like every other member of the class—preordered and paid for ACM on or

27  before its release date, during which time Gearbox was widely promoting the Demoed Versions on

28

a what you see is what you get basis (i.e., by saying the Demoed Versions portrayed "actual gameplay") to the video game industry press and paying public. Defendants' use of a review embargo—through which "critics or industry reviewers [lacked] permission to review . . . [ACM] in advance of its release date," (Dkt. 43 ¶ 64), ensured that negative, or even honest press coverage regarding the Retail Version of ACM was held at bay until such time as pre-orders had been paid for. Thus, because Locke made his purchasing decision on Defendants' pre-release advertising campaign—which centrally showcased the Demoed Versions of ACM as a reason to buy and remained unexposed by the industry press (or by Defendants) until after the game's release—and now seeks a complete or partial refund of his purchase, his claims are thus reasonably co-extensive with those of the absent class members. *See*, *e.g.*, *Astiana,* 291 F.R.D. at 502-03 (quoting *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ("Plaintiff Larsen testified that she would not have purchased the Kashi product or would have paid less for the Kashi product had she known it contained artificial ingredients. Thus, Plaintiff Larsen alleges to have suffered the same type of economic injury and seeks the same type of damages as the putative class members; namely, a refund of all or part of the purchase price. As such, Plaintiff Larsen's interests 'align[ ] with the interests of the class.' ").

In the end, because Plaintiff's claims are premised on Gearbox's pre-release misrepresentations of the game, they are also typical of every other proposed class member's, and the typicality requirement is thus satisfied here.

### 4.      Plaintiff (and his Counsel) Will Adequately Represent the Class.

The fourth and final requirement of Rule 23(a)—adequacy—is satisfied where "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy has two components: whether the named plaintiff and his counsel have any conflicts of interest with other class members, and whether plaintiff and his counsel will prosecute the action vigorously on behalf of the class. *Hanlon*, 150 F.3d at 1020. Here, there are no conflicts of interest between Plaintiff (or his counsel) and the other members of the class, as they have all been injured in the exact same manner by Gearbox's marketing of ACM and all seek the same

relief—i.e., receiving a product that did not conform with Gearbox's many "what you see is what you get" representations concerning the marketed Demoed Version of the game, and, thus, seeking a return of all or part of the money they spent on it.

In addition, Plaintiff and his counsel have vigorously pursued this action—and will continue to do so. Plaintiff Locke has kept in close communication with his counsel throughout this case, has been apprised of case developments, continues to play an active role as a Class representative, and stands ready to answer any discovery propounded on him, should Defendants choose to do so.[17] (Ex. G, Locke Decl. ¶¶ 2-3.) Likewise, Plaintiff's counsel are well-qualified and experienced members of the plaintiffs' bar who have extensive experience in class actions of similar size, scope, and complexity to the instant action. (Balabanian Decl. ¶ 3.) They have regularly engaged in major complex litigation involving consumer technology issues, have the resources necessary to conduct litigation of this nature, and have frequently been appointed lead class counsel by courts throughout the country. (*Id.* ¶ 4.) Specifically, Plaintiff's counsel have prosecuted numerous class actions related to the alleged fraudulent design and marketing of various types of software and consumer goods. (*Id.*)

Because Plaintiff and his counsel are committed to litigating this case, and are well-qualified to do so, Rule 23(a)(4)'s adequacy requirement is met. *See, e.g., Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 111 (N.D. Cal. 2008) (finding adequacy met where named plaintiffs "demonstrated their commitment to the action" and their attorneys were "qualified to represent the class").

### B.   The Proposed Class Falls within Rule 23(b)(3).

As noted above, in addition to meeting all four of Rule 23(a)'s prerequisites for certification, a proposed class must also fall within one of the subsections of Rule 23(b). Here, the proposed class falls within Rule 23(b)(3).

---

[17] Defendants had noticed Locke's deposition in October 2013 (i.e., for November 19, 2013), and Locke worked with his counsel to identify alternative dates for his deposition. (Balabanian Decl. ¶ 2.) Ultimately, and at Defendants' suggestion that "pending discovery [be put] aside," Defendants chose to not to go forward with Locke's deposition once the Parties engaged in early settlement discussions in November 2013. (*Id.*)

1  The purpose of Rule 23(b)(3) is "to cover cases in which a class action would achieve

2  economies of time, effort, and expense, and promote uniformity of decision as to persons similarly

3  situated, without sacrificing procedural fairness or bringing about other undesirable results."

4  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (internal quotations omitted). A court

5  may certify a class under Rule 23(b)(3) where "the questions of law or fact common to class

6  members predominate over any questions affecting only individual members, and … a class action

7  is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.

8  R. Civ. P. 23(b)(3). The proposed class here satisfies both the predominance and superiority prongs

9  of Rule 23(b)(3).

10  **1.      Common Questions of Law and Fact Predominate.**

11  As discussed above, there are numerous common questions of law and fact here stemming

12  from Gearbox's marketing of ACM. These common questions predominate over any individual

13  questions. Indeed, the only *possible* individual issue here is reliance given that a consumer's

14  motivation for purchasing any particular product is, by definition, subjective. Nevertheless, any

15  potential questions over class members' individual reliance on Gearbox's misrepresentations do

16  not defeat Rule 23(b)(3) predominance, and certification of the proposed class is warranted here.

17  First, UCL and FAL claims do not even require individual reliance on the part of plaintiffs;

18  liability under those statutes is based entirely on defendant's conduct. *See In re Brazilian Blowout*

19  *Litig.*, 2011 WL 10962891, at *8 ("[U]nder either the UCL or FAL, relief is available without

20  individualized proof of deception, reliance and injury."); *Makaeff v. Trump Univ., LLC*, No. 3:10-

21  cv-0940-GPC-WVG, 2014 WL 688164, *11 (S.D. Cal. Feb. 21, 2014) ("Liability under either the

22  specific false advertising provisions of the FAL or the broader provisions of the UCL may be found

23  without any individualized proof of deception and solely on the basis a defendant's conduct was

24  likely to deceive customers."); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011)

25  ("To state a claim under either the UCL or the false advertising law, based on false advertising or

26  promotional practices, it is necessary only to show members of the public are likely to be

27  deceived.") (quoting *In re Tobacco II Cases*, 207 P.3d 20, 29-30 (Cal. 2009)). Gearbox's liability

28

under the UCL and FAL thus will be determined solely by an analysis of its conduct and whether that conduct was likely to mislead consumers, not whether any particular consumer relied on that conduct in deciding to preorder ACM. Similarly, Gearbox's liability for breach of express warranty likewise depends solely on Gearbox's conduct, not on any reliance by individual consumers. *See Astiani v. Kashi Co.*, 291 F.R.D. 493, 505 (S.D. Cal. 2013) ("Determinations of whether Defendant misrepresented its products and, as a result, whether warranties were breached, are common issues appropriate for class treatment."). Consequently, there is *no* individual issue of reliance with respect to Plaintiff's UCL, FAL, or breach of warranty counts.

Further, while Plaintiff's CLRA, fraud, and negligent misrepresentation claims require reliance, individual reliance issues do not predominate here because reliance can be presumed as to the entire class where material misrepresentations have been made to the class. *See Stearns*, 655 F.3d at 1022 ("If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class.") (internal quotation omitted); *Brazilian Blowout*, 2011 WL 10962891, at *8 ("Although Plaintiffs must prove actual reliance as an element of their fraud and negligent misrepresentation claims, reliance may be presumed as to the entire Class if Defendant's misrepresentations or omissions were material."); *Trump Univ.*, 2014 WL 688164, at *13 ("[R]eliance on the alleged misrepresentations may be inferred as to the entire class if the named plaintiff can show that material misrepresentations were made to the class members.") (internal quotation omitted). As one court in this circuit has explained, "[f]or the purpose of class certification, it is sufficient that the alleged material misstatement and omission was part of a common advertising scheme to which the entire class was exposed, and is a sufficiently definite representation whose accuracy has been legitimately called into question." *Kashi*, 291 F.R.D. at 505.

Here, Gearbox made sufficiently definite representations whose accuracy has been legitimately called into question. Specifically, Gearbox represented that the Demoed Versions of ACM—with their featured cinematic graphics, artificial intelligence features, and advanced technical capabilities—showed "actual gameplay" that would be available in the Retail Version

ultimately sold to consumers. And here, Defendants' many representations were not made through vague promises—they were made by (i) *showing* what the game would "actually" look like (e.g., through the E3 Reenactment and other trailers derived from the Demoed Versions of ACM) and by (ii) *explaining* that the video gameplay footage being shown (i.e., of the Demoed Versions) accurately reflected the game itself. Those representations were, in other words, "'specific and unequivocal' statements to the effect of what you see is what you will get." [18] (*See* Dkt. 40 at 10.) These were sufficiently definite representations, and their accuracy has been more than legitimately called into question as evidenced by critics' and other reviewers' outrage at the differences between the Demoed Versions and the Retail Version of ACM. Further, Gearbox's "actual gameplay" representations were material, in that a reasonable consumer would attach importance to whether actual gameplay would be the same as that portrayed in the Demoed Versions when deciding whether to preorder ACM. *See Stearns*, 655 F.3d at 1022 ("[A] misrepresentation … is material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.") (internal quotations omitted). At the very least, because it is based on an objective reasonable person test rather than a subjective individual test, materiality is a common—not an individual—issue. *See Kashi*, 291 F.R.D. at 505 ("The ultimate question of whether the allegedly misleading information

---

[18]     To preview the merits of this case, the Court has already weighed in on statements made by Gearbox over the course of presenting the Demoed Versions of ACM to the public—including those closely analogous to those used by Pitchford during the E3 Reenactment:

> Plaintiffs . . . allege numerous statements by Defendants to the effect that the demonstrations were 'real,' and were 'representative of the retail product.' (*See* FAC [Dkt. 26] ¶ 36.) Plaintiffs also allege that one of Defendants' trailers stated that it 'was shot with '100% IN-GAME FOOTAGE.' (*Id.* ¶ 42.) Plaintiffs contend that, contrary to these statements, the retail version of the game was not the version presented during the presentations at which these statements were made. Thus, the Plaintiffs have alleged facts that, if true, show the Defendants did make 'specific and unequivocal' statements to the effect of *what you see is what you get*.

(Dkt. 40, Order Denying Defendants' Motion to Dismiss, at 9:26 – 10:5) Critically, discovery has confirmed that these statements were made in reference to trailers created by *Demoed Versions*— not the Retail Version—of the game. (*See supra*, Motion page 8:4-9 (referring to trailer created in or around May 2012 ███████████████ that states "100% IN-GAME FOOTAGE").)

1   is material is a common question of fact suitable for treatment in a class action.") (internal

2   quotations omitted).

3           Finally, Gearbox's representations were part of a common marketing scheme to which the

4   entire class was exposed. The concentrated campaign to create pre-release buzz for ACM, focused

5   on a target audience, utilized gameplay demonstrations describing the Demoed Versions as "actual

6   gameplay" performed at video game conventions widely covered by industry press and broadly

7   disseminated over the internet, relied upon many video trailers that were created by capturing

8   gameplay footage created by the Demoed Versions, and made it highly likely that each member of

9   the proposed class—consumers who preordered ACM—were exposed to the alleged

10  misrepresentations. *See Trump Univ.*, 2014 WL 688164, at *13 (inferring class-wide reliance where

11  defendant engaged in a "multi-media promotional campaign [that] was uniform, highly

12  orchestrated, concentrated and focused on its intended audience," making it "highly likely that

13  each member of the putative class was exposed to the same misrepresentations"); *Brazilian*

14  *Blowout*, 2011 WL 10962891, *7-8 (presuming class-wide reliance where alleged

15  misrepresentation was "an integral part of every aspect of [defendant's] marketing and advertising

16  campaigns," which included, among other things, "trade shows"). Consequently, because the entire

17  class was exposed to material misrepresentations, class-wide reliance can be presumed for

18  Plaintiff's CLRA, fraud, and negligent misrepresentation claims. Thus, the common factual and

19  legal issues predominate over any individual issues with respect to all six of Plaintiff's claims.

20          2.      **A Class Action is Superior to Other Available Methods of Adjudication.**

21          The superiority prong of Rule 23(b)(3) is likewise met here. The purpose of the superiority

22  requirement is "to assure that the class action is the most efficient and effective means of resolving

23  the controversy." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010)

24  (internal quotation omitted). "Where recovery on an individual basis would be dwarfed by the cost

25  of litigating on an individual basis, this factor weighs in favor of class certification." *Id*. Here,

26  potential recovery to any individual member of the proposed class is low, given that each paid

27  $100 or less for ACM. The only alternative to a class action would be tens of thousands of

28

individual actions in small claims court. That would be neither efficient (given that each consumer would be required to present the same, if not identical, arguments and evidence) nor realistic (given that the costs of litigation would quickly exceed the potential return in each individual case). Consequently, a class action is superior to other available methods of adjudicating this controversy. *See, e.g., id.* at 1176 ("The amount of damages suffered by each class member is not large. Forcing individual [consumers] to litigate their cases, particularly where common issues predominate for the proposed class, is an inferior method of adjudication. Accordingly, although alternative means of recovery are available, e.g., small claims court, we conclude that class-wide adjudication of common issues will reduce litigation costs and promote greater efficiency."); *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (finding superiority requirement "easily satisfied" where "[i]f plaintiffs cannot proceed as a class, some—perhaps most—will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover."); *Brazilian Blowout*, 2011 WL 10962891, at *9 ("[I]ndividual prosecution of Plaintiffs' claims is impractical because the cost of litigating a single case would likely exceed the potential return [and] adjudicating these claims as a class action will promote efficiency by avoiding multiple individual lawsuits.").

### C.    Plaintiff's Counsel Should Be Appointed Class Counsel.

Because the proposed class satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), as well as the predominance and superiority requirements of Rule 23(b)(3), the proposed class should be certified. Further, under Rule 23, "a court that certifies a class must appoint class counsel … [who] must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). Plaintiff respectfully requests that his counsel be appointed class counsel here.

In making this determination, the Court must consider the following attributes of counsel: (1) work in identifying or investigating potential claims; (2) experience in handling class actions or other complex litigation, and the types of claims asserted in the case; (3) knowledge of the applicable law; and (4) resources committed to representing the class. Fed. R. Civ. P.

23(g)(1)(A)(i-iv). As discussed above, Plaintiff's counsel have extensive experience in prosecuting similar class actions, including numerous actions involving the promotion and functionality of consumer goods and software. (Balabanian Decl. ¶¶ 3, 4.) Importantly, Plaintiff's counsel have diligently investigated and prosecuted *this* matter by dedicating substantial resources to the investigation and litigation of the claims at issue in this action for the benefit of the proposed class. (*Id.* ¶ 5.) Accordingly, this Court should appoint Rafey Balabanian and Ben Thomassen of Edelson PC as class counsel.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff John Locke respectfully requests that this Court enter an order (1) certifying the proposed class against Gearbox with Plaintiff as class representative; (2) appointing Rafey Balabanian and Ben Thomassen of Edelson PC as class counsel; and (3) granting such other and further relief as the Court deems equitable and just.

//

//

//

//

Dated:  September 11, 2014

**JOHN LOCKE**, individually and on behalf of a class of similarly situated individuals,

By:   /s/ Rafey S. Balabanian
       One of Plaintiff's Attorneys

Mark S. Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251

Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Christopher L. Dore (Admitted *Pro Hac Vice*)
cdore@edelson.com
Benjamin S. Thomassen (Admitted *Pro Hac Vice*)
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiffs and the Putative Class*