1  Mark S. Eisen (SBN - 289009)
   meisen@edelson.com
2  EDELSON PC
   555 West Fifth Street, 31st Floor
3  Los Angeles, California 90013
   Tel: 213.533.4100
4  Fax: 213.947.4251

5  Rafey S. Balabanian (Admitted *Pro Hac Vice*)
   rbalabanian@edelson.com
6  Christopher L. Dore (Admitted *Pro Hac Vice*)
   cdore@edelson.com
7  Benjamin S. Thomassen (Admitted *Pro Hac Vice*)
   bthomassen@edelson.com
8  EDELSON PC
   350 North LaSalle Street, Suite 1300
9  Chicago, Illinois 60654
   Tel: 312.589.6370
10 Fax: 312.589.6378

11 *Attorneys for Plaintiffs and the Putative Class*

12

13 **IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14

15 JOHN LOCKE and DAMION PERRINE,        Case No. 13-cv-01962-JD
   individually and on behalf of all others
16 similarly situated,
                                         **PLAINTIFFS' OPPOSITION TO
17                *Plaintiffs*,           DEFENDANT GEARBOX SOFTWARE,
                                         LLC'S MOTION FOR PARTIAL
            *v.*                          SUMMARY JUDGMENT**
18
19 SEGA OF AMERICA, INC. a California
   corporation, and GEARBOX SOFTWARE     Judge: Hon. James Donato
20 L.L.C., a Texas limited liability company,  Hearing Date: October 29, 2014
                                         Time: 9:30 a.m.
21                *Defendants*.           Courtroom: 11

22

23         **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ..................................................................................1

II.     STATEMENT OF FACTS ........................................................................3

     A.     The Development Agreement........................................................ 4

          1.     *Under the Development Agreement, Gearbox developed ACM* ...............4

          2.     *Under the Development Agreement and Master Services Agreement, Gearbox was required and entitled to promote ACM with Sega* ...............5

          3.     *Under the Development Agreement.* ███████████████████████████████████████████ ...............8

     B.     Evidence Submitted by Sega Demonstrates that Gearbox Additionally Marketed and Promoted ACM—Even Against Sega's Wishes and Instructions ........................................................ 9

     C.     Far From Simply "Developing Code," Gearbox Sought a Relationship With Every Single Purchaser of ACM ........................................ 11

III.    ARGUMENT ...................................................................................12

     A.     Gearbox Fails to Provide Credible Evidence in Support of its Motion ..........13

     B.     Summary Judgment is Improper: Plaintiffs Can Pursue Restitution and Injunctive Relief Under the UCL and FAL ........................................15

          1.     *Plaintiffs are entitled to restitution because Gearbox received financial benefit from the development and sale of ACM*.....................15

          2.     *Plaintiffs have standing to seek injunctive relief—Defendants continue to show the misleading "gameplay demonstrations" to consumers online* ...............18

     C.     Plaintiffs' CLRA Claims Survive As a Matter of Law ......................20

     D.     Gearbox Can Be Held Liable for the Express Warranties Created by its Promotion of ACM ..............................................................24

IV.     CONCLUSION ...............................................................................25

# TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES:**

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970)................................................................12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................12

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Casey v. Lewis,* 4 F.3d 1516 (9th Cir. 1993)........................................................................13

*Corns v. Laborers Int'l Union of N. Am.*, 709 F.3d 901 (9th Cir. 2013)...........................12

*Furnace v. Sullivan*, 705 F.3d 1021 (9th Cir. 2013) ............................................................12

*Hamilton v. Keystone Tankship Corp.,* 539 F.2d 684 (9th Cir. 1976) ...............................13

*Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055 (9th Cir. 2012) ..............................13

*Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978 (9th Cir. 2007).....................................12

**UNITED STATES DISTRICT COURT CASES:**

*Ferrington v. McAfee, Inc.*, 10-CV-01455-LHK, 2010 WL 3910169,
    (N.D. Cal. Oct. 5, 2010)............................................................................18, 22

*Hartless v. Clorox Co.*, CIV. 06CV2705JAHCAB, 2007 WL 3245260,
    (S.D. Cal. Nov. 2, 2007) ....................................................................................17

*Haskins v. Symantec,* 13-CV-01834-JST, 2013 WL 6234610,
    (N.D. Cal. Dec. 2, 2013) ..............................................................................21-22

*Henderson v. Gruma Corp.*, No. CV 10-04173 AHM AJWX, 2011 WL 1362188,
    (C.D. Cal. Apr. 11, 2011) ..................................................................................20

*In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224 (N.D. Cal. 2012) ............................24

*In re iPhone 4S Consumer Litig.*, C 12-1127 CW, 2013 WL 3829653,
    (N.D. Cal. July 23, 2013) ...................................................................................21

*In re iPhone Application Litig.*, 844 F. Supp. 2d 1040 (N.D. Cal. 2012) .........................20

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig,*
    903 F. Supp. 2d 942 (S.D. Cal. 2012) ...........................................................16, 23

*Idaho Conservation League v. Atlanta Gold Corp.*, 844 F. Supp. 2d 1116,
    (D. Idaho 2012) ...................................................................................................15

*Koehler v. Litehouse, Inc.*, CV 12-04055 SI, 2012 WL 6217635,
    (N.D. Cal. Dec. 13, 2012) ........................................................................19

*Long v. Hewlett-Packard Co.*, C 06-02816 JW, 2006 WL 4877691,
    (N.D. Cal. Dec. 21, 2006) ......................................................................24

*McMahon v. Take-Two Interactive Software, Inc.*, EDCV 13-02032-VAP,
    2014 WL 324008 (C.D. Cal. Jan. 29, 2014) ...........................................22-23

*Parker v. J.M. Smucker Co.*, C 13-0690 SC, 2013 WL 4516156,
    (N.D. Cal. Aug. 23, 2013) ......................................................................24

*Pelletier v. Pac. WebWorks, Inc.*, CIV S-09-3503 KJM, 2012 WL 43281,
    (E.D. Cal. Jan. 9, 2012) .......................................................................20-21

*Quinones v. Potter*, 661 F. Supp. 2d 1105 (D. Ariz. 2009) ........................................13

*Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523 (N.D. Cal. 2012) ..............................19, 20

*Sanders v. Apple Inc.*, 672 F. Supp. 2d 978 (N.D. Cal. 2009) ......................................25

*S. California Water Co. v. Aerojet-Gen. Corp.*, CV 02-6340ABCRCX,
    2003 WL 25537163 (C.D. Cal. Apr. 1, 2003)  ...........................................18

*Trew v. Volvo Cars of N. Am.,* No. CIV–S–05–1379, 2006 WL 306904,
    (E.D. Cal. Feb. 8, 2006) ........................................................................16-17

*Wakamatsu v. Oliver*, 868 F. Supp. 2d 866 (N.D. Cal. 2012) ......................................12

*Yunker v. Pandora Media, Inc.*, 11-CV-03113 JSW, 2013 WL 1282980,
    (N.D. Cal. Mar. 26, 2013) .......................................................................22

*ZL Technologies, Inc. v. Gartner, Inc.*, CV 09-02393 JF (RS), 2009 WL 3706821,
    (N.D. Cal. Nov. 4, 2009).........................................................................17

**STATE COURT CASES:**

*Berry v. American Exp. Publishing, Inc.,* 147 Cal. App. 4th 224 (2007) ....................................21

*Fieldstone Co. v. Briggs Plumbing Products, Inc.,* 54 Cal. App. 4th 357,
    (Cal. Ct. App. 1997)................................................................................24

*Fundin v. Chicago Pneumatic Tool Co.,* 152 Cal. App. 3d 951(1984) .......................................24

*Greenman v. Yuba Power Prods.*, 59 Cal. 2d 57 (1963)  .......................................25

*In re Tobacco II Cases,* 46 Cal .4th 298 (2009) .......................................20

PLAINTIFFS' OPP. TO MOT. FOR
PARTIAL SUMMARY JUDGMENT
         iii
         CASE NO. 13-cv-01962-JD

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003) .................................. 17-18

*People v. Sarpas*, 225 Cal. App. 4th 1539 (2014) .................................................................17, 18

*Troyk v. Farmers Group, Inc.,* 171 Cal. App. 4th 1305 (Cal. Ct. App. 2009).............................17

**STATUTES & RULES:**

Cal. Civ. Code §§ 1760-61 ..............................................................................................21

Fed. R. Civ. P. 56............................................................................................. *passim*

1    **I.     INTRODUCTION**[1]

2           Misrepresenting that the facts in support of its Motion for Partial Summary Judgment (the

3    "Motion") are "undisputed," Defendant Gearbox Software, LLC ("Gearbox") claims that it is

4    entitled to prevail as a matter of law on some of Plaintiffs John Locke's and Damion Perrine's

5    ("Plaintiffs") claims—namely, those arising under the Consumer Legal Remedies Act ("CLRA"),

6    Unfair Competition Law ("UCL"), and False Advertising Law ("FAL"), and for breach of express

7    warranty. Its position, however, is neither supported by the facts of this case nor applicable law.

8           First, contrary to Gearbox's representation that the key facts in this case are "undisputed,"

9    the core facts underlying Gearbox's Motion are the subject of heated disagreement between

10   Gearbox on the one hand, and Plaintiffs and Defendant Sega of America, Inc. ("Sega") on the

11   other. At the forefront of the Parties' dispute is Gearbox's bald assertion that it had no hand

12   whatsoever in the marketing and promotion of *Aliens: Colonial Marines* ("ACM") (the

13   fraudulently-marketed video game that is the subject of Plaintiffs' suit), and acted as nothing more

14   than a software developer for the game—narrowly characterizing its role as limited to "writ[ing]

15   software that would run the game" on a "work-for-hire" basis. (Def. Mot. 1.) Recent filings from

16   *both* Plaintiffs, (*see*, *e.g.*, Plaintiff Locke's Motion for Class Certification (Dkt. 95) at n.2 and pp.

17   3-8 generally), and Defendant Sega of America, Inc. ("Sega"), however, demonstrate that this

18   "fact" is hardly undisputed, as Gearbox claims. Sega, for example, recently explained that

19   "Gearbox was jointly responsible for marketing ACM, often acted independently to promote it,

20   and frequently acted without Sega's approval [in its marketing and promotional efforts]." (Dkt. 93

21   at 2.[2]) In support—and, here, conclusively showing that these issues are, at the very least,

22   disputed—Sega provided the Court with sworn testimony, confidential communications (both

23   internal to Sega and with Gearbox), and citations to portions of its contracts with Gearbox. (*See*

24   Declaration of John Cheng (Dkt. 93-1) and Exhibits A-W attached thereto.) What's more, Gearbox

25   ---

26   [1]       Unless otherwise noted, all references to Exhibits ("Ex.") in this brief refer to exhibits
     attached to the Declaration of Rafey S. Balabanian ("Balabanian Decl."), submitted
     contemporaneously herewith and in support of Plaintiffs' Opposition to Gearbox's Motion for

27   Partial Summary Judgment.
     [2]       All page numbers in reference to Sega's Reply in Support of Preliminary Approval (Dkt.

28   93) and its corresponding exhibits refer to the ECF stamped number at the top of the page.

1   itself does not offer competent evidence to support its own purportedly "undisputed facts." The

2   short declaration upon which the Motion *solely* relies is inherently unreliable, and the few portions

3   of the Gearbox-Sega contract relating to ACM (the "Development Agreement") attached to the

4   declaration were selectively redacted to create a document that, at first blush in this "cut-up" form,

5   appears to support its position—but upon examination of the entirety of the document, that support

6   falls apart. As explained below, Gearbox's presentation of the facts is hardly "undisputed."

7         Second, and given that its legal arguments rely on false and unsupported statements of

8   "fact," Gearbox further fails to show its entitlement to judgment as a matter of law.[3] Attacking

9   Plaintiffs' UCL, FAL, and CLRA claims, Gearbox claims that Plaintiffs cannot pursue the

10  remedies of restitution and injunctive relief that are afforded under those statutes, despite Gearbox

11  having received financial benefit from the unfair business practices alleged in Plaintiffs' complaint

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) and despite the fact that Gearbox

13  continues to show its deceptive marketing statements to consumers—including to members of the

14  putative class—on its website. And though the issue has already been considered and ruled upon in

15  reference to Gearbox's previous Motion to Dismiss Plaintiffs' Claims (Dkt. 29 (Motion to

16  Dismiss); Dkt. 40 (Order denying Motion to Dismiss))—and without pointing to *any* "new"

17  evidence to support its once-rejected arguments—Gearbox again raises the argument that its ACM

18  video game is not a tangible good subject to the CLRA. Finally, Gearbox claims that it cannot be

19  held liable for breaching the express warranties created by its advertising statements because it was

20  not a direct "seller" of ACM, even though it developed ACM and marketed it to consumers.

21        None of Gearbox's arguments stands up to scrutiny. First, Gearbox fails to provide any

22  competent evidence in support of its Motion and, without that, cannot prevail. Second, Plaintiffs

23  are entitled to restitution because pursuant to the Development Agreement that Gearbox negotiated

---

[3]      On a related point, Gearbox's contention that it has stood by passively while Sega carried on its defense is likewise without merit. (Def. Mot. 1.) The record reflects that counsel representing both Defendants carried on a vigorous defense of Gearbox's claims: jointly filing motions to dismiss Plaintiffs' original class action complaint (Dkt. 14) and the First Amended Complaint ("FAC") (Dkt. 29), attending and participating in a case management conference before the Court (Dkt. 42), filing Gearbox's answer to the FAC (Dkt. 43), negotiating and moving to enter a stipulated protective order in the case (Dkt. 44), and participating in mediation and settlement discussions with the parties. (*See* Dkt. 93-3 ¶¶ 1-5.)

1  and agreed to, ██████████████████████████████████████████████████

2  ██████████████████████████████████. And even accepting Gearbox's statement that

3  "sales [from ACM] never triggered any *further* payments to Gearbox," (Def. Mot. at 5), the law is

4  clear that restitution is an available remedy against defendants that received financial benefit from

5  the unlawful activities that directly injured plaintiffs—even where such a defendant was not a

6  direct recipient of a plaintiff's money. Third, injunctive relief remains a viable and necessary

7  remedy in this matter, as Defendants (including Gearbox) continue to display their

8  misrepresentations to consumers online—the enjoining of which would align precisely with the

9  objectives of California consumer protection statutes like the UCL and FAL. Fourth, and as this

10  Court has already determined, Defendants' ACM game is a physical and tangible good subject to

11  regulation under the CLRA—and Gearbox's renewed *legal* argument (which brings no new facts

12  to the table here at the summary judgment stage) cannot prove otherwise. Fifth, as the developer

13  and manufacturer of ACM, Gearbox likewise is liable for the express warranties it made to

14  consumers via its many advertisements and promotional efforts (upon which Plaintiffs relied),

15  even without direct contractual privity—to say nothing of the ongoing "relationship" Gearbox

16  sought to maintain with purchasers of ACM through its sweeping EULA.

17       Therefore, far from showing that no genuine issues of fact or law exist such that summary

18  judgment can properly be granted in this case, Gearbox's Motion instead presents a compelling

19  argument for why judgment as a matter of law is improper. It should be denied.

20  **II.  STATEMENT OF FACTS**

21       By now, the Court is well aware of the allegations and Plaintiffs' claims for relief.

22  Plaintiffs generally take issue with Gearbox's and Sega's marketing of ACM—alleging that (i) the

23  representations made over the course of that marketing (i.e., that the demo versions of ACM that

24  Defendants promoted to the public demonstrated what "actual gameplay" of ACM would look,

25  feel, and play like) were deceptive and misleading, (ii) Plaintiffs John Locke ("Locke") and

26  Damion Perrine ("Perrine") relied on those representations in deciding to pre-order ACM, and (iii)

27  neither Locke nor Perrine would have pre-ordered ACM had they known that the demonstrated

28

versions did not reflect the quality and features of the retail version of the game. (*See generally* FAC (Dkt. 26) at ¶¶ 72-100.) And while Gearbox has *just* begun to fulfill its discovery obligations, (*see* Dkt. 98), the available record evidence already shows that the vast majority of the so-called "UNDISPUTED" facts set forth in Gearbox's Motion are anything but. (*See* Def. Mot. at 4.) Rather, Gearbox only glosses over the relevant facts of this case; selectively redacts portions of its contract with Sega to suggest it was only hired "to develop code" for ACM (when, in fact, it was hired to do much more); and then hopes (or, given what has transpired since the filing of the Motion, "hoped") that Sega would remain silent as to the many available facts that point towards Gearbox's liability.[4] Thus, and for the sake of correcting the record—in addition to showing why the relief Gearbox seeks here is wholly inappropriate—Plaintiffs present a more complete and accurate version of the facts relevant to Gearbox's Motion.

### A.     The Development Agreement.

#### 1.     Under the Development Agreement, Gearbox developed ACM.

Gearbox "developed" ACM—that much is true. (*See* Def. Mot. at 4.) It agreed to do so pursuant to the terms of the Development Agreement, the contractual document that largely governed the relationship between Gearbox and Sega. Those terms required that Gearbox "build" the code for the game that would ultimately be sold to consumers. (*See generally* Ex. A ("Development Agreement Excerpts") § 2.) But contrary to Gearbox's overtly misleading suggestion that it was simply "Hire[d] . . . To Develop Code For [ACM]," (*see* Def. Mot. at 4), the Development Agreement required much, much more of Gearbox. Likewise, an additional contract entered into between Gearbox and Sega—a "Master Services Agreement"—imposed obligations on Gearbox separate and apart from the mere development of code.[5] (*See generally* Ex. B ("Master

---

[4]     As explained in Section § III.A, *infra*, the entirety of the scant evidence offered in support of Gearbox's Motion is highly suspect. Gearbox supports its Motion with a single declaration and a few portions of its primary contract with Sega (the "Development Agreement"). But although that declaration purports to be given on Steve Gibson's "personal and firsthand knowledge," Plaintiffs learned that much of that declaration was not "firsthand" at all. It is therefore of questionable, if any, evidentiary value in the context of Gearbox's Motion.

[5]     Further, though Gearbox claims that the Development Agreement "established Sega as the 'exclusive owner' of copyrights in the game" (Def. Mot. 4), it neglects to mention that ████████████████████████████████████████████████████████████ (*See* Ex. A. § 5.) ████████

Services Agreement"); *see also* Ex. F ("Excerpts from Stephen Bahl Deposition Transcript ["Bahl Tr."]")11:14-12:5).)

        2.      *Under the Development Agreement and Master Services Agreement, Gearbox was required and entitled to promote ACM with Sega.*

Gearbox offers one fact to distance itself from the marketing of ACM (and, thus, this case)—i.e., that the Development Agreement "reserved [to Sega] the absolute right to control and direct the marketing and the sales of [ACM]." (Def. Mot. at 4 (citing Development Agreement § 6.1); *see also* Ex. C ("Excerpts from Steve Gibson Deposition Transcript ["Gibson Tr."]") 235:3-238:14.) But Gearbox fails to (i) describe the many rights and responsibilities *Gearbox* was given under the plain terms of the Development Agreement to also promote the game or (ii) explain why it selectively redacted and omitted portions of the Development Agreement submitted to the Court that set forth those exact rights and responsibilities.[6]

Thus, while the Development Agreement reserved to Sega discretion over the marketing of ACM's "███████████,"[7] (*see* Ex. A § 6.1), the vast majority of the promotion of and marketing for ACM occurred long before the game was packaged and ready for retail sale to consumers.[8] And, as both Sega and Plaintiffs have already explained to the Court, (*see* Dkt. 91 at 4-6; Dkt. 93 at 2-4), Gearbox was responsible for and otherwise took part in much of this. Among other examples, the Development Agreement, along with its subsequent amendments, set out that:

███████████████████████████████████████████████████████."): Ex. A at GB0000002-3██████████████████████████████████████████████████.)

[6]    That Gearbox decided to hide such portions of the Development Agreement from the Court and the public (including from the putative class) without first asking for leave to do so (i.e., to file such information under seal) is a matter for another day. *See* L.R. 79-5(b) commentary ("This rule is designed to ensure that the assigned Judge receives in chambers a confidential copy of *the unredacted and complete document . . .* and that a redacted copy is filed and available for public review that has the minimum redactions necessary *to protect sealable information.*").

[7]    The Development Agreement specifically defines ████████████████████████████████████████████████████████████████." (Ex. A at GB0000005.)

[8]    For its part, Gearbox's Rule 30(b)(6) designee and Vice President of Marketing testified that he never "███████████████████████████—even though it informed the basis for his (and Gearbox's) presumption that marketing for ACM remain in Sega's sole discretion. (Gibson Tr. 235:3-238:14.)

1) <u>Sega was required</u> "█████████████████████████████████
████████████████████████████████████." (Ex. A § 6.1.)

2) <u>Sega and Gearbox would</u> "████████████████████████████████
█████████████████████████." (Ex. A § 6.2.)

3) <u>Gearbox had the sole right</u> █████████████████████████████
███████████████████████████████████████ (Ex. A § 6.7.)

4) <u>Sega and Gearbox agreed to</u> █████████████████████████████
████████████████ (Ex. D ("Third Amendment to Development Agreement"), § 2.14.)

5) <u>Gearbox agreed to</u> █████████████████████████████████████
█████████████████████████ (Ex. A, § 2.5.17; Ex. E ("Fourth Amendment to Development Agreement") at GB0000113.)

Many other examples can be found throughout the Development Agreement—cutting sharply against Gearbox's contention that it was only present to "develop code" for the game. (*See* Def. Mot. at 4-5.) (*See also* Gibson Tr. 273:23-274:5 (agreeing that ███████████████ ████████████████████████████).) What's more, Sega and Gearbox entered into an entirely separate contract—a "Master Services Agreement"—wherein Gearbox further agreed █████████████████████████, (Gibson Tr. 295:13-297:6 (agreeing that the Master Services Agreement ███████████████████ ███████)), including both the ███████████████████████████ ████████████ (Ex. B. at GB0000220 §§ 1.1, 1.3.) Of course, Gearbox also fails to explain why the Master Services Agreement was not attached to or referenced by its Motion— even though it was primarily entered into to █████████████████████ ██████████████████████████████████████").

And, of course, these many contractual rights and obligations were carried out by Gearbox. Sega paid Gearbox for the many marketing assets that Gearbox created and delivered under the terms of the Development Agreement and Master Services Agreement. (*See*, *e.g.*, Gibson Tr. 280:7-285:5.) ██████████████████████████████

1     ████████ and, through those webpages, directly interacted with potential purchasers of the game.[9] (Ex.

2     A, § 6.7; Gibson Tr. 35:1-36:23; Bahl Tr. 159:16-160:8.) And not to belabor the point, but Sega

3     and Gearbox have long since admitted to jointly participating in aspects of ACM's marketing.

4     (FAC ¶¶ 30, 31, 38, 40; Dkt. 43 (Answer) ¶¶ 30, 31, 38, 40.) Further, Sega has additionally

5     provided evidence of many other instances where Gearbox acted to promote ACM according to the

6     terms of Defendants' contractual relationship. For example, Sega has explained and provided

7     supporting evidence that it and Gearbox "jointly attended 'Marketing Summits' to plan and make

8     decisions about marketing for ACM, at which Gearbox made numerous suggestions and demands

9     for the ACM marketing strategy." (Dkt. 93 at 3:25-4:5 (citing Dkt. 93-24 at 1-2 ("Jan. 24, 2010

10    Marketing Summit Minutes"), Dkt. 93-25 at 3 ("Dec. 7, 2010 Summit Minutes")).) Sega has also

11    provided documentation supporting its contention that "Gearbox's participation—Randy

12    Pitchford's [Gearbox's President and CEO], in particular—was a key element in the ACM

13    marketing strategy from the beginning." (Dkt. 93 at 4:10-20 (citing Dkt. 93-22 at 7 ("Proposition

14    Document" emailed from Sega to Gearbox setting forth that "Gearbox must be given a certain

15    amount of free reign to generate PR hits [because] Randy Pitchford is a respected development

16    celebrity and is guaranteed to be headline material in worldwide press coverage.")).) And Sega has

17    shown that the E3 2011 gameplay demonstration—featuring the version of ACM used to generate

18    the 11 minute video at the center of this case, which was narrated by Randy Pitchford and

19    described by him as showcasing "actual gameplay" of the ACM product, (*see* FAC at ¶¶ 30-50)—

20    "was created entirely by Gearbox," who additionally told Sega (just like Randy Pitchford told

21    consumers) that "the E3 2011 demo is indeed the bar that [Sega] should use to determine where the

22    entire game will be." (Dkt. 93 at 4:22-5:2 (citing Dkt. 93-16 ("June 27, 2011 Email")).)

23

24    ─────────────────────────────

      [9]    Much like its filings with the Court, Gearbox's Rule 30(b)(6) witness Steve Gibson did his

25    best to avoid admitting that Gearbox exercised its right under the Development Agreement to
      ████████████████████████████████████ (Ex. A, § 6.7), because, under

26    Gearbox's apparent view, ████████████████████████████████████████████████████
      ████████████████████████████████████████████████████████ (Gibson Tr. 35:21-

27    36:3.) Regardless, Gearbox's other Rule 30(b)(6) designee confirmed the obvious point that ████
      ████████████████ ahl Tr. 159:16-160:8.) Gearbox's gamesmanship doesn't stand up to scrutiny.

28

In short, while the misleading factual record provided by Gearbox attempts to distance itself from playing *any* role in the promotion of ACM—which is, as Gearbox admits, the focus of this case, (Def. Mot. at 1, 2)—the undisputed contractual documents at the center of the Sega-Gearbox relationship belie that strategy.

   3.   *Under the Development Agreement,* ██████████████████████████████████.

As with its direct (and mandated) involvement in the promotion of ACM, the terms of the Development Agreement also doom Gearbox's claim that the money it received for developing (and promoting) ACM bore no relationship to *sales* of the game. (*See* Def. Mot. at 5.) The opposite is true. Under the terms of the Development Agreement that Gearbox agreed to, ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████. (*See* Dkt. 93 at 7:12-13 (Sega explaining that "[t]he Sega-Gearbox Development Agreement flatly disproves [Gearbox's contention that it did 'not receive money' from the sale of ACM.") (citing Dkt. 88 at 2).) Presumably, if Gearbox was intent on distancing itself from actual game sales (i.e., as a true "work for hire"), it could have simply negotiated a flat rate to "develop code" for the game. Instead, it agreed that ████████████████████████████.

Per the Development Agreement, Gearbox received payment for its work relating to ACM in one way—it would submit "████████████████" to Sega and, ████████████ ████████████████████████████████████████████████████. (Ex. A at GB0000004; Bahl Tr. 138:5-140:25.) The Development Agreement also set out ████████████████████████████████████████ ████████████████. (Ex. A at GB0000048 (Exhibit C to Development Agreement ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ As copies of the game were sold, Sega sent Gearbox quarterly ████████████████████████████████████████

at GB0000151

); Bahl Tr. 144:20 – 146:24.) And, of course, because both Plaintiffs *paid* for their copies of ACM on or before February 12, 2013, (*see* Ex. I ("Excerpts from Deposition of John Locke ["Locke Tr."]"), 125:20-127:2, 134:6-135:1; FAC ¶¶ 90, 94), Sega thus

[10]

Here, Gearbox doesn't explain why it kept this central fact from the Court's attention, or failed to include those portions of the Development Agreement that tie the money Gearbox received to early sales of the game—including those sales relating to the putative class. Instead (and without explaining as much), Gearbox gestures towards the fact that because it has not yet paid back ██████████████████, Gearbox has not received "further" royalties from sales of ACM. (Def. Mot. at 5 ("The sales [of ACM] never triggered any further payments to Gearbox."); Ex. A at GB0000048.) But failure to receive *additional* payments from sales of the game—██████████████, (*see* Dkt. 93 at 7:17-20), as the game is still for sale today—doesn't negate that █████████████████. Thus, Gearbox's claim that it didn't profit from sales of ACM is untrue.

**B.     Evidence Submitted By Sega Demonstrates that Gearbox Additionally Marketed and Promoted ACM—Even Against Sega's Wishes and Instructions.**

In addition to performing its obligations (developmental, promotional, and otherwise) under the Development Agreement, it is—at the very least—disputed as to whether Gearbox took *additional* efforts to promote ACM. Namely, Sega has provided evidence showing that, pursuant

---

[10]     As explained elsewhere, pre-order and first day sales of ACM were on the order of around 130,000 total units sold—including the two units purchased by Plaintiffs. (*See, e.g.,* Dkt. 78-2 ¶ 7.) ████████████████████████████████████ *ee* Ex. A at GB0000048.) Thus, it is undisputed that Gearbox already received its cut of the money that Locke, Perrine, and all of the putative class paid for ACM.

1  to an understanding reached between it and Gearbox, Gearbox had independent discretion to

2  conduct marketing and promotion of ACM—even acting at times without Sega's approval. (Dkt 93

3  at 5:4 – 7:10 (citing collected and supporting testimony/exhibits).) As noted above, section 6.7 of

4  the Development Agreement, for instance, afforded Gearbox the sole right to ████████████

5  █████████████████████████████████████████████████████████████████████████

6  █████████████████████████████████████████████████████████████████

7  ████████████████ (Ex. A, § 6.7.) (*See also* Dkt. 93-9 ("Screenshots of Gearbox Community Page").)

8  Sega has also explained that Gearbox likewise could access the official ACM Facebook page,

9  where it was able to (and did) post content without Sega's approval. (Dkt. 93 at 5:21-25.) Further,

10  Gearbox hosted its own company-sponsored "Community Days" in 2011 and 2012, where ACM

11  was promoted. (Dkt. 93 at 5:26-6:4.) Sega has explained that Gearbox had complete control and

12  planning over the Community Day events at which ACM was promoted, as well as control over

13  who attended (including even whether Sega would attend, or would help at all in the planning of

14  the day—including the planned presentation of ACM). (Dkt. 93 at 5:26-6:4 (citing Dkt. 93-11

15  "Emails About Community Day 2011").) Sega also noted that Gearbox ran its own promotions for

16  ACM, which Gearbox "handled and hosted entirely" independently, without Sega's assistance.

17  (Dkt. 93 at 6:5-7 (citing Dkt. 93-23 "August 1, 2012 Email").)

18         Even apart from those events where Sega at least tacitly approved Gearbox's independent

19  marketing efforts, Sega has explained that Gearbox, at times, conducted marketing activities both

20  unbeknownst to and unapproved by Sega, such as by making announcements to the press and

21  public without Sega's approval—or in spite of Sega's overt *disapproval* of such leaks. To that end,

22  and through its recent filing, Sega, describes several occasions where Gearbox had "leaked

23  information . . . that Sega had not intended to be made public at that time, with Sega finding out

24  only after the fact." (Dkt. 93 at 6:8 – 7:10.) For example (and among others that Sega identified):

25       1)  "At Gearbox's Community Day 2011, Gearbox made announcements about ACM

26           that weren't discussed with Sega and that Sega had not planned to make public at
         that time." (Dkt. 93 at 6 (citing Dkt. 93-12 ("June 15, 2011 Emails").)

27

28

2) "In July 2012, Gearbox posted a developer profile for ACM to its website 'without prior approval' from Sega." (Dkt. 93 at 6 (citing Dkt. 93-15 ("June 25, 2012 Email").)

3) "In September 2012, Gearbox allowed an unapproved screenshot of ACM to be released to the press. The screenshot turned up on multiple press websites." (Dkt. 93 at 6 (citing Dkt. 93-17 ("September 10, 2012 Emails").)

4) "At Community Day 2012, Gearbox allowed a press participate to experience part of the game that Sega did not want shown at that time." (Dkt. 93 at 6 (citing Dkt. 93-13 ("Sept. 19, 2012 Emails").)

Ultimately, the plain language of Defendants' Development Agreement, as well as the additional evidence provided by Sega, shows that Gearbox exercised its own independent discretion—whether Sega liked it or not—to advertise and promote ACM. For Gearbox to claim otherwise is false.

### C.   Far From Simply "Developing Code," Gearbox Sought a Relationship With Every Single Purchaser of ACM.

Further trying to distance itself from having anything to do with ACM (other than "developing code"), Gearbox contends that "when the game was sold, it was pursuant to Sega's End User License Agreement ["EULA"], not Gearbox's." (Def. Mot. at 2:12-15.) Yet that's only half the story. *Gearbox's* EULA (like Sega's EULA) was also referenced in the game manual and, by its terms, Gearbox sought to have it apply to *every purchaser* of ACM and define the "relationship" between it and such purchasers. The included reference to Gearbox's EULA states: "Additional terms governing online play (game play via an internet accessible device) are available at shift.gearboxsoftware.com/eula **and will govern your relationship with Gearbox Software, LLC**." (*See* Ex. J ("ACM Manual") to the Balabanian Decl.) As *every* gaming platform and console that ran the ACM game was internet accessible (including the PlayStation 3, Xbox360, and PCs[11]), Gearbox—by the terms provided in the product manual—attempted to create and define the "relationship" between Gearbox and every end user of ACM. Accordingly, Gearbox's suggestion that it had absolutely no real relationship with buyers of ACM is—like Gearbox's other

---

[11]    It's not a matter of dispute that the PlayStation 3, the Xbox360, and personal computers are "internet accessible devices." *See* PlayStation 3 website, available at http://www.playstation.com/en-us/explore/ps3/ (describing the many online features of the PlayStation 3); Xbox 360 website, available at http://www.xbox.com/en-US/xbox-360 (describing the many online features of the Xbox 360 console).

1    "undisputed facts"—demonstrably not true.[12]

2    **III.    ARGUMENT**

3          Summary judgment may be granted where "the pleadings, depositions, answers to

4    interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

5    genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

6    of law." Fed. R. Civ. P. 56(c). The movant bears the "burden of showing the absence of a genuine

7    issue as to any material fact, and for these purposes the material it lodged must be viewed in the

8    light most favorable to the opposing party." *Wakamatsu v. Oliver*, 868 F. Supp. 2d 866, 870 (N.D.

9    Cal. 2012) *aff'd*, 12-cv-16079, 2014 WL 1568849 (9th Cir. Apr. 21, 2014) (citing *Adickes v. S.H.*

10   *Kress & Co.,* 398 U.S. 144, 157, (1970)).

11          Summary judgment employs a high legal standard and is appropriate *only* "when, viewing

12   the evidence in the light most favorable to the non-moving party, no genuine issue of material fact

13   exists and the moving party is entitled to judgment as a matter of law." *Corns v. Laborers Int'l*

14   *Union of N. Am.*, 709 F.3d 901, 907 (9th Cir. 2013). In fact, "at the summary judgment stage, the

15   court does not make credibility determinations or weigh conflicting evidence." *Soremekun v.*

16   *Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Evidence and reasonable inferences must

17   be viewed and drawn in the light most favorable to the nonmoving party. *Anderson v. Liberty*

18   *Lobby, Inc.*, 477 U.S. 242, 255 (1986).  In order to defeat summary judgment, "the plaintiff must

19   present affirmative evidence" regarding a genuine material dispute "from which a jury might

20   return a verdict in his favor." *Id.* at 257. In other words, summary judgment is inappropriate if "as

21   to any given material fact, evidence produced by the moving party . . . conflicts with evidence

22   produced by the nonmoving party." *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).

23          With the majority of evidence directly contradicting Gearbox's largely unsupported

24   contention that there are no undisputed facts here, and without clear support of the law, Gearbox's

25

26   _____
     [12]     In addition to misrepresenting the facts of its relationship with Sega, Gearbox's Motion and
27   supporting declaration press additional unsupported assertions. For instance, Gearbox fails to
     provide any basis for its assertion that the number of consumers who purportedly viewed a "final
28   gameplay version" of the game online (released one week before the game itself) "outnumbers all
     of the pre-orders." (Def. Mot. at 2:26-3:5.)

request for summary judgment is unquestionably improper and should be denied.

### A.     Gearbox Fails to Provide Credible Evidence in Support of its Motion.

As an initial matter, and as described throughout Section II *supra*, Gearbox's request for summary judgment should be denied outright because it fails to provide credible evidence of "undisputed" facts and, thus, is insufficient on its face. "[A] party against whom a motion for summary judgment is directed need not file any contravening affidavits or other materials but is entitled to a denial of the motion for summary judgment where the movant's papers are insufficient on their face or themselves demonstrate the existence of a material issue of fact." *Hamilton v. Keystone Tankship Corp.,* 539 F.2d 684, 686 (9th Cir. 1976). An affidavit supporting summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The Rule "requires that a declarant must show personal knowledge and competency to testify as to facts stated, whereas a declarant's mere assertions that he or she possesses personal knowledge and competency to testify are not sufficient." *Quinones v. Potter*, 661 F. Supp. 2d 1105 (D. Ariz. 2009). "Conclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient." *Casey v. Lewis,* 4 F.3d 1516, 1527 (9th Cir. 1993); *see also Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012).

Here, Gearbox submits a single piece of evidence to support its Motion: the declaration of Steve Gibson, Gearbox's Vice President of Marketing, to which self-selectively redacted excerpts of the Development Agreement are attached. (Dkt. 66-1.) Stating that he has "personal and firsthand knowledge" of all the facts he attests to, Gibson offers testimony about, among other things, the 2006 discussions between Gearbox and Sega which led to Defendants entering into the Development Agreement (¶ 3); Sega and Gearbox's respective rights and obligations under the terms of the Development Agreement (¶ 4); and the financial arrangement and money exchanged between the two entities, including Sega's approval of and payment for Gearbox's "milestone submissions" for ACM and all monies Gearbox received from Sega (¶¶ 6, 7, 12). This testimony is

1   central to Gearbox's summary judgment position. (*See*, *e.g.*, Def. Mot. at 14 (Gearbox's argument

2   seeking summary judgment on Plaintiffs' restitution claims relying on Gibson Decl. ¶ 12).)

3         The Gibson Declaration is wholly unreliable—a point that Mr. Gibson all but confirmed

4   through his deposition as a Gearbox Rule 30(b)(6) designee. To begin, it is undisputed that Gibson

5   did not join Gearbox until 2009—three years after Sega and Gearbox had entered into the

6   Development Agreement—and thus, it is factually impossible for him to testify, based upon

7   "firsthand or personal knowledge," of the circumstances surrounding the formation of the

8   relationship between Sega and Gearbox relating to ACM, as well as each party's respective rights

9   and obligations as contemplated during the contract's formation. During his deposition, Gibson

10  acknowledged as much. (*See* Gibson Tr. 57:13-60:19 ████████████████████████████

11  ████████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ████████ ████████████████████ Gibson also testified that his knowledge of the

14  "payments and statements" exchanged between Sega and Gearbox, including Sega's approval of

15  and payment for Gearbox's milestone submissions,████████████████████████. (*Id.*

16  67:5-23; 69:13-17; 123:12-16; 124:10-13; 209:21-24.)[14] Thus, Mr. Gibson's contention that all

17  facts set forth in his declaration are based upon "personal and firsthand knowledge" is false—and

18  calls into question whether *any* of the evidence submitted by Gearbox can support its Motion.

19        Likewise, and as described above, the redacted portions of the Development Agreement

20  attached to Gibson's declaration also—by themselves—raise self-defeating disputed issues of fact.

21  (*See supra*, § II.A; Ex. A, § 6 *generally*.) For example, Gearbox can *only* represent that "Sega

22  reserved the absolute right to control and direct the marketing and the sales of the game" by (i)

23  presenting snippets of the Development Agreement supporting its position and (ii) *omitting* other

___

[13]     Curiously, though ████████████████████████████████████████████
████████████████████████████████████ (*see*, *e.g.*, Gibson Tr. 58:3-5; 67:5-10),
Gearbox chose not to submit a declaration from Mr. Bahl himself in support of its Motion.

[14]     As for Gibson's ████████████████████████████████████████████
████████████████████████████████████." (*Id.* 69:13-17.)

portions of the Development Agreement that stand *contrary to* Gearbox's statements of facts. (*See* Def. Mot. at 4.) Even Sega has flagged this fact. (*See* Dkt. 93 at 3:13-24.) Stated otherwise, because the *complete* document upon which Gearbox so heavily relies severely undercuts its own summary judgment position, its Motion fails at the outset.

Accordingly, Gearbox's Motion wholly fails to present competent—much less "undisputed"—evidence relating to at least (i) the contract formation and actual business relationship between Sega and Gearbox, (Dkt. 66-1 ¶¶ 3, 4; Ex. A to Gibson Decl.) and (ii) Defendants' financial dealings, including payments made and received. (Dkt. 66-1 ¶¶ 6, 7, 12.) Thus, because Gibson's declaration is unreliable, and because both it and Exhibit A attached to that declaration raise internal disputed issues of fact, they should not be considered and, without factual support, Gearbox's Motion fails from the start. Or, at the very least, those portions of Gibson's declaration made *without* his "personal and firsthand knowledge," (*Id.* ¶¶ 3, 4, 6, 7, 12), should be stricken. *See Idaho Conservation League v. Atlanta Gold Corp.*, 844 F. Supp. 2d 1116 (D. Idaho 2012) (striking paragraph from affidavit made by an officer of defendant company that spoke to the content of negotiations leading up to decree, when it became apparent that statement could not have been made on personal knowledge, as no supporting documentation was provided for the statement, and record indicated that the officer was not present at the negotiations.).

## B.   Summary Judgment is Improper: Plaintiffs Can Pursue Restitution and Injunctive Relief Under the UCL and FAL.

Next, Gearbox is not entitled to summary judgment on Plaintiffs' UCL and FAL claims because it does not demonstrate, as it contends, that Plaintiffs are unable to seek restitution and injunctive relief as a matter of law.

### 1.   *Plaintiffs are entitled to restitution because Gearbox received financial benefit from the development and sale of ACM.*

Gearbox first argues that Plaintiffs cannot seek restitution under the UCL and FAL because Gearbox allegedly did not receive any money directly from Plaintiffs' purchase of ACM. This argument lacks support in both the facts and the law.

First, Plaintiffs are entitled to restitution because Gearbox received money tied directly to individual sales of ACM ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See*, *supra*, § II.A.3. Under the

1  terms of the Development Agreement, every payment that Gearbox received from Sega relating to

2  ACM █████████████████████████████████████████████████████████████████████

3  ██████████████████████████. (*See* Ex. A at GB0000004

4  ███████████████████████████████████████████████"); Bahl Tr. 138:5-140:25.)

5  In fact, the Development Agreement set out ███████████████████████████████████

6  ██████████████████████████. (Ex. A at GB0000048.) And further, as

7  copies of the game were sold, Gearbox received █████████████████████████████

8  █████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10 ███████ (*See, e.g.*, Ex. G at GB0000151.)

11      Here, and even though it chose to hide this plain evidence (and thus did not address it in the

12 Motion), Gearbox's only possible argument is one of structure. Namely, that (i) Gearbox

13 structured its payment relationship with Sega ████████████████████████████████

14 ████ (ii) when Plaintiffs paid for the game, ██████████████████████████████

15 █████████████████████████████, and that, therefore, (iii) Plaintiffs actual money

16 █████████████████ But acceptance of that argument would allow *any* defendant to

17 easily "escape restitution by structuring their [payment] schemes to avoid receiving *direct* payment

18 from their victims." *See People v. Sarpas*, 225 Cal. App. 4th 1539, 1562 (2014) (emphasis added).

19 Here, the fact that Gearbox received Plaintiffs' money "indirectly" (i.e. ██████████████████

20 ████████████████████████████████████████ cannot doom Plaintiffs'

21 claims for restitution.

22      Second, many courts have acknowledged that restitution is available from defendants who

23 profited from an unfair business practice (i.e., through payment of services rendered) and

24 otherwise obtained an economic benefit from class members—even without receiving payments

25 directly. *See In re Sony Gaming Networks & Customer Data Sec. Breach Litig.,* 903 F. Supp. 2d

26 942, 970 (citing *Trew v. Volvo Cars of N. Am.,* No. CIV–S–05–1379, 2006 WL 306904, at *2

27 (E.D. Cal. Feb. 8, 2006) (finding restitution appropriate even where defendant did not receive

28

1   money directly from plaintiff if defendant otherwise profited from an unfair business practice));

2   *Troyk v. Farmers Group, Inc.,* 171 Cal. App. 4th 1305, 1338 (Cal. Ct. App. 2009) (allowing

3   restitution to be pursued against third party who did not receive money from sales and noting that

4   "it can be inferred [that] a substantial portion of the service charges paid by class members to [the

5   intermediary] were indirectly received by [defendants] through payments made by [the

6   intermediary to the defendants] for services rendered."); *Hartless v. Clorox Co.*, CIV.

7   06CV2705JAHCAB, 2007 WL 3245260 (S.D. Cal. Nov. 2, 2007) ("[R]estitution is available to

8   plaintiff if she can prove she was an "actual direct victim. Thus, plaintiff's allegations that she

9   purchased defendant's product is, in this Court's view, sufficient to support her claim that she is a

10  direct victim of the alleged UCL violation.") (internal citations and quotations omitted); *ZL*

11  *Technologies, Inc. v. Gartner, Inc.*, CV 09-02393 JF (RS), 2009 WL 3706821 (N.D. Cal. Nov. 4,

12  2009) (noting both that direct payment from plaintiff to defendant is not necessary to state a claim

13  of false advertising or unlawful practices under the UCL and that California law requires "that the

14  defendant have benefitted from the actions that resulted in an economic loss to plaintiff.").

15          As applied here, even disregarding that Gearbox was paid ███████████████

16  ██████████████████████████████████, Gearbox indisputably benefitted through

17  payments made by Sega to Gearbox for the services rendered as part of Gearbox's development

18  and promotion of ACM. Gearbox cannot dispute that it received financial benefit and profited from

19  Sega's payment for the services it rendered for the marketing and promotion of the game—which

20  it was required to perform under the Development Agreement, (*see, e.g., supra* § II.A), and which

21  constitute the very unfair business practices at the heart of this case (the unfairness of which

22  Gearbox does not challenge through the Motion and which Plaintiffs relied upon when deciding to

23  pre-purchase the game). Accordingly, because Gearbox received economic benefit from its

24  development and fraudulent promotion of ACM, it is liable for restitution to Plaintiffs.

25          Finally, the minimal authorities cited in support of the Motion are inapposite. The facts in

26  *Korea Supply Co.*, for example, are far afield from this case—as, there, the plaintiff sought to

27  recover restitution from a competitor for monies the competitor had obtained through unfair

28

business practices, even though such monies never actually belonged to the plaintiff. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1140 (2003) ("This case addresses what claims and remedies may be pursued by a plaintiff who alleges a lost business opportunity due to the unfair practices of a competitor… []" and "address[es] whether disgorgement of profits allegedly obtained by means of an unfair business practice is an authorized remedy under the UCL where these profits are neither money taken from a plaintiff nor funds in which the plaintiff has an ownership interest."). The case did not concern, as it does here, a direct loss of money taken from the plaintiffs. What's more, the California Court of Appeals has since clarified that *Korea Supply* "does *not* hold that a plaintiff who paid a third party money (i.e., money in which the plaintiff had a vested interest) may not seek UCL restitution from a defendant whose unlawful business practice caused the plaintiff to pay that money." *Ferrington v. McAfee, Inc.*, 10-CV-01455-LHK, 2010 WL 3910169, at *7 (N.D. Cal. Oct. 5, 2010); *People v. Sarpas,* 225 Cal. App. 4th 1539, 1561 (2014). Gearbox's only other cited authority, *S. California Water Co. v. Aerojet-Gen. Corp.*, CV 02-6340ABCRCX, 2003 WL 25537163 (C.D. Cal. Apr. 1, 2003), fares no better, as the case similarly requested the "nonrestitutionary disgorgement of profits" from a defendant who had polluted the plaintiff's water supply—rather than, as here, Plaintiffs' direct loss of money they paid for ACM.

Here, Plaintiffs have an ownership interest in the money they paid for ACM, which Gearbox financially benefited from, and are therefore, not seeking disgorgement of money unrelated to their purchase. Plus, Plaintiffs *paid* for copies of ACM based on Gearbox's efforts in marketing the game, and Gearbox's profits stemmed *entirely* from ███████████████ ██████████████████████████████ Accordingly, restitution from Gearbox remains an available and viable remedy.

> **2.** *Plaintiffs have standing to seek injunctive relief—Defendants continue to show the misleading "gameplay demonstrations" to consumers online.*

Plaintiffs likewise have a basis to seek injunctive relief, as Defendants continue to display the misleading "actual gameplay" demonstrations to consumers online—including those videos showing the non-retail, "demo" version of ACM—on both Sega's and Gearbox's websites and

YouTube channels.[15] (FAC ¶¶ 37, 42.) *See Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012) (finding standing for injunctive relief and noting that though "the fact that [plaintiffs] discovered the supposed deception some years ago does not render the advertising any more truthful…Should plaintiffs encounter the [misleading label] at the grocery store today, they could not rely on that representation with any confidence. This is the harm California's consumer protection statutes are designed to redress."). Defendants have taken no action to remove their misleading advertisements from the web—where they continue to confuse and trick consumers. Thus, in this case, the availability of injunctive relief as a remedy aligns closely with the objectives of California consumer protection statutes like the UCL and FAL. *See Koehler v. Litehouse, Inc.*, CV 12-04055 SI, 2012 WL 6217635, at *6 (N.D. Cal. Dec. 13, 2012) (finding standing to pursue injunctive relief under the UCL, CLRA, and FAL, despite plaintiff's averment that he would not purchase the advertised product in the future, because "to do otherwise would eviscerate the intent of the California legislature in creating consumer protection statutes because it would effectively bar any consumer who avoids the offending product from seeking injunctive relief."); *Henderson v. Gruma Corp.*, No. CV 10-04173 AHM AJWX, 2011 WL 1362188, at *8 (C.D. Cal. Apr. 11, 2011) (denying defendant's argument that plaintiffs did not have standing to seek injunctive relief and holding that "while Plaintiffs may not purchase the same [] products as they purchased during the class period, because they are now aware of the true content of the products, to prevent them from bringing suit on behalf of a class in federal court would surely thwart the objective of California's consumer protection laws…[] With such advertising remaining on supermarket shelves, Plaintiffs, as representatives of a class, should be entitled to pursue injunctive relief on behalf of all consumers in order to protect consumers from Defendant's alleged false advertising."); *Ries*, 287 F.R.D. at 533 ("[W]ere the Court to accept the suggestion that plaintiffs' mere recognition of the alleged deception operates to defeat standing for an injunction, then

---

[15]     *See, e.g.* Aliens: Colonial Marines Gameplay Demo Walkthrough located on the Gearbox Youtube Channel, (https://www.youtube.com/watch?v=EOlzCrVFvs&list=UUSRO0JNUYTC jsk7VmMdNYKw) (last accessed Sept. 20, 2014); Aliens: Colonial Marines Gameplay Video located on the Gearbox website (http://gearboxsoftware.com/community/game/aliens-colonial-marines?page=3) (last accessed Sept. 20, 2014).

1    injunctive relief would never be available in false advertising cases, a wholly unrealistic result.");

2    *In re Tobacco II Cases,* 46 Cal. 4th 298, 320 (2009) ("The purpose of such [injunctive] relief, in

3    the context of a UCL action, is to protect California's consumers against unfair business practices

4    by stopping such practices in their tracks.").

5         Accordingly, because Gearbox continues to make the misrepresentations at issue to

6    consumers nationwide, and to deter such behavior from continuing, injunctive relief is proper.

7    **C.    Plaintiffs' CLRA Claims Survives As a Matter of Law.**

8         Attempting another bite at the apple, Gearbox next claims that Plaintiffs' CLRA claim

9    must fail because the ACM game is "software" and thus, not a good or service covered under the

10   CLRA. (Def. Mot. at 8.) Not really caring that *this Court*[16] has already ruled on this issue, Gearbox

11   insists that "it is undisputable that the product at issue in this litigation—Aliens: Colonial

12   Marines—is software." (*Id.* at 9.) But Gearbox provides no new facts in support of this once-

13   rejected argument and, instead, chooses to press it again. And, as before, Gearbox is wrong.

14        Here, as Plaintiffs previously explained to the Court, (Dkt. 30 at 9-11), Plaintiffs did not

15   merely download software (or access some online service or platform), but rather paid for and

16   received a tangible product from a retail store. Their purchases included the ACM game discs, as

17   well as the product cases and game manuals that came with them. (*See id.* at 10, n. 2.) Courts have

18   found that such claims concerning software held in tangible mediums do in fact concern "goods"

19   as defined by the CLRA. *See, e.g., In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1070-71

20   (N.D. Cal. 2012) (finding that the iPhone is a "good" within the meaning of the CLRA, where

21   claims dealt with Apple's iOS 4 software that was pre-installed on Apple's iPhone as opposed to

22   "free [software] apps downloaded by Plaintiffs" onto those phones); *Pelletier v. Pac. WebWorks,*

23   ---

[16]      *See* Order Denying Defendants' Motion to Dismiss, Dkt. 40 (issued by Judge White on

24   Oct. 3, 2013). Gearbox inaccurately claims that the Court "deferred resolution of this issue when
     defendants' prior counsel raised it at the pleading stage." (Def. Mot. at 9.) There was no "deferral."

25   In reality, the Court considered the issue at length (devoting nearly half of its ten page order in
     analysis) and *ruled* that Plaintiffs had pled sufficient facts to state their claim. (Dkt. 40 at 7.) The

26   Court did, however, invite Gearbox to revisit the point—presumably with help of additional facts
     to counter (if appropriate) the allegations of the FAC. (*Id.* (noting that it "may ultimately be

27   persuaded" that ACM is not a good, but concluding that the *facts alleged* were sufficient to support
     its holding).) But here, at the summary judgment stage, Gearbox offers nothing "new" to challenge

28   the facts alleged in the FAC or otherwise change the Court's opinion.

1    *Inc.*, CIV S-09-3503 KJM, 2012 WL 43281, at *5 (E.D. Cal. Jan. 9, 2012) (finding a "Google

2    Business Kit" was a "good" under the CLRA over argument that the kit was principally consumer

3    software because "plaintiff tendered money for the Kit in the expectation of receiving a physical,

4    tangible product."); *In re iPhone 4S Consumer Litig.*, C 12-1127 CW, 2013 WL 3829653 (N.D.

5    Cal. July 23, 2013) (differentiating between allegations based upon downloaded software on

6    iPhones, i.e. applications, as opposed to specific complaints regarding "specific function[s] of the

7    iPhone 4S [that] did not perform as advertised," and finding the latter to be covered under the

8    CLRA). Ultimately, since both Plaintiffs purchased physical copies of ACM, they purchased

9    "goods" as defined by the CLRA and state a valid claim for relief.

10           Further, concluding that tangible software products, such as ACM, are goods aligns with

11   both the purpose of the CLRA and its instruction that it be "liberally construed," while also giving

12   effect to the requirement that "goods" be tangible. *See* Cal. Civ. Code §§ 1760-61. For this point,

13   the detailed analysis provided by the court in *Haskins v. Symantec,* 13-CV-01834-JST, 2013 WL

14   6234610 (N.D. Cal. Dec. 2, 2013), is instructive.[17] In *Haskins*, the court provided a detailed

15   examination of the CLRA's exclusion of software, pointing out that the "tangible chattels"

16   language in the CLRA's definitions dates from 1970—and noting that "[i]t seems unlikely that the

17   Legislature knowingly exempted computer software from the CLRA's scope []" and "[m]ore

18   probably, the purpose of the language was to exempt commodities such as credit or insurance from

19   the CLRA's scope, since those commodities are inherently intangible promises which have no

20   direct and concrete impact on the physical universe." *Id.* at *9 (citing *Berry v. American Exp.*

21   *Publishing, Inc.,* 147 Cal.App. 4th 224, 229 (2007) to distinguish the extension of credit from the

22   purchase of goods and services). Though the court conceded that its suspicions about the

23   legislature's intentions alone "would not justify a construction [expanding the statute's terms]," it

24   noted that the plain meaning of "tangible" means "[h]aving or possessing physical form;

25   corporeal." *Id*. (citing Black's Law Dictionary (9th ed. 2009)). As such, the court reasoned:

26

27   _____
     [17]    The *Haskins* opinion was published about two months after the Court's CLRA ruling in
     this case. It's notable that Gearbox chose to ignore it, even though it's wholly on point, comes
28   from within this District, and strongly supports this Court's prior ruling.

Defendant's software is often purchased in physical form. Moreover, no matter how the software is delivered, it works a physical change on a physical hard drive. It possesses corporeal form in a way that credit or insurance inherently cannot. A consumer can purchase Norton Antivirus [defendant's software product] in a store, pick it up in her hands, and carry it home. It is in that way the same as most commodities considered to be "goods" under the CLRA, and distinct from the sorts of commodities that are considered not to be. [] Defendant argued that the fact that the software is delivered through a tangible medium is irrelevant, since the disc itself is nothing but a physical mechanism for delivering a nonphysical right to use intangible software. But by slicing things that thinly, many of even the most tangible of commodities could be characterized as delivery mechanisms for the transmission of intangible things. No one would seriously dispute that a book is a "tangible chattel," despite the fact that the physical object itself is merely a delivery mechanism for the transmission of information. Insurance contracts and credit cards, in contrast, are not delivery mechanisms; they are merely physical representations of the parties' intangible agreement. Consumers do not purchase software discs or books to memorialize or prove the existence of an agreement; they purchase the objects to possess and use them. As a physical object purchased for a consumer's use, a software disc is a tangible chattel.[9]

*Id.* at *9. Under this analysis, and though the *Haskins* court noted that "the issue presents a very close call" (citing *Ferrington v. McAfee, Inc.,* No. 10-cv-01455-LHK, 2010 WL 3910169, at * 18-19 (N.D. Cal. Oct. 5, 2010)), it decided that "appropriate deference to the CLRA's direction to courts that the statute must 'be liberally construed and applied to promote its underlying purposes'" must be given, declining to dismiss plaintiff's CLRA count on the grounds that software available for purchase in a store via a tangible medium is not a good. *Haskins,* 2013 WL 6234610, at *10. Here, because Plaintiffs purchased *physical* copies of ACM, *Haskins'* is on point.

For its part, Gearbox primarily relies upon two authorities in asking the Court to reverse its prior ruling. The Court already considered one of them, *Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2010 WL 3910169, at *19 (N.D. Cal. Oct. 5, 2010), and declined to follow it. (*See* Dkt. 40 at 7 (concluding, after a four page analysis, that based upon the facts of this case, the decisions in *Yunker v. Pandora Media, Inc.*, 2013 WL 1282980, at *13 (N.D. Cal. Mar. 26, 2013) and *Ferrington* "do not control the outcome here" and declining to follow).) Gearbox has provided no new facts to support a different finding.

Instead, Gearbox requests that this Court disregard its previous Order per the analysis given in *McMahon v. Take-Two Interactive Software, Inc.*, EDCV 13-02032-VAP, 2014 WL 324008 (C.D. Cal. Jan. 29, 2014). But *McMahon* is not the silver bullet Gearbox hopes for, as its CLRA

1    analysis does not even apply to the facts of this case. In *McMahon*, the court addressed the

2    defendants' specific argument that "they [could not] have violated the CLRA because 'the CLRA

3    does not apply to *online video game platforms* such as GTA Online.'"[18] *Id.* at *11 (emphasis

4    added). In support, defendants cited to *In re Sony*, where the court had found that the PSN (the

5    "PlayStation Network," Sony's *online gaming platform* used by the PlayStation 3 video game

6    console) "[was] not a good or service as defined under the [CLRA]." 903 F. Supp. 2d 942 at 972.

7    The *McMahon* court followed suit, concluding that "software and online services"—like GTA

8    Online and the PSN—"fall outside the 'goods' and 'services' covered by the CLRA." *McMahon*,

9    2014 WL 324008, at *10 (citing *In re Sony*, 903 F. Supp. 2d at 972). Here, Plaintiffs nowhere

10   allege, and Gearbox does not suggest, that ACM is an online service or online platform. Rather,

11   the ACM game discs that Plaintiffs purchased were physical, tangible chattels—just like a book.

12   *See Haskins*, 2013 WL 6234610, at *9-10. And critically, here, Plaintiffs are *not* attempting to

13   bootstrap their way into the CLRA by tying an online service or platform to a physical medium, as

14   their case is *only* about the physical products that were promoted and purchased.[19]

15        Gearbox likewise contends that it can prevail on Plaintiffs' CLRA claim on the separate

16   ground that Plaintiffs cannot pursue restitution or injunctive relief under the statute. But as

17   Plaintiffs explained in Section III.A, *supra*, restitution and injunctive relief are available remedies,

18   rendering judgment as a matter of law improper. Because Gearbox offers *nothing* new to allow this

19   Court to revisit its argument—and does not challenge the pleadings upon which the Court's prior

20   ruling was based—Gearbox is not entitled to summary judgment on Plaintiffs' CLRA claim either.

21

22

23

---

24   [18]    The court explained that "GTA Online" was the "online multiplayer component" of a video game ("GTAV") sold to consumers in October 2013. *Id.* at *1. The case brought by consumers

25   complained that this online service was not available at the time that GTAV was sold. *Id.*
     [19]    In contrast, the plaintiffs in both *McMahon* and *In re Sony* unsuccessfully tried to salvage

26   their CLRA claims by tying the online services/platforms at issue in each case (i.e., GTA Online in *McMahon* and the PSN in *In re Sony*) to physical mediums (i.e., the retail version of GTAV and

27   the PlayStation gaming consoles, like the PlayStation 3). *See, e.g.*, *In re Sony*, 903 F. Supp. 2d at 972 (noting, but rejecting, that "[p]laintiffs try to fit within the CLRA by arguing that Sony 'sold'

28   PSPs and PS3s with the intent that they be used in conjunction with the PSN").

### D. Gearbox Can Be Held Liable for the Express Warranties Created by its Promotion of ACM.

This Court has already held that the *Defendants'* gameplay demonstrations and statements constituted " 'specific and unequivocal' statements to the effect of what you see is what you will get . . . and conclude[d] that Plaintiffs have alleged facts sufficient to state a claim for breach of express warranty." (Dkt. 40 at 10.) Many of the statements singled out in the FAC came directly from Gearbox and, here, Gearbox does not challenge that they amount to the same "what you see is what you get" promise previously identified by the Court. Instead, Gearbox simply contends that it had no part in the bargains at issue ("[t]he bargain in this case was struck between consumers and Sega"), that the transactions for ACM "were subject to Sega's EULA," not Gearbox's, and that, therefore, it "had no part in the bargains or sales at issue, [and] cannot be subject to liability" on Plaintiffs' claims for breach of express warranty. (Def. Mot. at 12 (arguing that only "sellers" can create express warranties).) Once again, Gearbox is wrong both on the facts and law.

To start, numerous courts in California have consistently recognized that "[w]hen a consumer relies on representations made by a *manufacturer* in labels or advertising material, recovery is allowable on a theory of express warranty without a showing of privity." *Long v. Hewlett-Packard Co.*, C 06-02816 JW, 2006 WL 4877691, at *4 (N.D. Cal. Dec. 21, 2006) (citing *Fundin v. Chicago Pneumatic Tool Co.,* 152 Cal. App. 3d 951, 957, 199 Cal. Rptr. 789 (1984)) (emphasis added); *see also Fieldstone Co. v. Briggs Plumbing Products, Inc.,* 54 Cal. App. 4th 357, n. 10, 62 Cal. Rptr. 2d 701 (Cal. Ct. App. 1997) ("As a general rule, privity of contract is a required element of an express breach of warranty cause of action. However, there is an exception where plaintiff's decision to purchase the product was made in reliance on the *manufacturers'* written representations in labels or advertising materials.") (citations omitted, emphasis added); *In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1236 (N.D. Cal. 2012); *Parker v. J.M. Smucker Co.*, C 13-0690 SC, 2013 WL 4516156 (N.D. Cal. Aug. 23, 2013) ("Moreover, Plaintiff is correct that California law provides an exception in express warranty claims arising from affirmative representations made in labels.") (internal citation and quotations omitted). As these and other cases show, and contrary to Gearbox's insistence that a consumer's breach of express warranty

claim can only lie against a "seller" of a product, (Def. Mot. at 12), non-sellers, like *manufacturers*, are likewise liable for breaching express warranties made to consumers. *See*, *e.g.*, *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 989 (N.D. Cal. 2009) (noting that "timely notice of a breach of an express warranty is not required where the action is against a manufacturer and is brought "by injured consumers against manufacturers with whom they have not dealt.") (quoting *Greenman v. Yuba Power Prods.,* 59 Cal. 2d 57, 61, 27 Cal. Rptr. 697, 377 P.2d 897 (1963).

Here, Gearbox—as ACM's developer—was the functional equivalent of the game's manufacturer, as it "built" the game by developing its software code ████████████████." (*See* Ex. A, §§ 2.2, 2.5 (████████████████████████████████ ████████) And as detailed throughout the FAC, many of the pre-release representations about ACM were made *expressly by Gearbox*—including by its President, Randy Pitchford. (FAC ¶¶ 31, 34, 44.) Sega has explained that certain of these representations—including the "2011 E3 demo" at the heart of the FAC—were "created entirely by Gearbox," (Dkt. 93 at 3), as were many of Gearbox's independent advertising activities relating to ACM. (*See supra*, § II.A.) And contrary to Gearbox's gloss over the facts, it (like Sega) sought to maintain a "relationship" with every purchaser of ACM through the inclusion of *its* EULA with the copies of ACM sold to the public. [20] Plaintiffs additionally pled specific reliance upon Gearbox's promotional statements and advertising materials, the very same information that forms the basis for the express warranties at issue here. Thus, though Plaintiffs purchased ACM from other parties (e.g., Locke purchased from Amazon (Locke Tr. 62:8-13; Dkt. 95-8 ¶ 2), Gearbox's specific warranties regarding ACM (made through its advertising statements and other representations as the game's developer) are actionable.

## IV.    **CONCLUSION**

Gearbox has neither shown the absence of genuine issues of material fact nor demonstrated that it is entitled to judgment as a matter of law. Accordingly, Plaintiffs respectfully request that this Court deny Gearbox's Motion for Partial Summary Judgment in its entirety.

---

[20]    Further speaking to Gearbox's ongoing relationship with end users (*see supra*, n. 4). ████████████████████████████████████████████████████████

Dated:  September 25, 2014

**JOHN LOCKE**, individually and on behalf of a class of similarly situated individuals,

By:    /s/ Rafey S. Balabanian
        One of Plaintiff's Attorneys

Mark S. Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251

Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Christopher L. Dore (Admitted *Pro Hac Vice*)
cdore@edelson.com
Benjamin S. Thomassen (Admitted *Pro Hac Vice*)
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiffs and the Putative Class*