ROBERT M. SCHWARTZ (S.B. #117166)
  rschwartz@omm.com
VICTOR JIH (S.B. #186515)
  vjih@omm.com
HARRISON A. WHITMAN (S.B. #261008)
  hwhitman@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Seventh Floor
Los Angeles, California  90067-6035
Telephone:    (310) 553-6700

Attorneys for Defendant Gearbox Software, LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DAMION PERRINE, and JOHN LOCKE, individually and on behalf of a class of similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>SEGA OF AMERICA, INC., and GEARBOX SOFTWARE, L.L.C.,<br><br>Defendants. | Case No. 3:13-CV-01962 JD<br><br>**REPLY IN SUPPORT OF DEFENDANT GEARBOX'S MOTION FOR PARTIAL SUMMARY JUDGMENT (CLAIMS 1-4)**<br><br>Hearing Date:  October 29, 2014<br>Time:          9:30 a.m.<br>Courtroom:     11<br>Judge:         Hon. James Donato |

## I. INTRODUCTION

Plaintiffs' complaint is a textbook example of kitchen sink pleading. It seeks to turn one allegation—that, for some, a video game may have been less interesting to look at and less fun to play than expected—into six different statutory and common law claims. The time has come to prune four of those claims that cannot withstand legal scrutiny.

Plaintiffs devote much of their opposition to challenging background information that Gearbox included for context. Although Gearbox disagrees with plaintiffs' version of events, particularly with regard to Gearbox's limited involvement in the promotion of the game, none of it matters to this motion. In 25 pages of briefing, plaintiffs never dispute the few facts that entitle Gearbox to judgment:

(1) The subject of this lawsuit, *Aliens: Colonial Marines*, is video game software;

(2) Gearbox was the software developer of the game, not the seller;

(3) Gearbox never received consumers' money from the sale of the game; and

(4) Plaintiffs have already purchased the game.

When the law is applied to these facts, Gearbox is entitled to judgment on the first four claims in the complaint. On the UCL, FAL, and CLRA claims, plaintiffs are not entitled to either of the two available remedies, restitution or injunction. Restitution would be available from Gearbox only if it obtained plaintiffs' money. But Gearbox received *no* money from sales of the game. As to an injunction, plaintiffs in federal court lack Article III standing to seek an injunction unless they are at risk of future harm. Neither plaintiff qualifies because each has already purchased the game and does not plan to do so again.

Gearbox is also entitled to judgment on the CLRA claim for the separate reason that the statute applies to the sale of only "tangible chattel."  Video game software does not qualify.

Gearbox is entitled to judgment on the express warranty claim because Gearbox did not sell the game, as is required under California law, and because its development of software for Sega did not constitute a "sale of goods" by Gearbox under the California Commercial Code.[1]

---

[1] Plaintiffs have no basis to say that Gearbox tried to mislead the Court by "selectively" redacting part of its contract with Sega. Gearbox cited the sections germane to the issues raised by the motion, i.e., that Sega, not Gearbox, sold the game. Plaintiffs also attack portions Steve Gibson's

## II. GEARBOX IS ENTITLED TO JUDGMENT ON PLAINTIFFS' FIRST, SECOND, THIRD, AND FOURTH CLAIMS FOR RELIEF.

### A. Plaintiffs Have No Remedy On Their UCL, FAL, And CLRA Claims.

Plaintiffs do not dispute that, under the UCL and FAL, they could be entitled to only restitution and injunctive relief. *See* Cal. Bus. & Prof. Code §§ 17203, 17535; *McMahon v. Take-Two Interactive Software, Inc.*, 2014 WL 324008, at *6 (C.D. Cal. Jan. 29, 2014). Nor do plaintiffs dispute that they are seeking only those remedies under their CLRA claim. (Opp. at 23.) To avoid summary judgment, plaintiffs simply blur the legal requirements for each remedy.

#### 1. Plaintiffs Have No Right To Seek Restitution From Gearbox.

Gearbox never obtained any money from either plaintiff. It is undisputed that Sega sold the game and that Gearbox received $0 from Sega's sales. *See* Sega Royalty Statements, Ex. A to Whitman Decl. The only money Gearbox received from Sega was payment for Gearbox's software *development*, in the form of pre-set payments that "were not tied to the number of units of the game that Sega ultimately sold." Dkt. 66-1, ¶ 12 (emphasis added). Gearbox's 30(b)(6) witness confirmed [REDACTED]

[REDACTED]. Whitman Decl., Ex. B at 147:9-14; 149:14-150:4. Sega likewise confirmed that Gearbox has not received payments from the sale of the game: It is only "*If* and when Sega recoups the royalties advanced to Gearbox" that "Gearbox will receive a percentage of net receipts for each sale of ACM." (Dkt. 93 at 6) (emphasis added.) That hypothetical future has not happened. In fact, according to Sega's accountings, [REDACTED], which renders royalties irrelevant for restitution. *See* Whitman Decl., Ex. A.

Plaintiffs ignore this. Instead of focusing on money paid by *consumers*, they argue that they are entitled to the money paid by *Sega* to Gearbox for software development, dating back to 2006. In other words, they seek restitution form monies paid by non-consumers for non-sales,

---

declaration, concerning Gearbox's involvement in marketing the game, for lack of personal knowledge. (Opp. at 13-15.) This too, is misplaced. As Gearbox's senior marketing officer, the law presumes Mr. Gibson's foundation to testify on that very issue, a presumption validated during more than 7 hours of his deposition testimony. *Arrow Elecs., Inc. v. Justus (In re Kaypro)*, 218 F.3d 1070, 1075 (9th Cir. 2000) ("Personal knowledge may be inferred from a declarant's position" such that a corporate officer's "personal knowledge of various corporate activities could be presumed.") (citing *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990)).

1  before anyone actually purchased anything. (Opp. at 15-16.) This is legally untenable.

2  Restitution can be had against only those in possession of "the funds improperly taken from

3  plaintiffs." *Ferrington v. McAfee, Inc.*, 2010 WL 3910169, at *8 (N.D. Cal. Oct. 5, 2010).

4  Plaintiffs' pursuit of development money is, in reality, an improper request for disgorgement—a

5  broader remedy than restitution that does not require a link between plaintiffs and the money.

6  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1145 (2003).

7  However, "disgorgement is not available in statutory unfair competition cases." *Feitelberg v.*

8  *Credit Suisse First Boston, LLC*, 134 Cal. App. 4th 997, 1007 (2005). And, plaintiffs—who paid

9  money to other parties—may seek restitution only "*as long as* it is reasonable to infer [Gearbox]

10 indirectly received that money." *Id*. (emphasis added). Because Gearbox did not receive *any*

11 money from pre-release sales of the game, plaintiffs have no right to restitution from Gearbox.

12    Plaintiffs claim nonetheless that they can seek restitution if the defendant received money

13 *indirectly*. (Opp. at 16-17.) But the cases they cite hold that, even in such cases, a defendant

14 must still obtain a financial benefit *from the plaintiff. See In re Sony Gaming Networks Litig.*,

15 903 F. Supp. 2d 942, 970 (S.D. Cal. 2012) (dismissing restitution because Sony "did not benefit

16 financially" or "receive monies paid by Plaintiffs"); *ZL Techs., Inc. v. Gartner, Inc.*, 2009 WL

17 3706821, at *10 (N.D. Cal. Nov. 4, 2009) (rejecting restitution because plaintiff "'failed to allege

18 that the money [it lost] is now, or ever was, in the possession of" the defendant).[2]

19    Gearbox did not receive any money, even indirectly, from what plaintiffs or anyone else

20 paid for the game. "Indirect" receipt occurs when the plaintiff pays an intermediary, but the

21 defendant profits directly from it. Thus, in *Trew*, car owners alleged that Volvo's unfair business

22 practices required them to purchase replacement parts, many of which were purchased from and

23 installed by independent repair shops. Volvo sought to dismiss the restitution claim, arguing that

---

[2] That differs from the facts in *People v. Sarpas*, 225 Cal. App. 4th 1539, 1558 (2014) (rejecting argument that "direct payment" to defendant is necessary for restitution); *Hartless v. Clorox Co.*, 2007 WL 3245260, at *7 (S.D. Cal. Nov. 2, 2007) (same); *Trew v. Volvo Cars of N. Am.*, 2006 WL 306904, at *3 (E.D. Cal. Feb. 8, 2006) (restitution permitted because "Volvo profited from class members"); and *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1340 (2009) (allowing restitution where defendant "received the benefit of direct revenue" from plaintiffs).

1 | it did not sell the parts to the plaintiffs. The Court disagreed because the repair shops had to buy
2 | the parts from Volvo and were an intermediary in the transaction. 2006 WL 306904, at *3.
3 |       Here, however, Sega was not acting as Gearbox's intermediary with those who bought the
4 | game. Gearbox did not sell the game to Sega. And Gearbox did not receive any money as a
5 | result of plaintiffs' purchase of the game. Every dollar Gearbox has received from Sega was
6 | triggered by Gearbox's delivery of software to Sega, and none was tied to Sega's later sale of
7 | units of the final game to others. Indeed, the money Sega paid to Gearbox did not even require
8 | Sega to release the game or sell a single unit to anyone. *See* 66-1, ¶ 12. Thus, by definition,
9 | Gearbox never received any money from Sega's sale of the game to plaintiffs, even indirectly.
10 |       **2.    Plaintiffs Lack Standing To Seek An Injunction.**
11 |       It is undisputed that plaintiffs have already purchased *Aliens: Colonial Marines* and will
12 | not do so again. Whitman Decl., Ex. C (Perrine Dep.) at 112:22-113:1 [redacted]
13 | [redacted]). Plaintiffs admit that, with the information they *now* have,
14 | they "would have either waited to purchase the game, or not purchased it at all." Dkt. 26, ¶¶ 79,
15 | 93. This single fact precludes plaintiffs from seeking injunctive relief in federal court. A named
16 | plaintiff must demonstrate that he is at risk of future harm in order to establish Article III standing
17 | to pursue injunctive relief. *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) (plaintiff must
18 | demonstrate he is "realistically threatened by *repetition* of the violation") (emphasis added).
19 | Thus, a "plaintiff does not have standing to seek prospective injunctive relief" unless "the
20 | plaintiff is still interested in purchasing the product in question." *Mason v. Nature's Innovation,*
21 | *Inc.*, 2013 WL 1969957, *4 (S.D. Cal. May 13, 2013). It is not enough to allege that the
22 | defendant's wrongful conduct continues *unless* that conduct puts the plaintiff at risk. *See Wang v.*
23 | *OCZ Tech. Grp., Inc.*, 276 F.R.D. 618, 626 (N.D. Cal. 2011) (harm to "unnamed class members is
24 | insufficient" to establish standing for the named plaintiff).
25 |       Plaintiffs ignore this requirement and focus instead on potential harm to others. (Opp. at
26 | 18.) This is insufficient to establish standing. *See, e.g., Werdebaugh v. Blue Diamond Growers*,
27 | 2014 WL 2191901, at *9 (N.D. Cal. May 23, 2014) ("Plaintiff lacks standing to pursue"
28 | injunctive relief because "there is no likelihood of future injury to Plaintiff"); *Rahman v. Mott's*

*LLP*, 2014 WL 325241, at *10 (N.D. Cal. Jan. 29, 2014) ("to establish standing, plaintiff must allege that he intends to purchase the products at issue in the future"); *Delarosa v. Boiron, Inc.*, 2012 WL 8716658, *4 (C.D. Cal. Dec. 28, 2012) (same); *In re Intel Laptop Battery Litig.*, 2011 WL 7290487, at *2 (N.D. Cal. April 7, 2011) (same).

The three cases plaintiffs cite (Opp. at 19) fail to account for the threshold issue of Article III standing. In *Delarosa*, the court addressed plaintiffs' cases directly, explaining that to "the extent that *Henderson* and other cases purport to create a public-policy exception to the standing requirement, that exception ***does not*** square with Article III's mandate." 2012 WL 8716658, at *5 (emphasis added). In August 2014, the court in *In re: Con Agra Foods, Inc.*, also emphasized that "Article III's standing requirements take precedence over enforcement of state consumer protection laws." 2014 WL 4104405, at *28 (C.D. Cal. Aug. 1, 2014).

The Ninth Circuit has recognized that a plaintiff—like plaintiffs here—"'whose cause of action [under § 17204] is perfectly viable under state law may nonetheless be foreclosed from litigating the same cause of action in federal court, if he cannot demonstrate the requisite injury' to establish Article III standing." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1022 (9th Cir. 2004) (quoting *Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997, 1001–02 (9th Cir. 2001)).

Plaintiffs' effort to bootstrap standing through a concern for others does not help: Their class is limited to those who, like plaintiffs, have already purchased the game, and did so more than 18 months ago. None of them is eligible for (or entitled to), an injunction that limits what can be shown to sell something they have already purchased.

**B.     Video Game Software Is Not Covered By The CLRA.**

It is undisputed that the item at issue here is video game software. The legal issue is whether this software is a "good" under the CLRA, which defines "goods" as "tangible chattels." Cal. Civ. Code §§ 1770(a); 1761(a). In October 2013, this Court did not reject this point in denying defendants' motion to dismiss, as plaintiffs suggest. The Court deferred a ruling on the issue. It noted that "software does not fall within" the CLRA's "statutory definition" of goods, but permitted the claim to proceed based on the allegation that it did. Dkt. 40 at 4, 7.

1    Since that ruling, four district courts have addressed the issue.  Three squarely support Gearbox's position that software is not a good (including one a case specifically about another video game).  Only one ruling supports a novel position to the contrary.  *See Williamson v. McAfee, Inc.*, 2014 WL 4220824, *7 (N.D. Cal. Aug. 22, 2014) (dismissing CLRA claim directed at anti-virus software and agreeing with "courts in this district" that "California law supports a finding that software, along with licenses to it, is not included in the CLRA's scope"); *Lazebnik v. Apple, Inc.*, 2014 WL 4275008, at *5 (N.D. Cal. Aug. 29, 2014 2014) (purchase of a "Season Pass" for season five of *Breaking Bad* was "not a 'good' within the meaning of the CLRA" because "it [wa]s either software or a license"); *McMahon*, 2014 WL 324008, at *10 (video game "software and online services fall outside the 'goods' and 'services' covered by the CLRA"); *contra Haskins v. Symantec Corp.*, 2013 WL 6234610, at *9 (N.D. Cal. Dec. 2, 2013) ("a software disc is a tangible chattel" because it is "a physical object purchased for consumer use, a software disc is a tangible chattel").

The California Supreme Court has not ruled on this issue.  Thus, "a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case."  *In re Alexander*, 472 B.R. 815, 821 (Bankr. 9th Cir. 2012) (quoting *Aetna Cas. & Sur. Co. v. Sheft*, 989 F.2d 1105, 1108 (9th Cir.1993)).  "Under California law, a court must 'look[ ] first to the language of the statute and give[ ] effect to its plain meaning.'" *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 945 (9th Cir. 2013) (quoting *In re Lieberman*, 245 F.3d 1090, 1091 (9th Cir. 2001)).

In the case plaintiffs rely on, *Haskins*, the district court did not give adequate deference to how California courts would address the issue, and reached the wrong conclusion.  At issue there was anti-virus software, and the court concluded that because the software "works a physical change on a physical hard drive," it "possesses corporeal form."  2013 WL 6234610, at *9. So does electricity from a computer's battery, but that does not make electricity a "good" under the CLRA.  The court also reasoned that the definition of "goods" dated back to 1970, and it

"seem[ed] unlikely that the Legislature knowingly exempted computer software from the CLRA's scope two years before the invention of Pong." *Id*. That is pure speculation.[3]

Further, *Haskins* did not pay proper deference to the California authorities that the *Ferrington* court drew on to hold that "current California law suggests that these words"—i.e. tangible chattel—"exclude software from the Act's coverage." *Ferrington,* 2010 WL 3910169, at *19. That court relied on the fact that the California Commercial Code "expressly excludes computer programs from the definition of 'goods'" and that the California Court of Appeals had previously held that "a database stored on a computer is not 'physical' or 'tangible' in the 'ordinary and popular sense.'" *Id*. at *18 (citing Cal. Comm. Code § 9102(44) and *Ward Gen. Ins. Servs., Inc. v. Emp'rs. Fire Ins. Co.*, 114 Cal. App. 4th 548, 556 (2003)). *Haskins* did not address these California authorities, and courts in this district have continued to follow the reasoning in *Ferrington* to hold that software is not covered by the CLRA. *E.g.*, *Williamson*, 2014 WL 4220824, *7 (N.D. Cal. Aug. 22, 2014).

The plaintiffs argue also that the CLRA should be "liberally construed" and for that reason extends to software. (Opp. at 22.) But "liberal interpretation" refers to *how* to apply a statute to that which is already within its reach. It does not allow a party to artificially *extend* a statute's scope. *See Berry v. American Exp. Publishing, Inc.*, 147 Cal. App. 4th 224, 232 (2007) (courts should not "rewrite" the CLRA "under the guise of a liberal interpretation"). The *Ferrington* court rejected this same argument and refused to include software within the definition of "tangible chattels" in light of "current California law." 2010 WL 3910169, at *19.

Plaintiffs ignore this analysis—and *Ferrington*—claiming that this "Court already considered" *Ferrington* and "declined to follow it." (Opp. at 22.) But that is not true. This Court actually recognized that "the *Ferrington* case contains the most comprehensive analysis of the issue," but thought that this lawsuit was an "even closer call" given the bare allegations as they existed *at the time*. Dkt. 40 at 5, 7. It *deferred* at the pleading stage, acknowledging that "the

---

[3] The Legislature amended the CLRA in 1975, 1979, 1984, 1986, 1990, 1996, 2008, 2012, and 2013, and could have revised the definition of "goods" to extend beyond "tangible chattel" and include software, if it had wanted to.

1  Court may ultimately be persuaded by Defendants' argument that *Aliens: Colonial Marines*
2  cannot be considered a good under the CLRA." *Id*. at 7.

3  Lastly, plaintiffs have no good answer to *McMahon*. That case involved nearly-identical
4  claims by consumers involving a video game played on the very same consoles as the game at
5  issue here. *McMahon* followed the precedents to reach the type of reasoned determination that
6  the highest California court would reach, ultimately endorsing the obvious: The CLRA did not
7  apply to the purchase of video game software. 2014 WL 324008, at *10 ("Plaintiffs cannot assert
8  a CLRA violation based on allegations arising from their purchase of GTAV and GTA Online").

9  Plaintiffs attempt to distinguish *McMahon* solely because the plaintiffs there complained
10 that they could not access the game's promised online features. (Opp. at 23.) It makes no
11 difference to whether software is a "good" under the CLRA if the alleged problem with the game
12 software is limited to features that are accessible through an online connection. In both that case
13 and this one, the plaintiffs purchased a video game and filed a lawsuit because they claimed the
14 software did not deliver the expected functionality. *Id*. at *1.[4]

15 **C.    Gearbox Cannot Be Held Liable For Breach Of Any Express Warranty.**

16 California Commercial Code section 2313, which governs express warranty claims,
17 applies only to someone who "sells or contracts to sell goods." *See* Cal. Com. Code §§
18 2103(1)(d), 2313(1). It is undisputed that Gearbox is a software developer that never sold *Aliens:*
19 *Colonial Marines* to any retailer or consumer.

20 Recognizing that Gearbox is not a seller, plaintiffs claim that Gearbox is the "*functional*
21 *equivalent*" of a manufacturer. (Opp. at 24-25.) To support this assertion, plaintiffs cite cases
22 addressing the unrelated issue whether a consumer can sue a manufacturer for breach of express

---

[4] Gearbox's counsel learned in late September (from Gearbox's former joint counsel with Sega, Fenwick & West) that plaintiffs failed to serve a demand letter before filing suit, as they are required to do under the CLRA unless they seek only injunctive relief. *See* Cal. Civ. Code § 1782(a). That failure bars them from pursuing restitution under the CLRA. *See Ries v. Hornell Brewing Co.*, 2011 WL 1299286, at *5-6 (N.D. Cal. April 4, 2011). The requirement persists throughout the pendency of the claim, and the failure to raise it at the earliest opportunity is not a waiver. *See Shein v. Canon U.S.A., Inc.*, 2009 WL 3109721, at *6 (C.D. Cal. Sept. 22, 2009). Although plaintiffs' CLRA claim should not survive this motion, if it does, in later proceedings Gearbox will formally raise this defect with the claim.

warranty without contractual privity.  (*Id*.)  None of the cases, however, address—let alone excuse—the statutory requirement that a defendant must be a seller of goods.

If plaintiffs are suggesting that Gearbox somehow "sold" software to Sega that Sega then used in what it sold to consumers, plaintiffs are wrong on the law.  Gearbox's development of game software for Sega was not a "transaction in goods" as required by the California Commercial Code.  Cal. Com. Code § 2102.  Where "software is designed from scratch, or the transaction is mainly for one party's knowledge and skills in creating software, the software is often found to be a service rather than a good." *Simulados Software, Ltd. V. Photon Infotech Private, Ltd.,* 2014 WL 1728705, at *6 (N.D. Cal. May 1, 2014).

Moreover, the Gearbox-Sega Development Agreement cannot be transformed from a *development* contract into a contract for the sale of *goods*.  In *Systems America, Inc. v. Rockwell Software, Inc.*, the court held that a software development agreement "may have been formed with the ultimate purpose of creating software" to sell to consumers, "but that purpose *does not transform a development contract into a contract for a sale of goods*."  2007 WL 218242, at *4 (N.D. Cal. Jan. 26, 2007) (emphasis added); *see also Gross v. Symantec Corp*., 2012 WL 3116158, at *9 (N.D. Cal. July 31, 2012) (distinguishing the development of software from the sale of software to a consumer—only the latter being actionable under § 2313); *TK Power, Inc. v. Textron*, *Inc.,* 433 F. Supp. 2d 1058, 1062 (N.D. Cal. 2006) (finding that "the essence of that agreement was for service" because "most of the price was for the development of software code").  Because Gearbox only developed software for a publisher—Sega, who insisted upon owning the software along with all publishing rights—Gearbox cannot be treated as a seller and thereby held liable for breach of express warranty under section 2313.

### III.     CONCLUSION

For the foregoing reasons, Gearbox respectfully requests that the Court grant Gearbox summary judgment on plaintiffs' First, Second, Third, and Fourth Claims for Relief.

1  Dated: October 9, 2014.                    Respectfully submitted,

                                              ROBERT M. SCHWARTZ
                                              VICTOR JIH
                                              HARRISON A. WHITMAN
                                              O'MELVENY & MYERS LLP

                                              By: */s/ Robert M. Schwartz*
                                                    Robert M. Schwartz

                                              Attorneys for Defendant Gearbox Software