ROBERT M. SCHWARTZ (S.B. #117166)
    rschwartz@omm.com
VICTOR JIH (S.B. #186515)
    vjih@omm.com
HARRISON A. WHITMAN (S.B. #261008 )
    hwhitman@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Seventh Floor
Los Angeles, California  90067-6035
Telephone:    (310) 553-6700

Attorneys for Defendant Gearbox Software, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DAMION PERRINE, and JOHN LOCKE, individually and on behalf of a class of similarly situated persons,<br><br>            Plaintiffs,<br><br>    v.<br><br>SEGA OF AMERICA, INC., and GEARBOX SOFTWARE, L.L.C.,<br><br>            Defendants. | Case No. 3:13-CV-01962 JD<br><br>**GEARBOX SOFTWARE'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date:    November 12, 2014<br>Time:              9:30 a.m.<br>Courtroom:      11<br>Judge:            Hon. James Donato |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................. 1

II.     BACKGROUND ............................................................................................. 3

    A.      There Was No Uniform Public Demonstration Of The Game ............................... 3

    B.      A Large Portion Of The Class Never Saw An Allegedly Misleading Demo .......... 4

    C.      Many Widely Viewed, Pre-Release Demonstrations Did Not Contain Any Footage That Plaintiffs Claim Was Misleading. .................................................... 5

    D.      Consumers' Experiences With The Game Varied Widely ..................................... 7

III.    LEGAL STANDARD FOR CLASS CERTIFICATION .................................................. 9

IV.     THE PROPOSED CLASS CANNOT BE CERTIFIED BECAUSE INDIVIDUAL FACT ISSUES PREDOMINATE ......................................................................... 9

    A.      *All* Of Plaintiffs' Claims Require Individualized Proof. ..................................... 10

    B.      Class Members' Individual Experiences Varied Significantly. ............................. 14

    C.      Class Members' Alleged Injuries Are Not Subject To Classwide Proof. .............. 16

V.      THE COURT CANNOT CERTIFY A NATIONWIDE CLASS BECAUSE INDIVIDUAL *LEGAL* ISSUES PREDOMINATE. ...................................................... 17

    A.      California's "Governmental Interest" Test Requires The Application Of The Law Of Each Consumer's State Of Purchase. ................................................. 18

    B.      Different States' Laws Vary in Material Ways. .................................................... 19

    C.      Each State Has A Strong Interest In Applying Its Own Laws ............................... 21

    D.      Other States' Interests Would Be More Impaired Than California's .................... 22

VI.     A CLASS ACTION IS NOT A SUPERIOR METHOD OF ADJUDICATION. ............... 23

VII.    MR. LOCKE'S AND MR. PERRINE'S CLAIMS ARE NOT TYPICAL NOR ARE THEY ADEQUATE CLASS REPRESENTATIVES. ............................................ 24

VIII.   CONCLUSION ............................................................................................. 25

1

# TABLE OF AUTHORITIES

2

**Page**

3

## <u>CASES</u>

4

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ............................................................................................ 12

5

*Antoninetti v. Chipotle Mexican Grill, Inc.*,
    2012 WL 3762440 (S.D. Cal. Aug. 28, 2012) ........................................................ 9

6

7

*Arthur Andersen v. Superior Court*,
    67 Cal. App. 4th 1481 (1998) ............................................................................... 21

8

*Astiani v. Kashi Co.*,
    291 F.R.D. 493 (S.D. Cal. 2013) .......................................................................... 13

9

*Baranco, Inc. v. Bardshaw*,
    456 S.E.2d 592 (Ga. Ct. App. 1995) .................................................................... 19

10

*Baughn v. Honda Motor Co.*,
    727 P.2d 655 (Wash. 1986) .................................................................................. 20

11

12

*Berger v. Home Depot USA, Inc.*,
    741 F.3d 1061 (9th Cir. 2014) .............................................................................. 12

13

*Brownfield v. Bayer Corp.*,
    2009 U.S. Dist. LEXIS 63057 (E.D. Cal. July 2, 2009) ...................................... 10

14

*Campion v. Old Rep. Home Prot. Co.*,
    272 F.R.D. 517 (S.D. Cal. 2011) ..................................................................... 12, 13

15

16

*Castano v. Am. Tobacco, Inc.*,
    84 F.3d 734 (5th Cir. 1996) ............................................................................. 10, 20

17

*Castro Valley Union 76, Inc. v. Vapor Sys. Techs., Inc.*,
    2012 WL 5199458 (N.D. Cal. Oct. 12, 2012) ..................................................... 10

18

19

*Cipollone v. Liggett Grp., Inc.*,
    893 F.2d 541 (3d Cir. 1990), *aff'd in part & rev'd in part*, 505 U.S. 504 (1992) ................. 20

20

*Cohen v. DIRECTV, Inc.*,
    178 Cal. App. 4th 966 (2009) ............................................................................... 11

21

22

*Cole v. GMC*,
    484 F.3d 717 (5th Cir. 2007) ............................................................................... 20

23

*Colgan v. Leatherman Tool Grp., Inc.*,
    135 Cal. App. 4th 663 (2006) ............................................................................... 17

24

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ..................................................................................... 9, 16

25

26

*Cortez v. Purolator Air Filtration Prods. Co.*,
    23 Cal. 4th 163 (2000) ......................................................................................... 17

27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Davis v. Powertel, Inc.*,
   776 So. 2d 971 (Fla. Ct. App. 2000) ................................................. 19

4

*Eisen v. Carlisle & Jacquelin*,

5
   417 U.S. 156 (1974) ......................................................................... 23

6

*Field v. Mans*,
   516 U.S. 59 (1995) ........................................................................... 19

7

*Fieldstone Co. v. Briggs Plumbing Prods., Inc.*,

8
   54 Cal. App. 4th 357 (1997) ............................................................ 20

9

*Flory v. Silvercrest Indus. Inc.*,
   633 P.2d 383 (Ariz. 1981) ................................................................ 20

10

*Gianino v. Alacer Corp.*,

11
   846 F. Supp. 2d 1096 (C.D. Cal. 2012) ........................................... 22

12

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) .......................................................... 24

13

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ............................................................ 24

14

*Holt v. Globalinx Pet LLC*,

15
   2014 U.S. Dist. LEXIS 11825 (C.D. Cal. Jan. 30, 2014) ................ 23

16

*Horowitz v. Stryker Corp.*,
   613 F. Supp. 2d 271 (E.D.N.Y. 2009) ............................................. 20

17

*In re BankAmerica Corp. Sec. Litig.*,

18
   95 F. Supp. 2d 1044 (E.D. Mo. 2000) .............................................. 25

19

*In re Brazilian Blowout Litig.*,
   2011 WL 10962891 (C.D. Cal. Apr. 12, 2011) .......................... 13, 14

20

*In re Bridgestone/Firestone Tires Prods. Liab. Litig.*,
   288 F.3d 1012 (7th Cir. 2002) ..................................................... 17, 18

21

*In re Control Data Corp. Sec. Litig.*,

22
   116 F.R.D. 216 (D. Minn. 1986) ...................................................... 21

23

*In re Hotel Tel. Charges*,
   500 F.2d 86 (9th Cir. 1974) .............................................................. 10

24

*In re Tobacco II*,

25
   46 Cal. 4th 298 (2009) ............................................................... 11, 19

26

*In re Vioxx Class Cases*,
   180 Cal. App. 4th 116 (2009) ........................................................... 10

27

*Izzarelli v. R.J. Reynolds Tobacco Co.*,
   117 F. Supp. 2d 167 (D. Conn. 2000) .............................................. 19

28

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

**TABLE OF AUTHORITIES**
(continued)

Page

*Keegan v. Am. Honda Motor Co.*,
284 F.R.D. 504 (C.D. Cal. 2012) ............................................................... 18, 19, 20

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (2003) ....................................................................................... 19

*Kuehn v. Stanley*,
91 P.3d 346 (Ariz. Ct. App. 2004) ....................................................................... 19

*Liodas v. Sahadi*,
19 Cal. 3d 278 (1977) .......................................................................................... 20

*Makaeff v. Trump University, LLC*,
2014 WL 688164 (S.D. Cal. Feb. 21, 2014) ........................................................ 13

*Mass. Mut. Life Ins. Co. v. Superior Court*,
97 Cal. App. 4th 1282 (2002) .............................................................................. 10

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012).......................................................................... passim

*Moncada v. Allstate Ins. Co.*,
471 F. Supp. 2d 987 (N.D. Cal. 2006) ................................................................. 10

*Offshore Rental Co. v. Cont'l Oil Co.*,
22 Cal. 3d 157 (1978) .......................................................................................... 22

*Pfizer, Inc. v. Superior Court*,
182 Cal. App. 4th 622 (2010) .............................................................................. 11

*Pilgrim v. Universal Health Card, LLC*,
660 F.3d 943 (6th Cir. 2011)................................................................................ 18

*Ries v. Ariz. Beverages USA LLC*,
287 F.R.D. 523 (N.D. Cal. 2012).......................................................................... 17

*Rikos v. Procter & Gamble Co.*,
2012 WL 641946 (S.D. Ohio Feb. 28, 2012)........................................................ 20

*S-1 & S-2 v. Spangler*,
832 F.2d 294 (4th Cir. 1987)........................................................................... 23, 24

*Sanders v. Apple, Inc.*,
672 F. Supp. 2d 978 (N.D. Cal. 2009) ................................................................. 10

*Sanders v. Robinson Humphrey/Am. Express, Inc.*,
634 F. Supp. 1048 (N.D. Ga. 1986) ..................................................................... 20

*Saxton v. Harris*,
395 P.2d 71 (Alaska 1964)................................................................................... 20

*Schwartz v. Lights of Am.*,
2012 U.S. Dist. LEXIS 142789 (C.D. Cal. Aug. 31, 2012)................................. 22

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Sebago, Inc. v. Beazer E., Inc.*,
    18 F. Supp. 2d 70 (D. Mass. 1998) ........................................................................ 19

*Sevidal v. Target Corp.*,
    189 Cal. App. 4th 905 (2010) ............................................................................... 11

*Stearns v. Ticketmaster*,
    655 F.3d 1013 (9th Cir. 2011) ............................................................................... 14

*Stephenson v. Capano Dev., Inc.*,
    462 A.2d 1069 (Del. 1983) .................................................................................... 19

*Stutman v. Chem. Bank*,
    731 N.E.2d 608 (N.Y. 2000) ................................................................................. 19

*Thurston v. Bear Naked, Inc.*,
    2013 U.S. Dist. LEXIS 151490 (S.D. Cal. July 30, 2013) ..................................... 23

*Tucker v. Pac. Bell Mobile Servs.*,
    208 Cal. App. 4th 201 (2012) ............................................................................... 13

*Valente v. Sofamor, S.N.C.*,
    48 F. Supp. 2d 862 (E.D. Wis. 1999) .................................................................... 19

*Wash. Mut. Bank v. Superior Court*,
    24 Cal. 4th 906 (2001) ................................................................................ 18, 21, 22

*Weinstat v. Dentsply Int'l, Inc.*,
    180 Cal. App. 4th 1213 (2010) ............................................................................. 20

*Werdebaugh v. Blue Diamond Growers*,
    2014 U.S. Dist. LEXIS 71575, 74 (N.D. Cal. May 23, 2014) ............................... 23

*Williams v. Oberon Media, Inc.*,
    2010 WL 8453723 (C.D. Cal. Apr. 19, 2010) ......................................................... 9

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ............................................................................ 9, 23

**STATUTES**

Ala. Code 1975 § 8-19-10(f) (West 2012) ................................................................... 19

Cal. Com. Code § 2313(1)(a) ............................................................................... 10, 20

Fla. Stat. Ann. § 501.204(1) (West 2012) ................................................................... 19

Ga. Code Ann. § 10-1-372 (West 2012) ................................................................ 19, 23

Ga. Code Ann. § 10-1-399 .......................................................................................... 19

Ga. Code Ann. § 10-1-399(a) (West 2012) ................................................................. 19

Ind. Code Ann. § 24-5-05-4(a) .................................................................................... 19

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

**TABLE OF AUTHORITIES**
(continued)

Page

Kan. Stat. Ann. § 50-626(a) (West 2012) ........................................................................ 19

La. Rev. Stat. § 51:1409(A) ........................................................................................... 19

Miss. Code Ann. § 75-24-15(4) ..................................................................................... 19

Miss. Code Ann. § 75-24-5(1) (West 2012) ................................................................... 19

Mont. Code Ann. § 30-14-133(1) ................................................................................... 19

N.J. Stat. § 56:8-19 ......................................................................................................... 19

S.C. Code Ann. § 39-5-140(a) ........................................................................................ 19

S.C. Code Ann. § 39-5-20(a) (West 2012) ..................................................................... 19

S.D. Codified Laws § 37-24-6 (West 2012) ................................................................... 19

Va. Code §§ 59.1-204(A-B) ............................................................................................ 19

**OTHER AUTHORITIES**

S. Rep. No. 109-14 (2005) .............................................................................................. 21

**RULES**

Fed. R. Civ. P. 23 ................................................................................................ 8, 16, 23

1

## I.    INTRODUCTION

2      This motion for class certification is based on the false premise that the two named

3 plaintiffs' subjective disappointment with a video game is not only actionable, but somehow

4 uniform among 129,998 others who (plaintiffs say) bought the game before its February 12, 2013

5 release.  Plaintiffs' depositions demonstrated the obvious flaw in that assumption: What people

6 expect from their entertainment varies from person to person, and that is especially true for the

7 unique experience each person expects to have, and has, with interactive entertainment, such as a

8 video game.  Both plaintiffs further doomed their class motion by admitting that, whether

9 someone who bought the game before its release liked or disliked it, or thought it "looked better"

10 in one of the pre-release demos, is a matter of each person's individual and subjective opinion.

11 Courts have repeatedly rejected class treatment for such claims.  So should this Court.

12      As explained below, cramming those 130,000 individual and subjective views into one,

13 monolithic class would be unprecedented, particularly because plaintiffs know so little about the

14 absent class members to enable the Court to take such a leap under Rule 23:

15   • Do plaintiffs know whether everyone who purchased the game before its release even *saw*

16      the allegedly misleading demos before buying it?  No, and they have identified no

17      common evidence that could establish that core fact across the class.  In fact, Mr. Perrine

18      pre-ordered the game *years* before any of the demos even existed.

19   • Do plaintiffs know whether everyone who purchased the game before its release even

20      *noticed* or *relied on* the aspects of those demos that allegedly differed from the final

21      game?  No again and, again, they have identified no classwide evidence to establish that.

22   • Do plaintiffs know whether those who purchased the game before its release did so

23      because of what they saw in the many *other* demos and advertising materials, such as the

24      two-hour demo of the final game in the ten days before its release, shown on the same

25      IGN.com website that plaintiff Locke visited on a *daily* basis to look for news on games of

26      interest to him?  No again.  And they have identified no common evidence on that issue.

27   • Do plaintiffs know whether those who purchased the game before its release, even if they

28      saw the suspect demos, liked it and had no concern over claimed differences between the

1

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

1    demos and the game they received?  No again.  And they have no common evidence there.

2    In short, plaintiffs have identified no common evidence that could prove their class

3    claims.  And a few key facts rule out any possibility that these claims could be decided on

4    evidence common to the class.  As shown below, there was a wide variation in the content of

5    game demos.  *See* Whitman Decl. ¶ 2.  In fact, plaintiff Perrine's first pre-order occurred in 2009,

6    *years* before the allegedly misleading demos were created, and does not even appear on the chart.

7    

8    

9    

10   .  Regardless, sorting out who saw what,

11   when, and whether it had any effect on their pre-release purchase decision would be impossible

12   on a class-wide basis:

13
14
15
16
17
18
19
20
21
22
23
24

25   Certification is also ruled out here because of the need to apply the laws of 50 states to the

26   class claims.  Plaintiffs fail even to mention, let alone address, the Ninth Circuit's controlling

27   decision on this point, *Mazza v. American Honda Motor Co*., 666 F.3d 581 (9th Cir. 2012).

28   For these and the other reasons identified, below, plaintiffs motion should be denied.

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

1   II.    **BACKGROUND**

2          More than 18 months ago, plaintiffs John Locke and Damion Perrine made sweeping

3   allegations that defendants Sega and Gearbox intentionally deceived fellow gamers into buying

4   *Aliens: Colonial Marines* ("ACM" or "the game").   The essence of their claim is that defendants

5   enjoyed the time and resources to develop and market a promotional version of the game, which

6   plaintiffs call the "Demoed Version," and then released an inferior version, which they call the

7   "Retail Version."  *See, e.g.*, Mot. 1:2–7.  Plaintiffs claim that defendants planned to market the

8   promotional version to induce as many consumers as possible to pre-order the game before the

9   supposed scheme was revealed the day the game was first offered for sale.  First Amended

10  Complaint ("FAC") ¶¶ 14, 23, 25.  They claim in their motion that the scheme worked and that

11  *every single person* who purchased the game before February 12, 2013, was equally deceived and

12  equally disappointed with the game.  Plaintiffs bring fraud- and warranty-based claims on behalf

13  of themselves and a proposed class of "[a]ll persons in the United States who paid for a copy of

14  the Aliens: Colonial Marines video game either on or before February 12, 2013," which they

15  estimate to include 130,000 consumers.  Mot. 9:24–25, 13:4.

16         A.    **There Was No Uniform Public Demonstration Of The Game.**

17         Plaintiffs claim that defendants presented "Demoed Versions" of ACM at video game

18  conventions in 2011 and 2012, and then used the same "Demoed Versions" to create promotional

19  videos that they distributed online.  Mot. 7:3–9:15.  This is false, and the concept of a set of

20  uniform "Demoed Versions" is plaintiffs' invention.  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

21  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

22  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆  Whitman Decl., Ex. C; Deposition of

23  Gearbox's Stephen Bahl at Exhibit B to the Whitman Declaration ("Bahl Dep.") 93:6–12, 104:3–

24  9; Declaration of Steve Gibson in Support of Gearbox's Opposition ("Gibson Decl.") ¶¶ 4–6.

25  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

26  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

27  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

28

1  [REDACTED]. Bahl Dep. 108:9–21, 109:24–110:2, 110:20–111:11.

2  They all accurately represented the software at that given point time, but they were not the same.

3         The versions from which footage was taken to create promotional videos also varied

4  widely.  Gibson Decl. ¶¶ 4–6.  Plaintiffs allege that the game footage in "most" of the ACM

5  videos is derived from the same 2011 "Demoed Version" of the game.  Mot. 7:7–13.  But the only

6  evidence that plaintiffs cite for this assertion is: (a) links to YouTube and other videos, which do

7  not identify the source of the footage and thus do not constitute evidence of the content of videos

8  that Sega or Gearbox might have posted; [REDACTED]

9  [REDACTED]

10  [REDACTED]

11  [REDACTED]

12  [REDACTED] Bahl Dep. 35:1–4 [REDACTED]

13  [REDACTED]

14  [REDACTED]

15        A review of the videos that plaintiffs ask the Court to *assume* were posted by a defendant

16  shows that they vary significantly—from "traditional" three-minute trailers to lengthy interviews

17  with the game developers that are briefly interspersed with game footage.  Mot. 7:3–9:15.  Some

18  share a few game sequences, while others do not overlap at all.  A few are identified as "actual"

19  gameplay demonstrations, while the vast majority do not indicate whether the footage is from the

20  game or not.  At least one was marked conspicuously as a "WORK IN PROGRESS," which

21  Mr. Locke acknowledged indicates that the defendants were still "working on the game."

22  Deposition of John Locke at Exhibit D to Whitman Declaration ("Locke Dep.") 245:23–246:5.

23  [REDACTED] while Mr. Locke is not sure if he did.  *See*

24  Deposition of Damion Perrine at Exhibit E to Whitman Declaration ("Perrine Dep.") 68:20–22,

25  74:10–13; Locke Dep. 241:4–19.

26        **B.    A Large Portion Of The Class Never Saw An Allegedly Misleading Demo.**

27        Despite these variations, plaintiffs insist that it is "highly likely" that each of 130,000 saw

28  a demonstration of the "Demoed Versions."  Mot. 22:8.  But they fail to provide any *evidence* to

1   support this assertion.  The only material they cited indicates that several recordings of one

2   demonstration of the game were collectively viewed 1.2 million times.  *See* Declaration of Amir

3   Missaghi in Support of Plaintiffs' Motion ("Missaghi Decl.") ¶ 11.  Because these are not unique

4   views, however, this number does not indicate how many *people* saw the demonstration, much

5   less how many class members saw it.  ███████████████████████████████████████████████

6   ██████████████  *See, e.g.*, Declaration of John Locke in Support of Plaintiffs' Motion ("Locke

7   Decl.") ¶ 5; Perrine Dep. at 82:8–14 █████████████████████████████  Even if there

8   were several million views of a particular online video, that would not mean that everyone who

9   pre-ordered the game first watched that video—much less "highly likely" so.

10      Mr. Perrine personifies the problem with plaintiffs' theory.  █████████████████

11  ████████████████████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████.  FAC

13  ¶¶ 30, 85–86; Perrine Dep. 42:5–18, 45:16–47:10.  Every other potential class member who, like

14  Mr. Perrine, pre-ordered the game before June 2011 could not have been exposed to the allegedly

15  misleading demo, and yet plaintiffs throw them all into the proposed class.

16      **C.    Many Widely Viewed, Pre-Release Demonstrations Did Not Contain Any**

17          **Footage That Plaintiffs Claim Was Misleading.**

18      Plaintiffs concede that several videos for ACM shown before the game's release contain

19  footage from only the final retail version, rather than from plaintiffs' illusory "Demoed

20  Versions." Mot. 7:7–13.  ████████████████████████████████████████████████████

21  ████████████████████████████████████████████.  *See* Exhibit F to Declaration of

22  Benjamin S. Thomassen in Support of Plaintiff's Motion.  Just one of these trailers had more than

23  500,000 views in the weeks before the game's release.  Declaration of Jeff Ramirez in Support of

24  Gearbox's Opposition ("Ramirez Decl.") ¶¶ 6–7.  ███████████████████████████████

25  ████████████████████████████████████████████████████████████████████████████████.

26  Perrine Dep. 80:4–84:19.

27      In addition, on February 2, 2013, ten days before the game's release, a leading video game

28  website, IGN.com, hosted a live event where gamers played the final version.  Gibson Decl. ¶ 4.

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

1  Recordings of this demonstration garnered hundreds of thousands of online views in the days

2  leading up to the release.  Ramirez Decl. ¶¶ 11–12, 17.  In fact, Mr. Locke, who is a "daily"

3  visitor to IGN's site—and whose experience is supposed to be typical of the class—may have

4  seen this video *before* he pre-ordered the game.  Locke Dep. 27:4–28:1, 40:8–13, 160:3–161:17.

5  ███████████████████████████████████████████.  Perrine Dep. 96:18–

6  97:25.  Because this broadcast showed the version of ACM that was released to the public, there

7  can be no claim that it misrepresented its features.  Gibson Decl. ¶ 5; Bahl Dep. 110:24–111:11.

8         Such pre-release availability and publicity for the final, retail version of the game

9  eviscerates the "embargo" theory that plaintiffs assert in their motion.  Mot. 11:1–5.  For nearly

10  two weeks before the game's release, the final version was exhibited online, for extended periods

11  of time.  *See* Gibson Decl. ¶ 5.  Attendees at that IGN exhibition, as well as the *hundreds of*

12  *thousands* of consumers who viewed it online, were free to share their thoughts and observations

13  about what they saw.  *Id.* ████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████████████████████  Whitman Decl., Ex. A. ███████████████

16  ████████████████████████████████████.  *Id.*  Under

17  these circumstances, it is reasonable to believe that, if consumers viewed any videos, they likely

18  viewed those depicting the version of the game that they received.  Any class member who

19  bought at this time and who wanted to know what the game looked like or what features it

20  contained, either saw the final version or could have done so.  In any event, plaintiffs' contention

21  that *all* of class members viewed and relied on the earlier, allegedly misleading "Demoed

22  Versions" (and, implicitly, nothing else) is unsupported by any evidence, and the uncertainty

23  about who in the class saw what, when, renders the claims unsuited to class treatment.

24         Even after Sega released the game there was ample opportunity for those who placed pre-

25  orders to see the final version and avoid the harm that plaintiffs allege by returning it unopened.

26  Mr. Locke acknowledged that at his deposition.  Locke Dep. 154:7–24.  He does not remember

27  whether he played the game the day it arrived.  *Id.* at 152:22–153:15.  Records indicate that

28  Mr. Locke may not have played the game until Friday, February 15—three days later.  Gibson

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

1  Decl. ¶ 10.  Regardless of when he played the game, like any class member who paid for the

2  game on or before February 12, 2013, he had an opportunity to return the game for a full refund

3  once he learned of the "[i]mmediate [b]acklash" that allegedly arose the day of its release.  Mot.

4  9:17.  Mr. Locke did not do so, despite his daily review of video game news and his admission

5  that he may have seen negative reviews *before* he opened it.  Locke Dep. 27:22–28:1, 154:7–24.

6       **D.       Consumers' Experiences With The Game Varied Widely.**

7       Perrine and Locke claim they were disappointed with the game.  Mr. Locke insists that

8  promised features were not delivered, namely: (1) particular "gameplay sequences" or "scenes";

9  (2) advanced "artificial intelligence" guiding the behavior of the aliens; and (3) superior graphics,

10 including "lighting" and a "level of detail" that "looked more natural" in the demonstration than

11 the final game.  Mot. 1:2–7, 20:26–27; Locke Decl. ¶ 6; Locke Dep. 171:7–173:4, 186:4–18,

12 187:7–188:11, 190:3–14.  ████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████  Perrine Dep. 52:22–53:25.

15      Plaintiffs' assessment of the game is not, however, universally shared.  Reviews of the

16 game reveal that, while some were disappointed, many enjoyed it.  There are scores of positive

17 reviews, including many that focus favorably on the game's graphics or artificial intelligence:

18   • "I love this Collector's Edition PS3 game," Whitman Decl., Ex. F;

19   • "First off, I think that this games is a must for all Aliens fan like myself…. The game is

20      simply great," *id.*, Ex. G;

21   • "This game is a great [first-person shooter]! Graphics, story, suspense, action and great

22      weapons make this game stand out…. The folks who gave this game bad reviews,

23      obviously can't appreciate the fact that these sort of games are to be played for fun and

24      for a challenge.  If u have given aliens col. marines a bad review, you are not a true

25      gamer," *id.*, Ex. H;

26   • "I purchased the Pre-Order Collectors Edition for PS3 Loving it so far, one of the best

27      Aliens games to date!" *Id.*, Ex. I;

28

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

1       • "Greatest game and awesome Graphics. Especially when your stranded in a planet. With

2         so many Easter Eggs in it and much more!" *Id.*, Ex. J.

3  On Amazon.com, where Mr. Locke purchased his copy, reviewers assign a rating of one to

4  five stars. Of the 215 Amazon.com buyers who have reviewed the game there, more than one-

5  half gave it a positive rating of either four or five stars. *Id.*, Ex. K. Thus, many if not most

6  class members were entirely satisfied with the game and suffered no harm whatsoever.

7  [REDACTED]

8  [REDACTED].

9  Mr. Locke agreed that "other people might have thought it was pretty good" and that it is a

10  "subjective individual opinion." Locke Dep. 176:10–21. [REDACTED]

11  [REDACTED]

12  [REDACTED] Perrine Dep. 115:8–14; *see also* 53:11–25, 169:8–24, 174:2–18.[1]

13  [REDACTED]

14  [REDACTED]. Mr. Locke explained that the

15  quality of a game's graphics and gameplay could vary based on whether it is played on a

16  PlayStation, an Xbox, or a personal computer. Locke Dep. 88:12–89:2, 89:11–20, 94:15–95:3,

17  95:13–20. [REDACTED]

18  [REDACTED] Perrine Dep. 87:18–88:9. [REDACTED]

19  [REDACTED]

20  [REDACTED] Locke Dep. 96:21–97:3, 99:4–8;

21  Perrine Dep. 163:21–164:10, 167:20–168:5. In other words, a consumer's objective experience

22  with ACM is likely to vary greatly. Even more so would their subjective satisfaction.

23

24

25

26  [1] Mr. Locke also admitted that: (1) he did not complete the game and therefore does not know if
the scenes he thinks he saw in the demo videos are actually missing from the game (Locke Dep.

27  186:19–187:4); (2) the aliens in the game acted exactly like the aliens in the movies and that his
evaluation of their "intelligence" is just a "subjective, individual opinion" (*id.* at 173:20–175:6,
208:14–209:5); and (3) what looks more "natural" graphically is a "personal subjective

28  assessment" about which "somebody else might have a different view." *Id.* at 191:4–17.

**III.    LEGAL STANDARD FOR CLASS CERTIFICATION**

Under Rule 23, plaintiffs, as the parties seeking certification, bear the burden of affirmatively demonstrating that Rule 23's requirements have been met. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  They must establish that the proposed class satisfies the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy, as well as the requirements of one of the types of class actions identified in Rule 23(b).  The Court must conduct a "rigorous analysis" to ensure plaintiffs have met each of these requisites before certifying the proposed class.  *Id.* at 1186.

**IV.    THE PROPOSED CLASS CANNOT BE CERTIFIED BECAUSE INDIVIDUAL FACT ISSUES PREDOMINATE.**

Plaintiffs seek to certify a class under Rule 23(b)(3).  Mot. 18:23–24.  They therefore bear the burden of demonstrating that the determination of issues "subject to generalized proof" will "predominate over those issues that are subject only to individualized proof." *Williams v. Oberon Media, Inc.*, 2010 WL 8453723, at *7 (C.D. Cal. Apr. 19, 2010).  Common issues "predominate" only where "there is a clear justification for handling the dispute on a representative basis …." *Antoninetti v. Chipotle Mexican Grill, Inc.*, 2012 WL 3762440, at *5–6 (S.D. Cal. Aug. 28, 2012).  The Court must take a "close look" at the evidence to make this determination. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).

Plaintiffs have not met their burden because the evidence demonstrates that individual, rather than common, issues will predominate.  Each proposed class claim in this case—under the UCL, FAL, CLRA, breach of express warranty, fraud, and negligent misrepresentation—requires plaintiffs to prove that they *and every class member* were exposed to a misrepresentation about the game, that there is at least some causal link between that misrepresentation and their purchase, and that they incurred monetary harm as a result.  But whatever evidence Mr. Locke or Mr. Perrine might present in support of his individual claim could not prove the claims of every class member.  Adjudicating other class members' claims would require the Court to conduct an individualized inquiry into the experience of each class member to determine: (1) which, if any, allegedly misleading demonstrations each person saw; (2) whether each person bought the game

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

1   based on that demonstration or other factors; and (3) whether each person was satisfied with his

2   or her purchase.  There are obviously many others.  But even these three questions are not subject

3   to common proof, which is why fraud- and warranty-based claims such as these "rarely are

4   certified." *Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978, 990–91 (N.D. Cal. 2009).[2]

5       **A.**    ***All* Of Plaintiffs' Claims Require Individualized Proof.**

6       Plaintiffs seek to avoid these individualized inquiries by taking the extraordinary position

7   that the experiences of unnamed class members are irrelevant to proving classwide liability under

8   California law, and that they are entitled to monetary relief from Gearbox without demonstrating

9   that anything Gearbox did caused them harm.  *See, e.g.*, Mot. 19:17–20:4 ("liability under [the

10  UCL and FAL] is based entirely on defendant's conduct").  That is not the law—not with respect

11  to the UCL and FAL and not with any other of plaintiffs' claims for relief.

12      To recover damages under the CLRA, plaintiffs must "show not only that a defendant's

13  conduct was deceptive but that the deception caused [the plaintiff] harm."  *In re Vioxx Class*

14  *Cases*, 180 Cal. App. 4th 116, 129 (2009) (citing *Mass. Mut. Life Ins. Co. v. Superior Court*, 97

15  Cal. App. 4th 1282, 1292 (2002)).  In other words, for their CLRA claim, plaintiffs must "prove

16  [they] relied on a material misrepresentation."  *Brownfield v. Bayer Corp.*, 2009 U.S. Dist. LEXIS

17  63057, at *9 (E.D. Cal. July 2, 2009).  Likewise, for breach of express warranty, plaintiffs must

18  show an "affirmation of fact or promise" about the product that became part of the basis of the

19  bargain.  Cal. Com. Code § 2313(1)(a).  Express warranty claims thus require reasonable reliance

20  as well.  *Moncada v. Allstate Ins. Co.*, 471 F. Supp. 2d 987, 997 (N.D. Cal. 2006) ("[u]nder the

21  law relating generally to express warranties a plaintiff must show reliance on the defendant's

22  representation.").  The same is true of plaintiffs' claims for fraud and negligent misrepresentation.

23  *Sanders*, 672 F. Supp. 2d at 991; *Castro Valley Union 76, Inc. v. Vapor Sys. Techs., Inc.*, 2012

24  WL 5199458, at *10–11 (N.D. Cal. Oct. 12, 2012).

25  ---

[2] As noted in Gearbox's motion to strike the class allegations, there is general consensus among the circuit courts that individual issues of exposure and reliance ordinarily bar certification of claims based on affirmative misrepresentations.  *See, e.g.*, *Castano v. Am. Tobacco, Inc.*, 84 F.3d 734, 745 (5th Cir. 1996) ("[A] fraud class action cannot be certified when individual reliance will be an issue."); *In re Hotel Tel. Charges*, 500 F.2d 86, 89 (9th Cir. 1974) (reversing class order: "Without eliminating or eroding the traditional or statutory elements of a fraud action, there is no possibility that common questions can predominate over individual ones").

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

While reliance is not an element of a cause of action under the UCL and FAL, California appellate cases decided in the wake of *In re Tobacco II*, 46 Cal. 4th 298 (2009), have held that unnamed class members are not entitled to recover restitution under the UCL and FAL without having suffered some injury that is "causally connected" to the alleged wrongdoing.  *Id.* at 324. In fact, courts since *Tobacco II* have denied certification in UCL cases just like this one where causation and injury could not be litigated on a classwide basis.

In *Pfizer, Inc. v. Superior Court*, 182 Cal. App. 4th 622 (2010), for example, the plaintiffs alleged that they bought Listerine based on the defendant's misrepresentations about the mouthwash's benefits, and the trial court certified a class of all individuals who had purchased the product over a six-month period.  *Id.* at 625–26.  The Court of Appeal found that the lower court had improperly "presume[d] there was a classwide injury," despite the fact that "many, if not most, class members were not exposed" to the alleged misrepresentation, which appeared on only one-half of the labels.  *Id*. at 632.  An unnamed class member who "could not possibly have lost money or property as a result of the unfair competition is not entitled to restitution."  *Id.* at 631.

Similarly, in *Sevidal v. Target Corp*., 189 Cal. App. 4th 905 (2010), the court affirmed an order denying certification of a class of consumers who had bought merchandise that was allegedly advertised on Target's website as "Made in USA."  *Id*. at 910.  Because a substantial part of the class likely never saw the misrepresentation and therefore would have no right to recover, the court concluded that the proposed class was impermissibly overbroad.  *Id*. at 915, 923.  "Even after the *Tobacco II* decision, the UCL and FAL still require some connection between the defendant's alleged improper conduct and the unnamed class members who seek restitutionary relief."  *Id*. at 924; *see also Cohen v. DIRECTV, Inc*., 178 Cal. App. 4th 966, 980 (2009) (UCL does not authorize relief "on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice").

The Ninth Circuit applies these holdings in *Mazza* to facts materially indistinguishable from plaintiffs' allegations here.  There, the plaintiffs claimed that Honda had violated the UCL, FAL, and CLRA by misrepresenting the features of its braking system in a "mass advertising" campaign involving television commercials, magazine advertisements, brochures, and

1    promotional videos that were presented on its website and at dealerships.  666 F.3d at 586–87.

2    Examining California law after *Tobacco II*, the Ninth Circuit found that "California courts have

3    recognized that *Tobacco II* does not allow a consumer who was never exposed to an alleged false

4    or misleading advertising campaign to recover damages under California's UCL."  *Id.* at 596

5    (quotation and citation omitted).  The Ninth Circuit concluded that, to have any hope of being

6    certified, the plaintiffs' class "must be defined in such a way as to include only members who

7    were exposed to advertising that was alleged to be materially misleading."  *Id*.  Because the

8    proposed class included *all* who purchased the cars during a particular time period, the Ninth

9    Circuit vacated the district court's decision to certify the class.  *Id*.; *see also Berger v. Home*

10   *Depot USA, Inc*., 741 F.3d 1061, 1070 (9th Cir. 2014) ("the question of whether a material

11   misrepresentation was made to the entire class requires an individualized determination that in

12   our view the district court reasonably found predominates over any common questions").[3]

13        For the same reasons, and contrary to plaintiffs' assertions, reliance by unnamed class

14   members on alleged misrepresentations cannot be presumed or proven on a classwide basis for

15   purposes of the CLRA, fraud, or negligent misrepresentation claims.  Mot. 20:9–23.  While

16   reliance can be inferred in some circumstances, the Ninth Circuit has made clear that it must first

17   be established that the entire class was exposed to a uniform misrepresentation.  *Mazza*, 666 F. 3d

18   at 595 ("the misrepresentations at issue here do not justify a presumption of reliance ... primarily

19   because it is likely that many class members were never exposed to the allegedly misleading

20   advertisements"); *Berger*, 741 F.3d at 1070.  Where, in contrast, "a class of consumers may have

21   seen all, some, or none of the advertisements that form the basis of a plaintiff's suit, an inference

22   of common reliance or liability is not permitted."  *Campion v. Old Rep. Home Prot. Co*., 272

23   F.R.D. 517, 536 (S.D. Cal. 2011).

24        Moreover, even if plaintiffs could prove that all class members saw at least one of the

25   allegedly misleading demonstrations, that does not mean that they are all entitled to restitution or

26   _____

27   [3] This principle of California law is consistent with Rule 23 and the Rules Enabling Act.  Because
     Rule 23 is merely a procedural tool used to aggregate individual claims and does not "abridge,
     enlarge or modify any substantive right," it cannot permit a class member recovery who would
28   not otherwise be entitled to it.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997).

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

1   that such a claim can be certified—even under the UCL.  In *Tucker v. Pacific Bell Mobile*

2   *Services*, 208 Cal. App. 4th 201 (2012), for example, the plaintiff sued his cellphone provider,

3   claiming that "each and every rate plan offered for sale" by the defendants "contain[ed] a material

4   misrepresentation with respect to the actual number of airtime minutes" covered by the plan.  *Id.*

5   at 218.  But because many customers had no restitution claim, the court refused to certify a class:

6   "Even if we assume that there were a common misrepresentation as to the number of

7   conversational minutes in the Defendants' advertised rate plans, and that the representations were

8   material, Plaintiffs could not present UCL class claims for restitution."  *Id*. at 228; *see also*

9   *Campion*, 272 F.R.D. at 533 ("an individualized analysis would be necessary to determine

10   whether restitution is appropriate and, if so, the amount of any restitution").

11        Plaintiffs' position that class members' individual circumstances need not be considered

12   has never been adopted by any court.  In all of the four cases plaintiffs cite for this proposition,

13   the court either found—upon a substantial evidentiary showing—that every member of the class

14   had been uniformly exposed to the same misrepresentation, or the claim was based on a

15   fraudulent omission where classwide exposure to a misrepresentation was not at issue.  *See* Mot.

16   19:17–20:8.  Thus, in *In re Brazilian Blowout Litigation*, 2011 WL 10962891 (C.D. Cal. Apr. 12,

17   2011), the plaintiffs presented "substantial evidence" that a consumer could not purchase the hair-

18   straightening product at issue without being exposed to the claim that it was free of

19   formaldehyde, which was not only an "integral part of every aspect of its marketing and

20   advertising campaigns" but appeared on the side of every package.  *Id*. at *7.  The court came to

21   essentially the same conclusion in two of the other cases plaintiffs cite, *Astiani v. Kashi Co*., 291

22   F.R.D. 493 (S.D. Cal. 2013), and *Makaeff v. Trump University, LLC*, 2014 WL 688164 (S.D. Cal.

23   Feb. 21, 2014).  *See Astiani*, 291 F.R.D. at 500 ("Because the alleged misrepresentations appeared

24   on the actual packages of the products purchased, there is no concern that the class includes

25   individuals who were not exposed to the misrepresentation."); *Makaeff*, 2014 WL 688164, at *13

26   (because of the "highly orchestrated" nature of the promotional campaign for real estate courses it

27

28

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

1    was "highly likely" that each class member was exposed to "the same misrepresentations,"

2    including the claim that Trump University is "accredited").[4]

3        None of these cases permits the Court to ignore the individual experiences of absent class

4    members. Rather, they stand for the unremarkable proposition that each class member need not

5    submit individualized proof *if* the plaintiff establishes that all their experiences were the same.

6    But plaintiffs have presented no such evidence here. And the actual evidence establishes just the

7    opposite, which precludes any inference of classwide exposure, reliance, or injury.

8        **B.    Class Members' Individual Experiences Varied Significantly.**

9        To begin, many unnamed class members could not have been harmed because they were

10   never exposed to the allegedly deceptive conduct. Plaintiffs claim that "each member of the

11   proposed class"—that is, each of the approximately 130,000 consumers who bought the game on

12   or before February 12, 2013—saw the demonstrations that they claim are misleading. Mot. 22:3–

13   10. But plaintiffs do not supply any actual *evidence* to satisfy their burden to prove this assertion.

14   Evidence that an allegedly misleading demonstration accumulated 1.2 million non-unique views

15   on Youtube does not say anything about how many *class members*—limited to those who pre-

16   ordered the game—actually saw the video. Missaghi Decl. ¶ 11. Moreover, it is undisputed that

17   all of the class members who, like Mr. Perrine, pre-ordered the game before June 2011 could not

18   have seen the allegedly misleading demonstration because it did not exist. FAC ¶¶ 30, 85–86.

19   ████████████████████████████████████████████████████████

20   ██████████████████████████████████████████████. *See, e.g.,* Locke

21   Dep. 63:5–13; Perrine Dep. 80:4–84:19, 96:18–97:25. During his deposition, Mr. Locke at first

22   said that he is "very confident" he saw the supposedly misleading videos identified in his

23   declaration. Locke Decl. ¶ 5; Locke Dep. 63:19–64:6. But just moments later, he testified that he

24

25   [4] The court in *Brazilian Blowout* also found that the defendant likely had an affirmative duty to disclose the presence of formaldehyde in the product anyway, rendering classwide exposure to any misrepresentation irrelevant to the certification analysis. 2011 WL 10962891, at *8.

26   Similarly, in *Stearns v. Ticketmaster*, 655 F.3d 1013 (9th Cir. 2011), also cited by plaintiffs, the plaintiffs had accused Ticketmaster of failing to disclose that it transferred users' credit card

27   information to a related site, which then made charges without their permission. *Id.* at 1017. Because there was no misrepresentation in *Stearns* that the class members may or may not have

28   been exposed to or relied on, it also has no application here.

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

1  cannot say "with any degree of certainty" if he saw those videos or others "like them."  Locke
2  Dep. 66:13–67:10.
3
4  . Perrine Dep. 79:1–16, 97:6–25.
5
6
7
8
9
10
11
12
13
14
15  .
16  Perrine Dep. 109:6–110:7.  Thus, whether a consumer was even exposed to the alleged
17  misrepresentation is an individual question.
18      In addition, it is not enough to determine that a consumer was *exposed* to the alleged
19  misrepresentation, as there are a variety of other reasons he may have bought the game.  In fact,
20  the Complaint identifies three reasons the game could "sell itself" in the absence of any marketing
21  whatsoever: (1) the popularity of the *Aliens* movie franchise, (2) Sega's reputation in the video
22  game industry, and (3) Gearbox's proven track record in creating games like ACM.  FAC ¶ 19.
23      On top of these selling points, an untold number of consumers were also motivated by the
24  many pre-release advertisements that did not include any of the representations that plaintiff says
25  are misleading.  For example, a significant portion of the class
26      likely saw and relied on the widely watched, two-hour-long demonstration of
27  the *final* version of the game that was broadcast online just ten days before it was shipped to
28  consumers.  Locke Dep. 27:22–28:1, 40:8–13, 160:3–161:2; Perrine Dep. 96:18–97:25; Gibson

1   Decl. ¶ 5. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

2   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Perrine Dep. 80:4–84:19.  No unnamed class member

3   could have been harmed by a demonstration plaintiffs do not claim to be misleading.  But sorting

4   that out will necessarily require an individualized inquiry for each member of the class.

5           There are also important variations among those class members who, if questioned, could

6   claim to have relied on the supposedly misleading demos.  There are several features that

7   plaintiffs say were not in the final game.  Plaintiffs assert that the "Demoed Versions" indicated

8   that the game would include particular "scenes" or "sequences," that the enemy aliens would be

9   guided by a certain type of "artificial intelligence," and that it would include certain graphical

10  capabilities.  Mot. 1:2–7, 20:26–27; Locke Decl. ¶ 6; FAC ¶¶ 18, 50, 79.  What if the trier of fact

11  concludes that one of these aspects of the game demonstration was misleading—the final game

12  does not include a particular scene depicted in a promotional video, for example—yet finds that

13  all the other aspects of the video were accurate?  It would be necessary to know which feature

14  appealed to each unnamed class member to know whether that person was misled.  ▉▉▉▉▉

15  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

16  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

17  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Locke Dep. 173:20–175:6, 191:4–17, 208:14–209:5; Perrine

18  Dep. 53:11–25, 115:8–14, 169:8–24, 174:2–18.  There is thus no common proof that could

19  demonstrate that, and a consumer-by-consumer inquiry would be required.

20          **C.**     <u>**Class Members' Alleged Injuries Are Not Subject To Classwide Proof.**</u>

21          A party seeking certification under Rule 23(b)(3) also bears the burden of establishing

22  "through evidentiary proof" that damages are "capable of measurement on a classwide basis."

23  *Comcast*, 133 S. Ct. at 1432–33.  If a plaintiff fails to satisfy this burden, he "cannot show Rule

24  23(b)(3) predominance:  Questions of individual damage calculations will inevitably overwhelm

25  questions common to the class."  *Id*. at 1433.  Plaintiffs fail to meet the standard established by

26  *Behrend* because they do not offer any evidence, expert opinion, or even a basic methodology for

27  calculating the alleged harm to each class member using classwide proof.

28          That failure dooms the motion.  None of plaintiffs' claims, including the UCL, permits a

court to order the return of arbitrary amounts of money. Restitution is permitted only to the extent necessary to "return … the excess of what the plaintiff gave the defendant over the value of what the plaintiff received," *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 174 (2000), the measure of which "must be supported by substantial evidence." *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 699–700 (2006). Restitution of the full price paid or disgorgement of profits is an improper windfall to plaintiffs where the products had at least some value to the consumers. *See, e.g.*, *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 531–32 (N.D. Cal. 2012).

In this case, class members who were not exposed to any allegedly misleading demo got exactly the value they expected to receive, as did those who saw the videos at issue but would have bought the game anyway for one of the several other reasons identified above. Even those who were fully satisfied by the game are swept into plaintiffs' proposed class. In addition, those class members who claim they would have still bought the game but only at a lower price would be entitled only to the difference between the purchase price and what they would have paid. For example, Mr. Locke believes the game is now worth $5 to him, while Mr. Perrine resold his game on the same day it was publicly released, recouping $17 from his purchase price. Locke Dep. 114:15–115:14, 259:8–15; FAC ¶ 97. Each plaintiff accordingly cannot receive more than the difference between what they paid and $5 or $17, an amount that could be determined only through an individualized inquiry into their circumstances. Plaintiffs cannot satisfy their burden to offer a way to calculate restitution on a classwide basis.

## V.     THE COURT CANNOT CERTIFY A NATIONWIDE CLASS BECAUSE INDIVIDUAL *LEGAL* ISSUES PREDOMINATE.

The Ninth Circuit's decision in *Mazza v. American Honda* forecloses certification of a nationwide class under California law in a consumer fraud case such as this. A class cannot be certified unless all the members are governed by the same legal rules. *Mazza*, 666 F.3d at 594. Plaintiffs' proposed nationwide class includes people from up to 51 different jurisdictions, and California choice of law rules require that many if not all of their claims be governed by their home state's laws. In Gearbox's motion to strike plaintiffs' class allegations, Gearbox explained

why *Mazza* forecloses plaintiffs' nationwide class.  Dckt. No. 67 at 11:11–13:28.  Plaintiffs'
motion never even mentions, let alone addresses, *Mazza*.  Because common legal issues will not
predominate, plaintiffs' proposed class cannot be certified.

**A.      California's "Governmental Interest" Test Requires The Application Of The
Law Of Each Consumer's State Of Purchase.**

Under California's choice of law test, California law "may only be used on a classwide
basis if the interests of other states are not found to outweigh California's interest in having its
law applied" as determined by a three-step "governmental interest" test.  *Mazza*, 666 F.3d at 589–
90 (*quoting Wash. Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 921 (2001)).  The first step is to
determine if the law in the other states materially differs from the law in California.  *Wash. Mut.*,
24 Cal. 4th at 919–20.  If so, the court must determine whether the states besides California have
an interest in having their own law applied.  *Id.* at 920; *Mazza*, 666 F.3d at 590.  If so, the court
must weigh which state's interests would be "more impaired" if its laws were not applied.  *Id.*

Because the claims and relevant facts here are materially the same as the false advertising
allegations addressed in *Mazza*, that decision is not just instructive but determinative at each step.
There, the defendant's principal place of business and headquarters for marketing was in
California, and it hired two California-based advertising agencies to create the advertising
campaign at issue.  *Id.* at 590, 597.  Even so, the court concluded that California choice of law
rules required that "each class member's consumer protection claim should be governed by the
consumer protection laws of the jurisdiction in which the transaction took place"—that is, the
state in which class members saw and relied upon the allegedly misleading advertisements—and
that a nationwide class therefore could not be certified.  *Id.* at 594.  *See also Keegan v. Am.
Honda Motor Co.*, 284 F.R.D. 504, 545-48 (C.D. Cal. 2012) (same conclusion for express
warranty claim).[5]  *Mazza* dictates the same result here.

---

[5] The great majority of courts require application of the law of the jurisdiction where each class
member was allegedly injured by deceptive advertising, even if the forum state is where the harm
originated.  *See, e.g.*, *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946–47 (6th Cir.
2011) ("No doubt, States have an independent interest in preventing deceptive or fraudulent
practices by companies operating within their borders.  But the State with the strongest interest in
regulating such conduct is the State where the consumers—the residents protected by *its
consumer*-protection laws—are harmed by it.");  *In re Bridgestone*, 288 F.3d at 1017–18 ("State

### B.     Different States' Laws Vary in Material Ways.

There are several material differences among the various states' treatment of all of plaintiff's six causes of action.  Although Gearbox catalogued these in detail in its motion to strike plaintiffs' class allegations, plaintiffs opted not to address them in their motion.

***Consumer Protection Statutes.***  As the Ninth Circuit recognized in *Mazza*, each state's consumer protection laws differ in numerous respects from California's UCL, FAL, and CLRA. 666 F.3d at 594.  Thus, while some state laws make only "deceptive" conduct actionable, others apply to "unfair" or "unconscionable" behavior.[6]  In others, private claims must be asserted on an individual basis, which forecloses the use of private class actions.[7]  State laws also vary in terms of the remedies and damages.  In California, the UCL does not permit recovery of damages,  only injunctive relief and restitution.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003).  Yet the New Jersey act permits recovery of treble damages.  N.J. Stat. § 56:8-19.

Standards for reliance and causation also vary.  *Keegan*, 284 F.R.D. at 542.  In many states, reliance may be required,[8] or, like California, the named plaintiffs must prove reliance.  *In re Tobacco II*, 46 Cal. 4th at 298.  But in others, reliance is not.[9]

***Fraud Claims.***  States also follow different rules for fraud claims.  As noted in *Field v. Mans*, 516 U.S. 59 (1995), states have adopted three reliance standards for fraud:  "actual," "justifiable," and "reasonable" reliance.  *Id.* at 72–73.  For this reason the Fifth Circuit denied

---

consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's laws to sales in other states with different rules").

[6] *Compare, e.g.*, Ga. Code Ann. § 10-1-372 (West 2012); Kan. Stat. Ann. § 50-626(a) (West 2012); S.D. Codified Laws § 37-24-6 (West 2012), *with* Fla. Stat. Ann. § 501.204(1) (West 2012) (listing "unconscionable acts or practices"); Miss. Code Ann. § 75-24-5(1) (West 2012) ("Unfair methods of competition … are prohibited"); S.C. Code Ann. § 39-5-20(a) (West 2012) (same).

[7] Ala. Code § 8-19-10(f) (West 2012) ("A consumer or other person bringing an action under this chapter may not bring an action on behalf of a class ...."); Ga. Code Ann. § 10-1-399(a) (West 2012) (same); La. Rev. Stat. § 51:1409(A) (same); Miss. Code Ann. § 75-24-15(4); Mont. Code Ann. § 30-14-133(1); S.C. Code Ann. § 39-5-140(a); Va. Code §§ 59.1-204(A-B).

[8] *E.g.*, *Kuehn v. Stanley*, 91 P.3d 346, 351 (Ariz. Ct. App. 2004); Ga. Code Ann. § 10-1-399; *Baranco, Inc. v. Bardshaw*, 456 S.E.2d 592, 594 (Ga. Ct. App. 1995); Ind. Code Ann. § 24-5-05-4(a); *Valente v. Sofamor, S.N.C.*, 48 F. Supp. 2d 862, 874 (E.D. Wis. 1999).

[9] *E.g.*, *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973-74 (Fla. Ct. App. 2000); *Sebago, Inc. v. Beazer E., Inc.*, 18 F. Supp. 2d 70, 103 (D. Mass. 1998) (Mass. law); *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611-12 (N.Y. 2000); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); *Izzarelli v. R.J. Reynolds Tobacco Co.*, 117 F. Supp. 2d 167, 176 (D. Conn. 2000).

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

1   class certification of nationwide fraud claims in *Castano v. American Tobacco Co*., 84 F.3d 734,

2   743 (5th Cir. 1996).  *See also Sanders v. Robinson Humphrey/Am. Express, Inc.*, 634 F. Supp.

3   1048, 1068-69 (N.D. Ga. 1986) (canvassing differences in scienter and reliance among state

4   common law fraud claims).  Even the burden of proof differs.  Some require a preponderance of

5   the evidence, while most demand clear and convincing evidence.  *See, e.g.*, *Saxton v. Harris*, 395

6   P.2d 71, 72 (Alaska 1964); *Liodas v. Sahadi*, 19 Cal. 3d 278, 287–88 (1977).

7      ***Express Warranty Claims.***  States' express warranty laws also vary considerably.  In

8   *Keegan v. American Honda Motor Co*, 284 F.R.D. 504 (C.D. Cal. 2012), for example, the court

9   found that a class of plaintiffs from just three different states failed to demonstrate predominance

10  of common legal issues on a claim for breach of express warranty given the different reliance and

11  pre-suit notice requirements in those states.  *Id.* at 545–49; *see also Cole v. GMC*, 484 F.3d 717

12  (5th Cir. 2007) (denying class certification after cataloging nationwide variations in reliance,

13  notice, and privity requirements on claim for breach of express warranty); *Rikos v. Procter &*

14  *Gamble Co.*, 2012 WL 641946 (S.D. Ohio Feb. 28, 2012) (rejecting nationwide class under

15  California choice of law rules because of differences in warranty laws).

16     For example, in California, reliance may be presumed, but any presumption can be

17  overcome.  *E.g.*, Cal. Com. Code § 2313; *Weinstat v. Dentsply Int'l, Inc*., 180 Cal. App. 4th 1213,

18  1229 (2010).  In Washington, the plaintiff must have been aware of the representations.  *Baughn*

19  *v. Honda Motor Co.*, 727 P.2d 655, 669 (Wash. 1986).  New Jersey shifts the burden to the

20  defendant to show the plaintiff *disbelieved* the representation.  *Cipollone v. Liggett Grp., Inc.*, 893

21  F.2d 541, 569 n.34 (3d Cir. 1990), *aff'd in part & rev'd in part*, 505 U.S. 504 (1992).  And New

22  York can require reliance as well.  *Horowitz v. Stryker Corp*., 613 F. Supp. 2d 271, 286

23  (E.D.N.Y. 2009).  If California law were applied nationwide, those in New York, Washington,

24  and New Jersey would be able to bring claims that would be barred in their own states.

25     Privity rules also differ.  California may not require privity when consumers relied on

26  advertisements, *Fieldstone Co. v. Briggs Plumbing Prods., Inc.*, 54 Cal. App. 4th 357, 369 n.10

27  (1997), but without showing privity in Arizona, for example, warranty claims for retail purchases

28  could be barred.  *Flory v. Silvercrest Indus. Inc.*, 633 P.2d 383, 387 (Ariz. 1981).  If this case is

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

1    allowed to proceed as a nationwide class under California law, class members in Arizona may be

2    allowed to recover without a showing of privity even if it is an essential requirement in their state.

3        ***Negligent Misrepresentation.***  California does not have a strict requirement that the

4    plaintiff be in privity with the defendant to state a claim, but states vary in their approach.  *Arthur*

5    *Andersen v. Superior Court*, 67 Cal. App. 4th 1481, 1501–03 (1998).  The district court in *In re*

6    *Control Data Corp. Securities Litigation*, 116 F.R.D. 216 (D. Minn. 1986), for example, refused

7    to certify a multistate class on a claim for negligent misrepresentation after finding that, in some

8    states, the claim can be brought by anyone whose reliance is reasonably foreseeable, while a

9    contractual relationship or duty is required in other states.  *Id*. at 223 n.6.  As with plaintiffs'

10   express warranty claim, unnamed class members from states that require privity could

11   consequently be awarded damages even though their home jurisdiction would forbid recovery.[10]

12            **C.      Each State Has A Strong Interest In Applying Its Own Laws.**

13       Since the conflicts of law at issue here are material, the Court must determine whether the

14   other states have an interest in having their own law applied to the case.  *Wash. Mut.*, 24 Cal. 4th

15   at 920.  *Mazza* again dictates the answer.  As the Ninth Circuit explained, consumer protection

16   laws reflect important policy judgments by each state about the conduct permitted within its

17   borders, and "each state has a strong interest in applying its own consumer protection laws to

18   [the] transactions [that take place there]"—even if another state's law might be more favorable to

19   consumers.  *Mazza*, 666 F.3d at 591–92.  The Ninth Circuit emphasized that it is error to

20   "discount[] or not recogniz[e] each state's valid interest in shielding out-of-state businesses from

21   what the state may consider to be excessive litigation."  *Id*. at 592.  This concern is not

22   diminished in class actions.  To the contrary, "[t]he importance of federalism when applying

23   choice of law principles to class action certification is reinforced by the Class Action Fairness

24   Act," a "key purpose" of which was to prevent courts from dictating the "substantive laws of

25   other states."  *Id*. at 593 (*quoting* S. Rep. No. 109-14, at 61 (2005)).

26

27   _____
     [10] Exhibit N to the Whitman Declaration identifies additional legal authorities and material
28   variations in the laws of some of the 51 jurisdictions whose laws are implicated by plaintiffs'
     motion.

1

**D.**     **Other States' Interests Would Be More Impaired Than California's.**

2      This prong of the analysis requires the court to determine "which state's interest would be

3   more impaired if its policy were subordinated to the policy of the other state." *Mazza*, 666 F.3d at

4   590; *Offshore Rental Co. v. Cont'l Oil Co.*, 22 Cal. 3d 157, 164-65 (1978); *Wash. Mut.*, 24 Cal.

5   4th at 920.  Here, as in *Mazza*, the jurisdiction where the alleged misrepresentation was viewed

6   and the purchase was made has the predominant interest in applying its laws to the case.

7      *Mazza* held that it is the "state where the last event necessary to make the actor liable

8   occurred" that has "the predominant interest" in regulating the conduct.  666 F.3d at 593.  Here

9   that is the state where each consumer saw the allegedly misleading demonstration and bought the

10   game. *Id.* at 594.  Mr. Locke saw the videos and bought the game in California, where he lives,

11   while Mr. Perrine did so in his home in Pennsylvania.  FAC ¶¶ 7, 8, 73–76, 81–82, 92, 94.  The

12   class members' state of residence has the greatest interest in regulating this conduct and applying

13   its laws to its residents' purchases.  But California's interest in applying its law to claims by

14   foreign plaintiffs against a foreign defendant based on a foreign transaction is highly attenuated.

15      And while the connection between the defendant's conduct and California is not

16   determinative, that connection is significantly weaker here than the contacts with California the

17   Ninth Circuit found inadequate in *Mazza*.  Sega is headquartered in California and two of the

18   eight demonstrations of the game identified in the complaint occurred here.  FAC ¶¶ 9, 30, 40.

19   But Gearbox is headquartered in Texas, and six of the eight demonstrations alleged in the

20   complaint were presented outside California.  FAC ¶¶ 10, 34, 36, 38, 40; Gibson Decl. ¶ 9.

21      Since *Mazza*, courts have repeatedly refused to certify nationwide classes after concluding

22   that California law cannot be applied to the claims of non-resident class members who allegedly

23   relied on misleading advertisements distributed from California by California defendants. *See*,

24   *e.g.*, *Schwartz v. Lights of Am.*, 2012 U.S. Dist. LEXIS 142789, at *14–31 (C.D. Cal. Aug. 31,

25   2012) (despite that the defendant "is a California corporation that conducts its business

26   exclusively in state," the law of the state where the class member received the alleged

27   misrepresentation about the lighting product governs his claim); *Gianino v. Alacer Corp.*, 846 F.

28   Supp. 2d 1096, 1100–03 (C.D. Cal. 2012) (despite that the defendant's "corporate headquarters

1   are in California, a large number of the proposed nationwide class resides in California, almost

2   50% of the Emergen-C products were manufactured in California, and the corporate decisions

3   regarding packaging and marketing of the Emergen-C products were all made in California," it is

4   the law of the state where the class members' reside that governs their claim that the product was

5   mislabeled); *Werdebaugh v. Blue Diamond Growers*, 2014 U.S. Dist. LEXIS 71575, at *3–4, 74

6   (N.D. Cal. May 23, 2014) (despite that the almond milk and the alleged misrepresentation

7   regarding its contents originated in California, the law of the state where the class member

8   purchased the product governs his claim); *Thurston v. Bear Naked, Inc.*, 2013 U.S. Dist. LEXIS

9   151490, at *35–37 (S.D. Cal. July 30, 2013) (same as to allegedly mislabeled granola); *Holt v.

10  Globalinx Pet LLC*, 2014 U.S. Dist. LEXIS 11825, at *22–23 (C.D. Cal. Jan. 30, 2014) (same as

11  to allegedly mislabeled dog food).  The class proposed here fails for the same reason.

12  **VI.    A CLASS ACTION IS NOT A SUPERIOR METHOD OF ADJUDICATION.**

13        Plaintiffs have also failed to demonstrate that a class action is "superior" to other available

14  methods for fairly and efficiently adjudicating this controversy.  *See* Fed. R. Civ. P. 23(b)(3).

15  Plaintiffs have the burden of showing that the "likely difficulties in managing a class action" can

16  be overcome, *id.* at 23(b)(3)(D), an inquiry that "encompasses the whole range of practical

17  problems that may render the class action format inappropriate for a particular suit." *Eisen v.

18  Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).

19        As the Ninth Circuit explained in *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180

20  (9th Cir. 2001), where "each class member has to litigate numerous and substantial separate

21  issues to establish his or her right to recover individually, a class action is not 'superior.'" *Id.* at

22  1192.  For the reasons discussed above, this is just such a case, and it is judicially unmanageable.

23        The proposed class settlement between plaintiffs and Sega also precludes a finding that

24  this proposed class is a superior method of adjudicating the claims.  By plaintiffs' account, the

25  relief awarded under that settlement to class members who submit claims will make them "more

26  than whole." Dckt. No. 78 at 1:15–17.  In addition to being able to keep the game, they will

27  likely recover their full purchase price, rendering their claims against Gearbox moot.  *Id.* at 18:1–

28  9:25; *S-1 & S-2 v. Spangler*, 832 F.2d 294, 297 (4th Cir. 1987) (settlement with one defendant for

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

1    all the monetary relief sought moots the action as to the other defendant).  Those who make

2    claims and obtain relief under the settlement cannot recover further from Gearbox.  *Id.*

3          The only members of the class who could theoretically seek to recover against Gearbox

4    thereafter are: (1) class members who opted out of the settlement, and (2) those who chose not to

5    file a claim.  Those in the first group will have decided that their claims are worth pursuing on an

6    individual basis.  In other words, they will have decided that a class action is not a superior

7    method of redressing their claims.  The second group, those who do not bother to file a claim, will

8    have necessarily determined they do not wish to recover, individually or as part of a settlement

9    class.  No class should be certified to address claims of those who do not wish to make any claim.

10   **VII.    MR. LOCKE'S AND MR. PERRINE'S CLAIMS ARE NOT TYPICAL NOR ARE**

11   **THEY ADEQUATE CLASS REPRESENTATIVES.**

12         Mr. Locke cannot establish that his claims are typical of the class because he will be

13   subject to particular defenses that could undermine his prosecution of the claims on a classwide

14   basis.  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  For example, Mr. Locke

15   testified that he is not even certain that he viewed the allegedly misleading videos before he

16   placed his pre-order.  Locke Dep. 66:13–67:10.  Moreover, because he visits IGN's website daily,

17   it is likely that he viewed its broadcast of the final version of ACM before its release.  *Id.* at

18   27:22–28:1, 40:8–13, 160:3–161:17.  And the fact that he appears not to have played the game

19   until at least a few days after it was released—after he was likely exposed to the negative online

20   reviews and video comparisons identified in the Complaint—makes it even more likely that he

21   was cured of any misimpression about the features he allegedly thought the game would include

22   before his purchase was final.  Gibson Decl. ¶ 10.

23         In addition, a plaintiff is not an adequate representative if he "ha[s] any conflicts of

24   interest with other class members" or will not "prosecute the action vigorously on behalf of the

25   class."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); Mot. 17:23–25.  If

26   Mr. Locke's proposed settlement with Sega is approved, his interests will not be aligned with the

27   class as a whole, as he admits he will have recovered from that settlement all the damages he

28   claims to have suffered.  Locke Dep. 273:2–11.  Moreover, under the Sega settlement, Mr. Locke

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD

1   would recover not just the full amount he paid for the game but also a $2,500 "incentive award,"

2   removing any remaining incentive he might have had to prosecute this action vigorously on

3   behalf of the class.  Dkt. No. 78 at 6:6–9.

4        Finally, until recently, plaintiffs' counsel sought to have plaintiff Damion Perrine—who

5   remains a named plaintiff in this action—appointed to serve as a class representative.  FAC ¶¶ 8,

6   101, 104–05.  Neither plaintiffs nor their counsel have ever revealed to the Court, however, that

7   Mr. Perrine has a long criminal history, including at least ten criminal convictions in

8   Pennsylvania, for offenses including burglary, theft, receipt of stolen property,

9        Whitman Decl. Exs. L–M; *see also* Perrine Dep. 187:8–25, 192:13–194:10.

10       Perrine Dep. 182:22–183:16, 185:1–

11  13, 185:20–188:15.  Even worse, Mr. Perrine is now under the supervision of the Allegheny

12  County Sheriff's Department, and he is also awaiting trial on terroristic threats, weapons, and

13  assault charges.  Whitman Decl. Ex. M–N.  For these reasons, he is an inadequate representative.

14  *See, e.g., In re BankAmerica Corp. Sec. Litig.*, 95 F. Supp. 2d 1044, 1050 (E.D. Mo. 2000)

15  (finding that "one proposed class representative was highly inadequate due to his criminal record

16  and history of participation in fraud").

17  **VIII.   CONCLUSION**

18       For the foregoing reasons, the Court should deny plaintiffs' motion.

19  Dated: October 9, 2014                    Respectfully submitted,

20                                            O'MELVENY & MYERS LLP
                                              ROBERT M. SCHWARTZ
21                                            VICTOR H. JIH
                                              HARRISON A. WHITMAN
22

23                                            By:   */s/ Robert M. Schwartz*
                                                   Robert M. Schwartz
24                                            Attorneys for Defendant Gearbox Software

25

26

27

28

OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
NO. 3:13-CV-01962 JD