Mark S. Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251

Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Christopher L. Dore (Admitted *Pro Hac Vice*)
cdore@edelson.com
Benjamin S. Thomassen (Admitted *Pro Hac Vice*)
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiffs and the Putative Class*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN LOCKE and DAMION PERRINE, individually and on behalf of all others similarly situated,<br><br>     *Plaintiffs*,<br><br>   v.<br><br>SEGA OF AMERICA, INC. a California corporation, and GEARBOX SOFTWARE L.L.C., a Texas limited liability company,<br><br>     *Defendants*. | Case No. 13-cv-01962-JD<br><br>**PLAINTIFF JOHN LOCKE'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Judge: Hon. James Donato<br>Hearing Date: November 12, 2014<br>Time: 9:30 a.m.<br>Courtroom: 11 |

**TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................... 1

II. ARGUMENT ............................................................................................................. 2

    A. **Individual Questions of Fact Do Not Predominate Because Reliance Either is Not Required or Can be Presumed** ........................................................ 2

        1. Plaintiff's UCL, FAL, and Breach of Warranty Claims Do Not Require Individual Reliance ....................................................................... 2

        2. Reliance Can Be Presumed with Respect to Plaintiff's CLRA and Common Law Claims ................................................................................. 3

            a. *The misrepresentations were made to the entire class through Gearbox's controlled advertising scheme* ........................................ 4

            b. *Whether Gearbox's misrepresentations were material is a question common to all class members* ............................................ 8

    B. **There Are No Individual Questions of Law Because California Law Applies to Every Consumer's Claims** ................................................................ 11

    C. **None of Gearbox's Other Arguments Preclude Class Certification** ................. 13

III. CONCLUSION ........................................................................................................ 15

# TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES:**

*Amgen, Inc. v. Connecticut Retirement Plans & Trust Funds*, 133 S. Ct. 1184 (2013) ...............10

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ........................................................................15

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) ............................................................11

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960 (9th Cir. 2013) .........................11

*Berger v. Home Depot USA, Inc.*, 741 F.3d 1061 (9th Cir. 2014).....................................................6

*In re Zukerkorn*, 484 B.R. 182 (B.A.P. 9th Cir. 2012) ..............................................................12, 13

*Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013) ...........................................................15

*Mazza v. American Honda Motor Co.,* 666 F.3d 581 (9th Cir. 2012)...................................6, 7, 11

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011 ..............................................3, 4, 7, 8

*United States v. Bingham*, 992 F.2d 975 (9th Cir. 1993)................................................................10

*Williams v. Gerber Prods. Co.*, 552 F.3d 934 (9th Cir. 2008)...........................................................3

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010)...................................13

**UNITED STATES DISTRICT COURT CASES:**

*Astiani v. Kashi Co.*, 291 F.R.D. 493 (S.D. Cal. 2013)............................................................3, 4. 8

*Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558 (S.D. Cal. 2012)................................................8, 9

*Burton v. Nationstar Mortg., LLC*, No. 1:13-cv-00307-LJO-JLT, 2014 WL 5035163,
    (E.D. Cal. Oct. 8, 2014) ...........................................................................................................8

*Campion v. Old Republic Home Protection Co.*, 272 F.R.D. 517 (S.D. Cal. 2011) .......................7

*Cayanan v. Citi Holdings, Inc.*, 928 F. Supp. 2d 1182 (S.D. Cal. 2013) ......................................12

*Ching v. Siemens Indus., Inc.*, No. C 11-4838 MEJ, 2013 WL 6200190
    (N.D. Cal. Nov. 26, 2013) .....................................................................................................14

*In re Brazilian Blowout Litig.*, No. CV 10-8452-JFW (MANx),
    2011 WL 10962891 (C.D. Cal. Apr. 12, 2011) ............................................................. 2-4, 6

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 WL 253298,
    (N.D. Cal. Sept. 29, 2013) .......................................................................................................1

*Lilly v. Jamba Juice Co.*, No. 13-cv-02998-JST, 2014 WL 4652283,
 (N.D. Cal. Sept. 18, 2014) ...................................................................................3, 8, 15

*Makaeff v. Trump Univ., LLC*, No. 3:10-cv-0940-GPC-WVG, 2014 WL 688164,
 (S.D. Cal. Feb. 21, 2014) ....................................................................................3, 4, 6, 7

*McCrary v. Elations Co., LLC*, EDCV 13-00242 JGB OP, 2014 WL 1779243,
 (C.D. Cal. Jan. 13, 2014) ...........................................................................................4, 8

*Moncada v. Allstate Ins. Co.*, 471 F. Supp. 2d 987 (N.D. Cal. 2006) ............................................3

*O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC, 2013 WL 6354534
 (N.D. Cal. Dec. 5, 2013) ...............................................................................................11

*Omstead v. Dell, Inc.*, 533 F. Supp. 2d 1012 (N.D. Cal. 2008) ......................................................11

*Sound Appraisal v. Wells Fargo Bank, N.A.*, 717 F. Supp. 2d 940 (N.D. Cal. 2010) ..................12

*Ubaldi v. SLM Corp.*, No. C 11-01320-EDL, 2013 WL 4015776
 (N.D. Cal. Aug. 5, 2013)...............................................................................................12

**STATE COURT CASES:**

*Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966 (2009).................................................................7

*Mass. Mutual Life Ins. Co. v. Superior Court of San Diego Cnty.*,
 97 Cal. App. 4th 1282 (2002) .........................................................................................6

*Nedlloyd Lines B.V. v. Superior Court of San Mateo Cnty.*, 3 Cal. 4th 459 (1992) ................11, 12

*Pfizer Inc. v. Superior Court*, 182 Cal. App. 4th 622 (2010) .......................................................5, 7

*Sevidal v. Target Corp.*, 189 Cal. App. 4th 905 (2010).................................................................6

*Wash. Mut. Bank, FA, v. Superior Court of Orange Cnty.*, 24 Cal. 4th 906 (Cal. 2001) ........11, 12

**STATUTES:**

Fed. R. Civ. P. 23............................................................................................................. *passim*

**MISCELLANEOUS:**

Restatement (Second) of Conflict of Laws § 187.................................................................. 11-13

## I. INTRODUCTION[1]

Contrary to Gearbox's assertion, this case is not about "two named plaintiffs' subjective disappointment with a video game." (Resp. at 1.) It's about a widespread marketing campaign in which material misrepresentations were made about a product. As explained in Plaintiff Locke's Motion, Defendants Sega and Gearbox widely promoted a version of ACM that was *different than* (and vastly superior to) the retail version ultimately sold to purchasers. The differences between these Demoed Versions of the game and the Retail Version are not (as Gearbox suggests) simply whether Locke preferred one over the other, but objective and significant differences between the products. The differences prompted one critic to note, following ACM's retail release, that "the demo looks absolutely nothing like the final game" and another to create a shot-by-shot comparison video—entitled "What the Hell Happened to *Aliens: Colonial Marines*?"—calling out those differences. (Mot. at 10.) Both Sega and Gearbox admitted that the Demoed Version and the Retail Version were objectively different: Gearbox's CEO, Randy Pitchford, responded to consumer concerns over the difference by saying "[t]hat is understood and fair and we are looking at that," and Sega Europe "acknowledge[d] [the] objection that trailers did not accurately represent the final content of the game." (Mot. at 11-12.) That consumers like Locke and industry critics were overwhelmingly disappointed with the Retail Version of ACM is not the point[2]—rather, the relevant questions here ask whether Defendants made representations about ACM that turned out to be false, promising a game of a quality and character that ultimately was not delivered. Because the answers to these questions depend entirely on Defendants' conduct and reference one final product, they are common to the class.

Other than some cursory objections to superiority and adequacy, Gearbox only objects to certification on the basis of predominance. Specifically, Gearbox says that "sorting out who saw what, when, and whether it had any effect on their pre-release purchase decision would be

---

[1] All capitalized terms and abbreviations used in this brief have the same meaning as set forth in Plaintiff John Locke's Motion for Class Certification (the "Motion"). (Dkt. 95.)
[2] Nor is the point that, as asserted by Gearbox, *some* consumers were not disappointed with the Retail Version. (Resp. at 7-8.) A class "may include individuals who did not perceive that they were short changed by the defendants' actions." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 WL 253298, *3 (N.D. Cal. Sept. 29, 2013).

PLAINTIFF LOCKE'S REPLY IN SUPPORT OF         1         CASE NO. 13-cv-01962-JD
MOTION FOR CLASS CERTIFICATION

impossible on a class-wide basis." (Resp. at 2.) Gearbox's concern, however, completely misses the point. Who saw what, when, and whether it influenced their decision goes entirely to reliance, which simply is not an issue here. Three of Plaintiff's claims do not require showing reliance, and with respect to the other three, reliance is presumed where, as here, material misrepresentations—judged on an objective, reasonable person basis (not a subjective, individualized one)—have been made. At the end of the day, the questions in this litigation are (i) what did Gearbox say about ACM, (ii) would those statements induce a reasonable consumer to buy, and (iii) were those statements accurate. Whatever the answers, they are the same with respect to the entire class.

Gearbox also asserts that individual questions of *law* predominate because the law of each purchaser's home state applies to that purchaser's claims. But Gearbox ignores that—by its own choice—a contractual choice of law clause selecting California law applies, providing a uniform law applicable to all of the class. Finally, none of Gearbox's other "kitchen sink" arguments have any merit either, and for the reasons discussed in the Motion and below, the proposed class should be certified. Alternatively, should the Court be convinced by any of Gearbox's arguments, it can certify a more narrowly-defined class to which none of Gearbox's objections would apply.

## II. ARGUMENT

### A. Individual Questions of Fact Do Not Predominate Because Reliance Either Is Not Required or Can Be Presumed.

Gearbox argues that the reason any particular consumer purchased ACM is an individual factual question. (*See* Resp. at 9-10.) Plaintiff does not dispute that a consumer's own, subjective motivation for purchasing the game is an individual question. The point, however, is that the answer to that question is irrelevant to the merits of Plaintiff's claims. Contrary to Gearbox's assertion, individual reliance is not an issue because (1) three of the claims don't require reliance as an element, and (2) for the other three, reliance can be presumed on a class-wide basis.

#### 1. Plaintiff's UCL, FAL, and Breach of Warranty Claims Do Not Require Individual Reliance.

As explained in the Motion, Plaintiff's UCL and FAL claims do not require a showing of individual reliance on Defendants' alleged misrepresentations. (Mot. at 19-20) (citing, among others, *In re Brazilian Blowout Litig.*, No. CV 10-8452-JFW (MANx), 2011 WL 10962891, *8

(C.D. Cal. Apr. 12, 2011) ("[U]nder either the UCL or FAL, relief is available without individualized proof of deception, reliance and injury.")). Thus, Gearbox's pointing to the individual question of whether any particular consumer saw and relied on any particular portion of its pre-release marketing campaign is simply irrelevant to the UCL and FAL claims. Indeed, as the Ninth Circuit has noted, UCL and FAL claims "are governed by the 'reasonable consumer' test." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).

Determining whether Gearbox's misrepresentations qualify under this objective reasonable consumer standard "will not require delving into issues specific to each consumer." *Lilly v. Jamba Juice Co.*, No. 13-cv-02998-JST, 2014 WL 4652283, *8 (N.D. Cal. Sept. 18, 2014) (holding that individual issues did not predominate in false advertising case). Rather, liability under the UCL and FAL turns on Gearbox's conduct. *See Makaeff v. Trump Univ., LLC*, No. 3:10-cv-0940-GPC-WVG, 2014 WL 688164, *11 (S.D. Cal. Feb. 21, 2014) ("Liability under either the specific false advertising provisions of the FAL or the broader provisions of the UCL may be found without any individualized proof of deception and solely on the basis a defendant's conduct was likely to deceive customers."); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) ("To state a claim under either the UCL or the [FAL], based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived.").

Similarly, Plaintiff's breach of warranty claim depends solely on Gearbox's conduct, not on any reliance by individual consumers. *See Astiani v. Kashi Co.*, 291 F.R.D. 493, 505 (S.D. Cal. 2013) ("Determinations of whether Defendant misrepresented its products and, as a result, whether warranties were breached, are common issues appropriate for class treatment."). While Gearbox cites *Moncada v. Allstate Ins. Co.*, 471 F. Supp. 2d 987, 997 (N.D. Cal. 2006) for the proposition that breach of warranty claims do require reliance, that case, unlike *Astiani*, did not address the predominance question at issue here or even involve a class action. Thus, the individual reliance questions raised by Gearbox do not predominate over common questions with respect to Plaintiff's UCL, FAL, and breach of warranty claims, because reliance is not even an element of those claims.

        2.     Reliance Can Be Presumed with Respect to Plaintiff's CLRA and Common Law Claims.

While Plaintiff's remaining CLRA, fraud, and negligent misrepresentation claims do require reliance, it can be presumed as to the entire class where the members were exposed to material misrepresentations. (*See* Mot. at 20) (citing *Stearns*, 655 F.3d at 1022 ("If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class.") (internal quotation omitted); *Brazilian Blowout*, 2011 WL 10962891, at *8 ("[R]eliance may be presumed as to the entire Class if Defendant's misrepresentations or omissions were material."); *Trump Univ.*, 2014 WL 688164, at *13 ("[R]eliance on the alleged misrepresentations may be inferred as to the entire class if the named plaintiff can show that material misrepresentations were made to the class members.") (internal quotation omitted)). Thus, the relevant inquiry with respect to those claims is not whether a consumer relied on any of Gearbox's representations, but whether Gearbox's misrepresentations were made to the entire class, and whether they were material.

        a.    *The misrepresentations were made to the entire class through Gearbox's controlled advertising scheme.*

With respect to whether the alleged material misrepresentations were made to the entire class, the issue isn't whether each and every individual class member *saw* this or that advertisement, (*see* Resp. 1), but rather whether the alleged misrepresentations were "part of a common advertising scheme to which the entire class was *exposed*[.]"[3] *Astiani*, 291 F.R.D. at 505 (emphasis added). Here, there is no question that the alleged misrepresentations were part of a common advertising scheme to which the entire class—those who pre-ordered ACM—was exposed. As explained in the Motion, Gearbox focused its early advertising efforts on its (and Sega's) target market (gamers of a certain type) so as to generate and maintain "buzz" about ACM prior to launch. (Motion at 3) (citing Dkt. 93-22 (internal marketing strategy document)). Gearbox accomplished this through a controlled, pre-release marketing campaign that centrally-featured the Demoed Versions of ACM, first shown at E3 2011, but also shown at numerous other video game

---

[3] For example, courts routinely find that purchasers of misleadingly labeled products were "exposed" to such advertising without any findings of whether this-or-that class member read, or even noticed, the labels in question. *See*, *e.g.*, *McCrary v. Elations Co., LLC*, EDCV 13-00242 JGB OP, 2014 WL 1779243, at *7 (C.D. Cal. Jan. 13, 2014) (quoting *Astiana*, 291 F.R.D. at 500).

PLAINTIFF LOCKE'S REPLY IN SUPPORT OF           4          CASE NO. 13-cv-01962-JD
MOTION FOR CLASS CERTIFICATION

conventions, and featured in multiple trailers that were widely disseminated and viewed online. (Mot. at 3-9.) This marketing campaign was not only intended to reach the targeted consumers directly, but also indirectly through widespread use of the press to disseminate information about ACM (including the alleged material misrepresentations). (Mot. at 3 (noting Gearbox's focus on press exposure over winning E3 awards—because "[d]o E3 awards = sales?") (quoting Dkt. 93-25), Mot. at 4 (citing Gibson Tr. 125:21-127:7)). And, most importantly, Gearbox ensured that consumers were exposed to the *totality* of its campaign *throughout* the entire pre-release phase of ACM, which purported to demonstrate/advertise a *single* product—i.e., rather than explaining that it *first* advertised an advanced (and overly ambitious) version of the game (the Demoed Versions) and *later* advertised a less advanced (but realistic, in terms of what Gearbox was capable of delivering to consumers) version, which would be offered for sale (the Retail Version).[4]

      Here, Gearbox's only real defense is to break up its advertising campaign into discrete subparts and suggest that the entire class could not have been exposed to those *misleading* aspects of its campaign—that it's impossible to discern those who saw the E3 Reenactment video (as it was first released in September 2011) from those who saw the "live event" hosted on IGN ten days before ACM's retail release. But that argument is disingenuous. Gearbox's advertising campaign was not like a series of television ads (where you were either exposed to an ad aired in September 2011 or you missed it), or a campaign utilizing misleading labels affixed to *some* versions of a product (where you either picked up and were thus exposed to a deceptively labeled product or you didn't/weren't). *See*, *e.g.*, *Pfizer Inc. v. Superior Court*, 182 Cal. App. 4th 622, 631-632 (2010). Rather, Defendants took full advantage of the opportunity to *exclusively* control the pre-release

---

[4] Mr. Perrine's experience demonstrates how (and that) this tactic worked. He followed the entirety of ACM's development, but still understood that the 2011 E3 Reenactment showed *actual gameplay* that would be sold to consumers. (Dep. Tr. of Perrine ("Perrine Tr."), excerpts of which are attached to the Declaration of Rafey S. Balabanian ("Balabanian Decl.") as Exhibit 7, 34:20 – 36:8; 65:24 – 72:7 (explaining that the E3 Reenactment was "what [made] me say I want this game;" that he "thought it was the final [product] . . . I thought that's what the game was supposed to look like. [Gearbox] showed me actual gameplay, so I thought, well, that's the game;" that over the next two years of ACM's development he "thought [Gearbox] just had to add more to the game as far as levels go;" and that "[t]his is what it's going to look like when you pop it in your console[.]").) Thus, when Mr. Perrine played the *Retail Version* of the game, he was certain "it wasn't the same game [Gearbox had] advertised," despite his exposure to all of Gearbox's campaign. (*Id.* 74:2-9.)

| PLAINTIFF LOCKE'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION | 5 | CASE NO. 13-cv-01962-JD |

messaging for ACM and then promulgate a holistic story and marketing campaign about the product—which, at all times, was *entirely* available to consumers (including through websites like IGN, which exposed its readers to the *entirety* of Gearbox's campaign to date, regardless of when they visited the site). (*See* Balabanian Decl. ¶¶ 9-11.) Gearbox's leveraging of this control provides the exposure necessary for the presumption of reliance. *See Trump Univ.*, 2014 WL 688164, at *13 (inferring class-wide reliance where defendant engaged in a "multi-media promotional campaign [that] was uniform, highly orchestrated, concentrated and focused on its intended audience," making it "highly likely that each member of the putative class was exposed to the same misrepresentations"); *Brazilian Blowout*, 2011 WL 10962891, at *7-8 (presuming class reliance where alleged misrepresentation was "an integral part of every aspect of [defendant's] marketing and advertising campaigns," including, *inter alia*, "trade shows"); *Mass. Mutual Life Ins. Co. v. Superior Court of San Diego Cnty.*, 97 Cal. App. 4th 1282, 1294 (2002) (affirming certification where alleged misrepresentations had been "broadly disseminated").[5]

None of the cases cited in Gearbox's Response involved the kind of broad and aggressive marketing scheme like the widely disseminated misleading representations at issue. For example, in *Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 912 (2010), the alleged "Made in the US" misrepresentation on Target's website was merely the result of a computer bug that inadvertently misidentified imported items and only at certain times, rather than the focus of a concerted marketing campaign. Likewise, in *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069 (9th Cir. 2014), the only alleged misrepresentations at issue involved signage at individual Home Depot stores and personal interactions with Home Depot employees, not, as here, the wide demonstration—again and again—of a false product to consumers and the press.

What's more, and given the above explanations, Gearbox's focused and pervasive pre-release advertising campaign avoids the very issues that doomed certification in *Mazza v. American Honda Motor Co.*, where consumers "were exposed to quite disparate information from

---

[5] Locke is not relying on an "embargo theory," as Gearbox keeps suggesting. (*See* Resp. at 6.) Rather, and as alleged and Sega admitted, Defendants used embargos to prevent *the press* from saying anything critical about ACM prior to its retail release. (*See* Dkt. 26 ¶ 64; Dkt. 43 ¶ 64.).

various representatives of the defendant" (which included a few TV ads and other materials primarily distributed through dealerships) and a presumption of reliance thus did not arise.[6] 666 F.3d 581, 596 (9th Cir. 2012) (quoting *Stearns*, 655 F.3d at 1020 (9th Cir. 2011). Here, had the class been defined to include consumers who purchased ACM *after* its release date, *Mazza*'s analysis would likely doom certification—because, following ACM's release, Defendants lost the ability to exclusively control the information available about it (e.g., gamers could make purchasing decisions based on Gearbox's pre-release representations, on the many reviews of the game, or on the published descriptions of the mismatch between the Demoed and Retail Versions of ACM). But *prior to ACM's retail release*, Defendants controlled the message and ensured class members were exposed to *one* advertising campaign—which centrally featured the misleading Demoed Versions of the game and, here, gives rise to the presumption of reliance.[7]

Finally, to the extent this Court finds that all consumers who pre-ordered ACM were not exposed to Gearbox's alleged misrepresentations through Defendants' common advertising scheme, the class can be narrowed to include only those consumers who were. As the Ninth Circuit noted in *Mazza*, in the absence of a marketing campaign likely to reach all class members, "the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading." 666 F.3d at 596. Here, that could be accomplished by narrowing the class to all persons who viewed an advertisement for ACM incorporating the Demoed Version—which were available to prospective purchasers beginning at least in mid-2011 (i.e., at E3 2011), and *all of which* were readily available at the time of ACM's

---

[6] Other courts have noted that *Mazza*'s holding does not require a "massive advertising campaign" for a presumption of reliance. Rather, where the overall "effect of [a] campaign was to make it highly likely that each member of the putative class was exposed to the same misrepresentations," reliance can be presumed. *See, e.g., Trump Univ.*, 2014 WL 688164 at *13.

[7] The other cases cited by Gearbox likewise do not suggest that Defendants' broad pre-release marketing campaign of ACM is insufficient to support a presumption of class-wide reliance. *See Pfizer Inc.*, 182 Cal. App. 4th at 632-33 (finding that alleged misrepresentation was not widely disseminated where over half of product shipped without label containing alleged misrepresentation); *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966 (2009) (containing no discussion at all of how the product was marketed); *Campion v. Old Republic Home Protection Co.*, 272 F.R.D. 517, 536 (S.D. Cal. 2011) (case involving, unlike here, both alleged misrepresentations and omissions, and noting that "courts are reticent to extend an inference of reliance to 'mixed' cases, *i.e.*, those involving allegations of material omissions and misrepresentations").

retail release.[8] While Plaintiff respectfully suggests that narrowing the class in this way is not required given Defendants' broad marketing scheme, this Court has the authority to do so. *See, e.g., Burton v. Nationstar Mortg., LLC*, No. 1:13-cv-00307-LJO-JLT, 2014 WL 5035163, *15 (E.D. Cal. Oct. 8, 2014) ("The Court has the authority to cure the defects of a proposed class definition [and] . . . may consider proposals to change a class definition first raised in a plaintiff's reply brief on a motion for class certification.").

                b.    *Whether Gearbox's misrepresentations were material is a question common to all class members.*

Given that the alleged misrepresentations were a part of an advertising campaign to which the class was exposed, the next question is materiality. Ultimately, materiality is a question for the trier of fact. *See Kashi*, 291 F.R.D. at 505 ("Although Defendant calls into question Plaintiffs' evidence tending to show the materiality of the representation … the ultimate determination is to be made by the trier of fact."); *Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558, 568 (S.D. Cal. 2012) (same). Further, materiality is determined with respect to an objective, reasonable person standard, not a subjective, individual standard. *See Stearns*, 655 F.3d at 1022 ("[A] misrepresentation … is material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.") (internal quotations omitted). Thus, given the class-wide exposure, the answer to whether Gearbox's alleged misrepresentations were material will be common to all class members and is appropriate for class-wide resolution. *See Kashi*, 291 F.R.D. at 505 ("The ultimate question of whether the allegedly misleading information is material is a common question of fact suitable for treatment in a class action.") (internal quotations omitted); *Lilly*, 2014 WL 4652283 at *8 ("In establishing the elements of a CLRA violation, an inference of common reliance arises if representations are

---

[8]     Requiring consumers to self-identify whether or not they viewed such an advertisement presents no barrier to certifying a class narrowed in this way. *See, e.g., McCrary v. Elations Co., LLC*, No. EDCV 13-00242 JDB (OPx), 2014 WL 1779243, *7 (C.D. Cal. Jan. 13, 2014) (certifying class of consumers who viewed particular misrepresentations, rejecting defendant's concerns regarding self-identification). And, along those lines, Gearbox cannot seriously believe it discredited Locke's testimony on this issue—where, as Gearbox admits, Locke testified several times that he was "very confident" he saw the deceptive videos using the Demoed Version of ACM before engaging with Gearbox's absurd questioning suggesting that Locke may have seen, instead, videos "like" the ones he identified. (Resp. 14-15; Dkt. 95-8, ¶ 5.)

material, and materiality is judged by an objective standard rather than any understandings specific to the individual consumer."); *Beck-Ellman*, 283 F.R.D. at 568 ("Plaintiff … may therefore prove with generalized evidence that Defendants' conduct was likely to deceive purchasers, rather than proving the reliance of each class member individually.").

In its Response, Gearbox relies heavily on a "live event" hosted on IGN, where it says the "final version" of ACM was purportedly shown to a small group of consumers less than two weeks before ACM's retail release. (Resp. at 5-6.) In Gearbox's view, this public disclosure absolves it of any previous statements that might have misled its customers. (*Id.*) But Gearbox does not disclose that *all of its* other demos, trailers, and advertisements were *also* featured on the IGN site at that very same time (i.e., from January 28 – February 12, 2013), and were equally available to every consumer who visited IGN's website. (Balabanian Decl. ¶¶ 9-11.) And because Defendants never clarified which aspects of their overall marketing campaign—to which early February 2013 visitors to the IGN website were thus also "exposed"—were not accurate (i.e., which did or did not reflect "actual gameplay"), consumers had no guidance such as, for example, "watch *this* video to get a sense of what will be sold at retail, but not *that* one." Again, Gearbox could have (but chose not to) guard against this exposure by taking down its misleading advertisements (or requesting that they be taken down), or by explaining that the Demoed Versions did *not* depict "actual gameplay." (*See* Mot. 10-11.) Such actions or clarifying statements would have let the public know that, perhaps, Gearbox aimed too high in its developmental efforts for ACM—i.e., that it at one time believed it would be able to deliver a product more akin to the gameplay shown in the E3 Reenactment, but fell short of that goal.[9] But because it offered no such clarification, websites like IGN made the *entirety* of Gearbox's marketing campaign (which, as discussed above, purported to show a *single* advertised product) wholly available to consumers, both before, at, and after ACM's release. And before Gearbox suggests that consumers should have been able to figure it out themselves, IGN's own coverage of ACM's retail release reflects the confusion—the *first* article it

---

[9]   Indeed, Plaintiff has never asserted that developers like Gearbox should be precluded from "aiming high" in their developmental efforts or from publicly sharing such ambitions. Rather, Locke—along with scores of critics and other consumers—only asks that Gearbox be forthright when doing so (i.e., rather making fraudulent "actual gameplay" promises as Mr. Pitchford did).

published after the "live event" and its own critical review of the game asked, as this case does, "Did [ACM's] Screenshots Lie to You?" (*See* Balabanian Decl. Ex. 8.) If IGN—which Gearbox describes as a "leading video game website" (Resp. at 5)—couldn't figure out the bait-and-switch until after ACM's sale, how were consumers supposed to?

The presumption of reliance sought here is closely analogous to the "fraud-on-the-market" theory of federal securities cases. *See, generally, Amgen, Inc. v. Connecticut Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1192 (2013) ("[T]he 'fraud-on-the-market" theory … permits certain Rule 10b-5 plaintiffs to invoke a rebuttable presumption of reliance on material misrepresentations aired to the general public."). In such cases, "[m]ateriality [is] judged in the context of the 'total mix' of information available to investors," or here, available to consumers. *United States v. Bingham*, 992 F.2d 975, 976 (9th Cir. 1993). Thus, here, even if a few later trailers incorporated footage derived from the Retail Version of the game, materiality can be determined based on the "total mix" of information comprising Gearbox's overall advertising scheme, including, for example, Gearbox's repeated and unqualified misrepresentations that the Demoed Versions (including the E3 Reenactment) represented "actual gameplay." (*See* Mot. at 1, 5-7.) In any event, such disputes illustrate that materiality is ultimately a question for the trier of fact, which, again, can be determined on a class-wide, objective reasonable person basis. *See Amgen*, 133 S. Ct. at 1191 ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class. Because materiality is judged according to an objective standard, the materiality of [Defendant's] alleged misrepresentations and omissions is a question common to all members of the class…. As to materiality, therefore, the class is entirely cohesive: It will prevail or fail in unison.") (emphasis in original).

For its part, Gearbox contests none of this. Instead, it only debates the "exposure" issue. (Resp. at 12 (acknowledging that "reliance can be inferred in some circumstances [where it is first] established that the entire class was exposed to a uniform misrepresentation.").) But because the putative class *was* exposed to Defendants' misleading, pre-release advertising scheme (or, as a backup, can be narrowed such that exposure is guaranteed), materiality—and, thus, the presumption of reliance—can be determined on a class-wide basis. And because the other half of

Plaintiff's claims does not require a showing of reliance, Gearbox's predominance challenge fails.

### B. There Are No Individual Questions of Law Because California Law Applies to Every Consumer's Claims.

Gearbox next argues that "[a] class cannot be certified unless all the members are governed by the same legal rules." (Resp. at 17.) Here, however, all members of the class *are* governed by the same legal rules—California law. While Gearbox argues that the law of the state where each class member purchased ACM should apply to each purchaser's claim, it ignores that it agreed to the application of California law to all such claims through a contractual choice of law provision in ACM's End User License Agreement ("EULA").[10] While Gearbox's argument relies entirely on the Ninth Circuit's decision in *Mazza* (and chides Plaintiff for not discussing *Mazza*'s choice of law holding in his Motion), *Mazza* is inapposite because there was no choice of law clause there.

This Court is to apply California choice of law rules. *See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 973 (9th Cir. 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). In determining the enforceability of a contractual choice of law provision, California applies the principles set forth in the Restatement (Second) of Conflict of Laws § 187, "which reflect a strong policy favoring enforcement of such provisions." *Nedlloyd Lines B.V. v. Superior Court of San Mateo Cnty.*, 3 Cal. 4th 459, 462 (1992).[11] "[Contractual] choice of law provisions are usually respected by California courts." *Id. See also, e.g., O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC, 2013 WL 6354534, *5 (N.D. Cal. Dec. 5, 2013) (applying California law to nationwide class pursuant to contractual choice of law clause).

---

[10] Pursuant to the terms included in every ACM manual, consumers' relationship with Gearbox is "governed" by a Gearbox EULA, as ACM could *only* be played on "internet accessible device[s]." (Balabanian Decl. ¶¶ 3-6). Gearbox's EULA, in turn, (i) incorporates Sega's "EULA terms applicable to [ACM]" and (ii) "also" provides terms (not relevant here) pertaining to the use of Gearbox's "online services known as 'Shift[.]'" (*Id.* ¶¶ 7-8.) By choosing to incorporate Sega's EULA applicable to ACM, Gearbox also chose to incorporate that EULA's California choice of law clause. (*Id.* ¶¶ 5, 7-8 ("This Agreement shall be construed under California law….").) Such language in a choice of law clause is read broadly to include all causes of action related to the transaction. *See Nedlloyd*, 3 Cal. 4th at 470 ("[W]e hold a valid choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses *all causes of action* arising from *or related to* that agreement, regardless of how they are characterized….") (emphasis added).

[11] While *Nedlloyd* involved a choice of law provision in a contract that had been negotiated at arm's-length, its analysis applies equally to all contracts, including consumer contracts of adhesion such as the EULAs here. *Omstead v. Dell, Inc.*, 533 F. Supp. 2d 1012, 1014 (N.D. Cal. 2008) (citing *Wash. Mut. Bank, FA, v. Superior Court of Orange Cnty.*, 24 Cal. 4th 906 (Cal. 2001)).

The relevant inquiry under the Restatement involves a two-step process: First, the court determines whether the chosen state has a "substantial relationship" to the parties or their transaction, or whether some "other reasonable basis" for the parties' choice of law exists. *Nedlloyd*, 3 Cal. 4th at 466. Second, the court determines whether the chosen state's law is contrary to a "*fundamental* policy" of the state whose law would otherwise apply. *Id.* (emphasis in original). If there is no conflict, the choice of law clause must be enforced. *Id.* The proponent of the choice of law provision must establish the first prong of this inquiry, while the party opposing application of the provision bears the burden at the second step of the inquiry. *Ubaldi v. SLM Corp.*, No. C 11-01320-EDL, 2013 WL 4015776, *5 (N.D. Cal. Aug. 5, 2013) (citing *Wash. Mut. Bank*, 24 Cal. 4th at 917)).

There is a substantial relationship between California and the parties with respect to the claims advanced here. While Gearbox is headquartered in Texas, Sega—the producer for whom Gearbox developed ACM—is headquartered in California (*see* http://www.sega.com/corporate/), and the centerpiece of Defendants' advertising campaign (Gearbox CEO Randy Pitchford's E3 Reenactment purporting to show "actual gameplay" of ACM) took place in California. (Dkt. 85 at 18.) This is sufficient to show a substantial relationship between California and the parties. *See Sound Appraisal v. Wells Fargo Bank, N.A.*, 717 F. Supp. 2d 940, (N.D. Cal. 2010) (holding that California law could be applied to dispute between a nationwide class and a non-California defendant where defendant allegedly conspired with a California corporation and some allegedly wrongful acts emanated from California).[12]

In contrast, Gearbox cannot show that application of California law would violate a fundamental policy of another state whose law might otherwise apply in the absence of the California choice of law clause. "There is no bright-line definition of a 'fundamental policy.'" *In*

---

[12] Even if there were no substantial relationship between California and the parties, there would still be a "reasonable basis" to enforce the California choice of law provision under Restatement (Second) of Conflict of Laws § 187(2)(a), given that a company, like Gearbox, that deals with consumers nationwide has an interest in having those transactions governed by a uniform body of law. *See, e.g., Cayanan v. Citi Holdings, Inc.*, 928 F. Supp. 2d 1182, 1194-95 (S.D. Cal. 2013) (holding that a reasonable basis existed for applying Nevada choice of law clause to company who transacted business in multiple states, even though there was no substantial relationship between Nevada and the parties).

PLAINTIFF LOCKE'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION            12            CASE NO. 13-cv-01962-JD

*re Zukerkorn*, 484 B.R. 182, 192 (B.A.P. 9th Cir. 2012). To be "fundamental," a policy must be a substantial one, and a court "will not refrain from applying the chosen law merely because this would lead to a different result than would be obtained under the local law of the state of the otherwise applicable law." Restatement (Second) of Conflict of Laws § 187 cmt. g. Here, even assuming that each class members' home state law would apply in the absence of the California choice of law provision, Gearbox argues only that those states' laws are *different* from California law; it fails to establish—as it must—that application of the California choice of law clause to which it agreed violates a fundamental policy of those other states.

Consequently, because a substantial relationship between California and the parties exists, and because Gearbox cannot show that application of California law violates a fundamental policy of any other state, the California choice of law clause must be enforced. And because the clause governs each consumer's claims, all questions of law are common to the entire proposed class.

In any event, even if this Court were to hold that the California choice of law clause does not apply, and that the law of each consumer's home state applies to their claims against Gearbox, this Court could avoid the purported "home state" problem altogether by certifying a narrowed class of California residents because Locke (the only named Plaintiff seeking appointment as a class representative) is a California resident. Gearbox clearly could not object to such a class as having individual legal questions predominating over common ones.

### C. None of Gearbox's Other Arguments Preclude Class Certification.

In addition to the unavailing predominance arguments discussed above, Gearbox makes a few cursory arguments in opposition to class certification, which can be disposed of quickly.

First, Gearbox asserts that the class settlement with Sega precludes finding that a class action is a superior method for adjudicating the claims against Gearbox. (Resp. at 23-24.) But the purpose of Rule 23(b)(3)'s superiority requirement is "to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). The class settlement with Sega has nothing to do with the efficiency of proceeding as a class against Gearbox. While Gearbox asserts that the Sega settlement *may* essentially moot the class's claims against Gearbox, (i) the Sega settlement is

pending this Court's approval and thus is not yet finalized, and (ii) even if it does become final, it affects all class members identically.[13] Whether recovery from Sega will preclude relief against Gearbox is thus a common question. Contrary to Gearbox's assertion, the Sega settlement does not render class treatment here inferior to 130,000 individual consumer actions valued at $100 or less.

Next, Gearbox asserts that Mr. Locke is not an adequate representative because if the Sega settlement is approved, he will recover from Sega and possibly get an incentive award. (Resp. at 24-25.) But other than the incentive award, Mr. Locke stands to receive exactly what all class members can get: a *pro rata* share of a settlement fund. As for the incentive award, it is a modest ($2,500) and recognizes the time and effort he spent litigating this case against Sega and obtaining a result for the class. Such awards are common, and don't render recipients inadequate class representatives. *See, e.g., Ching v. Siemens Indus., Inc.*, No. C 11-4838 MEJ, 2013 WL 6200190, *6 (N.D. Cal. Nov. 26, 2013) (incentive payments up to $5,000 are "presumptively reasonable").

Of course, Gearbox can't help but take a potshot at Mr. Perrine, who Gearbox says is not an adequate representative because of his criminal background and the fact that he "is now under the supervision of the Allegheny County Sheriff's Department." (Resp. at 25.) That attack, however, is both misguided and irrelevant. Mr. Perrine isn't *asking* to be appointed as a representative. Nor has Class counsel sought his appointment. And even *Mr. Perrine* agreed he shouldn't lead the class. (Perrine Tr. at 128:8 – 131:5 ("I'm unable to represent [the class] in a way that I [would] want to be represented."); 133:5 – 135:9 (explaining, **on direct examination by Gearbox's counsel**, his decision to withdraw as a class representative after being incarcerated).)

Gearbox also asserts that Mr. Locke's claims are not typical because there are defenses applicable only to him. (Resp. at 24.) Those supposed defenses, however, only rehash Gearbox's reliance arguments, asserting that Mr. Locke saw certain representations and not others. But

---

[13] Here, Gearbox uses shortcuts. The Sega settlement may provide a *partial* refund to all claimants—and, thus, would not moot anyone's claim. (Dkt. 78 at 18-19.) Gearbox does not address this. Gearbox also presumes to intuit the minds of those who may exclude themselves from the settlement or not file claims (Resp. at 24)—but that speculation hardly speaks against the superiority of a class action against Gearbox. Indeed, individuals who don't file claims or exclude themselves from the settlement may do so because they want recovery from *Gearbox* over *Sega*—which is reasonable, given that many of ACM's misleading statements came from Mr. Pitchford.

because reliance is either not an element of class members' claims, or can be presumed as to the class, Locke's claims are typical—indeed, identical—to every other class member's. All of the class's claims, including Mr. Locke's, depend solely on the misrepresentations made by Gearbox and whether they were material (judged by a reasonable person test), not, contrary to Gearbox's assertions, on who-saw-what-when and why each individual consumer decided to purchase ACM.

Finally, Gearbox argues that certification is not appropriate because damages are not capable of measurement on a class-wide basis. (Resp. at 16-17.) While Gearbox cites *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) in support of its position, the Ninth Circuit has "re-affirmed that, even after *Comcast*, '[i]n this circuit … damages calculations alone cannot defeat certification.'" *Lilly*, 2014 WL 4652283 at *9 (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013)). At certification, Locke must satisfy "only a very limited burden" of showing damages "can feasibly and efficiently be calculated once the common liability questions are adjudicated." *Lilly*, 2014 WL 4652283 at *10 (internal quotations omitted). Here, while Gearbox is correct that class members can recover the difference between the purchase price and the value of the game received, Gearbox is incorrect that the game's value is individualized. Thus, while Locke may believe the game is worth $5, or Mr. Perrine resold his for $17, the game *both* received—substantively different from the game promised—has a single, objective value that can be proven through expert testimony at trial. And even if damages could only be determined individually, the class could still be certified for purposes of liability. *Lilly*, 2014 WL 4652283 at *11 (bifurcating liability and damages issues, noting that "the fact that a class may not be certified for purposes of seeking damages does not mean that it cannot be certified at all"); Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").

### III. CONCLUSION

For the reasons discussed in Plaintiff's Motion and above, this Court should certify the class. Alternatively, should the Court find certification of the proposed class not appropriate, this Court has the power to—and should—certify a more narrowly-drawn class as described above.

| | | |
|---|---|---|
| 1 | | |
| 2 | Dated: October 23, 2014 | **JOHN LOCKE**, individually and on behalf of a class of similarly situated individuals, |
| 3 | | |
| 4 | | By: /s/ Rafey S. Balabanian<br>     One of Plaintiff's Attorneys |
| 5 | | Mark S. Eisen (SBN - 289009)<br>meisen@edelson.com |
| 6 | | EDELSON PC<br>555 West Fifth Street, 31st Floor |
| 7 | | Los Angeles, California 90013<br>Tel: 213.533.4100 |
| 8 | | Fax: 213.947.4251 |
| 9 | | Rafey S. Balabanian (Admitted *Pro Hac Vice*)<br>rbalabanian@edelson.com |
| 10 | | Christopher L. Dore (Admitted *Pro Hac Vice*)<br>cdore@edelson.com |
| 11 | | Benjamin S. Thomassen (Admitted *Pro Hac Vice*)<br>bthomassen@edelson.com |
| 12 | | EDELSON PC<br>350 North LaSalle Street, Suite 1300 |
| 13 | | Chicago, Illinois 60654<br>Tel: 312.589.6370 |
| 14 | | Fax: 312.589.6378 |
| 15 | | *Attorneys for Plaintiffs and the Putative Class* |